UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TIFFANY A. BROWN | : | CIVIL NO. 3:22-CV-01488-(SFR) |
| *Plaintiff* | : | |
| | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT, | : | |
| *Defendant* | : | June 20, 2025 |

### DEFENDANT'S INDEX OF EXHIBITS IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

Exhibit A    Excerpts from the Deposition of Tiffany Brown,

dated October 30, 2024;

Exhibit B    Excerpts from the Deposition of Laura Burton,

dated January 15, 2025;

Exhibit C    Excerpts from the Deposition of Jason Irizarry,

dated January 23, 2025;

**Deposition Exhibits**

Defendant's Deposition Exh. 2 – Plaintiff's Answers to Defendant's First Set of

Interrogatories

Defendant's Deposition Exh. 3 – Plaintiff's Complaint

Defendant's Deposition Exh. 4 – Offer Letter Addressed to Tiffany Brown

Defendant's Deposition Exh. 5 – PTR Dossier Checklist for Tiffany Brown

Defendant's Deposition Exh. 6 – Email from Tiffany Brown to Jason Irizarry dated March 2,

2022

Defendant's Deposition Exh. 8 – Email from Tiffany Brown to Monica Higgins dated

February 9, 2022

Defendant's Deposition Exh. 12 – Email from Kelly Bannister to Tiffany Brown and Jason Irizarry dated November 8, 2022

Defendant's Deposition Exh. 19 – Email from Jason Irizarry to Tiffany Brown and Laura Burton dated May 18, 2023

Plaintiff's Deposition Exh. 5 – Email thread from Tiffany Brown

Plaintiff's Deposition Exh. 9 – Letters from Students

Plaintiff's Deposition Exh. 10 – Letters from Students

Exhibit D    Affidavit of Laura Burton & Exhs. 1-7;

Exhibit E    Affidavit of Casey Cobb & Exhs. 1-3;

Exhibit F    Affidavit of Jennifer McGarry & Exhs. 1-7;

Exhibit G    Affidavit of Sarah Chipman & Exhs. 1-9;

Exhibit H    Affidavit of Megan Stimson & Exhs. 1-6;

Exhibit I    Affidavit of Melody Williamson & Exhs. 1-12;

Exhibit J    CHRO Affidavit of Certification & Exhibits.

DEFENDANT,

UNIVERSITY OF CONNECTICUT

WILLIAM TONG
ATTORNEY GENERAL


By:      /s/ Matthew L. Konowe
         Matthew L. Konowe
         Assistant Attorney General
         Attorney General's Office
         165 Capitol Avenue, Suite 5000
         Hartford, CT 06106
         Tel: (860) 808-5340
         Fax: (860) 808-5383
         E-mail: Matthew.Konowe@ct.gov
         Federal Bar # ct31335



**CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2025, a copy of the foregoing was electronically filed. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


         /s/ Matthew L. Konowe
         Matthew L. Konowe
         Assistant Attorney General

# Exhibit A

CERTIFIED COPY

1            UNITED STATES DISTRICT COURT

2               DISTRICT OF CONNECTICUT

3

4

5   TIFFANY A. BROWN,              }
           Plaintiff,              }  Civil Action Number:
6                                  }  3:23-CV-01488 (VAB)
           vs.                     }
7                                  }
    UNIVERSITY OF CONNECTICUT,     }
8          Defendant.              }

9

10

11

12

13

14        DEPOSITION OF:  Tiffany A. Brown, Ph.D.
          TIME:          9:34 a.m.
          DATE:          October 30, 2024
15        HELD AT:       Office of the Attorney General
                         165 Capitol Avenue
16                       Hartford, Connecticut

17

18

19

20

21

22        Reporter:  Annette Brown, LSR, No. 0009

23

24

25

**APPEARANCES**

**REPRESENTING THE PLAINTIFF:**

**THOMAS W. BUCCI, ESQUIRE**
**Willinger, Willinger & Bucci, P.C.**
**1000 Bridgeport Avenue - Suite 501**
**Shelton, Connecticut  06484**
**Telephone:        203.366.3939**
**E-mail:           thomaswbucci@outlook.com**

**REPRESENTING THE DEFENDANT:**

**MATTHEW L. KONOWE, ASSISTANT ATTORNEY GENERAL**
**Office of the Attorney General**
**165 Capitol Avenue**
**Hartford, Connecticut  06106**
**Telephone:        860.808.5340**
**E-mail:           Matthew.Konowe@ct.gov**

**ALSO PRESENT:**

**Kelly Bannister, Esquire**

1

2                    (Defendant's Exhibit 1, Notice of

3                     deposition, was marked

4                     for identification.)

5

6                    (Deposition commenced at

7                     approximately 9:34 a.m.)

8

9  TIFFANY A. BROWN, Ph.D., Deponent, having first been

10 duly sworn, deposes and states as follows:

11              THE WITNESS:  I do.

12              THE COURT REPORTER:  Are there any

13 stipulations?

14              MR. KONOWE:  Usual stipulations.

15              MR. BUCCI:  We'll read and sign.

16

17         DIRECT EXAMINATION BY MR. KONOWE:

18

19    Q    Good morning.  My name is Matt Konowe.  I'm

20 an assistant attorney general.  I'm the attorney

21 representing the University of Connecticut, the

22 defendant in this lawsuit.

23         Moving forward I might say UConn for short if

24 that's okay?

25    A    Yeah.

1    Q    Do you prefer to be called Dr. Brown?

2    A    You can call me Tiffany.

3    Q    Okay.  Thank you, Tiffany.

4         And with me is Kelly Bannister, associate

5    director and labor and employment attorney with UConn,

6    and we're here today for your deposition.  This

7    deposition involves formal testimony under oath subject

8    to the penalty of perjury.

9         I'll ask you a series of questions.  There's

10   a court reporter who's taking down everything that is

11   being said.  That being said, it's important to answer

12   questions verbally and out loud, so if I notice you

13   nodding or say uh-huh and I chime in and say is that a

14   yes, I'm not doing it to be difficult.  I'm just doing

15   it so the record gets accurately captured what's being

16   said, and we also don't want to speak over each other,

17   so I would ask that if you could please not answer a

18   question until it's completely posed.  Sometimes you

19   might anticipate how the question is concluding, but I

20   would just ask, for the convenience of the record and

21   the court reporter, that you just wait for the question

22   to be fully posed before responding.

23        Does that make sense?

24   A    Yes.

25   Q    And if I ask a question and you do not

 1  understand the question, please request clarification.
 2  Otherwise, if you answer the question we can presume
 3  you understood the question.
 4      A    That's fine.
 5      Q    And please let me know if you need to take a
 6  break, you can request a break at any point.  All I ask
 7  is that if a question is pending, we just ask that you
 8  answer the current pending question before we take a
 9  break.  Okay?
10      A    Okay.
11      Q    And one thing for us to just keep in mind
12  regarding breaks, I've been informed that you need to
13  conclude the deposition at four p.m. today?
14      A    Yes.
15      Q    And it is my goal to finish by then --
16      A    Uh-huh.
17      Q    -- and not to have the deposition continue on
18  another day, but obviously the number of breaks we
19  take, the length of the breaks, that could impact my
20  ability to finish by four.  I just wanted to mention
21  that just so that we could be mindful, and if I don't
22  finish by then, we may need to continue briefly on
23  another day, but my plan is to have us finished before
24  four p.m. today.  Okay?
25      A    Thanks.

1     **Q**    Just a few more basic questions to begin

2   with, are you -- and I have to ask everybody this:  Are

3   you currently under the influence of alcohol or other

4   drugs that would influence your ability to testify

5   today?

6     **A**    No.

7     **Q**    And are you under the influence of any

8   substances that would affect your ability to think

9   clearly and provide accurate responses to the questions

10  under oath today?

11    **A**    No.

12    **Q**    Any there any medical conditions that would

13  impact your ability to understand the questions being

14  posed today and to answer questions accurately and

15  truthfully?

16    **A**    No.

17    **Q**    Is there anything at all that could impact

18  your ability to understand the questions posed today

19  and to answer the questions accurately and truthfully?

20    **A**    No.

21    **Q**    And one other quick note, I do not intend to

22  ask you to say the full names of any students at any

23  point today to avoid the full names of any students

24  ending up in the transcript.

25    **A**    Okay.

1    Q    So in case you're asked any questions that

2  involve any specific students, I would ask that you

3  don't identify them by full names.  You can mention

4  their initials if you remember them, and we can go off

5  the record to ensure we have the full name of a

6  student, but there will not be a need to say the full

7  name of any students on the record today.

8    A    Great.

9    Q    So all that said, we'll jump into the

10  deposition.  Ready to move forward?

11    A    Yup, I guess I am.

12    Q    Sounds good.

13        And your attorney is with you?

14    A    He's here.

15    Q    All right.  This is going to be marked as

16  Exhibit 1.  If you could just take a quick look at

17  that, and here's a copy for your attorney.

18        And have you seen this document before

19  today?

20    A    No.

21    Q    Okay.

22    A    Oh, wait.  Yes, I have.  It's the same thing

23  that was e-mailed to me, right?  Or it was in an

24  e-mail?

25    Q    I can't answer that.

1  2021 to 2022 academic year; is that right?

2      A    That's right.

3      Q    Your job title with UConn was assistant

4  professor?

5      A    That's right.

6          MR. KONOWE:  This will be Exhibit 4.

7

8              (Defendant's Exhibit 4, Offer

9               letter, was marked for

10              identification.)

11

12  BY MR. KONOWE:

13      Q    I'm giving your attorney a copy.  Showing you

14  what's marked as Exhibit 4, and you'll notice there's a

15  redaction on the first page which was your address.

16      A    Uh-huh.

17      Q    And I will hand your attorney an unredacted

18  copy.

19          MR. KONOWE:  Here you go, Counselor.

20  BY MR. KONOWE:

21      Q    All right.  Is this the offer letter that you

22  received from UConn, this Exhibit 4?

23      A    Yes.

24      Q    And is it accurate to say you were not

25  tenured?

1          A    I hadn't earned tenure yet as of -- no.  I

2     was a tenure-track professor, yes.

3          Q    But during your time at UConn you did not

4     obtain tenure, correct?

5          A    No.  Yes.  Correct.

6          Q    And was this the first full-time job you had

7     as a professor?

8          A    Yes.

9          Q    And this was a nine-month appointment; is

10    that right?

11         A    Yes.

12         Q    And then if we just turn to the second page

13    of Exhibit 4, the third paragraph on the second page,

14    do you see where it says, "This position may lead to

15    academic tenure"?

16         A    Yes.

17         Q    Tenure was not guaranteed, correct?

18         A    That's correct.

19         Q    And this offer letter indicated you would

20    be subject to annual reappointment reviews; is that

21    right?

22         A    That's right.

23         Q    And if you look at the next paragraph --

24    we're still on page 2 -- do you see where it indicates

25    "one month of summer salary and a start-up package of

1  20,000"?

2       A    I do see that.

3       Q    Some of this is me learning a little bit

4  about the academic world.

5            Was that in addition to the $78,000?

6       A    Yeah.  So the summer salary I actually had to

7  advocate for because I was unemployed prior to this so

8  I needed to move.  So I asked Jason at the time what I

9  could negotiate, and he said not my salary.  So I said

10 can I at least get like an advance on my salary so that

11 I can move to where I need to be because my apartment

12 at the time was infested, so that's what that was.

13           The startup package everybody gets of

14 $20,000, but I did receive misinformation about how it

15 can be used and accessed over my time at UConn.  So

16 that was something I should point out about this

17 letter, and also pointing back to the first page before

18 we go any farther, the part -- something that comes up

19 in my interrogatories that's a matter of this letter,

20 so it says, "On occasion faculty members have an

21 opportunity to earn additional compensation."

22           I actually didn't have that opportunity which

23 is something I brought up with Lauren -- Laura and

24 Jason early on because the other person who was hired

25 at the same salary rate as me, Chen Chen, he was

1   working in the sports management department which has

2   opportunities for undergraduates to take classes in the

3   summer, but I was told that if I wanted to receive the

4   same opportunity for additional compensation I would

5   have to create and develop the courses and hope that

6   enough students signed on to be able to make that

7   salary.

8          So it was in the letter, but it wasn't

9   actually possible for me to earn a summer salary which

10  is something I discussed earlier on with Laura and

11  Jason almost from the start of my time there.

12      Q    So I just want to unpack a bit of that.

13      A    Sure.

14      Q    When you say "Jason," who was that?

15      A    So Jason irizarry was the dean at the time.

16  I guess he still is.  He called me before I got this

17  letter, and I asked him before I got the letter what I

18  can negotiate, so that's when we had that

19  conversation.

20      Q    And Jason offered you the month of summer

21  salary?

22      A    No, he didn't offer it to me.  So he told me

23  I couldn't negotiate my salary, but I said at the very

24  least can I have an advance on it so that I can move

25  out of my roach -- at the time -- infested apartment.

1    I'd been living there for a few months before it became

2    apparent so I needed to leave immediately, and that's

3    when he agreed that I could have the month of summer

4    salary up front.

5        Q    And how much was the month of summer

6    salary?

7        A    I believe it was just -- so our paycheck it

8    was a nine-month appointment but it was split evenly

9    over twelve months.  So that's what a nine-month

10   appointment paid biweekly paid over twelve months

11   means.

12       Q    And a short while ago you were talking about

13   Laura, who's that?

14       A    Laura Burton was department head at the time

15   of -- or I guess she still is -- of the department.  So

16   yeah, she's the one who made it clear to me that I

17   actually wouldn't have the opportunity to earn

18   additional compensation because my department didn't

19   offer undergraduate courses, so I would have to design

20   and hope that people registered for the classes in

21   order to be able to earn that additional compensation

22   is what I learned on the back end.

23       Q    When you say you learned it on the back end,

24   what do you mean?

25       A    I learned it when I went to them and I said,

1  hey, this person is making the same amount of money as

2  me and they say that they have opportunities to teach

3  summer classes where they can make more money where are

4  my equivalent opportunities, and that's when they said,

5  well, that person's working in the sports management

6  department.  They offer undergraduate courses in that

7  department so it's a little bit different.

8          So I said, well, how can I earn summer salary

9  since it was part of my contract, and they said, well,

10  basically you'd have to design the course and hope that

11  people enrolled to take it, but if they didn't it

12  wouldn't be guaranteed.

13      Q    So just so I understand, so summer salary

14  would be offered if there was a course to teach?

15      A    No.  So we got paid our nine-month contract

16  over twelve months so no matter what I was going to get

17  that money.  I just asked for it early.  Additional

18  compensation which is what's mentioned in the second

19  paragraph or third paragraph -- second paragraph

20  beneath this chart here -- table rather.

21      Q    You're on the first page?

22      A    Yes, I am.  So you see how it says, "On

23  occasion faculty members have an opportunity to earn

24  additional compensation," that usually means maybe

25  you'll get one of the classes we offer to teach, but I

1    didn't realize when I signed this that I actually would

2    never have that opportunity because of the department

3    that I was teaching in.  Like they don't have summer

4    classes unless you design them.

5        Q    So just to talk about that paragraph a little

6    more, the first few words are "on occasion"; is that

7    right?

8        A    That's true, but what I found was that

9    there would never be an occasion unless I made the

10    occasion.

11        Q    That there would never be an occasion?

12        A    So the difference between me and Chen Chen,

13    who is the person I'm thinking of in particular, was

14    that they had courses in sports management that were

15    offered to undergraduate students before he got there,

16    to my knowledge.  So he was just filling in the role of

17    like teaching those courses.  Whereas, they didn't have

18    that in my department so I would have had to create

19    those courses in order to have the same opportunity as

20    Chen.

21        Q    Going back to the second page of this

22    exhibit, the fourth paragraph -- sorry.  I'll count.

23    The fifth paragraph down.

24        A    Uh-huh.

25        Q    You were offered a -- you were offered $2,000

1    to relocate?

2         A    Yup.

3         Q    And you received that?

4         A    I did not.

5         Q    You did not receive that?

6         A    I don't believe so.  I mean I didn't use it,

7    so I didn't move.  They sent me an e-mail through a

8    company that they use for relocation, and I just never

9    followed up with that company, so I don't know where

10   that money went.

11        Q    Okay.  So you don't believe you received it?

12        A    I don't believe so.  I do remember a

13   representative from Signature Relocation, but I did

14   not relocate so I just stopped communicating with

15   them.

16        Q    The UConn campus where you were working, was

17   it at the Storrs campus?

18        A    It was Storrs.

19        Q    And you were commuting there from New York

20   City?

21        A    I was as others were.  At least two or three

22   people in the department were.

23        Q    Who were the others that were?

24        A    One of the people who was hired with me, Alex

25   Freidus, was commuting from Brooklyn as well at the

1  time, and then there was Kenny -- I don't know how to

2  pronounce his last name, but he was on my PTR

3  committee, Kenny Nienhusser.

4              THE COURT REPORTER:  I'm sorry.  Kenny

5  what?

6              THE WITNESS:  Kenny Nienhusser,

7  N-I-E-N-H-U-S-S-E-R.

8      A    And he would like -- I rode home with him one

9  time because he lives in the Bronx for instance, so

10  that was it.

11  BY MR. KONOWE:

12      Q    And then was there anyone else that you're

13  aware of?

14      A    I know people lived in Boston.  I know --

15  people lived in all sorts of states.  It wasn't just me

16  for sure.

17      Q    Did you want to relocate to Connecticut?

18      A    It wasn't my understanding at the time that I

19  accepted the position that I would have to.  It wasn't

20  until I saw this letter that there was an expectation

21  that I would.  But I personally was never going to move

22  as like a single woman.  My family is in New York.  One

23  of my aunts, that has since passed, I was like a

24  secondary caretaker for her.  Like it wasn't plausible

25  for me to move to Connecticut by myself with like those

1   responsibilities in New York.

2       Q    I know that some of the allegations in the

3   complaint involve or at least reference correspondence

4   regarding scheduling and commuting schedules?

5       A    Uh-huh.

6       Q    So was it challenging commuting?

7       A    The commute itself wasn't challenging because

8   I used to drive so being on the train was easier for

9   sure.  I think what was challenging was that they would

10  consistently schedule me for night courses which is not

11  something I anticipated when I signed up.

12           So the way that that would work is that I

13  would teach a class and it would let me out just in

14  time typically to have to pay for a cab to get back to

15  Hartford on time, which is expensive, as you know, and

16  I would eat that cost, you know.  But the issue was

17  that they started scheduling me for later and later

18  courses which I would have had no choice but to sleep

19  over in Connecticut in order to be able -- like I

20  wouldn't be able to commute back because the last train

21  leaving Connecticut -- Hartford wouldn't allow me to,

22  and they had already told me they weren't going to help

23  me with like expenses of any sort in terms of me

24  staying over for the night if I had to, so.

25       Q    Are you aware of UConn offering other people

1      A      Uh-huh.

2      Q      Okay.  And just to confirm you didn't teach

3  any courses in the fall of 2021, right?

4      A      I did not.

5      Q      Okay.  How did you spend your time during the

6  fall of 2021?

7      A      Trying to get my dissertation published

8  mostly because when I signed on, one thing Jason did

9  say is that he thought my work would bring the school

10  national acclaim.  So I guess his idea was that I would

11  spend my first semester working on my research.  So

12  they give me a course release for that.  That was

13  something we spoke about.  That's what I did.  I mean

14  it was mostly rewriting my writing, sending it in to

15  journals.

16      Q      And during that fall of 2021 did you finish

17  your dissertation?

18      A      Well, my dissertation was done before I got

19  there.

20      Q      It was done?

21      A      Yeah, yeah, yeah.

22      Q      I'm just trying to understand.

23      A      No.  Sorry.  So basically what you do is try

24  to work the dissertation to be published into

25  peer-reviewed material.

1      Q    I see.

2      A    So that's what you spend your time doing as

3  an assistant professor is publishing pretty much.

4      Q    Because you needed to have the dissertation

5  to get the Ph.D.?

6      A    Yes, yes, yes.

7      Q    Okay.

8      A    It's okay.  So basically -- but what wasn't

9  clear is that mine was initially three papers, so I was

10  trying to get them separately published, and when I got

11  rejections from those journals is when I realized that

12  I should just consolidate them and make them a book

13  proposal.  So that's when I started putting them into a

14  book proposal instead.

15      Q    I see.  So you were reworking the writings to

16  get it --

17      A    Yeah.

18      Q    -- to try and get it published?

19      A    Yeah, what a professor would normally do on

20  their sabbatical, I guess, which is the equivalent.

21      Q    And you said that was the understanding you

22  and Jason had as far as how you were spending your time

23  that semester?

24      A    Yeah, I would though there seemed to be a bit

25  of confusion between him and Laura on it.  I believe

```
 1    that it was his intention for me to work on my research
 2    that semester.
 3          Q    And just for the sake of the transcript,
 4    we're talking about Jason Irizarry and Laura Burton?
 5          A    Yes.
 6          Q    And what was the confusion between Jason and
 7    Laura?
 8          A    Well, by my second semester I was meant to be
 9    full time teaching, and I think they gave me a course
10    release, which I asked them.  I said I don't understand
11    like where this course release came from, but I think
12    they were still trying to get me to push out my
13    research as quickly as possible basically.
14               So that's where that came from, but it's also
15    -- I know plenty of professors whose first year they
16    spend the entire year not teaching while they work on
17    their research, so it was pretty par for the course if
18    they pulled somebody who they think their research
19    needs to be out of the gate immediately.
20          Q    And did you spend -- were you doing any other
21    tasks during that semester in addition to that?
22          A    Yeah, I was.  Actually, that's a good
23    question.  So I was doing some informal departmental
24    research that I was not being in any way acknowledged
25    or compensated for during that time.
```

1      They basically tasked me with figuring out

2   what had gone wrong with the Ed.D. curriculum to that

3   point.  So I was interviewing -- not interviewing.  I

4   was surveying students at the time for Laura and Jason.

5   They asked me to take that on and Casey actually.

6      So I surveyed, I want to say, maybe like 30

7   to 40 doctoral students at the time.  My intentions

8   were to follow up with them with a focus group, but the

9   department kind of dropped the research after I gave

10  the presentation to them.  They kind of just -- I

11  followed up and nobody ever got back to me.

12     So that's something they gave me to do that

13  nobody ever followed up on, but that's what I was meant

14  to be doing during that time.

15     Q    And that was the fall of 2021?

16     A    I believe so, yeah.

17     Q    And I have a few questions about that, but

18  just to make sure we're being inclusive, so in addition

19  to that surveying process that you just described and

20  then the process of reworking your dissertation

21  writings and trying to get them published, any other

22  tasks you performed during the fall of 2021?

23     A    Yup.  So I mean I came on as an assistant

24  professor of educational leadership, as you saw, but I

25  found quickly that what was in my job description

1   wouldn't necessarily be all that was expected of me.

2   Mainly, that I was pretty quickly put to work on

3   revising the doctoral curriculum for organizational

4   learning.

5         The person who had taught it prior to me I

6   believe was a lawyer, right.  So we actually had quite

7   different skill sets in terms of the content knowledge.

8   So they gave me a syllabus and told me you're going to

9   be teaching this course, but I looked at it and I

10   couldn't recognize most of the stuff on the syllabus

11   because it was probably what a person who has a topical

12   knowledge of the field would assign as opposed to

13   someone who went and got a masters in it like I did.

14         So that required a lot of work actually.  I

15   remember someone telling me to go -- like to have at it

16   actually because they were kind of -- and it's relevant

17   to what we'll discuss in a bit.  I was the only person

18   in the department with an actual organizational degree.

19   So even though others were doing research in that area

20   or they were teaching in that area, I think I was the

21   first person in the department with the sort of

22   expertise to actually design a syllabus in the area, so

23   they gave me that work to do up front.

24      Q    And circling back to the surveying of the 30

25   to 40 students, did you create a uniform -- tell me

1    what process of surveying, you know, did you create a

2    uniform survey that you e-mailed to them or was it

3    verbal?

4         A     This was so long ago.

5               It was a survey that I e-mailed to them.  I

6    never met anyone in person.  I remember the most

7    advocating I did was that I thought the department

8    should pay them for their time, which I did

9    successfully do, but other than that, I sent out a link

10   and whoever responded got compensated, and that was it.

11        Q     And how long did you spend creating the

12   survey?

13        A     I don't know, probably a few days.  Probably

14   a few days.  It was brief.  I was new at that time so I

15   mean I didn't know as much as I could.  It was

16   exploratory pretty much.

17        Q     And when you spent the few days creating the

18   survey, you spent the entire day those few days

19   creating the survey?

20        A     I'm saying a few days, but it's honestly a

21   few weeks' worth of work.  Like I do things sometimes

22   quicker than I do -- sometimes I think about things for

23   a very long time and then I complete it all in one

24   sitting pretty much.  So it was a lot of -- it was a

25   few weeks of brainstorming and then a few days of work

1    pretty much, but I would say the whole process took

2    about one to two months because I was tasked with doing

3    it over the course of that semester.  So it was meant

4    to take four months, the whole process.

5         Q    And when you say brainstorming, how would you

6    brainstorm?

7         A    Figure out what I didn't know about the

8    department because it was a weird position to be put in

9    to ask -- I mean it's not a weird position because

10   objectively as a researcher I was a new person.  It was

11   most likely that people were going to tell me the truth

12   than people they had been interacting with for a long

13   time, but I was trying to figure out what exactly the

14   department wanted to know, how to ask the questions

15   that might get them the information they were

16   interested in.

17        Q    I guess what I'm trying to --

18        A    Sorry.  So designed the whole thing for

19   researching, so I don't know how to answer -- go

20   ahead.

21        Q    Understood.

22        A    Okay.

23        Q    What I'm trying to understand more, you know,

24   because I'm trying to unpack how much you really spent

25   on --

 1        A    I spent the semester doing it.

 2        Q    -- actual work product, like number of hours,

 3   because, you know, sometimes we all spend time thinking

 4   about something when we're not at work --

 5        A    Uh-huh.

 6        Q    -- but, you know, as far as like actual time

 7   sitting down and time spent, work product?

 8        A    I mean it took up all of my fall 2021

 9   semester.  It wasn't like a one-and-done thing.  I

10   pretty much had to return as new tasks arose for the

11   project because there were slides.

12        Q    And then the survey that you sent to the 30

13   to 40 students, was it -- was it a digital survey using

14   a digital survey platform?

15        A    I believe so, yeah, and it was pretty much

16   about their coursework, to my remembrance, as in what

17   courses work and what courses don't work right now for

18   you.

19        Q    And how much time did you spend reviewing the

20   responses?

21        A    Probably at least two to three weeks because

22   I was figuring out how to visualize the data in a way

23   that they would actually want to see it which turned

24   out to be moot since no one ever responded to that work

25   anyway so.

1    Q    When you say no one responded, what does that

2    mean?

3    A    I sent the slides over and no one ever

4    responded to my e-mail.

5    Q    Who did you send the slides to?

6    A    To Jason, to Laura, and I believe to Casey

7    because he was head of the doctoral program at the

8    time, but that was just like the beginning of a pattern

9    of like my work being ignored by my supervisors so it

10   was pretty par for the course for my time at UConn.

11   Q    As far as that project, what specifically did

12   Laura Burton ask you to do?

13   A    So to my remembrance, because this is the

14   beginning of my time at an otherwise really traumatic

15   workplace environment for me, it was to ask whether or

16   not the students current doctoral curriculum was

17   working for them as in what -- what courses did they

18   find most or least useful to the program they intended

19   to sign up for basically, are we doing what we actually

20   think we're doing with these courses.

21   Q    Do you have -- withdraw that.

22        Are you aware of any written communications

23   from Laura where she asked you to do this, or was this

24   verbal only?

25   A    There -- I believe there were written

1   communications about it because I responded to an

2   e-mail where I was instructed to do it.  It's just once

3   I delivered the final work product, I didn't hear back

4   from them.

5        Q    When you e-mailed the 30 to 40 students the

6   survey, did you e-mail them all individually --

7        A    No.

8        Q    -- or did you e-mail them all together?

9        A    I got a list from the department of people

10  they wanted me to e-mail, and then I think maybe 30 to

11  40 responded.

12       Q    Oh, so did you -- you surveyed -- okay.

13       A    I honestly could not remember the numbers

14  exactly.  This was like my first semester there, but I

15  know that -- I don't remember how long the list was she

16  gave me, for example, but I know that at least 30

17  people responded to it.

18       Q    So you sent the survey to a list of --

19       A    Former doctoral students.  Sorry.  I didn't

20  mean to talk over you.

21       Q    That's okay.  I was slow with getting the

22  question out.

23       A    Sorry.

24       Q    So you're not sure how many total you sent

25  it out to, but you believe it was 30 or 40 that

1    begins?

2         A    Yeah, I believe so.

3         Q    And then it goes to --

4         A    May.

5         Q    -- May?

6         A    Yeah.

7         Q    Okay.  And now we're talking about the spring

8    of 2022?

9         A    Uh-huh.

10         Q    Just to confirm, did you teach the winter

11    session --

12         A    No.

13         Q    -- in between the fall of 2021 and the spring

14    of 2022?

15         A    I did not.

16         Q    And then the spring of 2022, you taught one

17    course that semester; is that right?

18         A    Yes.

19         Q    And that was EDLR 5204 Organizational

20    Learning?

21         A    That's right.

22         Q    And, again, I'm not going to ask you to say

23    the names of any students on the transcript.

24              As you sit here today, are you aware of

25    student grievances that were filed against you

1  regarding that course?

2      A    Yes.

3      Q    And what's your -- and, again, without

4  getting into names, what's your understanding of what

5  those grievances were?

6      A    Well, to be honest with you, I couldn't ever

7  really get a full grasp of what the grievances were

8  because at the time they refused to let me even see

9  what the grievances were.  Like I still to this day

10 have never seen like what actually was written down by

11 the students which I believe they said was to protect

12 the students, but I also -- I know that some of it is

13 relevant to what I flagged to them prior to receiving

14 that letter which was that I felt --

15          So the course I was teaching at the time was

16 the one that I had to redesign.  It was my first time

17 teaching this doctoral-level course that I redesigned

18 the syllabus for, and the group was being taught by

19 Casey as well, and so they would come to class and they

20 would talk about ways in which Casey was holding remote

21 classes, and I think teaching stats at the time, so

22 that it would bother them to have to learn stats online

23 or whatever, but basically whatever grievances were

24 happening in their other classes with the doctoral

25 program, I was hearing about in my course.

1    So that's the point at which I went to Laura

2  and Jason and I said, you know, I'm a little concerned.

3  Like I feel a little -- I think it's in the

4  interrogatories.  I just saw it.  Because I said to

5  them I kind of foresaw it.  I was like I'm a little

6  concerned teaching the same course as a tenured white

7  male professor that the grievances that the students

8  have about the program in general will be scapegoated

9  onto me as the only other person teaching them this

10  semester.

11    And I didn't receive any response to that

12  either, but I believe I did highlight at that time for

13  instance they had noted he was holding remote classes

14  at times that weren't convenient for them.

15    And I think I compared it to the fact that

16  one time I was -- I had to hold one of my classes

17  remotely because the Amtrak was cancelled that day, and

18  they gave me like a huge problem about it, and by

19  contrast Casey was able to decide discretionarily like

20  when he wanted to hold his classes remotely.

21    So I spoke to Jason by phone about it.  I

22  spoke to Jason and Laura about it.  I said why is Casey

23  able to make those kinds of decisions and I'm not, and

24  they told me it's just the way it was at the time, and

25  then soon after I received the grievances from the

1   students, which is to say I wasn't surprised by it

2   because I literally felt that there was disorganization

3   in the program in general, and I had a sense that as

4   like a young nontenured female black professor that the

5   students might scapegoat me for what they perceived to

6   be the program's shortcomings, so, yeah.

7        Q    So as you sit here today, you haven't seen --

8        A    Never.

9        Q    -- a copy of those grievances?

10       A    Never.  And I went to Karen Breiciano, who

11  was like the director of graduate student supports,

12  because I actually genuinely wanted to understand what

13  they were talking about, and I think once I finally did

14  get some semblance of it from -- what's her name? --

15  Dorothea Anagnastopoulos I think her name is, but I

16  don't remember what her title is.

17       Once I got some clarity around it, I think

18  they said they told the students that most of their

19  grievances were about academic freedom like I hadn't

20  actually violated any policies.  I think they just

21  didn't like that I was making some readings unavailable

22  to them or I mean -- I don't know.  I haven't seen the

23  list to be honest with you.

24       I thought it was really hard because I

25  remember wanting to learn from the list and I even went

1  to -- they recommended that I go to the Center for

2  Teaching and Learning, and I went and I said, well, how

3  I am to learn if like they won't even tell me what's

4  gone wrong or if -- and, you know, she couldn't help me

5  either so.

6      Q   How did you learn that students made

7  grievances about you?

8      A   I got an e-mail from Dorothea Anagnastopoulos

9  -- I'm going to butcher her name again -- but she's one

10  of the deans at the Ed school, and she just said they

11  had grievances, and I said, well, can I see the

12  grievances, you know, and she said, no, because, you

13  know -- I mean they told me virtually the entire class

14  signed it.  So it wouldn't have been anyone in

15  particular that would have been outed but she said no,

16  and she said that they already discussed it, her and

17  Jason and Laura, and that they decided to meet with

18  students separately and that, you know, they would let

19  the students know that I was entitled to academic

20  freedom, and that was pretty much what they told me,

21  but otherwise I don't know what was written down, no.

22      Q   The students for that same course in the

23  spring of 2022, EDLR -- sorry.  What is -- scratch

24  that.

25      A   Education leadership.

```
1   exhibit.  We'll come back to that in a little bit.

2        A    (Handed.)

3        Q    Thank you.

4             Turning back to the complaint, there were

5   some allegations about being asked to teach

6   race-related courses?

7        A    That's right.

8        Q    Can you tell me a little more about that?

9        A    Yup.  So right before -- right in the spring

10  semester they start planning for the semester

11  afterwards, and somebody -- Milagros was going to be on

12  sabbatical -- Castillo-Montoya I believe is her last

13  name -- was going to be on sabbatical for the fall

14  semester so they were trying to find people to take her

15  spot.

16            Now, Milagros isn't actually a person of

17  color but she actually studied race, so it's actually

18  different than just being a black person, right.  Well,

19  she happened to be Hispanic or Latina but I remember at

20  the time being assigned to the Social Justice

21  Leadership course and being confused because I was

22  hired at the same as someone, Alex Freidus, for the

23  same position, and Alex bills herself as a diversity

24  and class scholar, but Alex was asked to teach

25  race-neutral electives like policy and management,
```

1  which I actually have a masters in.  Like I have a

2  policy -- an education policy and management degree so

3  it was just strange because Alex doesn't and was being

4  asked to teach this race-neutral class.  Whereas, I was

5  asked to be teach Social Justice Leadership.

6        So I was talking about it with Milagros, and

7  she asked are you comfortable with that assignment, and

8  I said I hadn't really thought about that.  I just kind

9  of -- what Jason said, it's just one class, but for me

10 it felt uncomfortable because I'm not a race scholar

11 like I felt -- like what Lenore (as stated) said to me

12 at the time was that Social Justice Leadership would be

13 a good fit for me because it was like Organizational

14 Leadership with a critical lens, and I was like it

15 definitely isn't, you know.

16        And you could tell by Milagros's syllabus

17 which was so specific, was so -- she literally had two

18 different pathways students could take based on two

19 different types of literature in that vein.  And so I

20 told them, I said I'm not really sure why I'm being

21 asked to teach this course because especially, as I

22 mentioned, Alex doesn't have a degree in policy and

23 management and she's being asked to teach those

24 courses; whereas, I'm being asked to teach what she

25 would more likely, at least on paper, be a better

1   substitute for.  So that's what happened with that.

2        Q    So just to clarify Social Justice Leadership

3   that's the course that in your complaint when you're

4   making allegations about teaching race-related courses,

5   that's the course we're talking about?

6        A    Yeah, because the syllabus as it was written

7   had a lot of stuff about race and class on it and

8   there's all this research about how emotionally taxing

9   it is to sit in a room with people while they're

10  learning about race and class.  Like it's something you

11  actually have to be prepared to do because people are

12  processing while they're learning.  You have to be

13  prepared to scaffold that kind of learning which I

14  think is why Milagros asked me like are you comfortable

15  doing that.  Like merely being a black woman wouldn't

16  enable me to facilitate that conversation.

17       Q    And just for clarity, there's no other course

18  that you're claiming you were asked to teach that was

19  race related, just the --

20       A    Just that one.

21       Q    -- Social Justice Leadership, right?

22       A    Yup.

23       Q    You weren't asked to teach a critical race

24  theory course?

25       A    That course had critical race theory in its

6/20

1    syllabus.

2        Q    And when you say "in its syllabus," the

3    syllabus designed by --

4        A    Milagros.

5        Q    -- Milagros?

6        A    Yeah.

7        Q    And --

8        A    But I couldn't have redesigned it because I

9    don't have those skills.  Like I literally don't even

10   know that literature so I was going to have to go with

11   her syllabus in order to teach it.

12           The reason I could redesign Organizational

13   Learning is because I'm an organizational theorist by

14   training so that's different.  I can pick up a syllabus

15   and say I'll refine that.

16       Q    So just so I understand, so it's not that

17   UConn said you have to go with the syllabus, but you're

18   saying because you wouldn't feel comfortable

19   redesigning it given your background, you felt like

20   your only choice would be to stay with the previous

21   syllabus?

22       A    It wasn't a feeling.  Laura told me that it

23   was a good fit for me because Social Justice Leadership

24   is Organizational Leadership with a critical lens, and

25   I told her no, it's not.  I actually wrote a detailed

1    e-mail where I said it's actually a matter of not

2    having the pedagogical content knowledge to teach this

3    course, of not being willing to take on the emotional

4    labor of being a black woman in the room facilitating

5    this kind of content with a bunch of people who are

6    learning about it at different levels of

7    comprehension.

8        Q    Referring back to Exhibit 3, the complaint,

9    and if we turn to paragraphs 25, 26, 27, 28, if you

10   could just review those?

11       A    (Witness reviews document.)

12       Q    And then I'll show you another exhibit just

13   to make sure this is the correspondence it's talking

14   about.  Give me just a moment.

15            MR. KONOWE:  This will be Exhibit 6.

16

17                (Defendant's Exhibit 6,

18                 Correspondence, was marked for

19                 identification.)

20

21   BY MR. KONOWE:

22       Q    Showing you what's been marked Exhibit 6, if

23   you can take a little time to review that please?

24       A    (Witness reviews document.)

25            Uh-huh.  Yeah, that's it.

1    **Q**    So the correspondence contained in Exhibit 6

2    that's the correspondence that paragraphs 25, 26, 27,

3    and 28 in the complaint are referring to?

4    **A**    It's one of them because I brought this up

5    several times.  Let me see.

6    **Q**    Take some time to review all of them, not

7    just that first one.

8    **A**    (Witness reviews document.)

9    Yes, this -- yes.

10    **Q**    And if you don't mind just because of the

11    record and the court reporter, so just because you

12    wanted to look at it a second time, the

13    correspondence  that's Exhibit 6, is that what is being

14    referred to in paragraphs 25, 26, 27, and 28 of the

15    complaint?

16    **A**    Yes.  Everything in this thread titled, "Fall

17    Summer Schedule."

18    **Q**    I think we're all set with this now.

19    **A**    (Handed).

20    **Q**    You didn't end up teaching the Social Justice

21    Leadership course, right?

22    **A**    No.  I asked to be released.

23    **Q**    And they released you from it?

24    **A**    They did, but I also never received an

25    explanation as to why Alex who was not qualified to

1  teach the courses she was teaching was assigned to

2  those.  It just didn't make any sense that the person

3  with the degrees on the topic wasn't teaching the

4  subject matter, you know, for her or me.

5      Q    Alex Freidus had a background that lended

6  itself --

7      A    To social justice work, yeah, and mine is in

8  policy and management, which is the course she was

9  assigned to teach instead.

10     Q    All right.

11            MR. KONOWE:  This will be Exhibit 7.

12

13            (Defendant's Exhibit 7, Text

14             thread, was marked for

15             identification.)

16

17  BY MR. KONOWE:

18     Q    And this has a -- just a redaction you can

19  see of the phone number, but I'll give your attorney

20  the unredacted version.  I'm just trying to be mindful

21  about phone numbers and addresses and whatnot.

22          I'm showing you what's been marked as

23  Exhibit 7.

24     A    Uh-huh.

25     Q    Is it a text thread?

1   Exhibit 8.

2       A    I mean before I see the exhibit, I think I've

3   already established that my -- I learned a bit about my

4   advisor's perspective of me throughout the process of

5   these e-mails.  So I didn't know prior to this point

6   that she felt this way to be honest, and we haven't

7   spoken much since I realized that that's the way she

8   saw me.

9            Oh, can I see it?

10      Q    I'm just waiting for the court reporter to

11  mark it.

12

13                      (Defendant's Exhibit 8, E-mail

14                       thread, was marked for

15                       identification.)

16

17  BY MR. KONOWE:

18      Q    I'm showing you what's been marked as Exhibit

19  8.

20      A    Yeah, I mean just 'cause she sees that in me

21  doesn't mean that's what I am which is what I've

22  explained to her several times since.

23      Q    And you believe she told people from UConn

24  about your background in a way that you don't agree

25  with?

1    A    In the e-mail that I sent to her, which I

2  believe you have a copy of, I said, Monica, I don't

3  understand why you would attest to that given that

4  we've never discussed critical race theory, but I

5  also, in this example, I actually was writing -- this

6  was when I was trying to get my dissertation

7  published.

8            This was a paper about culturally responsive

9  classroom management.  So she was telling me that the

10  CRT -- I don't even remember what this article is, but

11  it would have been relevant for me discussing

12  culturally responsive classroom management but not like

13  as a general I-do-CRT way.

14    Q    And just for clarity, CRT stands for critical

15  race theory?

16    A    Yeah.

17    Q    And that's what's being referenced in that

18  e-mail?

19    A    Yes.  And I actually appreciate the reduction

20  of my approach to CRT because it's such a stigmatized

21  term.  It has nothing to do with what I actually study.

22  People hate listening to that term, and it has nothing

23  to do with me, you know.

24    Q    All right.  So then I'm just going through

25  the timeline.

```
1              We talked about the fall of 2021, we talked
2     about the spring of 2022 --
3         A    Uh-huh.
4         Q    -- and then summer of 2022.
5              Did you teach any courses in the summer of
6     2022?
7         A    Once I realized I had to design them, I
8     decided not to do it.  That was my option at the
9     time:  Design them and hope for people to sign up.
10        Q    So you did not teach courses?
11        A    No, that summer I took summer -- I took from
12    that 20K pot that was referenced in my first -- in my
13    offer letter.  I took from that to fund my research
14    that summer, start-up funds in my offer letter.
15        Q    And I just want to check in, are you good to
16    keep going?
17        A    Yeah.
18        Q    And you can let me know at any point if you
19    need a break.
20        A    I will.
21        Q    Just referring back to the complaint, just --
22    which is Exhibit 3.  We've already looked at this a few
23    times, and if you could look at Paragraph Number 29
24    please?
25        A    Uh-huh.
```

1          A     Not yet tenured, no.

2          Q     And I think we're good with that one for now.

3          A     (Handed.)

4          Q     Thank you.

5                So we've covered -- I'm just trying to remind

6     myself because -- we're in 2024, just to keep it

7     straight.

8                So we talked about fall of '21, talked about

9     the spring of '21, talked about the summer of '21 --

10         A     I just want to add --

11         Q     -- and I'm sorry, spring of '22, and summer

12    of '22.

13         A     Sorry.  To your last question, we were not

14    doing the same work, but I would argue it was actually

15    his job to do what I did in terms of flagging what

16    happened with the students by the time that I did.

17               Because the doctoral coordinator is supposed

18    to look at the students' schedule and make sure that

19    it's not interfering with their work schedule since

20    they're full-time employees, and he didn't do that.  So

21    it was really when I called Casey on what he hadn't

22    done in terms of his job to the department head that I

23    was thrown under the bus.

24         Q     In the fall of 2022 what courses did you

25    teach at UConn?

1    **A**    I taught a workplace learning class to Ed.D.

2    students, and I also taught teacher leadership in

3    organization or something like that.  They brought back

4    that course somehow.

5    **Q**    Yeah, I think it actually -- I think if we

6    look at Exhibit K -- not Exhibit K, Exhibit 5 again, I

7    think we might find what the two courses were in

8    there.

9         Actually just for clarity -- let's see.

10   **A**    Okay.  Teacher Leadership in Organizations.

11   **Q**    It was EDLR 5015 and EDLR 5202?

12   **A**    That's right.

13   **Q**    And EDLR 5202 that was workplace learning?

14   **A**    That's right.

15   **Q**    And was that the one where you had some

16   e-mail correspondence with Casey Cobb and Laura Burton

17   related to scheduling?

18   **A**    Yes.

19   **Q**    And what -- I think we're all set with this

20   exhibit for now.

21   **A**    (Handed).

22   **Q**    What was that correspondence about?  Tell me

23   about more about it.

24   **A**    Which one?

25   **Q**    The correspondence you had with Casey Cobb

1    and Laura Burton about scheduling and that course?

2        A    We never had one until I confronted Casey

3    about what happened by November.

4        Q    And how would you summarize that

5    correspondence in November?

6        A    That -- how would I correspond -- I'm sorry.

7    How would I summarize the correspondence between myself

8    and Casey and Laura?

9        Q    Yes.

10       A    I alerted them to an issue that Casey had

11   already flagged in August and said it was time for us

12   to do something about it.  Laura didn't respond.  Casey

13   responded and said that his initial instinct was to

14   have us just switch class times, and I said that didn't

15   work for the students because they were actually

16   full-time employees rushing from other places to be

17   there, and he said that -- I don't remember what his

18   second suggestion was but basically I told him the

19   options he was giving us were not solving the problem

20   of the students never being able to get to class on

21   time.

22           And then I said, you know, I'm going to

23   survey them because I want to know what they think

24   because they're paying to be here.  I surveyed them.  I

25   sent the survey stuff back to Laura and to Casey, and

1  that was the first response I got from Laura where she

2  said, you know, given what's been shared here, we're

3  not going to do any more remote classes, and if the

4  students have any more questions, they should come

5  speak to me directly.  That's pretty much what happened

6  that night.

7      Q    I think the complaint has an exhibit.  If you

8  look at Exhibit 3, the complaint, and look at Exhibit 4

9  of that exhibit, let me know if that's the --

10      A    Yeah, Exhibit 4.

11      Q    Yes.

12      A    It is exhibit -- no, it's Exhibit 4 we're

13  talking about right now.

14      Q    And do you want to just look over Exhibit 4

15  for a moment?

16      A    Yeah.  (Witness reviews document.)

17           Just up to that?  Yeah, just 4, right.

18      Q    Okay.  And so that's the correspondence that

19  you were speaking about before, right?

20      A    Yes.

21      Q    And that's the correspondence -- that's what

22  you're -- there's some allegations in the complaint

23  that reference scheduling and Casey Cobb and Laura,

24  that's what it's referring to?

25      A    Yeah.

1    Q    And then did you contact HR about that

2    correspondence?

3    A    I did.

4    Q    And why did you contact HR about that

5    correspondence?

6    A    Because after this exchange, one of my

7    students arrived to class having had to wait on the

8    side of the highway for a second classmate who got into

9    a car accident on the way coming to class, and instead

10   of going home with her car, she had it towed back to

11   New York and waited on the side of the street for

12   someone to come pick her up.  She wrote to Laura to let

13   her know about this.

14         And I was complicit like I felt like crazy.

15   I was like I can't -- first of all, I felt awful that

16   she came to class instead of going back with her car

17   because on the back end I'm hearing Casey like saying,

18   oh, let's just swap times, and then I'm like it's

19   actual like real people's lives.  Like she was coming

20   from New York when she got into that crash and had her

21   car, you know, towed back.

22         So it just felt like I was being -- I mean I

23   was scared.  I was scared to -- I was scared for the

24   students because of that car accident.  I was scared

25   for myself because I'm like if they care this little

1   about the students, they certainly don't care about me,

2   but I think it was really the car accident that made me

3   realize like I'm now complicit in this, you know, and

4   for no reason other than, what, like recovering Casey's

5   written mistake.  Like I just couldn't do it.

6       Q    "Written mistake," what do you mean by

7   that?

8       A    Where he writes in August that he probably

9   should have thought about the students complaining to

10  him about needing a different class time but also not

11  changing the schedule.

12      Q    Is it a problem to change the schedule when

13  the course is underway?

14      A    I can't tell you what's a problem in general

15  for UConn because this is only my first or second

16  semester of teaching, and there were discretionary

17  rules applied to different professors.  It's a fact of

18  life.  You know, like what worked for Casey is not what

19  was going to work for me.  I realized that very

20  quickly, so I can't tell you.

21           I know that Casey told me that for full-time

22  students it's possible to add in discretionary breaks

23  because given that they're often coming after work.  So

24  I took his advice because both sets of my classes had

25  students who were coming after a long workday, but

1    that's all of the information I had received about

2    discretionary decisionmaking.

3         Q    So we talked about you referring -- or I'm

4    sorry.  Withdrawn.

5              We talked about you contacting HR about that

6    correspondence that's in Exhibit 4 of the complaint.

7    So that's Exhibit 4 to Exhibit 3, because the complaint

8    is Exhibit 3.

9              So the next question is:  Did you contact OIE

10   about that correspondence?

11        A    I did.  So I contacted, it looks like here,

12   labor relations, which I'm not -- I can't remember if

13   it's a division of HR or if it's a separate division or

14   not.  Then I also contacted OIE because I'd been

15   logging silently with OIE like ever since I couldn't

16   get into my office.  I told her at the time I didn't

17   want to lodge a complaint.  I was new there, but she

18   said I could kind of like let her know if things are

19   going on to kind of build like a quiet file until I

20   decided to do something about it.

21             So this is the night -- or the e-mail at

22   which I said I guess we have to escalate it now because

23   it's kind of gotten out of control.

24        Q    And just for clarity, OIE stands for

25   Office...

1    A    Of Institutional Equity.

2    Q    And who in OIE did you contact about it?

3    A    I don't remember her name.  I think --

4    Q    Was is Sarah --

5    A    -- it was Sarah Chipman.

6    Q    -- Chipman?

7    A    Yeah, that's who it was.

8    Q    And what was it about that correspondence,

9    the one we've been talking about with Casey and Laura

10   and scheduling, what was it about that correspondence

11   that seemed not only like an HR and/or labor relations

12   matter but also an OIE matter?  What about it prompted

13   you to contact OIE?

14   A    Well, I was concerned for the students, like

15   I said.  Like somebody literally got into a car

16   accident rushing to class for no reason other than the

17   fact that we just chose not to change the schedule.  It

18   was a discretionary choice.  It didn't have to be that

19   way.  She could have gotten hurt.  It wasn't -- it was

20   completely avoidable.

21        Why I decided to go to OIE was before Jason

22   contacted me about an investigation on me, I had a

23   sense that some sort of university policy had been

24   broken, but I was new so I didn't know what it was.  It

25   wasn't until I saw Jason's e-mail that I realized that

```
 1   basically what had happened in terms of making
 2   discretionary decisions for the students that were
 3   harmful to them was a violation of university policy,
 4   but I knew something was wrong even without knowing
 5   what that actual policy was.  It just wasn't until
 6   Jason accused me of doing it that I realized it was
 7   like a legitimate thing at the school.
 8               I mean I just knew.  I intuited that like you
 9   can't, as a professor, make decisions that put your
10   students at risk of bodily harm and do nothing to
11   correct it just because you don't want to go back on
12   something that you identified as a mistake several
13   months ago.  That seems unfair.
14       Q    So I'm just trying -- you know, you've
15   explained that was your reasoning for going to HR
16   and/or labor relations, and then we'll talk about the
17   investigation in a little bit.  We haven't gotten there
18   yet -- but that -- you didn't get any notice about an
19   investigation until after you contacted OIE --
20       A    Well, I --
21       Q    -- about this, correct?
22       A    Sorry.  I didn't mean to cut you off.
23       Q    That's okay.
24       A    In terms of OIE, I was being treated unfairly
25   in my mind.  Like here's Casey, this guy whose written
```

1   down like that he knew he should have changed this

2   before it became a problem for the students.  He

3   misrepresented the scope of the problem because he said

4   it was going to be about two to three students.  It

5   turns out all of them were at work at four p.m., most

6   of them.  They're principals and administrators.  They

7   cannot be in two places at once.

8           So what am I to do when my department is

9   overriding its own rules it seems, going against the

10  best interest of the students just to save one person.

11  Like that's scary.  Like I had to reach out to any

12  institutional actor I could for support.

13          That was why I had gone to Michael Bradford

14  or Frank Tuitt because I just needed -- or Karen

15  Breiciano like I just needed to make as many people as

16  possible aware of the situation because I think I like

17  felt very much alone in my desire just to do right by

18  the students.

19      Q    I see.  And so just -- and if I don't have

20  this right, correct me, but to you it was an OIE issue

21  because you felt Casey was getting preferential

22  treatment?

23      A    It's because Casey had admitted he made a

24  mistake.  I brought it to the attention of our

25  supervisor.  I brought evidence that the students

1    themselves are being negatively impacted by Casey's

2    mistake, and my supervisor chose to override that

3    evidence and move forward as though it hadn't happened.

4    That was wrong.  In any workplace, it's wrong.  It's

5    abuse of power.

6         Q    I think we're all set with that for now.

7         A    (Handed).

8              MR. KONOWE:  Let's do a time check.

9              THE COURT REPORTER:  It is 11:13.

10             MR. KONOWE:  Okay.

11        A    Also -- sorry -- I should mention that

12   another reason I thought it was inequitable was because

13   I read Laura's research on microaggressions black women

14   experience in education leadership settings.  I know

15   she knew exactly what she was doing.  She literally has

16   written about experiences -- one of her articles is

17   called, I Want to Talk to a White Person.  That's

18   pretty effectively what she --

19   BY MR. KONOWE:

20        Q    It's called what?

21        A    "I Want to Speak to a White Person."

22             It's about how as a black person in a

23   leadership position often people undermine your

24   authority and ask to speak to their superior which they

25   assume to be a white person.

1          So if Laura writes an article about that and

2     then tells me in an e-mail that if the students have

3     further concerns they can come talk to her directly as

4     though I didn't just survey the students and prove to

5     her with Casey's own words that he made a mistake that

6     was negatively impacting them, how is that any

7     different than the microaggressions she writes about in

8     her research?

9                    MR. KONOWE:  Mark this as Exhibit 9.

10

11                    (Defendant's Exhibit 9, E-mail

12                       thread, was marked for

13                       identification.)

14

15    BY MR. KONOWE:

16         Q    Showing you what's been marked as Exhibit 9,

17    so this Exhibit 9, is this you -- is this the e-mail

18    thread where you forwarded to OIE the HR labor

19    relations the thread about the scheduling

20    correspondence with Casey and Laura that we were just

21    discussing?

22         A    I did.

23         Q    That's what this is, right?

24         A    Yes.

25         Q    And at the top of this first page, Sarah

1 Chipman wrote -- well, it speaks for itself, but what

2 is your understanding of what she wrote there?

3      A     She wasn't sure if it fell in OIE's

4 jurisdiction.  So I received -- I'd been bounced around

5 between a few different departments I tried to go to

6 for help with this.  I don't think Sarah realized what

7 I meant by what was happening to me until after Jason

8 sent me that e-mail saying that I was going to be under

9 investigation with HR.

10          I think people just kind of thought I was

11 just arguing about whether it should be remote or in

12 person when there was this whole other back story of a

13 professor who had chosen to schedule the class at a

14 time that was not working for the students, there

15 was me speaking against it, and there was my

16 department doubling down on supporting him despite

17 the fact that it was negatively impacting the

18 students.

19          I will say Jim Wohl is a person I spoke to

20 many times throughout my time at UConn.  Just there had

21 been an instance or two in which like, for example,

22 Laura came to me one time with a student's concern, and

23 I proved to her -- because the whole situation happened

24 in writing.  So she said, you know, a student came to

25 me and said you said this, please don't do it.  It's a

 1   violation of our policy.  And I said, Laura, I really

 2   don't appreciate being accused of something without you

 3   asking me what's going on.

 4           I sent her the e-mail thread.  I said here's

 5   the e-mail thread proving what the student said was

 6   incorrect or misrepresented, and she never got back to

 7   me.

 8           I had to get Jim Wohl involved to have him

 9   even get her to acknowledge formally that I hadn't

10   broken the policy.

11       Q    What's that person's name again?

12       A    Jim Wohl.  He's the university's

13   ombudsperson, but I literally, even for something as

14   simple as that, like had to ask him -- because I didn't

15   want it in writing as though I violated some policy

16   when in reality the student misrepresented what was

17   said, but Laura refused to provide that verification

18   for me until Jim Wohl got involved.

19           So also Sarah did reach back out to me before

20   I went on FMLA, but by that time I had left and when I

21   -- and I didn't come back -- or I came back and then

22   left right after, so.

23       Q    And, again, you know, the reason I'm asking

24   is just to understand the contours of, you know, your

25   claim and the lawsuit --

1       A       Yeah.

2       Q       -- and as you sit here today, do you believe

3   that the correspondence between you, Casey Cobb, and

4   Laura Burton that that was demonstrating

5   discrimination?

6       A       I would never venture to say what they were

7   thinking, but I would say that if I -- I can't think of

8   any reason why the claim I brought to them would have

9   been ignored especially since Casey had admitted in

10  writing what he had done.  The students had spoken.  As

11  a professor, I thought I had the jurisdiction to ask my

12  students how could I help them more efficiently, and it

13  was completely overridden.

14          At least again, according to Laura's

15  research, that is a form of microaggression.  It's a

16  form of discrimination.

17      Q       When you say what Casey admitted in writing,

18  you mean the August communication?

19      A       Yeah.  "I probably should have fixed the

20  schedule, but I'm not doing it."  That's a choice that

21  he just wasn't being held accountable for.

22      Q       I just want to try to find that exact -- is

23  that in --

24      A       I think it might be.  No, no, no.  It's not.

25  I might have quoted it in there, but I cannot -- oh,

1  yeah, here it is.  So it's quoted in this.  I don't

2  know what page this is.

3      Q    Yeah, they're not numbered.

4      A    It is at the bottom, 001430.

5      Q    Thank you.

6           So you're -- that bullet point is that what

7  you're talking about?

8      A    Yes.

9      Q    So that bullet point is a bullet point you

10  pulled from that August e-mail that he sent?

11     A    Yes.  And that's only after he tried to

12  change the time slot or come up with solutions that

13  have nothing to do with the students and everything

14  about accommodating himself so I'm like at some point

15  it has to be about them I thought.

16     Q    But what about the last bit of his -- of that

17  excerpt where it says, "It's just the reality with

18  their positions emergencies come up."

19          I mean isn't he saying in the same e-mail

20  that regardless of the schedule this might just come up

21  no matter what given the roles people have?

22     A    I think he's saying that these people work in

23  schools, so four p.m. is typically when school let's

24  out.  The reality is that schools let out at four p.m.

25  When I was working at Harvard the Ed.D.s weren't

1    working at the time so they wouldn't have any external

2    obligations, but here it's different.  They're coming

3    from work, so if you're going to plan something at a

4    time where you know most people are technically at

5    work, it's a reality you've chosen to accept but that

6    you're not planning for.  That's a choice as the leader

7    or coordinator of doctoral programs.

8         Q    All right.  So just to continue, I think

9    we're all set with that for now.

10        A    (Handed).

11        Q    Thank you.

12             So we're still talking about fall of 2022.

13   As you sit here today, are you aware of student

14   complaints about you in the fall of 2022?

15        A    I only became aware of those once Jason used

16   them as a reason to start an HR investigation against

17   me, but prior to that I surveyed my students, that was

18   part of the feedback that I got from my first time

19   teaching that I should do like beginning and mid

20   semester check-ins, and I hadn't received any negative

21   feedback from them directly in those check-ins, so.

22        Q    But Jason initiated the investigation because

23   of the student complaints?

24        A    I don't know why he initiated that

25   investigation to be honest with you.  I really don't.

1    professors but without the same protection.  Like they

2    get academic freedom but my academic freedom is, you

3    know, in the grievances the students, to my

4    understanding, is being policed by the students in a

5    different manner, and they're not standing by me the

6    same way.

7            So it was a few separate instances in which I

8    just felt as though -- or thought honestly I couldn't

9    do my job well because the department was kind of

10   getting in my way which I also put in my PTR documents

11   as well.

12       Q    All right.  You filed a CHRO EEOC complaint

13   in the spring of 2023; is that right?

14       A    That's right.

15       Q    Just looking at the complaint again, the

16   fourth count, the fourth cause of action, it's a

17   retaliation claim?

18       A    Uh-huh.  Yeah, I know.  Do you want me to

19   look at it?

20       Q    Yeah, if you don't mind.

21       A    Where does it begin?  Okay.  I'll find it.

22       Q    I can find it.  Give me a moment.

23       A    All right.  I found it.

24       Q    What page are you on?

25       A    18.

1      Q     Thank you.  You got there faster than me.

2   All right.

3            So in paragraph 389, you allege the defendant

4   has subjected the plaintiff to unlawful retaliation

5   because the plaintiff informed the defendant that she

6   would be filing a discrimination complaint against

7   Burton and Cobb with the defendant's Office of

8   Institutional Equity?

9      A     That's right.

10     Q     So I'm just trying to make sure because, you

11  know, a retaliation claim, it's retaliation in response

12  to some activity.  I just want to make sure that's the

13  one and only activity you're claiming you were

14  retaliated in response to?

15     A     Yes, against the protected activity of

16  complaining, yeah.

17     Q     So it's the -- it was in response to the

18  e-mail that you sent notifying Burton and Cobb that you

19  were going to make a complaint to the Office -- or

20  report to the Office of Institutional Equity?

21     A     It was -- I'm sorry.  Repeat the question.

22     Q     Your claim is that you were retaliated in

23  response to notifying Burton and Cobb that you were

24  going to make a report to OIE?

25     A     Notifying Burton and Cobb and Irizarry

1    because he was on that thread as well.

2        Q    I see.  So in the next paragraph it says, "As

3    a result of voicing to Irizarry, Cobb, and Burton"?

4        A    Yeah.

5        Q    But, again, that's the same -- that's the

6    same situation?

7        A    That's the same situation.

8        Q    So it was the protected activity is the

9    complaint to OIE?

10       A    Yes.  I mean I don't know -- I think there's

11   also -- I think I also -- there's university policy

12   against retaliation that I found out that I thought of

13   as well because that's what Jason cited to me when he

14   told me I was under investigation and he let me know I

15   should not retaliate.  At which point I said to him I

16   felt as though what he was doing to me was a form of

17   retaliation so, yeah.

18       Q    If we just look at Exhibit 5 of the complaint

19   just so that we're on the same page.

20       A    Uh-huh.

21       Q    This is the protected activity you're talking

22   about?

23       A    Yes.  That I think I cc'd Jason on another

24   e-mail as well like towards the end of the conversation

25   with Casey and Cobb -- or Casey and Laura rather on the

1   previous, but this was the first time that I told them

2   like explicitly I'm going to report you, yeah.

3        Q    Okay.  And this is -- because the CHRO

4   complaint was filed later, correct?

5        A    Uh-huh.  That's right.

6        Q    Okay.  So Exhibit 5 is what is being referred

7   to in paragraphs 389 and 390, Exhibit 5 to the

8   complaint, right?  If we turn back to the --

9        A    Oh, you're asking me again.  Same question,

10  right?

11       Q    Yeah.

12       A    Same answer.

13       Q    Fair enough.  Just to talk about the

14  investigation a little bit.

15       A    Okay.

16            MR. KONOWE:  Can we do a time check?

17            THE COURT REPORTER:  11:51.

18            MR. BUCCI:  Five minutes?

19            MR. KONOWE:  You want a five-minute

20  break.  Sure.

21

22            (Off the record from approximately

23            11:51 a.m. to 11:55 a.m.)

24

25            MR. KONOWE:  And we're back on the

1    record after a short break, and the time is now what

2    time?

3                       THE COURT REPORTER:  11:55.

4                       MR. KONOWE:  11:55.

5                       This will be Exhibit 12.

6

7                       (Defendant's Exhibit 12, Notice of

8                         factfinding investigation, was

9                         marked for identification.)

10

11   BY MR. KONOWE:

12        Q    Showing you what was marked as Exhibit 12.

13        A    Uh-huh.  (Witness reviews document.)

14        Q    I think if you turn to on the bottom it will

15   say UConn 000077, and then it continues on to the next

16   page briefly, but is this the notice of a factfinding

17   investigation?

18        A    Yes.

19        Q    And the factfinding was scheduled for

20   November 16, 2022?

21        A    Yes.

22        Q    Go to the first page, that was an e-mail from

23   Kelly Bannister on the first page?

24        A    Yes.

25        Q    The investigation never actually happened,

```
1   correct?
2       A    Yes.  Because I took FMLA before it gave me a
3   nervous breakdown, yeah.  It was scheduled to resume
4   upon my return, to my understanding.
5       Q    In the e-mail from Kelly Bannister, it said
6   "No decisions have been made," right?
7       A    Yeah, it does say that.
8       Q    So the investigation was scheduled, but it
9   didn't happen?
10      A    It did not happen because I left on FMLA
11  before it could, yeah.
12      Q    And do you believe the investigation was a
13  result of retaliation?
14      A    I believe this was his first response to me
15  making a good faith claim about another person who did
16  the exact same thing he told me I had done wrong here.
17  So to my understanding within a certain time frame it's
18  classic retaliation, but I cannot tell you what he was
19  thinking since it seems illogical to me.
20      Q    So is the time frame the factual basis for
21  alleging this was retaliation?
22      A    No, it's actually, as I mentioned, in Jason's
23  e-mail he said something about the retaliation which I
24  just -- I just thought it was crazy when I read it
25  because I was like this is the first time I'm hearing
```

 1                    (Defendant's Exhibit 13, Timeline,

 2                 was marked for identification.)

 3

 4       A    Thank you.

 5            You know, it's so funny because I've never

 6  seen this, and we would always ask for timelines for

 7  the PTR process.  This must be new.  It is 2022-2023.

 8  I've never seen this.  It wasn't available to me at the

 9  time that I was working at UConn.  We were working

10  really hard to get this done though so I'm glad they

11  got this together.

12  BY MR. KONOWE:

13       Q    Your PTR process happened during 2022 to

14  2023, right?

15       A    No.  So it happened twenty -- this is 2022 to

16  2023.  I left in November of 2022 so this wouldn't have

17  been available to me at the time that I left.  Like

18  I've never seen it.

19       Q    There's three categories on the left:

20  Department review, school college review, provost

21  university review?

22       A    Uh-huh.

23       Q    Do you see that?

24       A    Uh-huh.

25       Q    So it goes through different stages?

1      A     Yes, I do see it.

2      Q     And is that consistent with your

3  understanding of the process?

4      A     This is the most consistent understanding

5  I've ever had of the process to be honest with you.

6  I've never seen this, and it would have been really

7  helpful to have.  The only understanding I had before

8  this was the guidepost given by the department head

9  saying I'm going to send you this letter by this time

10 or you should have this by that or this before that.

11     Q     I think we're good with that one for now.

12     A     (Handed.)

13     Q     You were asked to update the PTR form; is

14 that right?

15     A     Every year.

16     Q     But after you submitted it, you were asked to

17 provide additional information by the department

18 committee?

19     A     Yes.  So I mean Laura said or someone said

20 that I should have known that I wasn't being

21 reappointed, but they definitely did ask me for more

22 information I think.

23             MR. KONOWE:  This will be Exhibit 14.

24

25

1    Q    If we turn to the last page, it's signed by

2    three people, correct?

3    A    Yes.

4    Q    It was signed by Jennifer McGarry, correct?

5    A    Yes.

6    Q    It was signed by Kenny Nienhusser, correct?

7    A    Yes.

8    Q    It was signed Saran Stewart, correct?

9    A    Yes.

10    Q    Is Saran a person of color?

11    A    She is.

12    Q    Casey Cobb did not vote, correct?

13    A    I don't know what he did.  I don't know.  I

14    know they talked to each other.  I don't know what

15    happened in the process.

16    Q    When you say you know that they talked to

17    each other, what do you mean?

18    A    I mean he's still on the committee even if he

19    didn't vote.  He was involved at some point prior to

20    this before he stopped being involved so I don't know

21    procedurally.  He was involved at one point.

22    Q    Do you believe that he was involved with the

23    department PTR committee when they discussed you?

24    A    I don't know.  I know he was on the committee

25    at the time I was being evaluated by the committee.

1    **Q**    But do you have any specific facts or

2    documents --

3    **A**    No.

4    **Q**    -- indicating that he participated in any

5    discussions about you with those three people that

6    signed it?

7    **A**    Just his name on all of their committee

8    papers.  That's it.

9    **Q**    Just his name on it?

10    **A**    Uh-huh.

11    **Q**    If we go back -- we're done with that exhibit

12    for the moment.

13    **A**    (Handed).

14    **Q**    If we go back to Exhibit 5 and turn to page

15    19, there's a numbered -- I think it's Number 19.

16    Section 2 is titled "Departmental PTR Advisory

17    Committee Report."

18        Do you see that?

19    **A**    Yes.

20    **Q**    That's referring to the letter in Exhibit 18

21    that we just looked at, right, that's the report?

22    **A**    So it says, "Describe the procedure for the

23    selection and PTR committee, its composition, and it's

24    procedures."

25        Is that where you're looking?

1    Q    I guess I'm just wanting to make sure we're

2  on the same page.  Exhibit 18 that we just looked at,

3  this is what's being -- this is the departmental PTR

4  advisory committee report?

5    A    Oh, yeah, that's the same committee.

6    Q    That's all.  I was just trying to make

7  sure.

8    A    Uh-huh.  Kenny is a person of color to my

9  understanding too.  It only matters because there's

10  e-mails between us all talking about the culture of

11  UConn being hostile towards people of color ironically,

12  so.

13    Q    If you turn to page 21, and when I say 21, it

14  has page 21 on the bottom of the page.

15    A    Uh-huh.

16    Q    Section 3 is titled, "Recommendation of the

17  department head," right?

18    A    Yes.

19    Q    So there's an additional step after

20  department advisory report, right?

21    A    Yes, but this is a step that should have

22  been privy to me if I had been privy to Laura's letter

23  prior to the night I left on FMLA.  So if you're asking

24  if I could see it coming, not really.

25    Q    That's not what I was asking.

1        A    Because I'm like I don't -- I think I was

2    supposed to see her before and at this stage.

3        Q    No, I'm just asking for confirmation that we

4    agree that Exhibit 18, the department PTR committee,

5    that's not the only step, there's more after that?

6        A    Yes, and before.

7        Q    So the next step after this is the department

8    head, that's Laura Burton, makes a recommendation,

9    right?

10        A    Yes.  That looks like what this is, yup.

11        Q    So in this case it's Laura Burton who's the

12    department head, right?

13        A    Yes.

14        Q    And she recommended that you not be

15    reappointed, right?

16        A    It looks so.

17        Q    And she made that recommendation on November

18    10, 2022; is that right?

19        A    I don't know when she made it because if I

20    had seen her initial letter, I probably would have seen

21    her say "not be reappointed" in that, so it's possible

22    she did it earlier.  I don't know.

23        Q    But her signature --

24        A    This says that -- this document is dated the

25    10th of November 2022.

1    Q    And if we look at the page -- if we look a

2    little further in Exhibit 5, we look at the page

3    numbered 23 on the bottom of the page, do you see it

4    says, "Dean's advisory council recommendation"?

5    A    I do.

6    Q    Do you see that it says "Provide an

7    independent evaluation of the candidate together with

8    supporting data"?

9    A    I do see that it says that.

10    Q    So there were more steps remaining in the

11    PTR process after Laura Burton's recommendation,

12    correct?

13    A    According to the document you showed me today

14    for the first time, yeah.

15    Q    And do you have any documents or facts or

16    otherwise demonstrating otherwise?

17    A    Otherwise what?

18    Q    That there aren't more steps after Laura

19    Burton's recommendation in the PTR process?

20    A    I did not understand the steps at all until

21    today when you showed me that sheet.

22    Q    Okay.

23    A    I'm being honest with you.

24    Q    No, I understand.

25    A    That would have been super helpful to me back

1   then.  I do know I didn't trust Jason to evaluate

2   me fairly after he didn't even respond to my good

3   faith report.  I think that's just common sense.  He

4   wasn't even listening to me at that point.  As I said,

5   he hadn't responded to any of my e-mails that semester.

6        Q    We were just looking at page 23.  If we go on

7   to the next page, it says "Dean's recommendation," and

8   again it says "Provide your independent evaluation of

9   the candidates."  Casey says that there, right?

10       A    Yes.

11       Q    So there was yet another step after that in

12  the process, right?

13       A    I'm learning so today, yes.

14       Q    And you were on FMLA effective November 11,

15  2022; is that right?

16       A    I did.

17       Q    And why did you go on FMLA?

18       A    I felt as though -- I mean it's not a

19  feeling.  The first response I received to my good

20  faith report about a senior colleague was to be

21  investigated, and I was scared.  I figured if they

22  weren't going to hold him accountable, they weren't --

23  I mean I said it in my e-mail.  I said I don't feel as

24  though my work is assessed fairly or objectively at

25  this point.  It's probably -- yeah.

1          It was hard.  Plus, as I mentioned, one of

2  the students got into a car accident and I felt

3  complicit like I was like this cannot be part of my job

4  to have to -- to do that to someone, so.

5          Q    What was the medical reason for the leave?

6          A    Severe anxiety and depression.  I was having

7  trouble getting on the train in the morning.

8          Q    And have you ever had anxiety or depression

9  prior to working at UConn?

10         A    Not that severe where I was getting panic

11 attacks.  It was kind of scaring me.

12         Q    Not that severe but you had anxiety before?

13         A    Yeah, I was in grad school for a long time;

14 it's par for the course, but this was different.

15         Q    And you had depression before?

16         A    Not severe depression, no.

17         Q    But you had some form of depression before?

18         A    Not prior to like this incident at UConn -- I

19 mean not prior to working at UConn in a long time, to

20 be honest with you.

21         Q    And is it your claim that the medical

22 condition underlying the FMLA was caused by UConn's

23 actions?

24         A    It absolutely was.  I literally could not do

25 my job.  Like I couldn't do it at all.  I felt so awful

1    for that student that had gotten into the car accident.

2    Like there was no choice for me other than to keep

3    dragging them to class at a time I knew they couldn't

4    make it.

5         Q    So you went on FMLA effective November 11,

6    2022?

7         A    I did.

8         Q    And then you remained on FMLA continuously up

9    to May 10, 2023.

10        A    Yes.

11        Q    And then you resigned on May 10, 2023,

12    right?

13        A    Yes, I came back and resigned that day.

14        Q    When you say you came back, did you enter the

15    building?

16        A    No, but I cleaned up some loose ends with

17    like e-mails, for example.

18        Q    And just to -- we're good with that for now.

19        A    (Handed).

20        Q    Thank you.

21             MR. KONOWE:  We're at 19, right?

22             THE COURT REPORTER:  Yes.

23

24             (Defendant's Exhibit 19,

25             Resignation letter, was marked for

1                          identification.)

2

3    BY MR. KONOWE:

4         Q    I'm showing you what's been marked as Exhibit

5    19.  On the bottom half of this first page that we're

6    looking at it says -- was this the resignation letter?

7         A    Yes.

8         Q    And then on the top half you got confirmation

9    of your resignation?

10        A    Yes.

11        Q    Okay.  We're good with this for now.

12        A    (Handed.)

13        Q    Thank you.

14             So we discussed that when the PTR process was

15   underway, you went on FMLA while that was underway,

16   right?

17        A    Well, I went under -- the decision had been

18   made at Laura's level and at the PTR's level from what

19   I'm understanding today, yeah.

20        Q    But as you understand as you sit here now,

21   you understand there were more levels after that?

22        A    I understand because of that document you

23   just showed me for the first time today.  Honestly,

24   I've never seen it.  I didn't understand which order

25   they came in especially after Laura's letter came after

1    it was supposed to.  I didn't know you could go off

2    script like that.

3        Q    Actually, right now I'm asking some questions

4    about your understanding as you sit here right now.

5    I'm not asking about your understanding on May 10th.

6        A    Oh, okay.

7        Q    I'm asking you questions about as you

8    understand it right now and that can include documents

9    you're seen today in forming your decision or otherwise

10   information you've learned since you left UConn.

11          But as as you sit here right now today, is

12   it your understanding that you went out on FMLA while

13   the PTR process was underway and wasn't fully

14   completed?

15       A    Yes.

16       Q    And as you sit here today, is it your

17   understanding that you remained on FMLA up until the

18   day that you resigned on May 10th, 2023?

19       A    Was I FMLA till May 12th?

20       Q    I'm sorry.

21       A    Yes.

22       Q    Till May of 2023?

23       A    Yes.

24       Q    And as you sit here today, is it your

25   understanding right now that you resigned before the

1    PTR process got to be completed?

2        A    I resigned because that was no way I was

3    going to have a fair PTR process.

4        Q    I'm not asking why you resigned.  I'm just

5    asking it's fair to say you resigned before the PTR

6    process was completed, as you sit here today based on

7    your understanding?

8        A    I don't know how to answer that.  I felt like

9    I was finished before I started.  I feel like I was set

10   up to fail.  I don't know how to answer that.

11       Q    I'm not asking how you felt.  It's really

12   just a factual either you did or you didn't.

13       A    Okay.

14       Q    Is it your understanding as you sit here

15   today that you resigned from your position from UConn

16   before the PTR process was completed?

17       A    I don't know.  I feel like answering that is

18   bad.  Should I answer that in a way that -- I don't

19   know how to answer that.

20       Q    You either did or you didn't.

21       A    Well, I resigned, yes.

22       Q    You resigned -- and you agree that -- you

23   agree that the PTR process wasn't completed when you

24   resigned based on documents you saw today?

25       A    Yeah.  Based on what I saw today, sure.

1    Q    So you resigned before the PTR process was

2  completed?  Is there any other way to interpret that?

3    A    I resigned because I was entitled to an

4  objective and independent evaluation, and I was not

5  going to have one.

6    Q    Yup.  I'm not asking you why you resigned.

7  I'm asking --

8    A    You already asked me and I answered it so it

9  feels antagonistic at this point, you know.

10   Q    I'm not trying to be --

11   A    I know.  I know, but I answered already.

12   Q    Just to follow up on something you just said

13 a moment ago --

14   A    Okay.

15   Q    -- you said you felt like the process was

16 done, the PTR process --

17   A    Well.

18   Q    -- and that the decision was made?

19   A    It wasn't a feeling.  It was.  I didn't have

20 that document that you just showed me so I had no idea

21 where I was in the process, and then once I realized

22 that Laura was going off script, I was like well, if

23 she's throwing the rules out the window, then how do I

24 know -- it's called procedural justice, right, which

25 you know as a lawyer, right?  Like if the process is

1  not be carried out the same way for everybody, then I

2  sensed I was being treated unfairly so, yeah.

3      Q    But as you sit here today, you don't know

4  whether the dean's council or Jason would have decided

5  to reappoint you or not?

6      A    Jason wasn't communicating with me, so I had

7  no understanding of where his head was at at all at

8  that point.  I tried to get a sense of where he was,

9  but he would not respond to me.

10     Q    Right.  But the point I'm getting at is there

11 were those other parts of the process remaining, of the

12 PTR process?

13     A    Uh-huh.  I was misinformed about them, so I

14 can't speak to like whether or not -- like it's hard to

15 -- I had an information asymmetry at the time, so it's

16 hard to sort of understand.  Do you see what I'm

17 saying?  Like I'm trying to respond to the best of my

18 ability given that.

19     Q    But right here right now you don't know --

20 let's imagine hypothetically --

21     A    I can't imagine that.

22     Q    Well, it's a deposition.  I can ask

23 hypothetical questions.

24     A    You can.  I just can't imagine it because I

25 wasn't being treated fairly so I can't imagine being

1    treated fairly at UConn, you know.  That's it.

2        Q    But what I was going to ask is if

3    hypothetically you hadn't resigned in May of 2023 --

4        A    Uh-huh.

5        Q    -- and if the PTR process had continued to

6    the other steps, you don't know definitively what those

7    additional decisions would have been?

8        A    The reason I don't know though is because I

9    so severely like -- like I was seeing a therapist at

10   the time that literally told me I could not come back.

11   You know, that's pretty much what happened.  She's like

12   it's either you or this job, so I chose myself.

13       Q    Tell me more about that.  Why did the

14   therapist say that?

15       A    I was having trouble getting on the train in

16   the morning.  Once the woman got into the car accident,

17   she e-mailed Laura about it, Laura ignored the e-mail,

18   I was scared.  I was scared for me.  I was scared for

19   them, and I just didn't know what else to do other than

20   just -- and I just got my book contract.  I didn't want

21   to ruin my opportunity.  Like I just had to go.  Like I

22   just had to save myself.

23       Q    I'm just looking at the complaint.

24       A    It was hard by the way.  It sucked having to

25   leave my job, so I really wish I didn't have to do it.

1  I really wouldn't have done it unless I thought it was

2  absolutely necessary.  I'm a cashier now as you know.

3  So it is what it is, you know.

4        Q    We're going to look at Exhibit 3, paragraph

5  51, and I understand that you were just explaining that

6  you didn't understand the process at the time and maybe

7  you didn't understand the process at the time of

8  filing this complaint, but just to sort of set the

9  record straight, where it says, "The decision not to

10 reappoint the plaintiff was finalized only after," fair

11 to say as you sit here --

12        A    I think they're finalized by Laura Burton.

13        Q    That's what you meant?

14        A    Yeah.

15        Q    I see.

16        A    Because her decision was final as was the

17 committee's even if the dean hadn't come to it yet, and

18 if you get to two out of three rungs and they're not

19 recommending you, the likelihood of the dean doing it,

20 it's not going to happen so.

21        Q    Well, two out of four, you said there's the

22 dean's council and the dean, right?

23        A    Well, I'm hedging my bets.  It's looking like

24 it's not happening if those two stages are negative for

25 me, but those were finalized, and they were sent to me

1    after I informed everybody.

2              That should say Burton and Cobb and Irizarry.

3         Q    Oh, in reference to paragraph 51 of the

4    complaint?

5         A    Yeah.

6         Q    But it hadn't gotten to Irizarry yet for his

7    decision?

8         A    I don't know.

9         Q    And then --

10        A    I only say I don't know because he's clearly

11   been talking about my performance elsewhere, but I

12   didn't know.

13        Q    That Jason was?

14        A    It seems so if he came out of nowhere with an

15   HR complaint against me because otherwise I hadn't

16   spoken to him all semester, so he must have been

17   discussing my performance with somebody and conduct.

18        Q    He had an HR complaint against you?

19        A    So in the complaint that HR sent to me it

20   said they were investigating my conduct and

21   performance, and so I hadn't spoken with him directly.

22   So I'm guessing he's had conversations with other

23   people about my conduct and performance.

24        Q    I see.  You're talking about the factfinding

25   investigation?

```
1               MR. KONOWE:  All right.  What time is it

2    right now?

3               THE COURT REPORTER:  It is 12:41.

4               MR. KONOWE:  So we'll come back at five

5    of.

6               MR. BUCCI:  Come back at one.

7

8                    (Off the record from approximately

9                     12:41 p.m. to 1:04 p.m.)

10

11              MR. KONOWE:  We're back on the record

12   after a break.  The time is 1:04 p.m.

13   BY MR. KONOWE:

14       Q    So just to follow up regarding the

15   investigation, you were never disciplined as a result

16   of the factfinding that was noticed, correct?

17       A    I think I would have had to go through with

18   it to see what the outcome would have been, yeah.

19       Q    And you never received any suspension from

20   UConn?

21       A    No, I didn't receive a suspension from them.

22   No.

23       Q    Or otherwise any discipline from UConn,

24   correct?

25       A    Well, according to its own policy, what Jason
```

1   did to me was a form of retaliation, but other that

2   that --

3       Q    I'm not asking about retaliation.  I'm asking

4   about any discipline.

5            Did you ever receive any --

6       A    Oh, well, I guess retaliation isn't a form of

7   discipline so no.

8       Q    Well, the question I'm asking is if you

9   received any formal discipline?

10      A    Uh-uh.  No.

11      Q    And just to circle back, earlier in the day

12  there was some discussion about travel and payment in

13  another department that had offered you -- you

14  mentioned about another department that was offering

15  for you to have an overnight stay paid for?

16      A    Yeah.

17      Q    It was just for one night; is that correct?

18      A    Just for one night.

19      Q    Was it for an ongoing basis?

20      A    If was for -- they asked for my consulting

21  help at a meeting.

22      Q    And just circling back to the department PTR

23  decision that had the signatures on it.

24            MR. BUCCI:  18 I believe.

25            MR. KONOWE:  Thanks very much.

1  that she was retaliating against you for the e-mail

2  about OIE?

3      A    No.  My claim was that I was being

4  investigated for reporting Casey for -- because I was

5  asked -- I was basically being accused of the same

6  thing I just told them Casey did, so.

7      Q    Have you heard of a terminal year

8  appointment?

9      A    Yeah, I heard of it.

10     Q    What is that?

11     A    It's basically when you -- like if you're not

12 reappointed, you have another year to stay on.  That

13 wasn't possible for me though.  It was very serious

14 what happened to me physically in terms of my health.

15 Like I was literally experiencing physical symptoms of

16 anxiety.  Like it was not possible for me to stay and

17 also a terminal year -- I mean that's the long and

18 short of it.  It was not possible for me to stay.

19     Q    For medical reasons?

20     A    Yeah.  I mean it wasn't getting better, and

21 also what I saw was that they were willing to break the

22 rules in order to get me out of there, so I didn't

23 really trust that they would follow the rules in terms

24 of keeping me there longer.

25     Q    There's one detail I'm curious about.

1           Your FMLA ended.  If it was a medical reason

2   that you couldn't stay there, could you have renewed

3   your FMLA?

4       A    I'm not sure.  Not and been paid I believe.

5   I think it was the paid element of it that would have

6   run out, to my understanding.

7       Q    Were you getting paid when you weren't on

8   that FMLA leave --

9       A    Yes.

10      Q    -- that we discussed earlier?

11      A    Uh-huh.

12      Q    Are you aware of any evidence or facts that

13  would suggest UConn would not have offered you a

14  terminal year appointment had the PTR process still

15  finished and ultimately led to you not being

16  reappointed?

17      A    I just think that whenever I noticed that

18  people are willing to break the rules in order to

19  achieve something, like once the means to an end are

20  not on the table anymore, like they're not aboveboard,

21  that to me is just -- like that's a gray area.  I can't

22  see what's coming at all.

23           You know, like I could look at a form and say

24  I know they have to do XYZ and follow a procedure this

25  way and they had done it, I would have been able to

1    trust them moving forward, but because I never got that

2    timeline because Laura had told me she would send me a

3    letter, did not send it until right before I went on

4    FMLA because the PTR committee had recommended that I

5    also not be reappointed and because that happened right

6    after the situation with my student's car accident, I

7    did not have good faith that moving forward I would

8    have been able to stay.  I mean if they're willing to

9    break one rule, I don't see why they wouldn't break

10   another.

11        Q    Any other facts other than what you just

12   mentioned, anything else as far as evidence suggesting

13   UConn would not have offered you a terminal year

14   appointment?

15        A    Just breaking the rules already, not

16   following their own procedure to that point.

17        Q    Anything else?

18        A    I think that's enough evidence for me

19   honestly.

20        Q    Your complaint includes allegations of

21   unequal pay; do you remember?

22        A    I do remember that.

23        Q    And you allege that you were paid

24   substantially less than Dr. Freidus and Dr. Chen?

25        A    I did.

1    Q    As far as Dr. Freidus, are you aware of
2  whether -- and that's Alex Freidus, right?
3    A    Yes.
4    Q    And it's okay with you if I say Alex Freidus
5  or Dr. Freidus?
6    A    Yeah.
7    Q    Same person?
8    A    Yes.
9    Q    Are you aware of whether Alex Freidus was a
10 faculty member at any school before UConn?
11   A    She was.
12   Q    At what school?
13   A    I don't know.  I just know that that's why
14 Jason told me that she was going -- well, actually when
15 I was hired, he told me all APs are brought in at the
16 same rate, and then after he explained to me it was
17 because she's been a faculty member at another school
18 that she was actually brought in a little -- but I
19 didn't find out about that until after I signed the
20 contract.
21   Q    Do you know how long she was at the other
22 school?
23   A    No, and I really don't care.  The point is
24 she wasn't -- we had the job responsibilities and we
25 weren't being paid the same and I had more actually

1  once I realized it was my job to actually redesign the

2  doctoral curriculum on Organizational Learning.  She

3  didn't have that responsibility, to my knowledge.

4       Q    Would you have knowledge about everything

5  that Alex was doing other than teaching classes?

6       A    Honestly, I cared less about what Alex was

7  doing and more about what I was doing that wasn't on my

8  job description.  So the fact she and I were hired for

9  the same position and seemingly doing the same work

10  that I was also being tasked with the redesign of the

11  Organizational Learning Department.  That's where it

12  started south with me in terms of comparison to Alex

13  that she had the extra load, then yes.  Then if no,

14  that's it.  That was it.  That's all I could see.

15       Q    Do you know how many classes Alex taught

16  during the time you were at UConn together?

17       A    I don't.  I just know what topics briefly.

18       Q    And just confirming, I believe you said

19  this earlier but just to double check, before you

20  started at UConn, you were not a full-time faculty

21  anywhere else?

22       A    Uh-uh.  I was not, but I was hired for the

23  same position as Alex, so they thought we were

24  qualified, I was qualified I think.

25       Q    Do you know how much -- do you know what

1  Alex's salary is?

2       A    Now I do after that spreadsheet and after the

3  offer letters.  Uh-huh.

4                 MR. KONOWE:  This will be -- what are we

5  up to?

6                 THE COURT REPORTER:  20.

7                 MR. KONOWE:  20.

8

9                    (Defendant's Exhibit 20, Offer

10                    letter to Alexandra Freidus, was

11                    marked for identification.)

12

13  BY MR. KONOWE:

14       Q    Showing you what's been marked as Exhibit 20

15  is this a document you've seen before?

16       A    Yes.

17       Q    And in the table the full-time annual salary

18  is?

19       A    $82,500.

20       Q    And yours was?

21       A    $78,000.

22       Q    And would you consider that substantially

23  more than yours?

24       A    Since we have the same job description, yes,

25  and I was being asked to fulfill more responsibilities

1    than what that description entailed.

2        Q    When you say you were asked to fulfill more

3    job responsibilities, as far as Alex goes, did you

4    assign Alex any work?

5        A    Talking about what was on our job description

6    in terms of like the content we were assigned to teach

7    like that was about educational policy and management

8    and leadership, the classes Alex actually was teaching;

9    whereas, I was tasked with redesigning the workplace

10   learning class for Ph.D.s.

11             At one point that masters class I had to

12   redesign as well because they weren't offering it

13   before I was there so that's what I mean.

14       Q    But fair to say you don't know what else Alex

15   was doing?

16       A    I know she wasn't redesigning doctoral-level

17   curriculum for a subject matter that no one else in the

18   department had expertise in.

19       Q    But you don't know what else she was doing?

20       A    All I know is we were paid differently and I

21   was doing what work I was doing versus what she was

22   doing.  I think this also mattered to me because we

23   were in the same department and Chen, for instance, was

24   paid the same amount as me, but Chen is in a department

25   that enables him to teach summer courses without having

1    to redesign them.  So that additional summer

2    compensation, he had more opportunity for that.

3            Basically what the difference is between me

4    and Alex's salary is what in theory I could have made

5    if I actually had the opportunity to make a summer

6    salary through teaching summer courses, but I didn't,

7    and there was no way for me to recoup that.

8        Q    We're all set with that exhibit.

9        A    (Handed.)

10       Q    Thank you.

11            In your complaint you talked about Chen Chen,

12   right?

13       A    Uh-huh.  For the same reasons I just

14   mentioned, yes.

15                MR. KONOWE:  This will be 21.

16

17                    (Defendant's Exhibit 21, Chen

18                     Chen's salary information, was

19                     marked for identification.)

20

21   BY MR. KONOWE:

22       Q    Showing you Exhibit 21, have you seen this

23   document before?

24       A    I have.

25       Q    Is this Chen Chen's salary information?

1          A     Looks so.

2          Q     And this was the same as yours?

3          A     Yes.  Well, the price was, the amount of it

4     was, yes.

5          Q     At least the start was, right?

6          A     Uh-huh.

7          Q     And then if we go to the last page of this

8     exhibit, is there an indication that Chen Chen got a

9     merit increase?

10          A     Looks so.

11          Q     Did you get a merit increase?

12          A     I applied but I didn't get one.

13          Q     Okay.

14          A     I applied because I was doing departmental

15     research and redesigning the doctoral-level classes,

16     but they didn't see that as extra even though it wasn't

17     on my job description.

18          Q     Do you know what Chen Chen was doing other

19     than teaching courses?

20          A     That process is so covert like honestly even

21     Kenny at one point told me like he -- it's

22     uncomfortable basically shooting in the dark.  You

23     don't really have much information about your

24     colleagues in terms of comparative reference but.  I do

25     know he was able to teach summer classes and I wasn't

```
 1   because sports management has those.

 2        Q    Chen Chen was in sports management?

 3        A    Uh-huh.  So not even the same department, but

 4   we were hired at the same salary level.

 5        Q    Did you have the same supervisor?

 6        A    I believe Laura, yeah, because she's in

 7   sports management because she happens to be not a

 8   supervisor but probably -- like she's a professor in

 9   sports management, so.

10        Q    Who was Alex Freidus's supervisor?

11        A    Laura.

12        Q    I'm just going to have you look at the

13   complaint one more time, but maybe not one more time as

14   in it may not be the last time --

15        A    I get it.

16        Q    -- but one additional time for now.

17             Turn to paragraph 7 please.

18        A    Uh-huh.

19        Q    It's referencing somebody, but it doesn't

20   give a name.

21        A    Okay.

22        Q    Who is that talking about?

23        A    I think the one -- wait.  The one nonblack is

24   probably Chen Chen and one nonblack Hispanic, I found

25   out Alex Freidus is apparently Hispanic, through this
```

```
1    process.  I say "apparently," because she was never at
2    any of the faculty of color meetings, and because I
3    kept asking them why -- like I don't understand why
4    they wouldn't ask Alex to teach the course they were
5    giving me especially because she's a woman of color
6    apparently, so that's how I found that out.
7        Q    Okay.
8        A    Yeah.
9        Q    So just to be clear, part of what I'm doing
10   is trying to understand the basis of all your claims so
11   I just didn't know if there were additional people
12   other than who we talked about there.
13            Paragraph 67 is talking about Chen Chen and
14   Chen Chen's salary information, right?
15       A    Yes.
16       Q    And then you probably see where I'm going
17   with this, paragraph 68.
18       A    That -- oh, gosh, what was his name?  I
19   cannot even remember that guy's name.  If I saw the
20   spreadsheet I could remember his name.  What was that
21   guy's name?  I wouldn't know because he was part-time
22   faculty.  It really -- I didn't see him that often.  He
23   was still getting paid more than me so I don't know.  I
24   really don't remember his name, but if I look at the --
25   if the spreadsheet in here somewhere, I could tell
```

1   you.

2       Q    I think it might be included as an exhibit.

3       A    Here it is.  McCready, Adam McCready,

4   nontenure track.

5       Q    And so Adam was part time?

6       A    To my knowledge, he's nontenure track is what

7   that means, yeah.

8       Q    And when you say fewer credentials than you,

9   what were his credentials?

10      A    I remember looking at his resume.  It was a

11  long time ago, but I have four degrees and

12  comparatively I was -- I taught before that.  I might

13  not have been at another university, but definitely had

14  more credentials or the same credentials as everybody

15  that I'm mentioning right now.

16      Q    Did Adam start at UConn at the same time as

17  you?

18      A    I don't know when Adam started.  I just

19  understood that there was something going on with the

20  pay, and that I was a full-time professor making way

21  less than he was.

22      Q    Where was Adam before UConn?

23      A    Don't know.

24      Q    Did he have a faculty job before UConn even

25  if you don't know where?

1    A    Literally I've never spoken to Adam

2  one-on-one, maybe briefly at a staff meeting.  The most

3  I knew about him was his pay information when I saw

4  this spreadsheet, to be honest with you.

5    Q    Okay.

6    A    And I just want to reiterate that the issue

7  was really when I asked Jason explicitly, he told me we

8  would all brought in at the same level before I signed

9  my contract.  Like he actually said that to me.

10    Q    There's allegations about Casey Cobb and

11  Casey getting paid more than you, but we talked earlier

12  Casey was -- you agree, he was an endowed -- was and is

13  an endowed professor?

14    A    Uh-huh.

15    Q    He wasn't a brand new assistant professor?

16    A    He wasn't.

17    Q    Okay.  So I'm just trying to understand the

18  basis of the unequal pay claim as it relates to Casey

19  Cobb because it's a different situation --

20    A    I think effectively UConn hired me to do more

21  work than it could afford to pay me for is what I think

22  because in this instance, for example, typically an

23  assistant professor is not charged with remaking a

24  doctoral-level curriculum or a doctoral-level class.

25  Like that's just completely outside the purview of a

1                        **CERTIFICATION**

2     I, ANNETTE F. BROWN, LSR and Notary Public within and
      for the State of Connecticut, do hereby certify that I
3     took the deposition of TIFFANY BROWN, Ph.D., on October
      30, 2024.
4
      I further certify that the above-named deponent was by
5     me duly sworn to testify to the truth, the whole truth
      and nothing but the truth concerning his/her knowledge
6     in the matter of the case of Brown v. University of
      Connecticut.
7
      I further certify that the testimony was taken by me
8     stenographically and reduced to typewritten form under
      my direction by means of COMPUTER ASSISTED
9     TRANSCRIPTION; and I further certify that said
      deposition is a true record of the testimony given by
10    said witness.

11    I further certify that I am neither counsel for,
      related to, nor employed by any of the parties to the
12    action in which this deposition was taken; and further,
      that I am not a relative or employee of any attorney or
13    counsel employed by the parties hereto, nor financially
      or otherwise interested in the outcome of the action.
14
      I WITNESS my hand and my seal this 11th day of
15    November, 2024.

16

17

18

19

20

21

22    Annette Brown, LSR No. 00009
23    Notary Public
      My Commission Expires:
24    November 30, 2024

25

# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


TIFFANY A. BROWN            :
        Plaintiff           :    CIVIL NO. 3:23-cv-01488-VAB
                            :
VS                          :
                            :
UNIVERSITY OF CONNECTICUT   :
                            :    JANUARY 15, 2025
        Defendants          :


REMOTE DEPOSITION OF LAURA BURTON


A P P E A R A N C E S :


        WILLINGER WILLINGER & BUCCI, P.C.
        Attorneys at Law
           1000 Bridgeport Avenue, Suite 501
           Shelton, Connecticut  06484
        BY:  THOMAS W. BUCCI, ESQ.

                    For the Plaintiff


        OFFICE OF THE ATTORNEY GENERAL
        Assistant Attorney General
           165 Capitol Avenue
           Hartford, Connecticut  06106
        BY:  MATTHEW KONOWE, ESQ.

                    For the Defendant


Also Present:  Attorney kelly Banister, In-House Counsel


                Ruth E. Prescott
        COMPUTER REPORTING SERVICE, LLC
               1 Grandview Terrace
        North Haven, Connecticut  06473-2043
               (203) 234-1144
               (203) 234-0046 Fax

1          Deposition of LAURA BURTON, a witness in the

2     above-entitled action, taken at the request of the Plaintiff

3     pursuant to Rule 26 of the Federal Rules of Civil Procedure

4     before Ruth E. Prescott, a Notary Public within and for the

5     State of Connecticut, commencing at 10:00 a.m.  The witness

6     provided testimony from University of Connecticut, Gentry

7     Building, 292 Glenbrook Road, Unit 3093, Storrs,

8     Connecticut.

9

10                        *  *  *  *  *

11

12                       STIPULATIONS

13

14          It was stipulated by and between counsel for the

15     parties that the requirements of notice of the taking of the

16     deposition have been complied; that proof of the

17     qualifications of the Notary Public before whom the

18     deposition is taken has been waived; that objections, except

19     as to matter of form, be reserved to the time of trial; and

20     that the deponent shall read the deposition transcript and

21     sign the original signature page before a Notary Public.  If

22     the transcript remains unsigned 30 days after delivery to

23     counsel for the deponent, signature shall be deemed waived.

24

25                        *  *  *  *  *

1          THE STENOGRAPHER:  My name is Ruth Prescott.

2     I am with Computer Reporting Service and I am the

3     court stenographer for this proceeding.  Counsel,

4     kindly introduce yourselves by stating your name,

5     who you represent and your agreement to the usual

6     stipulations including your agreement to proceed

7     with this deposition remotely.

8          MR. BUCCI:  Thomas Bucci representing the

9     Plaintiff, Tiffany Brown and I agree to the usual

10    stipulations as well as proceeding remotely.

11         MR. KONOWE:  Good morning.  Matt Konowe,

12    assistant attorney general.  I'm counsel for the

13    Defendant, University of Connecticut.  I agree to

14    proceeding with the remote deposition today and to

15    the usual stipulations and we'll read and sign.

16         THE STENOGRAPHER:  Ms. Burton, if you could

17    please state your full name and the location where

18    you are providing testimony for the record.

19         THE WITNESS:  Yes, Laura Burton.  I'm

20    providing testimony in my office in the Gentry

21    Building at the University of Connecticut.  It's

22    292 Glenbrook Road in Storrs, Connecticut.

23         THE STENOGRAPHER:  Thank you very much.  I'm

24    going to administer the oath so if you would raise

25    your right hand please.

1       Q    And who is your employer?

2       A    The University of Connecticut.

3       Q    And how long have you been employed by the

4    University of Connecticut?

5       A    Almost 20 years.

6       Q    What is your current position at the University of

7    Connecticut?

8       A    I'm a professor in sport management and department

9    head in educational leadership at the Neag School of

10   Education.

11      Q    And how long have you been a department head at

12   the school of education?

13      A    Five and a half years I believe.

14      Q    And if you would just give an outline of your

15   educational background for the record.

16      A    I have a Bachelor of Science in biology, a Master

17   of Science in physical education with a concentration in

18   athletic training and a Ph.D. in the social science of

19   sport.

20      Q    Doctor, do you have the exhibits that I will be

21   referring to?

22      A    I do not have access to them.

23           MR. KONOWE:  Yeah, I'm sorry to interrupt.  I

24           wasn't sure if you were going to screen share them

25           or what your process was going to be.

1   phone today on this and she recommended I meet with you to

2   talk further about why I can't teach this class in the Fall.

3   I'm going to ask that we have that follow-up conversation

4   once I've had a chance to gather more resources about how to

5   advocate for myself, which I began doing this week.  But in

6   the meantime I will mention a few reasons this teaching

7   assignment seems unfair to me."  So was this Dr. Brown's

8   first year in teaching at UConn?

9        A    Yes, it would have been.

10       Q    And she points out in the email her being assigned

11  certain courses in which she basically claims not to have

12  the competency for teaching those subject areas.  Do you

13  recall this discussion at all?

14       A    I do recall this discussion.

15       Q    You do?

16       A    Yes.

17       Q    And was she communicating with you about being

18  assigned social justice courses?

19       A    Yes, I asked her to consider teaching the social

20  justice leadership course.

21       Q    And she expressed a concern to you about that?

22       A    Yes, first expressed a concern about when the

23  class was scheduled and then expressed the concern she has

24  in this email.

25       Q    She seemed to indicate that the selection of her

1    to teach this course or the offer to teach this course was

2    because of her color.  Did you ever address that with her?

3          A    Can you clarify the question?

4          Q    Well, she seems to indicate that the teaching of

5    the course -- that she was asked to teach the course because

6    of her color being African American and that for some reason

7    that would make her qualified to teach this course even

8    though she had no background in teaching of these courses.

9    Did she express that concern to you?

10         A    She expressed it here but that was not why she was

11   asked to teach that course.

12         Q    Why was she asked to teach that course?

13         A    Because she has content knowledge around issues of

14   social justice within her dissertation as listed in her CV

15   so I asked her if she would consider teaching that course

16   because of content knowledge that she has within her

17   dissertation and within her CV.

18         Q    Did she explain to you that there were other

19   qualified faculty -- that there were faculty more qualified

20   than her who would be able to teach that course?

21         A    There are several faculty that could teach that

22   course but there's also an assignment of different courses

23   for other faculty for other areas of expertise so we

24   distribute courses based on faculty availability and content

25   knowledge.

```
 1          Q     Was she assigned to teach that course?

 2          A     No.

 3          Q     So who was given the course to teach if you

 4     recall?

 5          A     If I recall, we hired an adjunct to teach the

 6     course but I'd have to check that to remember or we may have

 7     switched the timing of the offering of that course.

 8          Q     On February 23rd on the next page at the bottom it

 9     says TB 000213, an email from Dr. Brown to you in which it

10     says, "Can we talk through this email sometime today?  I can

11     give you a call at a time that works for you."  Do you

12     recall responding to Dr. Brown?  I know it's almost three

13     years later.

14          A     I'm confused.  Was it in regard to the email above

15     from Jason that she's referencing?

16          Q     Jason writes to her, "Thank you for sharing your

17     concerns, Tiffany.  I think further conversation would be

18     helpful to address the issues you raise below.  Can you

19     please share some potential meeting times that work for

20     you."  And she writes to you -- actually, her email to you

21     was the day before.  Dr. Irizarry writes to her on

22     February 24th, this email from the 23rd is her reaching out

23     to you to speak to you.

24          A     I can't recall the order of those conversations.

25     I do recall having a conversation with Dr. Brown and Dean
```

1    committee?

2        A    We elect three members each year to represent the

3    merit review and they're tenure track faculty.

4        Q    And you said they're elected.  Who votes on them?

5        A    The tenure tract faculty in the department.

6        Q    Do you recall who was on that review committee in

7    2022?

8        A    It probably states it somewhere in the letter.

9        Q    The letter is from you dated June 23, 2022.  "I

10    have completed the department merit review process.  Based

11    on the recommendations provided to me by the merit review

12    committee and my own review of your materials you were not

13    recommended for a merit award."  So that was a decision by

14    you and the merit review committee?

15        A    Yes.

16        Q    And on the committee is Casey Cobb, Jennie McGarry

17    and Jennie Weiner?

18        A    Yes.

19        Q    Do you recall, were there any other professors in

20    the department who were not awarded merit?

21        A    It's a voluntary process so there could have been

22    faculty that did not submit materials for merit.  It's not a

23    requirement so there were, if I recall, probably two others

24    that did not receive merit but that's just my recollection.

25        Q    Do you recall any of these specific reasons that

1    Dr. Brown was not awarded merit?

2         A    I recall it was deemed that she hadn't done

3    anything that warranted meritorious achievement based on our

4    departmental criteria.

5         Q    Had she in the view of the committee done anything

6    that instead of deserved merit that diminished her chances

7    for merit?

8         A    That's not how we evaluate.  We're looking for

9    meritorious achievement.

10        Q    I noticed on the committee Dr. Jennie Weiner and

11   if you recall in Exhibit 2 she was the one apologizing in

12   December of 2021 for disrespecting Dr. Brown.  Did she at

13   any time mention that during the committee ratings?

14        A    That's not a part of the committee process.

15        Q    But would there be a question of her being biased

16   and having admitted to disrespecting Dr. Brown?

17             MR. KONOWE:  Objection to form.  You can

18             answer.

19        A    Well, I would say that that's why we have three

20   members of the committee making those decisions.

21        Q    You don't recall whether Dr. Weiner recused

22   herself?

23        A    I don't.

24        Q    If we look at Exhibit 18, this has to do with a

25   student evaluation of teachings for the spring semester

```
 1              go to Exhibit 22 if I could ask for a quick break
 2              this time?
 3                   MR. BUCCI:  Go ahead.
 4                   MR. KONOWE:  I just need like five minutes or
 5              we can maybe come back at 12:20.  Is that all
 6              right with everybody?
 7                   MR. BUCCI:  That's fine.
 8                   MR. KONOWE:  All right, thanks.
 9                   (A brief recess was taken.)
10  BY MR. BUCCI:
11       Q    Doctor, if you recall, you emailed -- Exhibit 21
12  is a copy of an email that you sent to Tiffany scheduling
13  the PTR review and she's informing you that you'll -- she'll
14  share your PTR letter with her prior to the meeting and
15  there's a Microsoft Teams meeting invite that was sent to
16  her.
17       A    Yes.
18       Q    And did you meet with her remotely if you recall?
19       A    Yes, I must have, yes.
20       Q    And did you share your letter with her prior to
21  the meeting?
22       A    I did not because there was a delay with the
23  letter from the department PTR committee so I hadn't written
24  my letter yet.
25       Q    Do you know why there was a delay in the PTR
```

1    letter?

2         A    I believe they had asked Dr. Brown to resubmit her

3    PTR form and also at that point one member of the

4    committee's father had been in Hospice and then subsequently

5    had passed away and another committee member's husband was

6    in the end stages of cancer and unfortunately lost that

7    battle the following spring so I think there was both a

8    delay for Dr. Brown and members of the committee had some

9    significant issues with their family.

10        Q    Jumping ahead to Exhibit 39 that I didn't mail out

11   this morning, I noticed there was an omission, and it's the

12   form that was prepared by Dr. Brown as part of the

13   promotion, tenure, and reappointment process and it says

14   date of hire August 23, 2021; date of tenure would be fall

15   of 2027.  Would that have been the anticipated date of

16   eligibility for tenure?

17        A    Yes, I believe so.

18        Q    And is a review done every year leading up to the

19   2027 date?

20        A    Yes.

21        Q    And there's instructions that are given in the

22   table of contents, what has to be submitted, the present

23   rank, educational background, teaching.  There's one

24   question on the seventh page of the form.  "The narrative on

25   teaching should include a teaching philosophy, goals

```
 1    relative to your instructional responsibilities, and any
 2    activities you have undertaken to enhance your teaching."
 3    Dr. Brown writes, "I don't think I've been teaching long
 4    enough to have developed a teaching philosophy.  Especially
 5    since something I learned this year is that my teaching
 6    style will be perceived and received differently depending
 7    on the demographic composition of the institution I am
 8    working in.  I'm just not a "blank slate" in that way that
 9    some of my peers are assumed to "look like" or "be
10    qualified" for the professoriate.  I am also thinking
11    differently about what my teaching philosophy looks like in
12    an environment which I perceive there to be a few social,
13    institutional, or organizational supports for the unique
14    challenges faculty of color experience in the classroom.
15    This shift in my thinking was necessary in response to the
16    realization that efforts to develop teaching supports for
17    faculty of color in the center for teaching and learning do
18    not appear to be currently led by people of color."  Do you
19    recall reading this when you were reviewing Dr. Brown's
20    eligibility for tenure?
21         A    Yes.
22         Q    Did you discuss it with her in your conference
23    that you had with her?
24         A    Discuss what?
25         Q    This topic of what -- her concern that she's in an
```

```
 1    institution that doesn't have supports to support faculty of
 2    color in the Center of Teaching and Learning and do not
 3    appear to be currently led by people of color.  She says
 4    here, I am thinking differently about what my teaching
 5    philosophy looks like in an environment in which I perceive
 6    there to be few social, institutional, or organizational
 7    supports.  Did you discuss that with her?  Did you tell her
 8    that she's wrong, that she's misconceiving the support that
 9    UConn gives its professors regardless of their color?
10         A    I don't recall ever saying that I perceived that
11    she was wrong.  I know that CETL -- they're not led by
12    people of color, do have supports including some external
13    supports for faculty of color development so those supports
14    are in place.  We do also have other faculty of color within
15    the department that she's been working with.
16         Q    So did you directly rebut Dr. Brown's perception
17    and try to clarify her perception?
18         A    In our meeting around her PTR process, no.
19         Q    In your opinion would this look -- these comments,
20    would this be looked upon favorably by the PTR committee?
21         A    These comments aren't a part of the teaching
22    philosophy per se.  I can't speculate on the favorability or
23    unfavorability.
24         Q    So her -- I'm going to call it her essay on this
25    topic seems to be highly critical of the University and of
```

1    submits it and then it goes through various reviews.

2    Doctor, could you hear me?

3        A    I'm sorry, I think you froze.

4                (A brief recess was taken due to technical

5                difficulties.)

6    BY MR. BUCCI:

7        Q    Doctor, on November 10, 2022 your signature

8    appears on the full form on page 21.  And it says my

9    internet connection is unstable and I hope I'm not going to

10   lose you, but that's your signature, Doctor?

11       A    That's correct.

12                (A brief recess was taken due to technical

13                difficulties.)

14   BY MR. BUCCI:

15       Q    All right, so Doctor, what I was asking is at the

16   end of the document is your recommendation which is dated

17   November 10, 2022 and your recommendation is that she is not

18   performing as expected, therefore, I do not recommend

19   appointment.  Was there any particular aspect where she was

20   not performing as expected?

21       A    Yes.

22       Q    What areas were those?

23       A    Research and teaching predominantly.

24       Q    Okay, when you say research where was she failing

25   in her research?

1          A     Dr. Brown was afforded three course releases and

2     so only taught one course during her first year as a faculty

3     member, and in lieu of that time there should be an emphasis

4     in developing her research and submitting manuscripts for

5     publication and making progress from a research perspective

6     and that wasn't evident.  And then in teaching in the one

7     course obviously as we've seen was not performing as

8     aspected relative to her peers.

9          Q     Well, you say as we've seen.  We saw some student

10     complaints which she vigorously rebutted.

11          A     That's not what I'm referring to.  I'm referring

12     to the student evaluation of teaching.

13          Q     Is the student evaluation of teaching a

14     significant factor in a rating as to whether the teacher

15     should be tenured?

16          A     It's a part of.

17          Q     A group dynamic of students complaining would

18     weigh significantly in that decision?

19          A     The student complaints weren't included in the

20     evaluation.

21          Q     So based upon research and basically student

22     ratings it was your opinion she did not -- she should not be

23     reappointed?

24          A     Correct.

25          Q     Was your decision based upon her criticisms of the

```
1      University about the way she felt teachers of color were not

2      being supported?

3          A     No.

4          Q     Did her race enter into your decision?

5          A     Never.

6          Q     Was her complaints about being subject to

7      discrimination enter into your decision?

8          A     No.

9          Q     Did you ever meet with Dr. Brown and caution her

10     that she was -- that her research was not meeting

11     expectations?

12         A     I recall during the PTR meeting that you were

13     referencing that I had scheduled we discussed that the

14     manuscript submitted should be revised and be moving forward

15     toward tenure and that wasn't what was happening.

16         Q     But prior to the PTR meeting was there any

17     indication to give it to her that there was failure in her

18     research aspect of the tenure process?

19         A     This would have been the appropriate place to

20     provide that feedback because that's when I received that

21     information.

22         Q     Well, if you meet with her in October and the

23     decision is made within a month to deny her tenure there's

24     not much time to correct that, is there?

25         A     Well, Dr. Brown was afforded the opportunity to
```

1    know what the standards are for a tenure track position.  In

2    the faculty orientation, the orientation for new faculty

3    they talk about the PTR process and expectations and the

4    Neag roles and responsibilities, the PTR process and the

5    expectations so there's multiple places including in the

6    first PTR process when she was here in the first month to

7    talk through what these expectations are.

8        Q   So she's given an opportunity by the committee on

9    October 10th to submit an addendum and that's Exhibit 23 and

10    she expresses her appreciation for doing that.  She explains

11    that I would also like to document -- this is the second

12    full paragraph.  "I would also like to document (and ask

13    that it be clarified somewhere in writing for future

14    reference) that I appear to have been misinformed about

15    tenure expectations. I learned in this year's PTR meeting

16    that though there has been some confusion in the past, two

17    articles a year must be published — not just submitted as I

18    was told repeatedly when I joined the faculty last year. It

19    would really help to be clear on how I'm being evaluated to

20    ensure I am meeting those expectations moving forward.  I am

21    writing this to emphasize that I achieved the following

22    despite the concerns I have documented in writing to the

23    Dean and department head since my first semester year, which

24    were largely addressed reactively rather than proactively —

25    and with little to no benefit of the doubt afforded to me

1    that one might expect as a basis for collegial trust and

2    respect."  Did these comments enter into your ultimate

3    decision not to recommend reappointment?

4        A    No, and I disagree with the characterization that

5    she was misinformed about the process.

6        Q    She does list her accomplishments, and let me jump

7    ahead here.  We'll go back to that.  Now, this letter is

8    dated October 5th and it's to you and it says, "The

9    department of education leadership faculty promotion and

10   tenure review committee has reviewed Dr. Brown's submitted

11   materials for consideration for reappointment as an

12   assistant professor in the department of education

13   leadership.  Two members of the committee (Drs. Saran

14   Stewart and Jennie McGarry) met with Dr. Brown on October 5,

15   2022 to discuss her dossier and to address questions she had

16   about the PTR process."  And it goes on, "Below is a summary

17   of our review of Dr. Brown's materials, including the

18   addendum, and our discussion with her on October 5th."  So

19   if the addendum wasn't provided until October 10th this date

20   can't be accurate, could it?

21       A    No, I believe it's an editorial mistake.

22       Q    Okay.  And it goes on and it says with a vote of

23   0 yes, 3 no, 0 abstain, and 1 absent the department of

24   education committee does not recommend that Dr. Tiffany

25   Brown be reappointed to the position of assistant professor.

1    Do you know why the other two signatures are not on the

2    letter?

3        A    It probably was because our admin support person

4    hadn't gotten those signatures yet added to that letter.

5    I'm sure there's another one that has them on there.  Jennie

6    may have finished it, added her signature and then sent it

7    forward.

8        Q    Do you recall when you actually received the

9    committee's recommendation?

10        A    It would have been sometime after that when it

11    received all the letters -- or the signatures, excuse me.  I

12    can't recall the exact date.

13        Q    At some point you did write to Dr. Brown and I

14    believe this is on November 10, 2022.  It says you met with

15    Dr. Brown on October 17, 2022 to discuss her progress and

16    your final recommendation, has not made meaningful or

17    significant progress.  As such I do not support Dr. Brown's

18    for reappointment as an assistant professor on the tenure

19    track.  Well, you do mention that you met Dr. Brown on

20    October 17th.  You had mentioned to Dr. Brown in a previous

21    email that you were scheduling the meeting and that you

22    would share your letter with her prior to the meeting.  Did

23    you share your letter with her prior to the October 17th

24    meeting?

25        A    No.  As I mentioned, I typically schedule those in

1    advance in anticipation that I'd have received the

2    department letter and then my own letter, but because

3    everything was delayed I still kept the meeting with

4    Dr. Brown.  I hadn't written my letter yet.

5         Q    So on October 17th you didn't have the committee's

6    recommendation?

7         A    I can't recall.  I don't believe I did.

8         Q    And so Dr. Brown meeting with you on October 17th,

9    did she have -- did you indicate to her that you weren't

10   going to recommend her for a reappointment?

11        A    No.  At that point I did not know what the

12   decision would be, what my decision would be.

13        Q    So October 17th you still had not made a decision?

14        A    Correct.

15        Q    Between October 17th and November 10th what made

16   you conclude that you were going to recommend not to

17   reappoint Dr. Brown?

18        A    Both the review of the materials and then the

19   department's recommendation and their review of her

20   materials, the department PTR committee that is.

21        Q    Dr. Brown's folder was submitted prior to

22   October 5th and her addendum was submitted October 10th.

23   You didn't have time to review those before October 17th?

24        A    I reviewed those.  As I said, I also wanted to

25   wait for the department committee to finish their work

1     before making a decision.

2          Q     And you don't remember when they finished their

3     work?

4          A     I don't recall.

5          Q     Now, prior to reaching your decision there was a

6     discussion about scheduling Dr. Brown's classes remotely, I

7     believe the last three classes of the semester?

8          A     For the fall 2022 semester?

9          Q     I believe so.

10         A     Yes.

11         Q     Dr. Brown had, if you look at -- which is part of

12    Exhibit 24, it appears that she had a vote as to remaining

13    Classes 11, 12 and 14.  It indicates that the students'

14    choice would be to meet on November 8th remotely,

15    November 15th again remotely and December 6th and she

16    submitted that I believe to you and she indicated as you can

17    see there's overwhelming majority.  The results support that

18    we should grant their request after the sessions

19    November 8th and 15th meet remotely.  Do you recall

20    receiving that communication?

21         A     I do.

22         Q     And your response was, After reviewing what has

23    been shared, it makes sense to offer the November 8th course

24    remotely.  The final two must meet in person.  If students

25    have concerns, please have them contact me directly, and

1          Q    This was dated November 2nd.  Would that complaint

2     to human resources and labor relations, would that have

3     entered into your decision about denying her or not

4     recommending her for reappointment?

5          A    No.

6          Q    Exhibit 27 she writes to you and copies

7     Dr. Irizarry and Dr. Cobb and she said just a heads up re:

8     the response I got from Labor Relations today.  I've filed a

9     complaint with the Office of Institutional Equity that names

10    you and Casey based upon experiences you both setting a

11    hostile work environment through the enactment of passive

12    workplace aggression bordering bullying with regards to your

13    handling of the EDLR5202 situation last night.  Do you know

14    what she's referring to, last night?  Is that the decision

15    to having the classes meet remotely?

16         A    That's my speculation, that it must be that

17    situation.

18         Q    What did you do when you received this email?  Did

19    you consult with Dr. Irizarry?

20         A    I don't recall.

21         Q    Did you contact Dr. Brown and request an

22    explanation as to why she filed this?

23         A    No, I don't recall doing that.

24         Q    And as a result -- not as a result.  You did then

25    prepare your letter with regard to recommending the

1    Exhibit 36, and it's Manage Transaction Details, Tiffany

2    Brown of May 12, 2013 (sic), termination; action, resigned

3    in good standing and on the next page it says resigned as of

4    May 12th, changed effective date from May 12th to May 13th

5    per Laura Burton.  So on the records of the University it

6    has Tiffany Brown resigning in good standing?

7         A    Yes, based on what's written there.

8              MR. BUCCI:  I have nothing further, Matt.

9              MR. KONOWE:  All right, I have a little bit.

10             Are we comfortable with jumping right in or do we

11             need another break?

12             THE WITNESS:  We can go forward.

13             MR. BUCCI:  I'm fine.

14             MR. KONOWE:  All right, sounds good.  I'll

15             try to be quick.

16                      * * * * *

17                   CROSS EXAMINATION

18   BY MR. KONOWE:

19        Q    All right, Dr. Burton, do you have any background

20   in the effects of discrimination as far as studies on the

21   impact of discrimination on people?

22        A    I have an understanding, yes.

23        Q    And have you done studies on the topic of

24   discrimination?

25        A    Yes, I have.

1    Q    And could you explain a little bit about your

2    background of your understanding on that topic?

3    A    Well, I've been utilized as an expert witness for

4    coaches, women coaches who have been fired for gender and

5    race discrimination from higher education coaching positions

6    meaning athletic coaching.

7    Q    Are you somebody that believes that discrimination

8    should be reported?

9    A    Certainly.

10   Q    Are you someone that believes in discrimination

11   laws to protect people's rights?

12   A    Absolutely.

13   Q    Do you believe that retaliation is okay?

14   A    No, not at all.

15   Q    There was testimony earlier about a social justice

16   leadership course.  Was that the only course that was ever

17   discussed with Tiffany Brown that had a social justice

18   component to it in the name of the course?

19   A    All of our courses in our department really at

20   large consider issues of social justice.  It's written into

21   kind of the mission of the department and it's something

22   that we take very seriously in the development of our

23   educational leaders and our sport managers so it's kind of

24   embedded and infused in all aspects of our department and

25   the curriculum.

1          Q     That being said, the social justice leadership
2     course, that's the only course that actually has the phrase
3     social justice in the title that was talked about with
4     Tiffany Brown; there were no others in the actual title of
5     the course?
6          A     That's correct.
7          Q     In terms of the job posting for the position that
8     Dr. Brown obtained with University of Connecticut, are you
9     aware of the job posting itself mentioning anything about
10    social justice?
11         A     Yes, I believe we would have mentioned it again,
12    like I just stated, within the mission of the department and
13    that we were seeking faculty with interest and expertise and
14    experience in issues around social justice.
15         Q     Is the social justice leadership course a course
16    that only talks about race?
17         A     No.
18         Q     What other topics might get covered in that
19    course?
20         A     Any kind of underrepresented groups.  That could
21    be class, ability, sexual orientation, gender identity, any
22    kind of underrepresented social identity or structural
23    underrepresentation like socioeconomic status.
24         Q     When the topic of the social justice leadership
25    course was being discussed with Dr. Brown, is it your

1  understanding that Dr. Brown first raised the issue of

2  timing of the course before addressing the content in more

3  detail?

4       A     That was correct.  The first conversations were

5  around when the course was offered and could we change when

6  the offering of that course was.  That was the first set of

7  conversations.

8       Q     Was it your understanding that Dr. Brown was

9  commuting to UConn from New York City?

10      A     That's my understanding, yes.

11      Q     Are you aware of other faculty members, past or

12  present, at UConn who have had long commutes?

13      A     Yes, we have two other faculty that commute from

14  New York City and two that commute -- three actually that

15  commute from outside of Boston.

16      Q     Would that detail alone be reason to change around

17  course scheduling?

18      A     No, we can't do that.

19      Q     Have you ever taught a course in a subject that

20  you're not a scholar in?

21      A     Yes, I teach our sport finance course and I don't

22  have a background in finance.

23      Q     As far as the social justice leadership course,

24  just to clarify, Dr. Brown did not ultimately end up having

25  to teach that course, correct?

1    A    That's correct.  We assigned a different course to

2    her.

3    Q    There were a series of emails that were reviewed

4    earlier in your deposition earlier today where Dr. Brown

5    perhaps expressed concerns regarding interactions with

6    students.  Do you recall that from earlier today?

7    A    I do.

8    Q    At the time that you received any of those emails,

9    that you received, that you were copied on or that you were

10   otherwise the recipient of, at the time that you received

11   any of them did you interpret any of the contents of those

12   emails to mean that Dr. Brown was being bullied by her

13   students or mistreated or discriminated against?

14   A    No, I didn't interpret them in that way.

15   Q    How did you interpret them at the time?

16   A    The students were confused about how the course

17   had been structured.  They had asked repeatedly for

18   clarification on how assignments were structured and were

19   provided differing responses to those assignments and course

20   structures and were feeling as though their concerns weren't

21   being heard is kind of how I initially interpreted it.

22   Q    There was some discussion earlier about written

23   complaints from students.  Just to clarify, that was

24   involving the semester -- that was the spring 2022 semester,

25   is that right?

1        A     That would be correct, right.  Yes, her first

2    semester of teaching.

3        Q     So Tiffany Brown was a professor at UConn in the

4    fall of 2021 but did not teach any courses that first

5    semester of being hired, correct?

6        A     Yes, she was provided two course releases to focus

7    on developing her research.

8        Q     And is that typical for somebody to get two course

9    releases in their first semester?

10       A     No, that was a high level of support.

11       Q     Was that decision made in an attempt to help

12   Dr. Brown succeed?

13       A     The dean makes those decisions, but yes, that was

14   his rationale for helping to support Dr. Brown.

15       Q     What is the typical course load or workload for a

16   full-time tenure track professor?

17       A     Her research, active tenure track faculty.  It's a

18   two course per semester so it's a 2-2 load.

19       Q     And could you explain what 2-2 means?

20       A     Yes, so in the fall semester you would teach two

21   courses and in the spring semester you would teach two

22   courses.

23       Q     And there would be an expectation to do research

24   on top of that, correct?

25       A     Correct.  If there is no research then the move is

1    to a three course per semester teaching load.

2        Q    And so that first semester in the fall of 2021

3    Dr. Brown was assigned no courses and given the opportunity

4    to do solely research at that time?

5        A    Yes.

6        Q    So then moving to that next semester, spring --

7    it's funny to call it spring when it's in January and

8    February, but anyway, spring of 2022, that's the semester

9    that there were written student complaints, is that right?

10       A    That's correct.

11       Q    At least the ones that were discussed and

12   displayed as exhibits earlier?

13       A    Yes.

14       Q    So as far as those written complaints in the

15   spring of 2022, what is your understanding of the

16   demographics of those students?

17       A    It's a diverse group of students; African

18   American, Blake Egyptian, Latino and white students so it's

19   a diverse group.

20       Q    There was discussion earlier about the merit

21   evaluation.  Do you recall that?

22       A    Yes.

23       Q    Does meeting expectations result in a merit

24   increase?

25       A    No, meeting expectations means that you're meeting

1    the expectations of your job.

2         Q    As far as the PTR process -- and actually, just to

3    make the record really clear here, what does PTR stand for?

4         A    Promotion, tenure and review.

5         Q    So any questions I ask about PTR we realize we're

6    talking about the same thing.  As far as the PTR process,

7    what are all the steps of that entire process from what you

8    can recall sitting here today?

9         A    So the faculty member submits their form.  In the

10   first, very very first year they just fill out the beginning

11   part of the form and then meet with our departmental

12   committee and have a meeting to discuss progress, answer

13   questions.  The department writes a letter.  The faculty

14   member meets with me, discusses the process, answers

15   questions and then I write my letter.  Then it moves forward

16   to the dean's advisory committee which is made up of full

17   professors across the Neag school and they conduct an

18   independent review of the materials put forward by the

19   faculty member and then they write a letter and then it goes

20   to the dean, the dean writes a letter and then it all goes

21   to the provost's office and the provost reviews all cases

22   that are what we call milestone cases and those milestone

23   cases are the midpoint review which is the beginning of the

24   fourth year for tenure track faculty members and at the

25   point of promotion and tenure.

1        Q    And there was discussion earlier about what gets

2    factored into the PTR evaluation process.  Just to clarify,

3    can you elaborate on -- no, I'll withdraw that.

4              MR. KONOWE:  Actually, Tom, can I ask, can

5              you stop screen sharing for a moment?  And if it's

6              okay, I'm going to screen share an exhibit.  Thank

7              you very much.

8              Just while I'm putting this up, just for the

9              record, I know there was mention earlier we're not

10             having student names and we don't want student

11             names in the transcript at all today so I'm

12             certainly not going to ask any questions about any

13             student names.  There were exhibits sent earlier

14             today that there may not have been an opportunity

15             to review in their entirety before here so to the

16             extent that there's any names in those of students

17             we wouldn't want that, but I'm actually going to

18             share my screen and show what was previously

19             marked as Defendant's Exhibit 5 from a prior

20             deposition in this matter.

21   BY MR. KONOWE:

22        Q    Are you able to see what was previously marked as

23   Defendant's Exhibit 5?

24        A    Yes, I am.

25             MR. KONOWE:  And I'll share this with counsel

1          and the court reporter following this as well.

2    BY MR. KONOWE:

3        Q    Do you recognize -- I realize we're just looking

4    at the first page but do you recognize this document?

5        A    Yes, that looks like the checklist that gets filed

6    to make sure all the information that's -- like the multiple

7    steps in the dossier that have to be completed and then

8    Alyssa signs that.  Alyssa Dylan is our program

9    administrator.

10       Q    Right now I'm looking at page 3 of Defendant's

11   Exhibit 5, Bates Numbered UConn 001778.  Do you recognize

12   this page?

13       A    Yes, that's the cover page that the candidate

14   completes.

15       Q    I'm just scrolling down.  There's just one thing I

16   want to get to.  Bear with me please.  All right, so right

17   now we're looking at PDF page 32 of Defendant's Deposition

18   Exhibit 5.  It's Bates Numbered UConn 001807.  Do you

19   recognize this page?

20       A    Yes, that's the student evaluation for Dr. Brown's

21   course.

22       Q    And this is the student evaluation that was

23   included as part of the PTR evaluation process, correct?

24       A    Correct.

25       Q    So this is not the same thing as the written

1    complaints that the students submitted, correct?

2        A    That's correct.

3        Q    Looking at the next page, Bates UConn 001808,

4    looking at these two graphs for two questions, what is your

5    overall rating of the instructor's teaching, what does the

6    graph demonstrate was the most popular response?

7        A    The rating was poor.

8        Q    That's a 1?

9        A    That's correct.

10       Q    On a scale of 1 to 5?

11       A    Correct.

12       Q    And then for the second question, the graph on the

13   right, the question is what is your overall rating of the

14   course, what was the most popular response?

15       A    That it was poor.

16       Q    That's a 1 on a scale of 1 to 5?

17       A    Correct.

18       Q    And how common is that to see ratings like this?

19       A    Very uncommon.

20       Q    Going back up, if we're looking at PDF page 24 but

21   on the bottom of the page it's numbered page 22 -- we're

22   still looking at Defendant's Exhibit 5 but we're looking at

23   page Bates UConn 001799.  Does this look like a page that

24   was looked at earlier today in this deposition?

25       A    Yes.

```
1          Q    That's your signature?

2          A    Yes.

3          Q    And that was on November 10, 2022?

4          A    That's right.

5          Q    Same date as the department head PTR letter that

6     you wrote, right?

7          A    That's right.

8          Q    Now, this on the next page, Bates UConn 001800,

9     dean's advisory council recommendation, does it say provide

10    an independent evaluation of the candidate together with

11    supporting data?

12         A    That's correct.

13         Q    And there's nothing filled out on this page,

14    correct?

15         A    Correct.

16         Q    That never happened, right?

17         A    That's correct.

18         Q    Did Dr. Brown go out on a leave almost immediately

19    following November 10, 2022?

20         A    That's my understanding, yes.

21         Q    And did that leave extend until May of 2023 as far

22    as you know?

23         A    I believe so from the review earlier.

24         Q    And then May of 2023 is when Dr. Brown resigned,

25    correct?
```

1          A    Correct.

2          Q    So this next part of the PTR process, the dean's

3     advisory counsel recommendation never had an opportunity to

4     take place, right?

5          A    That's correct.

6          Q    And then the dean's recommendation, Part E, that

7     didn't happen either?

8          A    Correct.

9          Q    And you mentioned some other layers as well.  We

10    can move on from that.  Apologies if this is repetitive but

11    just wanting to make sure it's linear here.  So the student

12    evaluations, those graphs, that was part of the PTR

13    evaluation process, correct?

14         A    Yes.

15         Q    But the student complaints, that did not factor

16    into your decision at all regarding PTR?

17         A    No, those aren't a part of the packet of material

18    evaluated.

19         Q    And was the expectation for you to create an

20    independent evaluation separate from the evaluation of the

21    department PTR committee?

22         A    Yes.

23         Q    So while you certainly reviewed their letter as

24    part of your process, you ultimately -- you could have

25    disagreed with it?

1      A    Yes, I could have.

2      Q    And similarly, the dean's counsel could have

3  disagreed with you?

4      A    That's correct.

5      Q    And so on and so forth through the other layers.

6  They all have an independent evaluation process essentially,

7  right?

8      A    Yes, correct.

9      Q    Was Casey Cobb involved in the department PTR

10  decision?

11      A    No, he wasn't.  As I mentioned, during that fall

12  semester his father went into Hospice and then ultimately

13  passed away so he had been voted as a member of the

14  committee and started as a member of the committee but

15  because of the death of his dad he asked to be absent from

16  the work.  But we needed to make sure that we acknowledged

17  that he had been a part of the committee and that's why we

18  acknowledged him as absent from the process.

19      Q    There were some questions earlier about whether

20  Dr. Brown was notified in advance of being -- of her

21  reappointment being in jeopardy.  Is there a requirement for

22  faculty members who are not being reappointed to be given

23  advance notice prior to the PTR decision-making process?

24      A    No, the actual PTR letter is the notice.

25      Q    As far as the department PTR process, the

```
 1    department PTR committee I should say, did you ever talk to

 2    any of the three signatures -- well, withdrawn.  Did you

 3    ever talk to any of the people involved in the department

 4    PTR committee process about Dr. Brown sending an email to

 5    labor relations or human resources?

 6        A    No.

 7        Q    Or did you ever talk to any of them about

 8    Dr. Brown making a complaint with the Office of

 9    Institutional Equity?

10        A    No.

11        Q    Is it your understanding Dr. Brown's familiar with

12    labor relations, human resources?

13        A    Well, as evidenced by her actions, it appears

14    she's familiar.

15        Q    Because she contacted them?

16        A    Right.

17        Q    Same thing for Office of Institutional Equity?

18        A    Correct.

19        Q    And those are avenues that people can contact if

20    they're feeling like they're a victim of discrimination,

21    retaliation or otherwise, right?

22        A    Yes, that's the job of those offices.

23        Q    As you sit here today are you aware of those

24    offices substantiating any claims made against you or

25    Dr. Irizarry or anyone else as far as complaints filed by
```

1    Tiffany Brown?

2        A    I have no knowledge of those being substantiated.

3        Q    Okay.  Why is articulating a teaching philosophy

4    so important in the PTR submission process?

5        A    Because teaching is foundational to the work that

6    we do and it's a critical part of the job so you could --

7    you didn't see within the form that we provide a link to

8    some resources through CETL that helps develop -- in the

9    development of the teaching philosophy.  Again, it's

10    something that's critical to the work that we do as tenure

11    track faculty members.

12        Q    Is it expected for a tenure track faculty member

13    to have the ability to articulate their teaching philosophy

14    clearly even early in their career such as, you know,

15    perhaps in their first year or two at UConn as a full-time

16    faculty member?

17        A    Yes.  Within our department we actually provide

18    support for our doctoral students to think about developing

19    a teaching philosophy before they go out onto the job market

20    for tenure track faculty.

21        Q    There was some testimony and there was discussion

22    earlier about some communication about wanting to change the

23    formats of courses.  Could you explain, you know, how are

24    decisions made about the format of a course as far as

25    whether it's in-person or online or hybrid and perhaps

1    elaborate about why that can't be changed part way through

2    the course?

3        A    Well, we have to provide students when they

4    register for the course an understanding of how the course

5    is going to meet and hold to that expectation for the

6    semester so that we're essentially not changing the rules

7    midway through the process.  That's our obligation.  We

8    certainly, because this was still the transition from COVID,

9    wanted to provide flexibility where we could, but again, we

10   have an obligation to be able to provide the courses in the

11   manner that we've advertised those courses so that the

12   students know what they're buying essentially.  They're

13   customers in some regard.

14       Q    In terms of communications that involved you,

15   Casey Cobb and Dr. Brown regarding the scheduling of

16   courses, did you interpret any of Casey Cobb's

17   communications to be demonstrating discrimination?

18       A    No, I didn't.

19       Q    Or unfair treatment to Dr. Brown?

20       A    No, I did not.

21       Q    And as you sit here today and reviewed several of

22   those communications, do you feel that there was any

23   unfairness in those communications and the decisions

24   regarding the formatting of those courses and their

25   scheduling?

```
1         A    No, I do not.

2         Q    Are there easily identifiable differences between

3    Casey Cobb and Dr. Brown?

4         A    In terms of their social identities, is that what

5    you're asking?

6         Q    Great question.  I'm sorry, good point.  In terms

7    of their status as faculty members at the time and their

8    experience levels.

9         A    Yes, you know, Dr. Brown is an assistant

10   professor; Dr. Cobb is an endowed professor meaning he's a

11   full professor but then was provided an endowment which is

12   an indication of faculty that are kind of considered top in

13   their field.  It's in many ways honorific and it's a

14   recognition of the extensive research, experience in the

15   field and their recognition as faculty that are major

16   contributors in their field.

17        Q    As you sit here today are you aware of ever seeing

18   an email demonstrating that Dr. Brown was being bullied by

19   anybody who worked for UConn?

20        A    No.

21        Q    As far as any of the emails that you've seen or

22   any of your observations, do you have reason to believe that

23   Dr. Brown was a victim of a hostile work environment during

24   her time at UConn?

25        A    I don't have reason to believe that, no.
```

1      Q    Did Dr. Freidus have faculty experience before

2   joining UConn?

3      A    Yes, I believe she taught at Seton Hall

4   University.

5      Q    There was some discussion about the fact finding

6   that was scheduled in November of 2022.  Was the conduct

7   that led to that -- sorry, withdrawn.  Is the conduct of

8   leaving class early different than the conduct at issue in

9   the complaint letters that were submitted by students in the

10  prior semester?

11     A    Yes, the complaints by the students in the prior

12  semester were confusion around content, course content,

13  assignment clarification, accessibility to have those

14  assignments clarified meaning like meeting with Dr. Brown

15  and having those questions answered.  Those are different

16  issues than issues of leaving a class prior to the scheduled

17  end time of the class.

18     Q    Were you aware of whether a fact finding ever

19  actually happened regarding the class times?

20     A    I'm not aware if there was.

21     Q    We talked about how in the fall semester, fall

22  2021 semester Dr. Brown didn't teach any courses.  In the

23  spring of 2022 did she only teach one course?

24     A    Yes, only one.

25     Q    Are you familiar with the phrase terminal

1    appointment?

2         A    Yes.

3         Q    Could you briefly explain what that is?

4         A    My understanding is that after completion of a

5    tenure process, at the end of that review, if a faculty

6    member is not going to be reappointed for another term

7    leading toward tenure they're provided a terminal year to

8    finish out their work and then move on so they're offered

9    another year of employment.

10         Q    Is it your understanding that it -- well,

11    withdrawn.  There was testimony earlier that the PTR process

12    was not completed, correct?

13         A    That's correct.

14         Q    If hypothetically the PTR process was completed in

15    its entirety and if hypothetically Dr. Brown certainly was

16    not reappointed through that entire PTR process, is it your

17    understanding she could have still had a terminal

18    appointment?

19         A    Yes, that's my understanding, that she would be

20    afforded that opportunity.

21         Q    I know it's been a long day and some of my

22    questions weren't as polished as they could be.  Is there

23    anything further you wish to clarify that you feel like

24    needs clarifying?  I guess I should say based on my

25    questioning.

```
1    STATE OF CONNECTICUT  )
                           )
2    COUNTY OF NEW LONDON  )

3         I, Ruth E. Prescott, a Notary Public within and for the

4    State of Connecticut, do hereby certify that I took the

5    deposition of LAURA BURTON, a witness in the above-entitled

6    action pursuant to Section 13-26 of the Connecticut Practice

7    Book on the 15th day of January, 2025 commencing at

8    10:00 a.m.  The witness provided testimony from University

9    of Connecticut, Gentry Building, 292 Glenbrook Road, Unit

10   3093, Storrs, Connecticut.

11        I further certify that said witness was by me duly

12   sworn to testify to the truth, the whole truth and nothing

13   but the truth, and that the following testimony was taken by

14   me stenographically and thereafter reduced to writing under

15   my supervision.

16        I further certify that I am not an attorney, relative

17   or employee of any party hereto nor otherwise interested in

18   the event of this cause.

19        In witness whereof, I have hereunto set my hand and

20   affixed my seal this 11th day of March, 2025.

21

22                                    _____

23                                    Ruth E. Prescott
                                      License #00136
                                      Notary Public
24

25   My Commission Expires July 31, 2027.
```

# Exhibit C

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

_____

TIFFANY A. BROWN,                :   CIVIL CASE NO

       Plaintiff(s)     :   3:23-cv-01488 (VAB)

   vs.                           :

UNIVERSITY OF CONNECTICUT,       :

       Defendant(s)     :   JANUARY 23, 2025

_____

DEPOSITION OF JASON G. IRIZARRY, Ed.D.

Pretrial deposition taken in the above-entitled action on behalf of the plaintiff, before Jean Carreiro Velez, a Notary Public, Shorthand Reporter, License No. 170, pursuant to the Federal Rules of Civil Procedure.  The deponent testified from University of Connecticut, Storrs, Connecticut.  The deposition commenced at 10:04 a.m.

COMPUTER REPORTING SERVICE, LLC - (203) 234-1144

2

1

2   A P P E A R A N C E S:

3

4

5        Representing the Plaintiff(s)

6             THOMAS W. BUCCI, ESQ.
              WILLINGER, WILLINGER & BUCCI, P.C.
7             855 Main Street
              Bridgeport, Connecticut 06604
8

9

10       Representing the Defendant(s)

11            MATTHEW KONOWE, ESQ.
12            ASSISTANT ATTORNEY GENERAL
              ATTORNEY GENERAL'S OFFICE
13            165 Capitol Avenue
              Hartford, Connecticut 06106
14

15

16       Also Present:

17            KELLY L. BANNISTER, ESQ.
              University OF Connecticut
18            9 Walters Avenue
              Unit 5075
19            Storrs, Connecticut 06269-5075

20

21

22        _____

23

24

25

26

Brown v. UConn - Motion for Summary Judgment
Exhibit B - Irizarry Deposition

1                                                                  3

2              STIPULATIONS AS TO TAKING OF DEPOSITION

3          IT IS HEREBY STIPULATED AND AGREED by and

4     between counsel representing the respective parties

5     that each party reserves the right to make specific

6     objections at the trial to each and every question

7     asked and of the answers given thereto by the

8     deponent, reserving the right to move to strike out

9     where applicable, except as to such objections as

10    are directed to the form of the question.

11         IT IS FURTHER STIPULATED AND AGREED by and

12    between counsel representing the respective parties

13    that proof of the official authority of the Notary

14    Public before whom this deposition is taken is

15    waived.

16         IT IS FURTHER STIPULATED AND AGREED by and

17    between counsel representing the respective parties

18    that the reading and signing of the deposition by

19    the deponent is reserved.

20         IT IS FURTHER STIPULATED AND AGREED by and

21    between counsel representing the respective parties

22    that all defects, if any, as to the notice of the

23    taking of the deposition are waived.

24         Filing of the Notice of Deposition with the

25    original transcript is waived.

26

```
 1              IRIZARRY, Ed.D. - DIRECT - BUCCI      10
 2        Q     And how long have you been employed by the
 3    University of Connecticut?
 4        A     Since 2005 with a three-year exception in
 5    the middle when I was at another institution.
 6        Q     And what is your current position with the
 7    University of Connecticut?
 8        A     I'm currently the Dean of the Neag School
 9    of Education.
10        Q     And how long have you been the Dean of the
11    Neag School of Education?
12        A     I will have completed four years in this
13    role March 1.
14        Q     So in 2020 you were the dean of the
15    school?
16        A     Yes.
17        Q     And are you familiar with a Tiffany
18    Brown?
19        A     Yes, I am.
20        Q     I'm going to show you Exhibit 1.
21              (Screen shared by Attorney Bucci.)
22        Q     Doctor, Exhibit 1 is a letter, undated
23    letter, to Tiffany Brown.  And on the bottom of the
24    letter it has printed on the right-hand bottom
25    corner "Jason G. Irizarry" and a signature in the
26    middle of the page.  Is that your signature?
```

1              IRIZARRY, Ed.D. - DIRECT - BUCCI        19

2    framing again, if you look at the mission statement

3    of the Neag School, if you look at the ad to which

4    Dr. Brown responded applying to the position, social

5    justice is embedded throughout.  And so while she

6    may not position herself as a quote, unquote social

7    justice scholar, the ad suggests that those types of

8    skills are part of the work, and folks infuse their

9    concepts into those courses, whether they squarely

10   identify themselves as social justice scholars or

11   not.

12       Q    Doctor, she indicates in point 2, The one

13   person in our department who has literally written a

14   book on social justice leadership (who I understand

15   works under very different circumstances as a

16   tenured professor) is not being asked to develop

17   the critical competencies required to teach a course

18   in the subject he wrote an entire book on.

19            And she goes on in point 3, The undo burden

20   of picking up where that person is not qualified

21   appears to have been passed down from woman of color

22   to woman of color since he stopped teaching it.

23            Did you have a discussion with Dr. Brown

24   about her perception that this course was -- this

25   burden of picking up where the person is not

26   qualified has been passed down from woman of color

```
1              IRIZARRY, Ed.D. - DIRECT - BUCCI      24

2      Q    Doctor, I'm going to proceed to Exhibit 8,

3  which is an email from -- I believe it's Dr. --

4      A    Anagnostopoulos.

5      Q    -- Anagnostopoulos to Dr. Brown.  And she

6  writes, I hope this email finds you well.  I am

7  writing because the dean's office received a letter

8  from students regarding their experience in the

9  EDLR5204 course you are teaching this semester.  The

10 students identified several challenges in the class

11 that they felt were impeding their learning.  I have

12 summarized their concerns below.

13         So when Dr. Dorothea refers to a letter

14 from students to the dean's office, would that be to

15 your office?

16     A    Can you repeat that question?  When

17 Dorothea sends an email --

18     Q    When she sent this email to Dr. Brown and

19 she referred to students writing to the dean's

20 office, was that your office she's referring to?

21     A    Correct.  Correct.

22     Q    And do you recall receiving this students'

23 letter?

24     A    I do.

25     Q    And what was your response to the letter?

26     A    So, Dr. Anagnostopoulos is the Associate
```

IRIZARRY, Ed.D. - DIRECT - BUCCI          25

1  Dean for Academic Affairs.  So I wanted to engage

2  her in the conversation, as she is the kind of

3  representative to the university supports that exist

4  to support faculty in their teaching.  So we wanted

5  to steer the students' concerns.  They were

6  significant and alarming.  And wanted to see if

7  there was a way that we could remedy the situation

8  and support Dr. Brown in completing that course

9  successfully.

10      Q    When you received the letter did you meet

11  with Dr. Brown?

12      A    I did not initially meet with Dr. Brown.  I

13  met with the students who sent the letter first.

14      Q    And do you recall how long after receiving

15  the letter you met with the students?

16      A    I don't recall.

17      Q    And so you met with the students without

18  first meeting with Dr. Brown?

19      A    Correct.

20      Q    Was there a reason you didn't meet with

21  Dr. Brown before meeting with the students?

22      A    The students asked for a meeting with their

23  dean.  As dean, I try to be responsive to student

24  needs.  I wanted to hear them out before engaging

25  Dr. Brown in conversation.  I didn't have a full

```
1              IRIZARRY, Ed.D. - DIRECT - BUCCI      26
2    grasp of what the concerns were and wanted time to
3    really grasp the situation before we engaged
4    Dr. Brown.
5         Q    So, Exhibit 9 would be the email from the
6    students to the dean in which they raise certain
7    issues with Dr. Brown's teaching.  And there was a
8    second letter as well, Doctor?
9         A    I believe so.
10        Q    Do you recall how far apart those letters
11   were?
12        A    Not offhand.
13        Q    And what was your response after receiving
14   the second letter?
15        A    What was my response.  I don't recall the
16   exact response.  So, the -- I don't know if we met
17   with the students again.  I think we just met with
18   them the one time, but I don't recall.
19        Q    Did you ever meet with Dr. Brown about
20   these letters?
21        A    So, the typical fashion is that the
22   Associate Dean for Academic Affairs would try to
23   provide some support.  And we offered support for
24   Dr. Brown, some resources that she could use, if she
25   so chose, but at no point did the dean's office have
26   any mandates for things for her to do in her class.
```

```
 1              IRIZARRY, Ed.D. - DIRECT - BUCCI        27
 2   So, at that point I believe she was engaging with
 3   the Associate Dean for Academic Affairs whose
 4   position as part of her portfolio supports faculty
 5   teaching.
 6        Q    So, I take that as you didn't meet with
 7   Dr. Brown.  The associate dean may have met with
 8   her?
 9        A    I don't recall.
10        Q    Do you recall communicating with Dr. Brown
11   asking for her to respond to what the students
12   raised?
13        A    I don't -- I don't recall that we asked her
14   to respond to what the students raised.  I believe
15   that we engaged in conversation about the students'
16   concerns.
17             I believe deeply in academic freedom.  Dr.
18   Brown and all my faculty have the ability to teach
19   what they teach, how they want to teach it, but
20   certainly felt we had a responsibility to convey the
21   concerns and provide some direction around
22   university resources that Dr. Brown could consult if
23   she wanted to address certain things for teaching.
24        Q    So Dr. Brown wasn't able to provide or did
25   not -- you didn't ask Dr. Brown in particular
26   specifically to provide a rebuttal to the students'
```

```
1              IRIZARRY, Ed.D. - DIRECT - BUCCI      28
2    concerns?
3        A    I don't believe so.
4        Q    You don't believe that you'd be in a better
5    position to responding to the students if you had
6    spoken to Dr. Brown beforehand?
7        A    No.  I think, again, I just want to go back
8    to -- I take academic freedom seriously.  So
9    students can have concerns that get voiced.  It
10   doesn't necessarily mean that the faculty member has
11   to do something differently.  And certainly the
12   dean's office doesn't require the faculty member to
13   pivot in terms of some of these practices, but
14   certainly want to make the faculty member aware so
15   that, again, this could be a successful experience
16   for all of those involved.
17       Q    This is part of Exhibit 11.  I believe it's
18   the second page of Exhibit 11.  It's an email from
19   Dr. Brown to Dorothea, Dr. Burton, and yourself.
20   And Dr. Brown raises -- in the middle of the page,
21   her query, What response will students receive from
22   the dean's office now that I've provided proof I had
23   indeed addressed these concerns prior to their
24   submitting this letter?"
25            Doctor, do you know what proof Dr. Brown is
26   referring to?
```

```
1              IRIZARRY, Ed.D. - DIRECT - BUCCI        29
2        A    No.
3        Q    This goes on to state, I agree with her
4   that it is important for students to understand that
5   most of these items -- aside from course modality,
6   including my choice to integrate my professional
7   experiences of problems endemic to faculty of color
8   across academia -- seem to be within my purview to
9   decide.  Without your strongly affirming that to
10  students, I think I would be left out to hang in a
11  way that further challenges my authority in the
12  classroom.
13            You were copied on this letter -- email,
14  Doctor.  Did you discuss it with Dorothea and how
15  she should respond to these students about their
16  concerns with Dr. Brown's teaching?
17       A    So, our response to the students was to
18  highlight academic freedom, help them understand
19  that faculty have the power to make pedagogical
20  decisions that they may not necessarily agree with.
21  And so this was kind of asked and answered.  In our
22  initial meeting none of this was about condemning
23  Dr. Brown or, you know, anything like that, but
24  rather trying to figure out ways to create a
25  supportive, instructive situation that folks can
26  move forward positively.  But the initial response
```

IRIZARRY, Ed.D. - DIRECT - BUCCI        30

1

2   to me addressed this because the focus of the

3   meeting was helping students understand academic

4   freedom, that they don't necessarily have to agree

5   with the pedagogical choices that their faculty

6   make, but that nevertheless faculty have the right

7   to make them.

8       Q    Doctor, I understand your response, but it

9   seems like that Dr. Brown believed that she needed

10  additional support from the dean's office in

11  responding to these student concerns.  Did you

12  address Dr. Brown and indicate to her that what

13  you're exactly saying now about academic freedom and

14  it would serve academic freedom to make these

15  decisions?

16      A    I definitely let Dr. Brown know that the

17  focus of that meeting was around academic freedom

18  and helping the students understand that and that

19  she certainly had academic freedom to make those

20  choices.

21      Q    Again, this is a continuation of the

22  Exhibit 11.  And Dr. Brown indicates to Dorothea,

23  Karen informed me this morning that you have asked

24  to meet with her separately today.  The purpose in

25  my asking for this meeting was to gain clarity about

26  the situation across several perspectives, since I

Brown v. UConn - Motion for Summary Judgment
Exhibit B - Irizarry Deposition

```
 1              IRIZARRY, Ed.D. - DIRECT - BUCCI        31
 2    am new to Neag and learning its norms through this
 3    process.  I figured transparency across these
 4    perspectives would be best, but again, it seems my
 5    voice is not being considered equally in this
 6    procedural process.  What I mean is that the
 7    continued lack of transparency surrounding this
 8    issue really makes it feel like I'm being treated as
 9    a student rather than a colleague.  It also doesn't
10    help that some of the recommendations made so far
11    have been based on assumptions that don't give me
12    the benefit of the doubt.  For example, I've been
13    writing emails for weeks to admin about my concerns,
14    and still it seems to be the case that folks might
15    assume I don't know the correct venue for using my
16    voice on faculty concerns.  I do believe that the
17    intent is to resolve things, but I've been kept in
18    the dark since the beginning of this matter from the
19    start when your office received this letter days
20    before I was notified about it.  Is there a reason
21    why I cannot be included in the conversation I asked
22    for?
23              So, Dr. Brown is raising these concerns
24    about not being involved in the discussion taking
25    place with the students over these emails.  In
26    receiving a copy of this email, did you reach out to
```

1          IRIZARRY, Ed.D. - DIRECT - BUCCI        32

2    Dr. Brown and try to respond to these concerns that

3    she's raising?  And here it is March 17th, a couple

4    of weeks after the email situation had occurred.

5          A    We had a plethora of conversations.  I

6    don't recall if I specifically responded to that

7    particular email.

8          Q    Do you believe that Dr. Brown was being

9    overly sensitive to this matter?

10               MR. KONOWE:  Objection to form.

11               You can answer.

12         A    Yeah, I don't know -- I don't know if I'm

13   well positioned to say she's being overly sensitive

14   or not.  I will tell you I don't know that she's

15   familiar with higher ed. enough in terms of some of

16   these assertions.  So, students raise issues

17   sometimes about faculty all the time.  It doesn't

18   mean that we inform the faculty member that the

19   dean's office received a complaint or letter.  In

20   this case, if you read the students' letter, there

21   was significant fear of retaliation.  It was more

22   than half of the class.  So this rose to a letter

23   where we thought we might -- this rose to a level

24   where we thought we might try to engage Dr. Brown in

25   some productive conversation around resources that

26   she might be able to use to help move this forward.

1                IRIZARRY, Ed.D. - DIRECT - BUCCI        33

2    At every point this was about being instructive and

3    supportive and not punitive.  But it's not automatic

4    that the dean's office receives a letter from a

5    student raising concerns in a class and that

6    automatically the faculty member gets to rebut those

7    concerns.

8         Q    Did you at this point in March of 2022

9    consider, based upon the letters from two -- or two

10   letters from the students involved in the class --

11   and you say it was close to 50 percent of the

12   students -- conducting a formal investigation of

13   Dr. Brown's teaching of these courses?

14                  MR. KONOWE:  Objection to form.

15                  You can answer.

16        A    So, can you repeat the question?  Because

17   we don't typically call it an investigation of her

18   teaching.  That's not a -- we raise the concern.

19   She can do what she wants, engage with the support

20   that we provide or not, finish the class, and at the

21   end she's evaluated.  The students have an

22   opportunity to engage in an evaluative process.  But

23   we don't necessarily do an investigation of people's

24   teaching unless it breaks one of the university

25   bylaws, in which case we report it to particular

26   office.  But the dean's office doesn't investigate

```
1            IRIZARRY, Ed.D. - DIRECT - BUCCI        34
2    faculty teaching in the way that you've framed it.
3        Q    We're still in this Exhibit 11.  And
4    there's another email from Dr. Brown to Dorothea,
5    Dr. Burton, Dr. Irizarry, and Michael Bailey, who I
6    believe was the union representative.  And she makes
7    the statement, After talking with faculty colleagues
8    both within and outside UConn this week, I believe
9    the department should have informed me immediately
10   of the letter and that I should have been asked if I
11   were approached about these concerns before
12   students' word was taken over mine.  I don't find it
13   useful that you all have reaffirmed our meetings
14   were not punitive or disciplinary, since all the
15   reaffirming you have done for me seems to have
16   occurred in private.  How do I return to class as a
17   leader when my deans have already let on they don't
18   trust my judgment?
19            Whether Dr. Brown is concerned or not, did
20   you think at this point, in reading this email, I
21   better sit down with Dr. Brown and address some of
22   these concerns more directly?
23       A    I engaged in more conversation with
24   Dr. Brown than I have with any assistant professor
25   in my tenure as dean.  We were in frequent
26   communication.  Literally she would call me on my
```

Brown v. UConn - Motion for Summary Judgment
Exhibit B - Irizarry Deposition

```
1              IRIZARRY, Ed.D. - DIRECT - BUCCI       35
2    cell phone.
3        Q    Well, in this email she's expressing it in
4    writing and she indicates she's finding it difficult
5    to go back to the classroom and face the students.
6    Did that raise a concern about her frame of mind
7    going forward?
8        A    Yeah, I'm not sure how to answer that
9    question.  So, you're asking me if I had a concern
10   about her frame of mind?  Like we were constantly
11   engaged in trying to provide support so she could
12   finish this experience, finish this course
13   successfully.  But faculty -- you know, issues come
14   up in class all the time.  Faculty are in a position
15   of power, grading the students, etc.  The
16   expectation is that they would finish the course
17   unless there was real threat to their safety to be
18   able to do so.  Sometimes faculty have unpleasant
19   experiences in courses.  They still have to finish
20   them.
21       Q    She indicates in the -- starting, In
22   retrospect, you may have actually set me up for
23   students to be even more bothered by the fact that I
24   didn't respond to the letter during our class last
25   Thursday because you all chose to keep me in the
26   dark until the end of the week.  Especially because
```

Brown v. UConn - Motion for Summary Judgment
Exhibit B - Irizarry Deposition

1              IRIZARRY, Ed.D. - DIRECT - BUCCI        44

2    Report.  Is this report prepared by the professor

3    for purposes of determining merit, merit pay?

4         A    It's done as part of the promotion, tenure,

5    reappointment process and is also considered in the

6    merit process.

7         Q    So Dr. Brown completed it and she would

8    submit this to her department head?

9         A    I believe so.

10        Q    We're not going to get into the substance

11   of the activity report, but on June 23rd Dr. Brown

12   receives a letter from Dr. Burton indicating that

13   she was not recommended for a merit award for 2022.

14   Did Dr. Burton confer with you before making this

15   decision?

16        A    The awarding of department merit is at the

17   discretion -- so we have university bylaws that

18   empower faculty to inform those decisions.  So

19   there's a merit committee at the department that

20   makes recommendations to the department head, and

21   the department head awards merit.  So that's not

22   something that the dean weighs in on.  There is a

23   separate pool of merit for those folks that were

24   meritorious, typically at the department level, to

25   be elevated to dean's level merit.  So I did not

26   engage in the department awarding of merit, nor do I

```
1              IRIZARRY, Ed.D. - DIRECT - BUCCI        45
2    engage in that process for any of the departments.
3        Q    Do you recall if Dr. Brown complained to
4    you about not receiving merit?
5        A    I don't recall.  I mean we had -- again, we
6    had a lot of conversations, but I don't recall if
7    she -- if she voiced that concern.
8        Q    Look at Exhibit 20.  We're taking about the
9    PTR review of Dr. Brown.  And this is Jennifer
10   McGarry writing to Dr. Brown.  And she indicates, I
11   am reaching out on behalf of the EDLR PTR Committee,
12   and specifically Casey and myself.  We are two
13   members of the larger committee who will be meeting
14   with you to discuss your PTR materials, answer
15   questions, and then craft a letter that will become
16   part of the PTR process.  You will be able to read
17   and comment on the letter before we submit a final
18   version to Laura for the department head portion of
19   the process.
20             Could you just generally explain what is
21   the PTR process?
22       A    Sure.  So PTR stands for promotion, tenure,
23   and review.  There are multiple levels of this
24   process.  We also have different faculty types.  So
25   for tenure track, faculty members like Dr. Brown,
26   who are assistant professors, they have one year
```

```
1              IRIZARRY, Ed.D. - DIRECT - BUCCI        46
2    renewable appointments up until they go up for
3    tenure.  There is a date set forth in the offer
4    letter by which they have to go up for tenure.  Some
5    people choose to go up early in rare occasions, but
6    basically they get evaluated every year.  There's an
7    evaluation that happens at the department level
8    where there's a group of department representatives
9    who evaluate the PTR materials in the area of -- in
10   the areas of scholarship, teaching, and professional
11   service.  And then the department head reviews those
12   materials, and then, when appropriate, it moves to
13   process the cases, it moves to the dean's office,
14   the provost's office, and then ultimately for the
15   awarding of tenure that's something that's voted on
16   by the Board of Trustees.
17        Q    And so that's done every year for a
18   tenure-track professor, assistant professor?
19        A    Assistant professor on the tenure track,
20   yes.
21        Q    So, what Dr. McGarry is scheduling is a
22   meeting with the faculty committee regarding -- or
23   the PTR committee that's made up of faculty as the
24   first step in the review process?
25        A    Yes.  And every department has their own
26   nuances around this.  In EDLR I find their process
```

Brown v. UConn - Motion for Summary Judgment
Exhibit B - Irizarry Deposition

1          IRIZARRY, Ed.D. - DIRECT - BUCCI        47

2    to be very supportive and instructive where they

3    don't just look at the materials in isolation.  They

4    give the faculty member a chance to provide some

5    additional framing and some conversation around the

6    materials.

7        Q    So, Dr. Burton is writing to Dr. Brown on

8    October 3rd:  Hi, Tiffany - Will this time work for

9    your PTR review meeting?  I will share my PTR letter

10   with you prior to the meeting.  Best, Laura.

11        So, Dr. Burton, being the department head,

12   is that another step in the process?

13        A    It is.

14        Q    On October 5th Dr. McGarry writes to

15   Dr. Brown indicating, I emailed with Laura and she

16   is fine with us getting the PTR Committee letter to

17   her middle of the week.  So if you can update the

18   PTR form by Monday, that would be great.  Also, you

19   have access to the shared drive to update the form.

20   If you have any trouble, Alyssa knows that you are

21   planning to update the form and can assist.

22        So, again, this discussion with Dr. McGarry

23   would be concerning the review by the PTR Committee,

24   not necessarily the department head; is that

25   correct?

26        A    Yes, but those processes are handoffs.  So,

Brown v. UConn - Motion for Summary Judgment
Exhibit B - Irizarry Deposition

```
1                  IRIZARRY, Ed.D. - DIRECT - BUCCI        51
2       A     So, in the first year Dr. Brown -- a
3    typical faculty member would teach four courses a
4    year.  She was given course releases to support her
5    moving forward with her scholarship and
6    publications.  So she only taught one course in the
7    spring.  So there really weren't a ton of data
8    points at that point.  And I would assume in the
9    second year there were more data points and that the
10   expectation progress was something that they were
11   looking at in terms of, you know, more quantifiable
12   data points.
13      Q     Doctor, on Exhibit 31 we have an email that
14   starts with Tiffany Brown writing to her union
15   representative, but I want to go down to her
16   response.  It says on, November 8, 2022 at 10:08
17   Irizarry, Jason wrote the following:  Dear Dr. Brown
18   -- Dear Professor Brown, a fact-finding meeting has
19   been scheduled with you on Wednesday, November 16th
20   via Webex.  You will be provided with credentials to
21   access the meeting.  The purpose of this meeting is
22   to discuss concerns regarding your performance and
23   conduct during fall 2022 semester.  More
24   specifically, it has been reported that you leave
25   approximately 10 minutes early every week -- or 30
26   minutes.
```

```
1              IRIZARRY, Ed.D. - DIRECT - BUCCI        52
2          I'm not sure.  Probably 30 minutes early
3    each week.
4          These behaviors, if true, may violate
5    university policies including, but not limited to,
6    the General Rules of Conduct.  In order to --
7    conduct a thorough and objective investigation, I
8    would like to meet with you to discuss these
9    allegations and provide you the opportunity to
10   respond and -- to respond.  In the interim, please
11   take a moment to review the university's
12   Non-Retaliation Policy, a copy can be found, etc.
13         Doctor, it says in here that, It's been
14   reported that you leave class 30 minutes early -- or
15   approximately 30 minutes early every week.
16         How did you receive that report?
17   A    My assistant dean shared that a student
18   communicated this with someone who reports to her as
19   her supervisor.
20   Q    Was this in writing?
21   A    No.  This was verbal.
22   Q    This was verbal.  A verbal report that the
23   assistant dean then shared with you?
24   A    Correct.
25   Q    Who was the assistant dean?
26   A    Dr. Ann Traynor.
```

1          IRIZARRY, Ed.D. - DIRECT - BUCCI      57

2     Q    -- who -- Why would you not ask for the

3   complaint to be in writing?

4     A    Because I knew I would give Dr. Brown a

5   chance to address it through this fact-finding.  So

6   there is no disciplinary action that's taken here

7   either.  This is just formally having an opportunity

8   to ask the question.  And Dr. Brown, if she said

9   that wasn't the case, likely we would not have moved

10  forward.  But again, there's nothing disciplinary

11  and binding.

12    Q    Doctor, you indicate in here that it's a

13  violation of university policy.  What --

14    A    If true.

15    Q    -- is she -- what is she to understand from

16  that, that it's non-disciplinary?

17    A    I think the letter clearly says these

18  behaviors, if true, may violate.

19    Q    Right.

20    A    So, if it's not -- if she's not engaging in

21  those behaviors, there is no violation or

22  disciplinary action that gets taken.  Literally it's

23  a fact-finding to understand what was going on.

24    Q    Well, before even sending this letter, this

25  fact-finding, this show cause document, why didn't

26  you have Dr. Brown in and say, Is this true or not?

```
1            IRIZARRY, Ed.D. - DIRECT - BUCCI        63
2    some time, but that's my recollection of the
3    conversation with the assistant dean.
4        Q    So you weren't going to interview the
5    student?
6        A    So I wasn't going to interview that
7    particular student.
8        Q    And you don't believe, as you sit here
9    today, that those student complaints raised more
10   serious concerns than this anonymous report that
11   Dr. Brown was leaving 30 minutes early each week?
12             MR. KONOWE:  Objection to form.
13       A    Can you repeat that?
14             MR. KONOWE:  You can answer.
15       A    Can you repeat that?
16       Q    You don't believe, as you're sitting here
17   today, that the two complaints that are on record
18   were -- raised more serious concerns than Dr. Brown
19   leaving early -- 30 minutes early each week?
20       A    So I think there were multiple events that
21   happened, as you've referred to in many of the
22   exhibits, over time, plus conversations, again, that
23   are not part of this deposition thus far.  And so
24   there seem to be kind of an escalation of issues
25   over time.  It's difficult, if not impossible, for
26   me to isolate the initial complaint and this
```

```
1              IRIZARRY, Ed.D. - DIRECT - BUCCI        64
2    complaint and compare them because they didn't
3    happen in isolation.  They happened over a
4    trajectory of time with this at this point being the
5    most recent thing, but coming on the heels of
6    multiple other issues.
7        Q    And it was only on November 8th that you
8    resorted to a show cause hearing requiring Dr. Brown
9    to come and address these charges?
10             MR. KONOWE:  Objection to form.
11             You can answer.
12       A    If that's the date that's on the email.
13       Q    Yes, that's the date on the email.  And at
14   no time prior to that date had you ever required
15   Dr. Brown to come to an investigative show cause
16   hearing; is that correct?
17       A    I don't believe so.  I believe that's
18   correct, that there wasn't a previous instance.
19       Q    I'm going to go to Exhibit 33.  This is a
20   letter from Dr. Burton to you regarding her decision
21   or her recommendation about the reappointment of --
22   this letter is dated November 10th and it's sent to
23   you and the Dean's Advisory Committee.  And going to
24   the last page of the letter, Dr. Burton concludes,
25   Dr. Brown has not made meaningful or significant
26   progress toward promotion and tenure as evidenced in
```

```
1              IRIZARRY, Ed.D. - CROSS - KONOWE        71

2      Q    At least it appears that way, right?

3      A    (The witness nodded affirmatively.)

4      Q    Did you go out of your way to be helpful to

5  Dr. Brown?

6      A    I really believe I did.

7      Q    And could you give some specific examples

8  of how you believe you went out of your way to be

9  helpful to Dr. Brown?

10     A    So I made myself available to her and tried

11 to support her with, you know, all of the issues

12 that were coming up, but also addressing problems of

13 practice.  I remember her talking to me just about

14 teaching in general and me sharing some of the

15 things that I did as an assistant professor and

16 typically as dean.  Those aren't conversations that

17 I would be having with assistant professors.

18          Dr. Brown had my cell phone number.  You

19 know, she texted and called, you know, at different

20 points to talk about various issues.  So, that's,

21 you know, a higher level of support than typically I

22 would be providing a newly-minted assistant

23 professor.

24     Q    Did you respond to --

25          MR. KONOWE:  Well, withdrawn.

26     Q    Did you communicate with Dr. Brown more
```

```
1              IRIZARRY, Ed.D. - CROSS - KONOWE        72

2    often than you normally would with a new

3    tenure-track assistant professor?

4        A     Absolutely.

5        Q     And would she call you at night sometimes?

6        A     Most definitely.  I remember being in a

7    hotel on the road either at a conference or

8    fundraising and talking to her about approaches to

9    engaging students, etc., and having some of the

10   conversations that I referenced earlier.

11       Q     There was some testimony earlier regarding

12   an email thread.  And I apologize if I can't recall

13   the exact question that was asked, but I think we

14   give each other some leeway here.  But I believe

15   what was asked was -- I think there was mention

16   about an email thread that was forwarded to you that

17   referred to some interaction or communication

18   between Jen McGarry and Tiffany Brown.  Do you

19   remember that conversation earlier during your

20   deposition?

21       A     I do.

22       Q     And I can't recall exactly what was asked,

23   but I believe there was some questioning about

24   whether you followed up with Jennie McGarry

25   regarding that.  And I'll ask you, did you see a

26   need to follow up with her regarding that email
```

```
1              IRIZARRY, Ed.D. - CROSS - KONOWE        74
2      course.  Is that your understanding of the order of
3      topics when that came up?
4          A    That is definitely my understanding of the
5      order of topics, that first -- the first question
6      after the assignment was about the timing and
7      scheduling of the course.  And then when that didn't
8      change began the thread of emails around her
9      perception of her qualifications.
10         Q    Do professors ever teach courses that
11     they're not a scholar in?
12         A    It happens.  You know, we all have to
13     stretch.  So we're a small school.  Interestingly, I
14     have a lot of expertise and training in social
15     justice, but I've never taken a leadership course
16     and I actually taught the social justice leadership
17     course one semester.  Dr. Burton has taught finance
18     courses in sport management.  She doesn't
19     necessarily have expertise in finance.  So,
20     oftentimes we have some expertise and then kind of
21     extend to fill in some of the gaps.
22         Q    And is it your understanding that Dr. Brown
23     ultimately didn't teach the social justice
24     leadership course?
25         A    Correct, she did not end up teaching that
26     course.  She was assigned a different course.
```

Brown v. UConn - Motion for Summary Judgment
Exhibit B - Irizarry Deposition

```
 1              IRIZARRY, Ed.D. - CROSS - KONOWE        75
 2        Q     You were shown a number of emails, some you
 3   were copied on, some you weren't, during your
 4   deposition today.  During the time that Dr. Brown
 5   was employed by UConn can you describe the volume of
 6   emails that you would typically receive?
 7        A     So, certainly atypical.  There was a lot of
 8   back and forth.
 9        Q     And just to be clear, I mean on the whole.
10   Like what was your inbox like in general?
11        A     I receive more emails from Dr. Brown around
12   issues than probably any faculty member in the
13   school regardless of rank.
14        Q     But in terms of emails from people other
15   than Dr. Brown, did you receive a lot of emails?
16        A     Oh, I get a lot of emails.
17        Q     Yeah.  That's what I'm getting.  That's
18   what I'm trying to --
19        A     Yes.
20        Q     Could you elaborate on the volume of emails
21   you get as a whole?  I'm not asking about Dr. Brown,
22   but just -- you know, just so that we can all
23   understand what your inbox, you know, looked like
24   during that time period.
25        A     I think, conservatively, I would say more
26   than 50 a day.  I mean it might even be more, but --
```

Brown v. UConn - Motion for Summary Judgment
Exhibit B - Irizarry Deposition

1          IRIZARRY, Ed.D. - CROSS - KONOWE          76

2     Q     Yeah.

3     A     It depends -- there's ebbs and flows, but

4 I'm inundated with emails.

5     Q     And would it be typical for you to

6 sometimes get emails that maybe don't necessarily

7 warrant a response from you directly?

8     A     Absolutely.

9     Q     That happens with some regularity?

10    A     It happens with some regularity.  And

11 oftentimes I'll forward an email from my associate

12 dean to follow up if it's more in her portfolio.

13 So, oftentimes I'll have other folks who have

14 expertise in those areas provide different layers of

15 support depending on what the email requires.

16    Q     There was some discussion earlier about the

17 grievances that were submitted in writing by some

18 students from that spring of 2022, I believe it was.

19 Yep.  And there was some discussion about meeting

20 with the students without Dr. Brown.  Do you

21 remember talking about that earlier in your

22 deposition?

23    A     I do.

24    Q     Now, was part of the reason for meeting

25 with the students without Dr. Brown because the

26 students raised concerns of grade retaliation or

Brown v. UConn - Motion for Summary Judgment
Exhibit B - Irizarry Deposition

```
1            IRIZARRY, Ed.D. - CROSS - KONOWE        77
2    other concerns?
3         A    Definitely.
4         Q    Would the grievances that were submitted by
5    the students in writing from that spring of 2022
6    semester have factored into the PTR process in any
7    way?
8         A    Not at all.  So, that situation, my
9    associate dean engaged with Dr. Brown around it, but
10   at no point do we share that with other faculty
11   members who might be on the PTR Committee at the
12   department level.
13        Q    And I know you said this earlier, but just
14   for clarity in the record, PTR stands for?
15        A    Promotion, tenure, and review.
16        Q    And if it's okay with you, every time I say
17   PTR, that's what I'm referring to.  Fair enough?
18        A    Fair enough.
19        Q    All right.  Did Dr. Brown receive any
20   discipline as a result of those two written
21   grievances that were submitted?
22        A    Absolutely not.
23        Q    Is there a difference between changing
24   class time but still meeting for the allotted class
25   time as opposed to leaving a class early?
26        A    There are certainly differences.
```

Brown v. UConn - Motion for Summary Judgment
Exhibit B - Irizarry Deposition

1    IRIZARRY, Ed.D. - CROSS - KONOWE        78

2    Q    Could you explain the difference in terms

3    of whether one would result in a fact-finding or

4    not?

5    A    Correct.  So, you know, using this

6    particular example, in that particular program

7    students come in in a cohort.  Many of them are --

8    an overwhelming majority are working professionals.

9    Many of them are working in K-12 schools during the

10   day, so the courses typically begin after school in

11   that 4:00 block.  And then knowing their busy

12   schedules as adult learners, they take two classes

13   typically on the same day to be more efficient for

14   them.  So we try to make sure, from a pedagogical

15   perspective, right, it doesn't make since you for

16   sit down for five hours straight.  So we try to

17   build in some breaks, you know, bio breaks, stretch,

18   just kind of reset breaks, so that we maximize the

19   pedagogical experience that they're having, right,

20   their experience with teaching and learning in that

21   space.  But again, those benefits accrue to the

22   students, so we try to work around the students.  At

23   no point do we change these things during the year

24   to accommodate the professor per se.  The

25   students -- it's really the pedagogy that drives it

26   and we set courses initially at times where we have

1          IRIZARRY, Ed.D. - CROSS - KONOWE          79

2    a market for those courses.  And so the market for

3    those courses is afternoon/evening.  If we offered

4    them during the day we wouldn't have students to run

5    them.

6          Q    Bear with me.  I'm just trying to -- trying

7    to go as fast as possible.  If you'll bear with me

8    just a moment.

9               I'm going I'm going to screen share and

10   show Plaintiff(s) Exhibit 9.

11              (Screen shared by Attorney Konowe.)

12         Q    Can you see this?

13         A    I can.

14         Q    And does this appear to be one of the

15   written grievances that was submitted?

16         A    It does.

17         Q    Then if I scroll down to Plaintiff(s)

18   Exhibit 10, does this seem to be another one?

19         A    It does.

20         Q    As you sit here today are you aware of

21   anything that came up in those two grievances that

22   required a fact-finding to take place to look into

23   discipline?

24         A    No.

25         Q    Now, regarding the verbal report that you

26   indicated you received about leaving class early, is

1          IRIZARRY, Ed.D. - CROSS - KONOWE        80
2     that sufficient to initiate a fact-finding
3     investigation to look into discipline?
4          A    I believe it is.
5          Q    You testified earlier about how you had
6     tried to have a variety of conversations with
7     Dr. Brown about various topics, but this was the
8     first time -- this fact-finding, this was the first
9     time -- or I should say the scheduling of a
10    fact-finding, I should correct, that was the first
11    time that you would ever be having a conversation
12    with her in any setting that actually had to do with
13    potential discipline if true, right?
14         A    That's correct.
15         Q    All right.  And would Dr. Brown have
16    ordinarily been entitled to union representation
17    during such a meeting?
18         A    I believe so.
19         Q    So in that case it wouldn't be appropriate
20    for you to call her into a meeting one on one before
21    having a formal fact-finding with the union present
22    with her, would it?
23         A    That's absolutely correct.
24         Q    All right.  And just to be clear, the
25    fact-finding that I've been speaking about here, the
26    one where there was an email in November of 2022

1        IRIZARRY, Ed.D. - CROSS - KONOWE        81

2    scheduling it, just so there's no confusion about

3    what we're talking about because I know I'm jumping

4    -- I know I'm time traveling a little bit, which I

5    try not to do, but talking about that fact-finding

6    that was scheduled.  Depending on what was discussed

7    during that fact-finding, if you wished to interview

8    additional people you could have, right?

9        A    Absolutely.

10       Q    And if you felt like you needed to

11   interview the student anonymously and if that seemed

12   like it was necessary, you could have insisted that

13   that happened, right?

14       A    Yes.

15       Q    But the fact-finding never actually

16   happened, did it?

17       A    It never happened.

18       Q    Dr. Brown went out on a leave, you know,

19   very shortly after that, right?

20       A    Correct.

21       Q    Would you perform a fact-finding while

22   someone is out on a leave, the type of leave that

23   Dr. Brown was out on?

24       A    I would not.

25       Q    That wouldn't be appropriate, would it?

26       A    It would be completely inappropriate.

IRIZARRY, Ed.D. - CROSS - KONOWE        82

1

2    Q    All right.  And when Dr. Brown went out on

3    that leave, she resigned, you know, right around

4    when that leave was scheduled to end, right?

5    A    Correct.

6    Q    So there was no opportunity for the

7    fact-finding to happen?

8    A    That's right.

9    Q    Given that she would have needed union

10   representation and that this could have potentially

11   involved discipline --

12            MR. KONOWE:  No.  Withdrawn.

13            I'm getting close to done.  Bear with

14        me.

15   Q    Just to go back again to those student

16   grievances, the written grievances from the fall of

17   2022, did you have any reason to believe at that

18   time that Dr. Brown was being bullied by students?

19   A    I did not have any reason to believe that

20   Dr. Brown was being bullied by students.

21   Q    And as you sit here today do you have any

22   reason to believe that she was bullied by

23   students?

24   A    I do not believe she was bullied by

25   students.

26   Q    Or treated unfairly by students?

1

2      A    I don't believe that she was treated

3  unfairly by students.  Actually, to the contrary.  I

4  thought the students showed a lot of care in their

5  letter acknowledging some of the challenges that Dr.

6  Brown might be experiencing and wanting to kind of

7  move forward delicately.  I thought they showed a

8  great deal of care and respect for Dr. Brown in

9  their letter and in the conversation.

10     Q    Now, I recognize that you're not an

11 attorney, but I imagine you're familiar with the

12 phrase hostile work environment.

13     A    I am familiar with the phrase.

14     Q    I'm sure -- well, fair to say you don't --

15 you're not in the business of trying to create a

16 hostile work environment.  Fair to say?

17     A    To the contrary.

18     Q    And by having Dr. Brown continue to teach

19 that course in the fall of 2022 where the students

20 had submitted written grievances, do you feel like

21 that was creating a hostile work environment by

22 having her continue that course?

23     A    I do not.

24     Q    And could you elaborate as to why not?

25     A    For a couple reasons.  One, you know, I

26 think removing a faculty member from a course is

Brown v. UConn - Motion for Summary Judgment
Exhibit B - Irizarry Deposition

IRIZARRY, Ed.D. - CROSS - KONOWE          84

1

2  really a last resort.  I don't -- I don't have a

3  recollection of removing a faculty member from a

4  course during my tenure.  Usually, you know, folks

5  try to work through these issues.  They are

6  professionals.  We're all growing kind of in our

7  work.  But I think there's also, you know, another

8  layer in that I did not want to remove Tiffany for

9  some of the reasons that she explained.  Like what

10  would it also look like, you know, if I removed her

11  in this particular context, what message does it

12  send more broadly?  But I think, in general, we

13  trust that faculty are professionals, that they will

14  work through whatever issues exist, but ultimately

15  faculty have agency on how they want to move forward

16  with their courses.  And I did not want to strip

17  Dr. Brown of that agency.

18      Q     Do you think that discrimination is okay?

19      A     Absolutely not.

20      Q     Do you think retaliation is okay?

21      A     Absolutely not okay.

22      Q     Are you a person of color?

23      A     I am.  I'm Latino.

24      Q     Okay.  What's your understanding of the

25  composition of the course, the fall 2022 course,

26  where the two grievances were submitted by

IRIZARRY, Ed.D. - CROSS - KONOWE          85

1

2  students?

3     A    Yeah.  Core of the students that had issues

4  were students of color.

5     Q    There were a lot of emails and there were a

6  lot of conversations.  And I know you mentioned not

7  being able to recall all the dates and what happened

8  when, but I'll just ask you, as you sit here today

9  is there anything at any point in time that

10 Dr. Brown raised to you that you felt demonstrated a

11 hostile work environment?

12    A    No, I don't believe so.

13    Q    And do you believe you created a hostile

14 work environment for Dr. Brown?

15    A    I absolutely did not create a hostile work

16 environment for Dr. Brown.

17    Q    Do you believe that Dr. Burton created a

18 hostile work environment for Dr. Brown?

19    A    I do not believe that Dr. Burton created a

20 hostile work environment for Dr. Brown.

21    Q    As far as the merit review, meeting

22 expectations does not lead to a merit review,

23 correct -- to a merit award, right?

24    A    The definition of merit is performance

25 above and beyond the norm.  And it's particularly in

26 the areas of scholarship and teaching and

```
 1              IRIZARRY, Ed.D. - CROSS - KONOWE          86
 2   professional service.
 3       Q    As far as the PTR process, the student
 4   evaluations, that's only one of various components
 5   in terms of evaluating for PTR, correct?
 6       A    That is correct.
 7       Q    The PTR process for Dr. Brown was never
 8   completed, correct?
 9       A    Correct, the process was never completed.
10   There was still multiple steps left.
11       Q    And it's possible that in those multiple
12   steps that were remaining, one of those multiple
13   steps could have reversed earlier decisions, either
14   by the department committee or by the department
15   head.  That could have happened, right?
16       A    Absolutely.
17       Q    But Dr. Brown went on a leave right after
18   receiving the department head's decision, right?
19       A    Correct.
20       Q    And she resigned right around when her
21   leave was coming to an end, right?
22       A    That's correct.
23       Q    Okay.  And I think an email might have been
24   shown that mentioned Casey Cobb in the PTR process,
25   but was Casey Cobb involved in the department PTR
26   decision?
```

```
1              IRIZARRY, Ed.D. - CROSS - KONOWE        88
2        A    No.
3        Q    Did you tell any of them about, you know,
4    student grievances?
5        A    No.
6        Q    Okay.  Did you talk to Laura Burton about
7    her PTR decision at the time that she was
8    formulating hers?
9        A    That's an independent review that I do not
10   engage -- I don't have any role and I try to stay
11   away from those to allow for the independent
12   review.
13       Q    And if it eventually made its way to you,
14   you would have engaged in your own independent
15   review?
16       A    Correct.  Consistent with what I've done in
17   all other cases in this school.  Sometimes I agree
18   with the recommendations of the department head.
19   And their recommendations, they're not binding
20   votes.  Ultimately, the provost makes the ultimate
21   decision in these cases.  So, I look at it and I try
22   to do an independent review that considers all of
23   the materials that come to me.
24       Q    All right.
25            MR. KONOWE:  Thank you so much for
26            your time.  I have nothing further.
```

90

## CERTIFICATION

STATE OF CONNECTICUT        )
                           )        ss.        North Haven
DISTRICT OF NEW HAVEN      )


        I, Jean Carreiro Velez, a Notary Public, duly
commissioned and qualified in and for the District
of New Haven, State of Connecticut, do hereby
certify that, pursuant to notice and in accordance
with the stipulations set forth, there came before
me on the 23rd day of January 2025.  The deponent
was located at University of Connecticut, Storrs,
Connecticut.  The following named person, to wit:
JASON G. IRIZARRY, Ed.D., the witness, who was by me
duly sworn to testify to the truth, the whole truth,
and nothing but the truth of his/her knowledge
touching and concerning the matters in controversy
in this action, that he/she was thereupon carefully
examined upon his/her oath and his/her examination
reduced to typewriting by me, that the deposition is
a true and accurate record of the testimony given by
the witness.

        I further certify that I am neither attorney or
counsel for, nor related to or employed by, any of
the parties to the action in which this deposition
is taken, and, further, that I am not a relative or
employee of any attorney or counsel employed by the
parties hereto or financially interested in the
outcome of said action.

        In witness whereof I have hereunto set my hand
and affixed my notarial seal this 5th day of March
2025.

                (My Commission expires March 31, 2025.)



                \s\ Jean Carreiro Velez
                _____
                Jean Carreiro Velez, Notary Public
                Certified Shorthand Reporter

**(Excerpted and Redacted)
Defendant's Deposition Exhibit 2**



## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TIFFANY A. BROWN                         :        CIVIL NO. 3:23-CV-01488-VAB
    *Plaintiff,*                        :
                                       :
v.                                        :
                                       :
UNIVERSITY OF CONNECTICUT                 :
    *Defendant*                        :        JULY 11, 2024

### PLAINTIFF'S ANSWERS TO DEFENDANT'S
### FIRST SET OF INTERROGATORIES

### INTERROGATORIES:

1.  Identify the person(s) answering these interrogatories, including their full name, current residential address, current work address and year of birth.

    **ANSWER:**

    TIFFANY BROWN

    Work and Residential Address

    

    Year of Birth ▮

2.  Please identify the name, address and telephone number of any person(s) who may possess facts relating in any manner to the allegations set forth in the Complaint or the answers to these interrogatories and describe the content of such person's knowledge.

    **ANSWER:**

    a.  Tiffany A. Brown, plaintiff. The plaintiff has knowledge regarding the unlawful retaliation to which the plaintiff had been subjected by the defendant when it (1) refused

1



3. Please state with specificity the details surrounding any complaints or reports of discrimination that the Plaintiff claims to have made, which the Plaintiff claims resulted in retaliation.

**ANSWER:**

　　a. At the very start of the plaintiff's employment in the 2021-2022 academic year, the plaintiff complained about the inherent race and color bias to which she was subjected when the defendant assigned the plaintiff teach race related courses even though she lacked experience such courses. After the plaintiff requested that the defendant explain in writing the reasons it believed that she was qualified to teach race-related courses, the defendant rescinded her assignment.

　　b. The plaintiff, after meeting with Burton and Irizarry on February 14, 2022, raised fairness issues in an email to them with regard to their evaluation of her job performance, as well as the inherent bias of the evaluation process employed to assess

8

her performance, to which neither Burton nor Irizarry ever responded.

c. On or about November 1, 2022, the plaintiff objected to her discriminatory treatment
to which she was subjected when Burton had favored Cobb in the scheduling of the
EDLR 5202 class, summarily dismissing the plaintiff's recommendation.

d. On November 3, 2022, the plaintiff informed Burton, Cobb, and Irizarry, by email
that she would be reporting Burton and Cobb's conduct to the Office of Institutional
Equity in summarily disregarding her recommendation as well as ignoring the
preference of the students regarding the remaining classes that should be taught
remotely.

e. On November 8, 2022, the plaintiff informed Irizarry, after he had initiated a bogus
investigation of her, that she is "being subject[ed] to harassment and discrimination
by being continuously held to different standards than those of my colleagues."

4. 

9



24. Please identify any alleged comparators, and if the Plaintiff believes that any alleged
comparators were similarly situated to the Plaintiff, please state the factual basis that such
individuals were similarly situated to the Plaintiff and were treated differently than the
Plaintiff.

**ANSWER:**

A. Cobb – On November 8, 2022, Irizarry notified the plaintiff that he had commenced an
investigation of the plaintiff's performance and conduct. The basis of Irizarry's charge
related to discretionary accommodations that Cobb had advised the plaintiff to employ for
her students who work full-time jobs. The underlying charge lodged by Irizarry against
the plaintiff was no different from the discretionary accommodations employed by Cobb,
a white male, with his full-time students for which he had not been subjected to an
investigation, which led the plaintiff to inform Irizarry that she is "being subject[ed] to
harassment and discrimination by being continuously held to different standards than those
of my colleagues."

B. Dr. Friedus and Dr. Chen. At the time of the plaintiff's hiring by the defendant as a tenure

21

track Assistant Professor, she was paid substantially less than Dr. Friedus and Dr. Chen. The defendant engaged in policies and practices which willfully discriminated against the plaintiff on the basis of her race, color, and gender by paying her a substantially lower salary than that paid to her male, and non-Black co-workers, Dr. Friedus and Dr. Chen.

C.  Additionally, although the plaintiff had been sharing a workload with Cobb, an Endowed Professor, and, at the same time, had been requested by the defendant to redesign the doctoral curriculum's sole offering in organizational studies for both the PhD and EdD programs, she was paid approximately one-third less than that paid to Cobb.

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 2
Page 5 of 6

### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

TIFFANY A. BROWN                    :       CIVIL NO. 3:23-CV-01488-VAB
    *Plaintiff,*                       :
                         :
v.                                  :
                         :
UNIVERSITY OF CONNECTICUT           :
    *Defendant*                        :       July 11, 2024

### <u>OATH OF RESPONDENT</u>

I, Tiffany A. Brown, being of sound mind and legal age, and having been duly sworn, do hereby depose and say that:

1.      I am the respondent identified in Interrogatory no. 1 above.

2.      The answers and documents provided in response to the attached Interrogatories and Requests for Production are true and accurate.

                           _____
                           Tiffany A. Brown

Subscribed and sworn to before me this _11th_ day of July, 2024.

                           _____
                           Commissioner of the Superior Court/
                           ~~Notary Public~~

23

# Defendant's Deposition Exhibit 3



## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TIFFANY A. BROWN, | : | CIVIL CASE NO. |
| Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT, | : | |
| Defendant. | : | NOVEMBER 10, 2023 |

## COMPLAINT

## I.   PRELIMINARY STATEMENT

1.   This action seeks declaratory, injunctive, and equitable relief, and compensatory
     damages, and costs and attorney fees for the race and color discrimination suffered
     by the plaintiff when the defendant refused to renew the plaintiff's employment on
     account of the plaintiff's race and color in violation of the provisions of the Title
     VII of the Civil Rights Act of 1964, as amended.

2.   Also, this action seeks declaratory, injunctive, and equitable relief, and
     compensatory, and costs and attorney fees for the race and color discrimination
     suffered by the plaintiff when the defendant constructively discharged the plaintiff
     from her employment on account of the plaintiff's race and color in violation of the
     provisions of the Title VII of the Civil Rights Act of 1964, as amended.

3.   Further, this action seeks declaratory, injunctive, and equitable relief, and
     compensatory, and costs and attorney fees for the gender and race discrimination
     suffered by the plaintiff when the defendant paid the plaintiff compensation
     substantially less than the compensation it paid to two male employees and a
     Hispanic female employee who were, in all material respects, similarly situated to

1



the plaintiff in violation of the provisions of the Title VII of the Civil Rights Act of 1964, as amended.

4. Additionally, this action seeks declaratory, injunctive, and equitable relief, and compensatory damages, and costs and attorney fees for the unlawful retaliation to which the plaintiff had been subjected by the defendant when it (1) refused to renew her contract of employment for the 2023-2024 academic year; (2) subjected her to a baseless investigation; and (3) constructively discharged her from her position as a tenure track Assistant Professor because the plaintiff opposed the race and color discrimination to which she had been subjected by the defendant in violation of the provisions of the Title VII of the Civil Rights Act of 1964, as amended.

## II.    **JURISDICTION**

5. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq., and the Civil Rights Act of 1991, 42 U.S.C. §1981a.

6. Jurisdiction is invoked pursuant to Title 28 U.S.C. § 1331, Title 28 U.S.C. § 1343(a)(3), Title 28 U.S.C. § 1343(a)(4), Title 28 U.S.C. § 1367, Title 28 U.S.C. § 2201(a), and Title 42 U.S.C. §2000e-5(f).

7. All conditions precedent to jurisdiction under Section 706 of Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. §2000e-5(f)(3), have occurred or have been complied with in the following manner:

   a. A charge of employment discrimination on the basis of race, color, and unlawful retaliation was filed with the United States Equal Employment Opportunity Commission and amended on or about April 5, 2023, which filings were within 300 days of the commission of the unlawful employment practice alleged

2

I LAW.COM RADAR

therein.

b. On November 8, 2023, the plaintiff was issued a "Dismissal and Notice of Rights" by the United States Equal Employment Opportunity Commission. *Exhibit 1.*

c. A complaint of employment discrimination on the basis of race, color, and unlawful retaliation and amended on or about April 5, 2023, were filed with the State of Connecticut Commission on Human Rights and Opportunities, which filing was within 300 days of the commission of the unlawful employment practice alleged therein.

d. On October 27, 2023, the plaintiff was issued a "Release of Jurisdiction" by the State of Connecticut Commission on Human Rights and Opportunities. *Exhibit 2.*

8.      Declaratory, injunctive, compensatory, and equitable relief is sought pursuant to Title 28 U.S.C. §2201, §2202 and Title 42 U.S.C. §2000e-5(g). Compensatory damages are sought pursuant to Title 42 U.S.C. §1981a.

9.      Costs and attorney fees may be awarded pursuant to Title 42 U.S.C. §2000e-5(k), and Title 42 U.S.C. §1988.

## III.   **VENUE**

10.     This action properly lies in the District of Connecticut pursuant to Title 29 U.S.C. §1391(b) because the claims arose in this judicial district, and pursuant to Title 42 U.S.C. §2000e-5(f)(3), because the unlawful employment practices were committed in this judicial district.

3

I LAW.COM RADAR

## IV. PARTIES

11. The plaintiff, at all times relevant to her complaint, was a citizen of the United States residing in New York, New York.

12. The plaintiff's race is African American, and her color is Black.

13. The defendant is a political subdivision of the State of Connecticut.

14. The defendant is a person within the meaning of Section 701(a) of Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. §2000e(a).

15. The defendant is an employer within the meaning of Section 701(b) of Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. §2000e(b).

16. The defendant employs in excess of fifteen employees.

17. The defendant is a person within the meaning of Section 701(a) of Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. §2000e(a).

## V. FACTS

18. In 2014, the plaintiff was awarded a Bachelor of Science degree in Foreign Service, Culture and Politics, Honors Psychology Program, from Georgetown University, and in 2016, she was awarded an M.A. in Social-Organizational Psychology, as well as an Advanced Certificate in Cooperation and Conflict Resolution Studies from Columbia University.

19. In 2018, the plaintiff was awarded an M.Ed. in Policy and Management from Harvard University, and in 2021, the plaintiff was awarded a Ph.D. in Education and Organizational Studies by Harvard University.

20. In 2021, the plaintiff received and accepted an offer of employment from the

4

I LAW.COM RADAR

defendant to the position of Assistant Professor for the 2021-2022 academic year.

21.   In her position as Assistant Professor, the plaintiff designed and taught doctoral level courses in organizational leadership and workplace learning to approximately sixty (60) students.

22.   Throughout her employment with the defendant, the plaintiff performed her duties and responsibilities in an exemplary manner.

23.   Despite her capable performance, the plaintiff throughout her employment with the defendant, was subjected to discriminatory treatment in the terms and conditions of her employment based on her race, color, and gender.

24.   The race and color discrimination to which the plaintiff was subjected by the defendant became more pronounced during her second year of employment, the 2022-2023 academic year, resulting in the plaintiff being subjected to a hostile work environment, the non-renewal of her appointment as a tenure track Assistant Professor, and being constructively discharged by the defendant from her employment.

25.   From the very start of her employment, the defendant exhibited an inherent race and color bias when the plaintiff, who had no experience teaching race related courses, was assigned by the defendant to assume the responsibility to teach such courses.

26.   Assigning race related courses to the plaintiff, with no experience or qualifications to teach such courses, betrayed the inherent racial bias that the plaintiff confronted throughout her employment with the defendant.

27.   The defendant resorted to an opinion, based on racial stereotypes, that the plaintiff,

5

I LAW.COM RADAR

being African American and Black, would be better suited to teach race related courses than non-African American and non-Black professors similarly situated to the plaintiff.

28. Shortly after the plaintiff requested that the defendant explain in writing the reasons it believed that she was qualified to teach race-related courses, the defendant rescinded her assignment.

29. On August 18th, 2022, Casey Cobb ("Cobb"), Neag Endowed Professor of Education Policy, University of Connecticut, prior to the start of the 2022-2023 Academic Year, sent an email to the plaintiff with the subject line "Fall email to EdD cohort." *Exhibit 3.*

30. Cobb and the plaintiff were both scheduled to teach the EdD students in Fall 2022.

31. The email summarized decisions made without the plaintiff's input regarding the composition and scheduling of classes for the EdD cohort.

32. In the email, Cobb identified a conflict in schedules of the EdD students', stating, "I had one of the Bridge students email me a few days ago asking about the possibility of holding the Aug 30th class remotely, due to her and two other students' concerns about making class on their first day of school. I didn't think of this and probably should have, but I also am not changing the schedule. Just making you aware the first day will be hectic and people will undoubtedly be late, as some travel from far and may not be able to leave school on time that day. In fact, expect throughout the semester 1-2 student (sic) invariably arrive late and are always apologetic. It's just the reality with their positions and emergencies come up."

33. Cobb also acknowledged that accommodations are made in scheduling courses for

6

I LAW.COM RADAR

the students, who mostly work full-time during the day.

34.   Cobb in his email informed the plaintiff that "You'll see in the email below the routine for the back to back courses. Our courses are a little shorter than normal because of the back to back nature after they work all day. We give them a 30 minute break for dinner. So you're course will start at 4 and go to 6:15. Throw in a short break as you see fit. Then I pick them up at 6:45 and go to 9 pm."

35.   On or about November 1, 2022, the plaintiff had been teaching the EdD cohort, a course entitled "Workplace Learning (EDLR 5202), which was scheduled from 4:15 p.m. to 6:15 p.m., as detailed in *Exhibit 3*.

36.   Based on her experience in teaching the EDLR 5202 class for approximately two months, the plaintiff emailed Cobb and Laura Burton ("Burton"), Department Head, Educational Leadership and Professor, Sports Management, University of Connecticut, to inform them that the students had not been able to make class on time when coming from their workplace commitments. *Exhibit 4.*

37.   In her email to Cobb and Burton, *Exhibit 4,* the plaintiff explained that the students have been regularly unable to attend class on time, as well as describing the impact on her own situation as an employee in terms of increased commuting costs to the defendant's campus.

38.   Cobb unreasonably suggested that he and the plaintiff swap time slots, which as the plaintiff pointed out did not solve the issue of the time slot itself being scheduled at a time slot when most students were still technically at work.

39.   In response to Cobb's noting that he lives just a few minutes away from campus, the plaintiff reminded Cobb that although the time slot may work for him, it does

7

LAW.COM RADAR

not work for students who are commuting from substantial distances to attend class.

40. The plaintiff also reminded Cobb that he had anticipated this issue in the August 18, 2022, email he had sent to the plaintiff, and took no action at that time to accommodate the students.

41. In a subsequent email dated November 1, 2022, at 3:09 p.m., the plaintiff admonished Cobb for ignoring the students' needs as well as her needs. "The problem is that you have known since before the semester started that students regularly cannot make my class on time and don't want to hold remote sessions to better serve their needs. You've ignored both their needs and mine (as an individual and as your colleague) by proposing we simply swap times knowing that the issue is arising because of a consistent timing conflict for the students. I cannot join you in knowing that this does not work for them and choosing against their best interests. The students will get to vote today, because I want to know what they think. Depending on their responses (which I am happy to share), I will get back to you on the plan for how to best support them moving forward." *Exhibit 4.*

42. On November 1, 2022, only eight of her 19 students were present at the start of the class.

43. When all the students were present, the plaintiff informed the students that they should vote in her absence on which of the remaining sessions they would prefer to have conducted remotely for the remainder of the semester.

44. After the students voted, the plaintiff informed Cobb and Burton that 60-80% of the students had expressed their preference to have at least two additional remote sessions.

8

I LAW.COM RADAR

45. Burton responded to the plaintiff's communication, stating, "[a]fter reviewing what has been shared, it makes sense to offer the Nov. 8th course remotely. The final two classes (11/15 and 12/6) must meet in person. If students have concerns, please have them contact me directly." *Exhibit 4.*

46. On November 3rd, 2022, the plaintiff informed Burton, Cobb, and Jason G. Irizarry ("Irizzary"), Ed.D, Dean of the Neag School of Education, University of Connecticut, by email that she would be reporting Burton and Cobb's conduct to the Office of Institutional Equity in summarily disregarding her recommendation as well as ignoring the preference of the students regarding the remaining classes that should be taught remotely.

47. The plaintiff raised Burton's "continued microaggressions toward [her] on [her] work since the start of [her] time here with reference to some of the research [Burton has] done on the topic regarding black female experiences in particular…yesterday's [November 1] interaction was an escalation of the *passive aggression/discrimination* [she had] experienced since last Spring when you tried to rationalize assigning me to the social justice leadership class even though Alex had also been hired for the same position and literally describes herself as a race and class scholar…." *Exhibit 5 (Emphasis added).*

48. On November 4, 2022, Jennifer McGarry ("McGarry"), chair of the EDLR PTR Committee, provided the plaintiff a communication from the Promotion and Tenure Review Committee stating that it had voted not to recommend the plaintiff for reappointment to the position of Assistant Professor in the upcoming academic year. *Exhibits 6 and 7.*

9

I LAW.COM RADAR

49.    Although the communication from McGarry was received by the plaintiff on
       November 4, 2022, *Exhibit 6,* the vote of the committee allegedly took place on
       October 5, 2022. *Exhibit 7.*

50.    Assuming that the date of the vote on the plaintiff's reappointment is accurate, the
       procedure followed by the committee failed to comport with the PTR procedures
       to which the defendant and the union ("AAUP") had agreed.

51.    The decision not to reappoint the plaintiff was finalized only after the plaintiff had
       informed Burke. Cobb, and Irizarry that she would be filing a discrimination charge
       with the defendant's Office of Institutional Equity, to which communication none
       of the addressees responded.

52.    On November 8, 2022, less than a week after he had received notice from the
       plaintiff that she would be filing a complaint with the Office of Institutional Equity,
       Irizzary initiated an investigation of the plaintiff's "performance and conduct
       during the Fall 2022 semester.  More specifically, it has been reported that [the
       plaintiff] leave[s] [her] ELDR 5015 class, scheduled Thursdays from 5:00pm to
       7:30pm, approximately 30 minutes early every week." *Exhibit 8.*

53.    At no time prior to November 8, 2022, had Irizarry, or any other official of the
       defendant, ever raised a concern with the plaintiff's "performance and conduct
       during the Fall 2022 semester."

54.    It was only after the plaintiff had notified Irizarry, Burton and Cobb, that Irizarry
       commenced an investigation of the plaintiff's performance and conduct.

55.    The basis of Irizarry's charge relates to discretionary accommodations that Cobb
       had advised the plaintiff to employ for her students who work full-time jobs.

10                          I LAW.COM RADAR

*Exhibit 8.*

56.    The underlying charge lodged by Irizarry against the plaintiff was no different from
       the discretionary accommodations employed by Cobb, a white male, with his full-
       time students for which he had not been subjected to an investigation, which led
       the plaintiff to inform Irizarry that she is "being subject[ed] to harassment and
       discrimination by being continuously held to different standards than those of my
       colleagues." *Plaintiff's Exhibit 8.*

57.    As a result of the retaliation, refusing to reappoint the plaintiff to the position of
       Assistant Professor, and subjecting her to a meritless investigation, to which she
       had been subjected by the defendant, the plaintiff experienced severe anxiety and
       depressive symptoms which required her, on the advice of her mental health care
       provider and her union representative, to take extended FMLA leave beginning on
       November 11, 2022

58.    On November 10, 2022, the plaintiff received a letter from Burton, dated November
       10, 2022, informing her that Burton would also be voting not to reappoint the
       plaintiff to the position of Assistant Professor. *Exhibit 10.*

59.    Burton's letter, just as with the communication from McGarry on November 4,
       2022, approximately one month after the committee had voted not to reappoint the
       plaintiff to the position of tenure track Assistant Professor, failed to follow the
       Promotion and Tenure Review procedures.

60.    As Burton acknowledged in an email to the plaintiff on October 3, 2022, Burton
       should have sent her letter, as the department head, to the plaintiff prior to meeting
       with the plaintiff to discuss the plaintiff's reappointment.

11

I LAW.COM RADAR

61. Burton did not send her letter to the plaintiff concerning her decision to oppose the reappointment of the plaintiff to the position of tenure track Assistant Professor until nearly one month after she had met with the plaintiff, and after the plaintiff had already been informed by McGarry that the PTR Committee had decided not to reappoint her.

62. In fact, Burton sent her letter to the plaintiff one night before the plaintiff, as Burton knew, had been scheduled to commence her FMLA leave on November 11, 2022. *Exhibit 11.*

63. Prior to the complaint that the plaintiff filed against Burton with the Office of Institutional Equity, Burton had never raised any concerns with the plaintiff about her reappointment being in jeopardy.

64. It was the plaintiff, after meeting with Burton and Irizarry on February 14, 2022, who raised fairness issues in an email to them with regard to their evaluation of her job performance, as well as the inherent bias of the evaluation process employed to assess her performance, which neither Burton nor Irizarry ever addressed. *Exhibit 12.*

65. On December 7, 2022, the defendant's human resources department informed the plaintiff that her FMLA leave had been granted from November 11, 2022, to May 11, 2023.

66. On or about April 1, 2023, Burton sent out a spreadsheet to all employees that showed the comparative salaries paid to the teachers in the plaintiff's Department. *Exhibit 9.*

67. There is one non-Black and one non-Black Hispanic full-time, tenure-tracked

12

I LAW.COM RADAR

coworkers, who were similarly situated to the plaintiff in all material respects, with similar or fewer credentials to the plaintiff, to whom the defendant had paid substantially more in compensation than what it paid to the plaintiff.

68. There is a part-time, non-tenure tracked, White male coworker with fewer credentials than the plaintiff who earns substantially more than the plaintiff on a proportionate basis.

69. The plaintiff was paid approximately one-third less than the defendant paid Cobb even though they shared substantially the same workload.

70. The defendant subjected the plaintiff to discrimination in terms of her compensation and denied equal pay for equal work performed.

71. As a result of the discrimination and harassment to which the defendant subjected the plaintiff, the plaintiff was forced to resign from her position as an Assistant Professor.

## VI.    FIRST CAUSE OF ACTION (Unlawful Employment Termination on account of the Plaintiff's Race and Color in Violation of Title VII of The Civil Rights Act Of 1964)

72-142.  The plaintiff incorporates as if re-alleged paragraphs 1 through 71.

143.    On May 12, 2023, the defendant, motivated by the plaintiff's race and color, constructively discharged the plaintiff from her employment as a tenure track Assistant Professor.

144.    The defendant discriminated against the plaintiff with malice and with a reckless indifference to the federally protected rights of the plaintiff guaranteed to the plaintiff by the provisions of Title VII of the Civil Rights Act of 1964, as amended, when it constructively discharged the plaintiff.

13

I LAW.COM RADAR

145.    The defendant was motivated by plaintiff's race, and color when it
        constructively terminated the plaintiff's employment.

146.    The plaintiff was fully qualified and capable of performing the duties of a tenure
        track Assistant Professor.

147.    At the time of her constructive termination, the plaintiff had been performing her
        job duties in a capable manner.

148.    Because the plaintiff's race and color were motivating factors and made a
        difference in the decision by the defendant to constructively terminate the
        plaintiff's employment, the defendant violated the provisions of Title VII of the
        Civil Rights Act of 1964, as amended.

149.    The defendant engaged in discrimination against the plaintiff with malice or
        reckless indifference to the plaintiff's rights under Title VII of the Civil Rights
        Act of 1964, as amended.

150.    The defendant's termination of the plaintiff's employment constitutes unlawful
        race, and color discrimination.

151.    The defendant violated the provisions of Title VII of the Civil Rights Act of 1964,
        as amended, when it constructively terminated the plaintiff's employment on
        account of her race, and color.

152.    As a result of the termination of the plaintiff's employment, the plaintiff has
        suffered economic losses, including loss wages and benefits.

153.    As a result of the termination of the plaintiff's employment, the plaintiff has
        suffered emotional distress.

14

I LAW.COM RADAR

## VII.    SECOND CAUSE OF ACTION (Unlawful Refusal to Reappoint the Plaintiff to the Position of Assistant Professor on account of the Plaintiff's Race and Color in Violation of Title VII of The Civil Rights Act Of 1964)

154-224.   The plaintiff incorporates as if re-alleged paragraphs 1 through 71.

225.       On November 4, 2022, the defendant, motivated by the plaintiff's race and color, informed the plaintiff for the very first time that it would not reappoint her to the position of tenure track Assistant Professor for the 2023-2024 academic year.

226.       The defendant discriminated against the plaintiff with malice and with a reckless indifference to the federally protected rights of the plaintiff guaranteed to the plaintiff by the provisions of Title VII of the Civil Rights Act of 1964, as amended.

227.       The defendant was motivated by plaintiff's race, and color when it refused to reappoint her to the position of tenure track Assistant Professor for the 2023-2024 academic year.

228.       The plaintiff was fully qualified and capable of performing the duties of a tenure track Assistant Professor.

229.       The plaintiff had been consistently performing her job duties in a capable manner when the defendant informed her that it would not reappoint her to the position of tenure track Assistant Professor for the 2023-2024 academic year.

230.       Because the plaintiff's race and color were motivating factors and made a difference in the decision by the defendant not to reappoint her to the position of tenure track Assistant Professor for the 2023-2024 academic year, the defendant violated the provisions of Title VII of the Civil Rights Act of 1964, as amended.

15

I LAW.COM RADAR

231.   The defendant engaged in discrimination against the plaintiff with malice or reckless indifference to the plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended.

232.   The defendant's refusal to reappoint the plaintiff to the position of tenure track Assistant Professor for the 2023-2024 academic year constitutes unlawful race, and color discrimination.

233.   The defendant violated the provisions of Title VII of the Civil Rights Act of 1964, as amended, when the defendant refused to reappoint her to the position of tenure track Assistant Professor for the 2023-2024 academic year on account of her race, and color.

234.   As a result of the defendant's refusal to reappoint the plaintiff to the position of tenure track Assistant Professor for the 2023-2024 academic year, the plaintiff has suffered economic losses, including loss wages and benefits.

235.   As a result of the defendant's refusal to reappoint the plaintiff to the position of tenure track Assistant Professor for the 2023-2024 academic year, the plaintiff has suffered emotional distress.

## VIII.   THIRD CAUSE OF ACTION (Unequal Compensation on account of the Plaintiff's Race, Color, and Gender in Violation of Title VII of The Civil Rights Act Of 1964)

236-306.   The plaintiff incorporates as if re-alleged paragraphs 1 through 71.

307.   At the time of the plaintiff's hiring by the defendant as a tenure track Assistant Professor, she was paid substantially less than Dr. Friedus and Dr. Chen.

308.   The plaintiff and Dr. Friedus, and Dr. Chen were similarly situated in all material respects, professor rank and years of service.

16

LAW.COM RADAR

309. On the other hand, the plaintiff had a heavier workload than the other two professors.

310. Furthermore, the plaintiff had the responsibility of remaking the doctoral curriculum specific to organizational theory, while neither Dr. Friedus nor Dr. Chen had similar responsibilities.

311. Additionally, the plaintiff, who had no experience teaching race related courses, was required to assume that responsibility.

312. The defendant engaged in policies and practices which willfully discriminated against the plaintiff on the basis of her race, color, and gender by paying her a substantially lower salary than that paid to her male, and non-Black co-workers, Dr. Friedus and Dr. Chen.

313. The job skills, work effort and responsibilities of Dr. Chen and Dr. Friedus were not equal or greater to the job skills, work effort and responsibilities of the plaintiff.

314. Additionally, although the plaintiff had been sharing a workload with Cobb, an Endowed Professor, and, at the same time, had been requested by the defendant to redesign the doctoral curriculum's sole offering in organizational studies for both the PhD and EdD programs, she was paid approximately one-third less than that paid to Cobb.

315. The above acts of the defendant violate the provisions of Title VII of the Civil Rights Act of 1964, as amended.

316. As a result of the defendant's unlawful actions, the plaintiff has suffered economic losses.

317. Because of the unlawful actions of the defendant, the plaintiff has suffered

17

emotional distress.

## IX. FOURTH CAUSE OF ACTION (Unlawful Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as amended The Civil Rights Of 1964)

318-388. The plaintiff incorporates as if re-alleged paragraphs 1 through 71.

389. The defendant has subjected the plaintiff to unlawful retaliation because the plaintiff informed the defendant that she would be filing a discrimination complaint against Burton and Cobb with the defendant's Office of Institutional Equity.

390. As a result of voicing to Irizarry, Cobb, and Burton,  her opposition to the race, color and gender discrimination to which she was being subjected by the defendant, the defendant initiated a baseless investigation of her job performance, refused to reappoint her to the position of tenure track Assistant Professor, and constructively discharged her from her position of tenure track Assistant Professor.

391. Because the plaintiff's opposition to the defendant's race and color discrimination was the determinative factor, the but-for cause, in the retaliatory actions to which the plaintiff was subjected by the defendant, the defendant violated Title VII of the Civil Rights Act of 1964, as amended.

392. The defendant engaged in retaliation against the plaintiff with malice or reckless indifference to the plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended.

393. The plaintiff's vocal opposition to the discriminatory treatment to which she had been subjected by the defendant constitutes protected activity under the provisions of Title VII of the Civil Rights Act of 1964, as amended.

18

ILAW.COM RADAR

394.   The retaliatory actions to which the defendant subjected the plaintiff would deter a
reasonable employee from making, filing, or supporting a claim of workplace
discrimination.

395.   The plaintiff is now and will continue to suffer emotional distress as a direct result
of the defendant's unlawful retaliation.

396.   The plaintiff has suffered economic injury as a direct result of the defendant's
unlawful retaliation.

397.   The defendant discriminated against the plaintiff on the basis of the plaintiff's
opposition to the defendant's unlawful race, color, and gender discrimination when
she complained about such acts to Burton, Cobb, and Irizarry.

398.   Because the plaintiff's opposition to the defendant's race, color, and gender
discrimination was a determinative factor, the but-for cause, in the retaliation the
defendant directed at the plaintiff, the defendant violated Title VII of the Civil
Rights Act of 1964, as amended.

## X.   PRAYER FOR RELIEF

WHEREFORE, THE PLAINTIFF PRAYS THAT THIS COURT:

(As to all causes of action)

   a. Declare the conduct engaged by the defendant to be in violation of the plaintiff's
      rights under Title VII of the Civil Rights Act of 1964, as amended;

   b. Require the defendant to reinstate the plaintiff to her position of tenure track
      Assistant Professor;

   c. Award plaintiff the equitable relief of back pay and benefits, together with
      prejudgment interest for the entire period as well as front salary and benefits

19

I LAW.COM RADAR

accrual;

d.   Award plaintiff compensatory damages;

e.   Award plaintiff costs and attorney fees; and

f.   Grant such other and further relief as the Court may deem just and proper.

## XI.   **JURY DEMAND**

### **THE PLAINTIFF REQUESTS A TRIAL BY JURY.**

THE PLAINTIFF – TIFFANY BROWN

BY/s/ Thomas W. Bucci
Thomas W. Bucci
Fed. Bar #ct07805
WILLINGER, WILLINGER & BUCCI, P.C.
1000 Bridgeport Avenue
Suite 501
Shelton, CT 06484
Tel: (203) 366-3939
Fax: (475) 269-2907
Email: thomaswbucci@outlook.com

20

I LAW.COM RADAR



ALL-STATE LEGAL®

**PLAINTIFF'S EXHIBIT**

1

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

New York District Office
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 11/08/2023

**To:** Tiffany Brown

Charge No: 16A-2023-00940

EEOC Representative and email:   AMON KINSEY
Supervisory Investigator
Amon.Kinsey@EEOC.gov

### DISMISSAL OF CHARGE

The EEOC is closing this charge because: The Charging Party is pursuing another forum.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If
you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal
or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.**
Receipt generally occurs on the date that you (or your representative) view this document. You
should keep a record of the date you received this notice. Your right to sue based on this charge
will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit
based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Timothy Riera
11/08/2023

Timothy Riera
Acting District Director

ILAW.COM RADAR

Cc:

UCONN
c/o Kelly Bannister
9 Walters Ave., Unit 5075
Storrs, CT 06269

Thomas Borner
155 Providence St
Putnam, CT 06484

Please retain this notice for your records.

| LAW.COM RADAR

PLAINTIFF'S
EXHIBIT

*ALL-STATE LEGAL®*

2

## STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

**Tiffany Brown**
**COMPLAINANT**

vs.

CHRO No. 2340319
EEOC No. 16A20230940

**CONN., UCONN-Neag School of Education**
**RESPONDENT**

### RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

*Tanya a Hughes*

**DATE: October 27, 2023**          Tanya A. Hughes, Executive Director

cc:

Complainant's Attorney: Thomas Bucci, Esq.
                        Willinger Willinger & Bucci PC
                        tbucci@wwblaw.com

Respondent's Atty.:   Kelly Bannister, Esq.
                      Kelly.bannister@uconn.edu

Case File

LAW.COM RADAR

PLAINTIFF'S
EXHIBIT

3

ALL-STATE LEGAL®

3/17/23, 2:48 PM

University of Connecticut Mail - Fall email to EdD cohort



**Appendix A**

Tiffany Brown <tiffany.brown@uconn.edu>

## Fall email to EdD cohort
9 messages

**Cobb, Casey** <casey.cobb@uconn.edu>
To: "Brown, Tiffany" <tiffany.brown@uconn.edu>

Thu, Aug 18, 2022 at 11:41 AM

Hi Tiffany,

We are getting close to starting the semester; I can't believe it. I wanted to share a few things with you about the fall. As EdD coordinator I'm a little late getting an email out to the cohort, but pasted below is what I plan to send to them by tomorrow if not sooner. A few quick bits of information:

- One of our students, ░░░░░░░░░ is deaf and receives accommodations. The Center for Disabilities may have reached out to you or perhaps Jeff did himself. They make arrangements to have an ASL interpreter in class (or online when remote). They have been great to work with, as has Jeff. It helps if you can send the interpreter a ppt or even provide access to HuskyCT if you use it, so they review some terminology, etc. Again, they should in theory be reaching out to you.
- I had one of the Bridge students email me a few days ago asking about the possibility of holding the Aug 30th class remotely, due to her and two other students' concerns about making class on their first day of school. I didn't think of this and probably should have, but I also am not changing the schedule. Just making you aware the first day will be hectic and people will undoubtedly be late, as some travel from far and may not be able to leave school on time that day. In fact, expect throughout the semester 1-2 student invariably arrive late and are always apologetic. It's just the reality with their positions and emergencies come up.
- You'll see in the email below the routine for the back to back courses. Our courses are a little shorter than normal because of the back to back nature after they work all day. We give them a 30 minute break for dinner. So you're course will start at 4 and go to 6:15. Throw in a short break as you see fit. Then I pick them up at 6:45 and go to 9 pm.
- ░░░░░░░ emailed us a while ago about the new Bridge students. They will not have met the cohort so if you want to do an icebreaker, go for it. If you do something more regular like introductions, that works too. Maybe let me know if you plan to do anything special so I don't duplicate efforts.
- I'm attaching the up to date list of students in the cohort. One of the students, ░░░░░░░░░░ asked yesterday to rejoin the cohort after a leave. I'm waiting on Morgaen's reply but I assume it's not a problem.
- Here is that email I plan to send out. Let me know if you see that I missed something:

Hi All,

I hope you are all doing well and were able to get some rest and relaxation this summer. There is still a little bit left ☺ . Soon you will launch into Year 2 of the EdD. You are making great progress.

I'm writing with information on the two courses for which you should be registering. We made a switch on one of the courses on the master schedule – we are swapping 5202 and 6467. So these are the two fall courses:

EDLR 5202 Workplace Learning (Dr. Tiffany Brown)
EDLR 6465 Educational Administration Issues and Research (stuck with me again…requires a permission # for some reason, which Alyssa has sent you)

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 3
Page 24 of 52

3/17/23, 2:02 PM                    University of Connecticut Mail - Re: edlr 5202's scheduled remote sessions



PLAINTIFF'S
EXHIBIT
4

UCONN
UNIVERSITY OF CONNECTICUT

Appendix B  Tiffany Brown <tiffany.brown@uconn.edu>

## Re: edlr 5202's scheduled remote sessions

31 messages

**Cobb, Casey** <casey.cobb@uconn.edu>                                    Tue, Nov 1, 2022 at 9:04 AM
To: "Brown, Tiffany" <tiffany.brown@uconn.edu>
Cc: "Burton, Laura" <laura.burton@uconn.edu>, "Weiner, Jennie" <jennie.weiner@uconn.edu>

Dear Tiffany,

The most pressing issue appears to be the time slot you are teaching. I am more than willing to swap time slots the rest of
the way. I have taught both the first and second Tuesday sessions since the EdD program started and am used to either
one. Just say the word and send me your room number and we can start as early as today.

In the meantime in terms of remote classes I am planning to ask the class tonight specifically about Nov 8. Election Day
can affect school schedules. So if they lean toward having difficulty getting here in person we can conceivably switch that
to online. By my count we have 5 sessions left, one of which is already scheduled online. We have to be somewhat
careful as some students have expressed preference for all in person.

Hope this helps.

Casey

Sent from my iPhone

> On Oct 29, 2022, at 11:40 AM, Brown, Tiffany <tiffany.brown@uconn.edu> wrote:
>
> Hi Casey -
>
> Condolences for your loss and I hope you and your family are doing alright.
>
> I need support for EDLR 5202. I talked with Laura last week about the scheduled remote dates and she let me know
that she wasn't involved in the conversation in which the decision to offer remote courses was made. When she
mentioned that I should ask my EdD colleagues, I remembered that I wasn't made aware we were offering remote classes
until you emailed to cross reference the dates you'd selected with me in August. I didn't receive an invite for the initial
planning conversation.
>
> Anyhow, at this point the students and I both need more remote sessions this semester to better support their learning.
You'll recall in August some wrote an email explaining how the current schedule conflicts with many of their work
responsibilities. For most of this semester folks have arrived to my class between 15 minutes to an hour late (or not at all)
because of various emergencies or urgent matters at the end of their work day. I was sick a week ago and had to change
class to the remote option; two people who said they couldn't make the session initially were able to attend once the
option was made available. There are folks who will have to miss upcoming classes (and course material related to their
final papers) entirely because of work required travel. It's impacting them and my own pedagogical goals to have to hope
that folks can make this class work into their schedule. They seem noticeably more engaged when they are settled in
remotely rather than rushing to my class from work. I don't think you experience this because your class starts later in the
evening.
>
> From my perspective- I hope you understand how demoralizing it is for me to travel without a car and get to campus
ready to start class only to have most of them show up when they can (not blaming them at all). I have to spend $50 both
ways to get from Hartford to Storrs every time I commute - that's excluding the cost of the Amtrak itself. There has been
no cost of living adjustment to my salary, and I'm managing inflated costs of everything on pretty much the same salary as
before this recession was set into motion. I'm not saying you can do anything about my salary, but having to delay paying
some of my bills because my commute costs have increased is a challenge exacerbated by the fact that students are not
able to be in class when it starts for various valid reasons. It's not fair to me or them, and it seems impractical for me to
keep traveling to campus to begin with half a class or consistent lateness as students finish their workdays.
>
> I feel as though my teaching is not being well supported because no one seems to care that my class is scheduled at a
time that's inconvenient for most of the students. Maybe I need to teach only masters' courses moving forward, but
something has to give. I've asked other colleagues who recall teaching mostly masters classes in their first few years and
thus not having to deal with the implications of the doctoral program's organizational issues (the ones we regularly focus

https://mail.google.com/mail/u/3/?ik=69084aa2ad&view=pt&search=all&permthid=thread-f:1748299023217966336&simpl=msg-f:1748299023217966336&simpl=...  1/38

3/17/23, 2:02 PM

University of Connecticut Mail - Re: edlr 5202's scheduled remote sessions

on in faculty meetings) in their early teaching experiences here. If the department values my teaching in the EdD program it would help to show it by scheduling my courses at a time when folks aren't rushing from work as a start.
>
> Can I be part of the next conversation on EdD scheduling? Either way, I'm proposing that we make at least one or two more of the sessions this semester remote as students have been asking for since August. I think I'll have no choice but to do so considering my finances simply aren't flexible enough to continue with the $50 cabs only to arrive to partial attendance.
>
> Thanks as always,
> Tiffany
>
>
> Sent from my iPhone
>

---

**Tiffany Brown** <tiffany.brown@uconn.edu>                                      Tue, Nov 1, 2022 at 12:53 PM
To: "Cobb, Casey" <casey.cobb@uconn.edu>
Cc: "Burton, Laura" <laura.burton@uconn.edu>, "Weiner, Jennie" <jennie.weiner@uconn.edu>

Hi Casey -

This doesn't help, and I don't agree that the time slot is the issue. The issue is this time slot happens at the end of the students' workday because most schools let out around 3-4 pm. Even folks in higher ed know this is still technically time they are on the clock. I don't remember seeing a response to the students' email about the scheduling issue that was addressed to you directly in August, but the issue remains. I think it's strange we are choosing to focus on some students' preferences rather than the general consensus that this time was not well scheduled for the demographic of students served by this program.

I don't live in CT and cannot afford to incur further costs to stay overnight and the last train leaves CT for NY at 7.59 pm. Hence the $50 cabs to get to Harford right after class. I also don't think it would help to change the students' schedule since they've got enough going on right now/it would add more uncertainty at a time no one needs it.

By my count, we have four classes left after today - one of which is remote. I still think we need at least one more for the reasons I've mentioned. My plan was to survey the students in class today as well, so let's see what their preferences are. My plan is to have them record their responses anonymously.

I'm absolutely not able to take your time slot, so I appreciate your helping to make this work for both the students and for me.

Thank you,
Tiffany

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT06269

[Quoted text hidden]

---

**Tiffany Brown** <tiffany.brown@uconn.edu>                                      Tue, Nov 1, 2022 at 3:03 PM
To: "Cobb, Casey" <casey.cobb@uconn.edu>
Cc: "Burton, Laura" <laura.burton@uconn.edu>, "Weiner, Jennie" <jennie.weiner@uconn.edu>

Hi again -

I just re-read one of Casey's emails from earlier this semester in which he foresaw that students would be regularly late to my class:

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 3
Page 26 of 52

3/17/23, 2:02 PM                                    University of Connecticut Mail - Re: edlr 5202's scheduled remote sessions

- *I had one of the Bridge students email me a few days ago asking about the possibility of holding the Aug 30th class remotely, due to her and two other students' concerns about making class on their first day of school. I didn't think of this and probably should have, but I also am not changing the schedule. Just making you aware the first day will be hectic and people will undoubtedly be late, as some travel from far and may not be able to leave school on time that day. In fact, expect throughout the semester 1-2 student invariably arrive late and are always apologetic. It's just the reality with their positions and emergencies come up.*

I am coming from the perspective of making student-centered decisions. I hope you will support my efforts to do so despite this initial stance, as again - it's not fair to me or to them (I lecture in the first 30 minutes of class, so many regularly miss it).

Tiffany Brown, Ph.D.
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

[Quoted text hidden]

---

Cobb, Casey <casey.cobb@uconn.edu>                                                     Tue, Nov 1, 2022 at 3:09 PM
To: "Brown, Tiffany" <tiffany.brown@uconn.edu>
Cc: "Burton, Laura" <laura.burton@uconn.edu>, "Weiner, Jennie" <jennie.weiner@uconn.edu>

Why don't you pick another remote class. Let me know the date.

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

  [Quoted text hidden]

[Quoted text hidden]

---

Tiffany Brown <tiffany.brown@uconn.edu>                                                Tue, Nov 1, 2022 at 3:14 PM
To: "Cobb, Casey" <casey.cobb@uconn.edu>
Cc: "Burton, Laura" <laura.burton@uconn.edu>, "Weiner, Jennie" <jennie.weiner@uconn.edu>

Casey -

The problem is that you have known since before the semester started that students regularly cannot make my class on time and don't want to hold remote sessions to better serve their needs. You've ignored both their needs and mine (as an individual and as your colleague) by proposing we simply swap times knowing that the issue is arising because of a consistent timing conflict for the students.

I cannot join you in knowing that this does not work for them and choosing against their best interests. The students will get to vote today, because I want to know what they think. Depending on their responses (which I am happy to share), I will get back to you on the plan for how to best support them moving forward.

Tiffany

Tiffany Brown, Ph.D.
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut

https://mail.google.com/mail/u/3/?ik=69084aa2ad&view=pt&search=all&permthid=thread-f:1748299023217966336&simpl=msg-f:1748299023217966336&simpl=...   3/38

3/17/23, 2:02 PM                                    University of Connecticut Mail - Re: edlr 5202's scheduled remote sessions

17 responses

Summary                    Question                  Individual

Class 11 (11/8/22)                                    Copy
17 responses

Class 12 (11/15/22)                                   Copy
17 responses

Class 14 (12/6/22)                                    Copy
17 responses

Two people are missing, but as you can see there's an overwhelming majority. The results support that we should grant their request that the sessions on 11/8 and 11/15 meet remotely.

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT06269

[Quoted text hidden]

---

**Burton, Laura** <laura.burton@uconn.edu>                                    Wed, Nov 2, 2022 at 4:16 PM
To: "Brown, Tiffany" <tiffany.brown@uconn.edu>, "Cobb, Casey" <casey.cobb@uconn.edu>, "Weiner, Jennie"
<jennie.weiner@uconn.edu>

Hi, all.

After reviewing what has been shared, it makes sense to offer the Nov. 8th course remotely.

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 3
Page 28 of 52

The final two classes (11/15 and 12/6) must meet in person.


If students have concerns, please have them contact me directly.


Laura


**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Date:** Tuesday, November 1, 2022 at 5:54 PM
**To:** Cobb, Casey <casey.cobb@uconn.edu>
**Cc:** Burton, Laura <laura.burton@uconn.edu>, Weiner, Jennie <jennie.weiner@uconn.edu>
**Subject:** Re: edlr 5202's scheduled remote sessions

As promised, the results of today's in-class poll (I stepped out of the room for 15 minutes and let
the students discuss their options/vote on their own):



Two people are missing, but as you can see there's an overwhelming majority. The results support
that we should grant their request that the sessions on **11/8** and **11/15** meet remotely.

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 3
Page 29 of 52

3/17/23, 2:02 PM                                        University of Connecticut Mail - Re: edlr 5202's scheduled remote sessions



Two people are missing, but as you can see there's an overwhelming majority. The results support that we should grant their request that the sessions on **11/8** and **11/15** meet remotely.

Tiffany Brown, Ph.D.

Assistant Professor

Department of Educational Leadership

Neag School of Education

University of Connecticut

249 Glenbrook Road, Unit 3093

Storrs, CT 06269

On Tue, Nov 1, 2022 at 4:16 PM Tiffany Brown <tiffany.brown@uconn.edu> wrote:

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 3
Page 30 of 52

Alrighty, I'll forward your email to the students.

**Tiffany Brown, Ph.D.**

Assistant Professor

Department of Educational Leadership

Neag School of Education

University of Connecticut

249 Glenbrook Road, Unit 3093

Storrs, CT 06269

On Wed, Nov 2, 2022 at 5:55 PM Burton, Laura <laura.burton@uconn.edu> wrote:

Hi, all.

After reviewing what has been shared, it makes sense to offer the Nov. 8th course remotely.

The final two classes (11/15 and 12/6) must meet in person.

If students have concerns, please have them contact me directly.

Laura

**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Date:** Tuesday, November 1, 2022 at 5:54 PM
**To:** Cobb, Casey <casey.cobb@uconn.edu>
**Cc:** Burton, Laura <laura.burton@uconn.edu>, Weiner, Jennie <jennie.weiner@uconn.edu>
**Subject:** Re: edlr 5202's scheduled remote sessions

As promised, the results of today's in-class poll (I stepped out of the room for 15 minutes and let the students discuss their options/vote on their own):

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 3
Page 31 of 52

PLAINTIFF'S
EXHIBIT
ALL-STATE LEGAL®
5

3/17/23, 2:02 PM                         University of Connecticut Mail - Re: edlr 5202's scheduled remote sessions

**Brierley, Kristen** <kristen.brierley@uconn.edu>                                        Thu, Nov 3, 2022 at 2:57 PM
To: "Brown, Tiffany" <tiffany.brown@uconn.edu>

Good afternoon,                     **Appendix C**

I am in receipt of your below emails and understand that you also spoke with our administrative assistant
earlier this week seeking assistance. If you believe that you are being subjected to a hostile work
environment or other prohibited conduct based on your membership in a protected class, I encourage you to
contact the Office of Institutional Equity to make a report or formal complaint. More information about how
to do so can be found here: https://equity.uconn.edu/reporting-form/.

Decisions about course modality and timing are matters of academic concern that should be addressed
through your departmental leadership.

Thank you,

Kristen

[Quoted text hidden]

---

**Tiffany Brown** <tiffany.brown@uconn.edu>                                             Thu, Nov 3, 2022 at 4:59 PM
To: "Burton, Laura" <laura.burton@uconn.edu>, "Cobb, Casey" <casey.cobb@uconn.edu>
Cc: "Irizarry, Jason" <jason.irizarry@uconn.edu>

Hey Laura -

Just a heads up re: the response I got from Labor Relations today (below). I've filed a complaint with the Office of
Institutional Equity that names you and Casey based on my experiences of you both setting a hostile workplace
environment through the enactment of passive workplace aggression (borderline bullying) with regards to your handling
of the EDLR 5202 situation last night. I'll be discussing with them the impact of your continued microaggressions
towards me on my work since the start of my time here with reference to some of the research you've done on the topic
regarding black female experiences in particular.

My perspective is that yesterday's interaction was an escalation of the passive aggression/discrimination I've
experienced since last Spring when you tried to rationalize assigning me to the social justice leadership class even
though Alex had also been hired for the same position and literally describes herself as a race and class scholar. I've also
been in touch with the Provost's office about your choice to ignore the student data collected on Tuesday night.

Thinking ahead to our upcoming departmental meetings, I'm writing this because I want you to understand why I will be
present but likely won't participate in them - because it's clearer than ever that departmental leaders don't value my
voice here and I wouldn't want to keep trying in vain. I simply don't know how to work with folks who refuse to share
professional respect for their colleagues. Besides that, talking with either you or Casey on my own would be extremely
uncomfortable for me because the evidence suggests neither of you are assigning, evaluating, or managing my work
objectively.

Thank you,

Tiffany Brown, Ph.D.
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT06269

3/17/23, 2:23 PM                              University of Connecticut Mail - Re: PTR Review



Sent from my iPhone

# Appendix D

Begin forwarded message:

**From:**"Brown, Tiffany" <tiffany.brown@uconn.edu>
**Date:** November 4, 2022 at 19:10:09 EDT
**To:**"McGarry , Jennifer" <jennifer.mcgarry@uconn.edu>
**Cc:** "Stewart, Saran" <saran.stewart@uconn.edu>, "Nienhusser, H. Kenny"
<h._kenny.nienhusser@uconn.edu>
**Subject: Re: PTR Review**

Hi all -

When someone is able will you explain the implications of this meeting? Not sure what I should be prepared
to share in this next meeting or if it will be with the same folks as before.

Have a good weekend,

Tiffany

Sent from my iPhone

On Nov 4, 2022, at 17:07, McGarry, Jennifer <jennifer.mcgarry@uconn.edu> wrote:

Dear Tiffany:

As chair of the EDLR PTR Committee, I am informing you of the negative findings regarding
your reappointment. I have attached the letter from the Committee that you have previously
read, now including the vote.

Per the Provost's Office guidelines, the Committee is providing you with the opportunity to
meet to discuss our findings:

> The Committee, after its review, shall provide the faculty member with an opportunity
> to appear before the committee to discuss substantive negative findings
> (https://provost.uconn.edu/faculty-and-staff-resources/promotion-tenure-
> reappointment/).

Please provide days/times you are available to meet during the week of November 7, either in
person or virtually.

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 3
Page 33 of 52

3/17/23, 2:23 PM                                    University of Connecticut Mail - Re: PTR Review

                Jennie

<PTR_Tiffany Brown_Vote.pdf>

---

**Tiffany Brown** <tiffany.brown@uconn.edu>                          Fri, Nov 4, 2022 at 7:54 PM
To: David Amdur <DavidAmdur@uconnaaup.org>

Alright, let me share the letter. It's not a completely accurate description of my conversations with the committee (and may
in fact reflect a private conversation I had with a PTR committee member one day when he offered to drive me home), but
here it is.

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

[Quoted text hidden]

📄 **PTR_Tiffany Brown_Vote.pdf**
     235K

---

**David Amdur** <DavidAmdur@uconnaaup.org>                           Fri, Nov 4, 2022 at 8:32 PM
To: "Brown, Tiffany" <tiffany.brown@uconn.edu>

*Message sent from a system outside of UConn.*

*Message sent from a system outside of UConn.*

Tiffany,

Thank you for this. Was today (11-4-22) the first time you saw this letter and knew the PTR cmte was
recommending non-reappointment? I note the letter is dated almost a month ago, October 5, 2022, so did it
take a month for them to let you know their decision? I also noted that Casey Cobb is on the PTR cmte but
is listed as absent. Was this related to his father's passing? Did he participate in any meeting you had with
the committee? I'd be curious if he participated in their deliberations? It seems from the vote tally he was
listed as absent, so that could make me think he didn't participate, but I am curious. Do you know what
Laura Burton's separate recommendation is as department head? Has she shared her letter with you?
Sorry, it's Friday night and I am asking you a lot of questions, but they're coming to mind.

https://mail.google.com/mail/u/3/?ik=69084aa2ad&view=pt&search=all&permthid=thread-f:1748611528856071956&simpl=msg-f:1748611528856071956&simpl=...   3/7

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 3
Page 34 of 52



PLAINTIFF'S
EXHIBIT
ALL-STATE LEGAL®
7

October 5, 2022

Dr. Laura Burton
Department Head
Department of Educational Leadership
Neag School of Education

Dear Dr. Burton,

The Department of Educational Leadership (EDLR) Faculty Promotion and Tenure Review (PTR) Committee has reviewed Dr. Tiffany Brown's submitted materials for consideration for reappointment as an Assistant Professor in the Department of Educational Leadership. Two members of the Committee (Drs. Saran Stewart and Jennie McGarry) met with Dr. Brown on October 5, 2022 to discuss her dossier and to address questions she had about the PTR process.

We discussed the gaps in information on Dr. Brown's PTR form and encouraged her to update the form, as faculty can update their PTR materials throughout the review process. Dr. Brown shared an addendum (see file in supporting materials folder in shared drive) with us. We also discussed what the PTR Committee can do better to support faculty preparation for the review process as well as how we can support faculty accessing resources that can assist them in progressing toward tenure and promotion. As a result of that conversation, Dr. Stewart shared examples of teaching statements with Dr. Brown.

Below is a summary of our review of Dr. Brown's materials, including the addendum, and our discussion with her on October 5.

## Scholarship

We began the conversation with Dr. Brown by asking if there have been any additional developments in her scholarship since she completed the PTR form in late August. She provided us with an update of the book proposal she has in review with Cambridge University Press, titled *Cultural Learning in Urban Schools and Minority Serving Institutions: For Educators.* Originally, she had submitted individual papers from her dissertation (please note these are the two papers submitted for publication on the PTR form), presented the work at AERA, and received feedback leading her to combine the papers/presentations into a book proposal. We encouraged her to continue to submit peer-reviewed papers while she is working on the book since those will have impact sooner than the book, and for tenure she will need to show that impact and her trajectory beyond tenure. She acknowledged our advice and shared that she has two manuscripts in progress based on data collected in 2017 from a high-performing higher education opportunity program. The papers are about professional socialization and essential components of the program's service delivery. We advised her to document the two papers on her PTR form as works in progress as well as encouraged her to provide samples of the work in the supporting materials folder. Her goal is to submit both papers by the end of Fall 2022.

ALM | LAW.COM RADAR

Dr. Brown acknowledged that she has a different sense of how to use her negotiated course release time (0:1 load for 2021-22) last year and feels that she is making progress in her scholarly pursuits. She also shared that she is gaining a better understanding of where her work belongs and spoke of organizational psychology journals.

Dr. Brown has not indicated any proposal submissions for internal or external funding.

Finally, we had the opportunity to clarify Dr. Brown's understanding of the expectations for promotion, tenure and reappointment related to the publication of peer-reviewed journal articles, or other scholarly products. She shared that she had been told that the expectation was two submissions per year, not two accepted or published products. We've included an excerpt from the Neag School Faculty Roles and Responsibilities (p. 21) that speaks to the expectation for publications here:

> Although the Neag School does not have as a metric [related to] the total number of products a tenure-earning faculty is expected to generate, the advice is typically given that tenure-earning faculty generate on average two peer-reviewed products per year, including manuscripts that are in-press.

### Teaching

Dr. Brown expressed that last year was hard for everyone, and particularly for her as a new female faculty member of color. The recent LLEP meeting helped her understand more about possible improvements to the program and connected with some of the concerns she heard from students last year in EDLR 5204: Organizational Learning. Dr. Brown provided her SET scores from Spring 2022 (EDLR 5204) and should also speak explicitly to her negotiated course release for Fall 2021 and Spring 2022 to account for only SET scores for one course. Her EDLR 5204 SET scores were notably low and she expressed that the PTR form and the SET did not address systemic issues impacting her and the students she taught. We spoke about potential SET+ options for Dr. Brown including formative assessments in her courses, the National Center for Faculty Diversity and Development, and inviting a colleague to observe and provide feedback on her teaching. Specifically, we suggested that Dr. Brown should share anonymized concept maps and memos that the students submit as evidence of their learning in her courses. We also recommended that Dr. Brown re-write her teaching statement and integrate information about how she approaches teaching and learning including identifying the mentors and scholars who have informed her teaching. While Dr. Brown has expressed her dissatisfaction with teaching and learning resources available through CETL, she shared that the Women of Color in the Academy conference she attended in the spring was beneficial. She acknowledged that she has engaged colleagues she met at the conference about course materials and course structure. Dr. Brown feels the Fall 2022 semester is going better for her and the students in her course because she has scaled back her expectations and is adapting to students' needs in real time. She is using course objectives that have been used before rather than trying to create them herself as she recognizes that she is still learning about the program objectives and how each class fits in.



ALM | LAW.COM RADAR

**Service**

In our conversation with Dr. Brown, we learned that while she is not being asked to serve on department, school, or university committees as a new, pre-tenure faculty member, she has engaged in program level service. She served on EdD committees last fall for the following students: Micah Heumann, Elsie Torres, Malik Champlain, Rebecca Aldred, India Monroe, and Patty King. Additionally, external to UConn, Dr. Brown has served as a reviewer for Educational Research Review and Contemporary Educational Psychology.

In summary, Dr. Brown has been asked to revise her PTR form to reflect her scholarship, teaching, and service to date. Related to scholarship, Dr. Brown does not have any published, accepted or in press manuscripts to date. She is awaiting notification of the status of a submitted book proposal. With teaching, Dr. Brown has been advised to revise her teaching statement to reflect her pedagogical process, teaching philosophy, goals relative to instructional responsibilities and activities undertaken to enhance teaching. The committee has also requested that Dr. Brown add language to her PTR form to account for her negotiated course release in Fall 2021 and Spring 2022. Lastly, based on the addendum Dr. Brown submitted following her meeting with the PTR committee representatives, there is an indication of program-level and professional association service. We also made specific recommendations and clarifications related to her scholarship, teaching, and service.

With a vote of 0 yes, 3 no, 0 abstain, and 1 absent the Department of Educational Leadership PTR Committee does not recommend that Dr. Tiffany Brown be reappointed to the position of Assistant Professor.

Sincerely,

*Jennifer C. McGarry*

Dr. Jennifer McGarry

---

Dr. H. Kenny Nienhusser

---

Dr. Saran Stewart

---

(absent)

Dr. Casey Cobb

ALM | LAW.COM RADAR

PLAINTIFF'S
EXHIBIT
8

3/17/23, 3:03 PM                    University of Connecticut Mail - Notice of Fact-Finding Meeting



**Appendix E**

Tiffany Brown <tiffany.brown@uconn.edu>

## Notice of Fact-Finding Meeting

4 messages

**Irizarry, Jason** <jason.irizarry@uconn.edu>                    Tue, Nov 8, 2022 at 10:05 AM
To: "Brown, Tiffany" <tiffany.brown@uconn.edu>
Cc: "Bannister, Kelly" <kelly.bannister@uconn.edu>, David Amdur <DavidAmdur@uconnaaup.org>


Dear Professor Brown:


A fact-finding meeting has been scheduled with you on Wednesday, November 16, 2022, at 10:00am, via WebEx. You will be provided with credentials to access the meeting.

The purpose of this meeting is to discuss concerns regarding your performance and conduct during the Fall 2022 semester. More specifically, it has been reported that you leave your EDLR 5015 class, scheduled for Thursdays from 5:00pm to 7:30pm, approximately 30 minutes early every week.

These behaviors, if true, may violate University policies including, but not limited to, the *General Rules of Conduct*. They also may demonstrate neglect of assigned responsibilities, failure to fulfill professional commitments, and/or conduct which impairs the rights of students.

In order to conduct a thorough and objective investigation, I would like to meet with you to discuss these allegations in greater detail and to provide you the opportunity to respond and offer documents or other evidence you deem relevant. In the interim, please take a moment to review the University's *Non-Retaliation Policy*, a copy of which can be found here: https://policy.uconn.edu/2011/05/24/non-retaliation-policy/. Because of the nature of this meeting, you are entitled to AAUP representation, and your union has been copied on this correspondence. A representative from the Office of Faculty and Staff Labor Relations also will be present.

If you are unable to attend, please notify me promptly. If you fail to respond or do not appear, we will proceed based on the information available to us at this time.

Respectfully,

*[signature]*

**Jason G. Irizarry, Ed.D.**

Dean and Professor
Neag School of Education | University of Connecticut
249 Glenbrook Rd, U-3064, Storrs, CT 06269-3064
Office: 860.486.3815 | education.uconn.edu


cc:    Kelly L. Bannister, Associate Director, Office of Faculty & Staff Labor Relations

       David Amdur, Associate Director, AAUP-UConn

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 3
Page 38 of 52

3/17/23, 3:05 PM                                 University of Connecticut Mail - RE: Notice of Fact-Finding Meeting

**PRIVILEGED AND CONFIDENTIAL COMMUNICATION**: The information contained in this electronic message and any attachments to it are intended for the *exclusive use of the addressees* and may contain confidential attorney-client communication and/or privileged information. If you are not the intended recipient, please destroy all copies of this message and attachments and immediately notify this office by sending a reply e-mail to the sender. Thank you.

**From:** Brown, Tiffany <tiffany.brown@uconn.edu>
**Sent:** Tuesday, November 8, 2022 10:25 AM
**To:** Irizarry, Jason <jason.irizarry@uconn.edu>
**Cc:** Bannister, Kelly <kelly.bannister@uconn.edu>; David Amdur <DavidAmdur@uconnaaup.org>; Chipman, Sarah <sarah.chipman@uconn.edu>
**Subject:** Re: Notice of Fact-Finding Meeting

Hi Jason -

Thanks for this email. Before we meet, will you explain on this thread how what I am being accused of is any different than what Casey has instructed me to do in order to accommodate his class schedule as described in this email from August of this year in which he discretionarily decided to cut my class short to accommodate his mistake in scheduling the EdD courses?

  • I had one of the Bridge students email me a few days ago asking about the possibility of holding the Aug 30th class remotely, due to her and two other students'concerns about making class on their first day of school. I didn't think of this and probably should have, but I also am not changing the schedule. Just making you aware the first day will be hectic and people will undoubtedly be late, as some travel from far and may not be able to leave school on time that day. In fact, expect throughout the semester 1-2 student invariably arrive late and are always apologetic. It's just the reality with their positions and emergencies come up.

  • You'll see in the email below the routine for the back to back courses. Our courses are a little shorter than normal because of the back to back nature after they work all day. We give them a 30 minute break for dinner. So you're course will start at 4 and go to 6:15. Throw in a short break as you see fit. Then I pick them up at 6:45 and go to 9 pm.

I ask because I'm currently speaking with the OIE about my perception that I am being subject to harassment and discrimination by continuously being held to different standards than those of my colleagues.

Thank you,

Tiffany

Sent from my iPhone

https://mail.google.com/mail/u/3/?ik=69084aa2ad&view=pt&search=all&permmsgid=msg-f:1748961743247517986&dsqt=1&simpl=msg-f:1748961743247517986    1/2

3/17/23, 3:03 PM                                          University of Connecticut Mail - Notice of Fact-Finding Meeting

[Quoted text hidden]

---

**Tiffany Brown** <tiffany.brown@uconn.edu>                                        Tue, Nov 8, 2022 at 12:26 PM
To: "Irizarry, Jason" <jason.irizarry@uconn.edu>
Cc: "Bannister, Kelly" <kelly.bannister@uconn.edu>, David Amdur <DavidAmdur@uconnaaup.org>, "Chipman, Sarah" <sarah.chipman@uconn.edu>

Hi Jason -

I would also like to note having reviewed the Non-Retaliation Policy that this Notice does feel retaliatory in and of itself. I cc'd you on the emails I sent to Laura and Casry last week in which they chose to violate the policies you described in your email - with no intervention on your part. It doesn't feel coincidental that this email is coming after you learned of my intent to file an OIE complaint, or as the PTR committee has recently recommended that I not be re-appointed.

Thank you,

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

[Quoted text hidden]

---

**Tiffany Brown** <tiffany.brown@uconn.edu>                                         Tue, Nov 8, 2022 at 1:32 PM
To: tiffanybrownphd@gmail.com

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

[Quoted text hidden]

Sender notified by
Mailtrack

https://mail.google.com/mail/u/3/?ik=69084aa2ad&view=pt&search=all&permthid=thread-f:1748941001419966668&simpl=msg-f:1748941001419966668&simpl... 3/3

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 3
Page 40 of 52

3/17/23, 3:05 PM                                    University of Connecticut Mail - RE: Notice of Fact-Finding Meeting



Tiffany Brown <tiffany.brown@uconn.edu>

## RE: Notice of Fact-Finding Meeting

**Bannister, Kelly** <kelly.bannister@uconn.edu>                                    Tue, Nov 8, 2022 at 3:38 PM
To: "Brown, Tiffany" <tiffany.brown@uconn.edu>, "Irizarry, Jason" <jason.irizarry@uconn.edu>
Cc: David Amdur <DavidAmdur@uconnaaup.org>, "Chipman, Sarah" <sarah.chipman@uconn.edu>

Professor Brown,

The letter sent to you by Dean Irizarry is to advise you of an investigatory meeting. The Dean is gathering
information and no decisions have been made. At this stage in the process, the Dean is not required to
answer questions. Your AAUP representative, David Amdur, is copied here and can advise you about the
fact-finding process. If there is information you would like to share with the Dean related to the matters
identified in the letter, David can advise you on how to do so.

To the extent you have raised issues of potential harassment, discrimination and/or retaliation, I see that you
have copied on your emails today Sarah Chipman in OIE who can advise you about their processes.

Thanks,

Kelly

**Kelly L. Bannister, Esq.**

Associate Director and Labor & Employment Attorney

Office of Faculty & Staff Labor Relations

University of Connecticut

9 Walters Avenue, Unit 5075

Storrs, Connecticut 06269-5075

Tel: (860) 486-2585 (direct)

Tel: (860) 486-5684 (main)

Fax: (860) 486-3390

kelly.bannister@uconn.edu

www.lr.uconn.edu

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 3
Page 41 of 52

PLAINTIFF'S
EXHIBIT

| Academic : Academic | Full Name | TT/NTT | Rank Desc | Faculty Ro | Affiliated I | Union Nan | Empl Class | Payroll FTE |
|---|---|---|---|---|---|---|---|---|
| Education | Educationa | Brown,Tiff: | TT | Assistant P | Faculty | | UConn - Fa | UConn Per | 1 |
| Education | Educationa | Burton,Lau | TT | Professor | Dept Head/Director | | UConn - Fa | Tenured | 1 |
| Education | Educationa | Castillo-Mc | TT | Associate F | Faculty | | UConn - Fa | Tenured | 0.5 |
| Education | Educationa | CHEN,CHEI | TT | Assistant P | Faculty | | UConn - Fa | UConn Per | 1 |
| Education | Educationa | Cobb,Case' | TT | Professor | Faculty | | UConn - Fa | Tenured | 1 |
| Education | Educationa | DeRosa,Da | NTT | Visiting Ins | Faculty | | UConn - Fa | Durational | 1 |
| Education | Educationa | Donaldson | TT | Professor | Associate Dean | | Manageria | Permanent | 1 |
| Education | Educationa | Evanovich, | NTT | Associate ( | Faculty | | UConn - Fa | Durational | 1 |
| Education | Educationa | Freidus,Ale | TT | Assistant P | Faculty | | UConn - Fa | UConn Per | 1 |
| Education | Educationa | Green,Pres | TT | Professor | Faculty | | UConn - Fa | Tenured | 1 |
| Education | Educationa | Grenier,Ro | TT | Professor | Faculty | | UConn - Fa | Tenured | 1 |
| Education | Educationa | Lyman,Kell | NTT | Lecturer | Faculty | | UConn - Fa | Durational | 0.5 |
| Education | Educationa | Mccready,. | NTT | Assistant P | Faculty | | UConn - Fa | Durational | 1 |
| Education | Educationa | McGarry,Jc | TT | Professor | Faculty | | UConn - Fa | Tenured | 1 |
| Education | Educationa | Nienhusser | TT | Associate I | Faculty | | UConn - Fa | Tenured | 1 |
| Education | Educationa | Stewart,Sa | TT | Associate I | Faculty | | UConn - Fa | Tenured | 1 |
| Education | Educationa | Weiner,Jer | TT | Associate I | Faculty | | UConn - Fa | Tenured | 1 |

ALM | LAW.COM RADAR

| Faculty Ba: | Appointme | Faculty Base (L | Additional 1 | Additional 2 | Admin Supple | Full Time Annu |
|---|---|---|---|---|---|---|
| 9 | 9 | $ 80,730.00 | $- | $- | $- | $ 80,730.00 |
| 9 | 10 | $ 150,870.00 | $ 16,764.00 | $- | $ 11,520.00 | $ 179,154.00 |
| 9 | 9 | $ 122,809.00 | $- | $- | $- | $ 122,809.00 |
| 9 | 9 | $ 81,680.00 | $- | $- | $- | $ 81,680.00 |
| 9 | 9 | $ 194,566.00 | $- | $- | $- | $ 194,566.00 |
| 9 | 9 | $ 76,661.00 | $- | $- | $- | $ 76,661.00 |
| 9 | 12 | $ 143,134.00 | $- | $- | $ 63,384.00 | $ 206,518.00 |
| 9 | 9 | $ 89,163.00 | $- | $- | $- | $ 89,163.00 |
| 9 | 9 | $ 86,338.00 | $- | $- | $- | $ 86,338.00 |
| 9 | 9 | $ 254,122.00 | $- | $- | $- | $ 254,122.00 |
| 9 | 9 | $ 107,366.00 | $- | $- | $- | $ 107,366.00 |
| 9 | 9 | $ 40,000.00 | $- | $- | $- | $ 40,000.00 |
| 9 | 9 | $ 84,934.00 | $- | $- | $- | $ 84,934.00 |
| 9 | 9 | $ 171,324.00 | $- | $- | $- | $ 171,324.00 |
| 9 | 10 | $ 101,954.00 | $ 11,328.00 | $- | $- | $ 113,282.00 |
| 9 | 11 | $ 108,935.00 | $- | $ 24,208.00 | $- | $ 133,143.00 |
| 9 | 9 | $ 121,930.00 | $- | $- | $- | $ 121,930.00 |

ALM | LAW.COM RADAR

Case 3:23-cv-01488-SFR   Document 46   Filed 06/20/25   Page 243 of 632
Case 3:23-cv-01488   Document 1   Filed 11/10/23   Page 44 of 52

| academic | Academic | Full Name TT/NTT | Rank Desc | Faculty Re-Affiliated | Union Nat Engl Class Payroll | FTI Faculty Is | Appointm. | Faculty Base | Addition 1 | Addition 2 | Admin Suppl. | Full Time Assoc Equivalent | Assoc Equivalent | Years LS | Last Prof Year | Assoc Prof Year | Prof Year | Year In Rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Education | Education | Brown,TT TT | Autliano F Faculty | UConn - Fi UConn Pe | 1 | 9 | $90,730.00 | | | | | $40,706.00 | $80,730.00 | 1 | 2021 | | | 3 |
| Education | Education | Bartels,Lin TT | Professor Dept Head/Director | UConn - Fi Tenured | 1 | 10 | $136,970.00 | $16,764.00 | | | $175,154.00 | $170,154.00 | $159,070.00 | 34 | 2001 | 2010 | 2018 | 4 |
| Education | Education | Castillo,M TT | Associate F Faculty | UConn - Fi Tenured | 1 | 9 | $122,809.00 | | $11,520.00 | | $171,525.00 | $161,353.00 | $150,070.00 | 9 | 2014 | 2021 | | 1 |
| Education | Education | DeNO,CHE TT | Assistant F Faculty | UConn - Fi UConn Pe | 0.5 | 9 | $81,660.00 | | | | $122,809.00 | $122,809.00 | $112,809.00 | 9 | 2021 | | | 1 |
| Education | Education | Oak,S,Cui TT | Professor Faculty | UConn - Fi Tenured | 1 | 9 | $134,546.00 | | | | $81,660.00 | $81,660.00 | $81,660.00 | 1 | 2006 | 2012 | | 10 |
| Education | Education | DeNura,D NTT | Visiting In Faculty | UConn - Fi Durational | 1 | 9 | $76,051.00 | | | | $134,546.00 | $134,546.00 | $134,566.00 | 33 | 2003 | | | |
| Education | Education | Develon NTT | Professor Associate Dean | Managerial Permanen | 1 | 12 | $143,344.00 | | | | $76,051.00 | $76,051.00 | $76,051.00 | 9 | 2014 | 2020 | | 2 |
| Education | Education | Evans,Elli NTT | Associate F Faculty | UConn - Fi Durational | 1 | 9 | $89,163.00 | | 61,344.00 | | $206,516.00 | $194,889.00 | $143,344.00 | 14 | 2022 | | | |
| Education | Education | Fedula,A TT | Assistant F Faculty | UConn - Fi UConn Pe | 1 | 9 | $88,398.00 | | | | $89,163.00 | $89,163.00 | $89,163.00 | 11 | | | | 1 |
| Education | Education | Green,Phil TT | Professor Faculty | UConn - Fi Tenured | 1 | 9 | $264,122.00 | | | | $84,398.00 | $88,398.00 | $98,398.00 | 9 | 2021 | | | 9 |
| Education | Education | Green,A TT | Professor Faculty | UConn - Fi Tenured | 1 | 9 | $107,265.00 | | | | $264,122.00 | $264,122.00 | $264,122.00 | 1 | 2005 | 2013 | 2021 | 1 |
| Education | Education | Lemm,X,H NTT | Lecturer Faculty | UConn - Fi Durational | 0.5 | 5 | $60,900.00 | | | | $107,265.00 | $107,265.00 | $107,266.00 | 17 | | 2021 | | 1 |
| Education | Education | Marzneks NTT | Assistant F Faculty | UConn - Fi Durational | 1 | 9 | $94,891.00 | | | | $60,900.00 | $40,900.00 | $60,900.00 | 0 | 2019 | | | 3 |
| Education | Education | McG,cry,S TT | Professor Faculty | UConn - Fi Tenured | 1 | 9 | $373,124.00 | | | | $94,891.00 | $84,891.00 | $94,891.00 | 20 | 2002 | 2008 | 2014 | 3 |
| Education | Education | Heshman TT | Associate F Faculty | UConn - Fi Tenured | 1 | 10 | $130,154.00 | $11,321.00 | | | $171,124.00 | $171,124.00 | $171,124.00 | 4 | 2016 | 2021 | | |
| Education | Education | Stewa't,Lo TT | Associate F Faculty | UConn - Fi Tenured | 1 | 11 | $138,936.00 | | | | $131,154.00 | $101,951.00 | $170,354.00 | 2 | 2021 | | | 2 |
| Education | Education | Webster,An TT | Associate F Faculty | UConn - Fi Tenured | 1 | 9 | $111,289.00 | | $21,208.00 | | $131,418.00 | $108,931.00 | $209,935.00 | 9 | 2020 | | | 2 |
| Education | Education | | | | | 9 | $111,289.00 | | | | $114,980.00 | $121,860.00 | $112,880.00 | | 2019 | | | 3 |

ALM | LAW.COM RADAR

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 3
Page 44 of 52



PLAINTIFF'S
EXHIBIT
ALL-STATE LEGAL®
*10*

**UCONN**
UNIVERSITY OF CONNECTICUT

November 10, 2022

Dean Jason Irizarry
Dean's Advisory Committee, PTR

Dear Dean Irizarry,

Dr. Tiffany Brown has submitted her PTR materials for review as she begins her second year as an Assistant Professor in Educational Leadership. Dr. Brown joined the Neag School of Education in fall of 2021. In my role as Department Head, I have reviewed Dr. Brown's submitted materials and the letter provided to me by the Department of Educational Leadership Promotion, Tenure, and Review committee. I also met with Dr. Brown on Monday, October 17, 2022 to discuss her progress toward promotion and tenure.

Teaching

Dr. Brown shared in her teaching philosophy statement that she does not feel she has had enough time teaching to be able to develop a teaching philosophy. Dr. Brown also noted that she perceived a lack of "social, institutional, or organizational supports for the unique challenges faculty of color experience in the classroom". Dr. Brown received two course releases in the fall 2021 semester to support her scholarly activities. In the spring of 2022, Dr. Brown taught EDLR 5204 Organizational Learning for students in the LLEP doctoral program. She also received one course release in the spring of 2022 to support her scholarly activities.

One measure of success in teaching is captured by student evaluations of teaching (SETs). And on this measure, in EDLR 5204 (spring 2022) Dr. Brown received scores of 1.4 (1 – 5 scale) for overall rating of instructors teaching and 1.8 (1 – 5 scale) on overall rating of the course.

Dr. Brown did not share evidence of development of her teaching in her PTR materials but noted in our meeting that she has implemented new structures into her instruction for her fall 2022 courses including shortening her lectures, conducting more in-class group discussions, and providing updated readings. Dr. Brown noted she also now seeking feedback from her students earlier in the semester. Dr. Brown is encouraged to continue to develop and share evidence of teaching excellence (formerly SET+) and to utilize the many resources available through the Center for Excellence in Teaching (CETL), through engagement with colleagues in the department, and the resources shared through the office of the Associate Dean for Academic Affairs in the Neag School.

Neag School of Education
**Department of Educational Leadership**
249 GLENBROOK ROAD, UNIT 3093
STORRS, CT 06269-3093
PHONE 860 486.6278
FAX 860.486.4028
www.edlr.uconn.edu

An NCATE Accredited Institution

Scholarship

Dr. Brown indicated on her PTR form that she submitted two manuscripts, one in January of 2022 and one in February of 2002. Based on feedback she has received from the two manuscripts submitted in spring of 2022, Dr. Brown indicated she has taken that feedback and submitted a book proposal "Cultural Learning in Urban Schools and Minority Serving Institutions: For Educators" that is under review at Cambridge University Press. Dr. Brown also noted that she is developing two manuscripts for submission that are based on data collected during her dissertation work from 2017.

In our meeting, Dr. Brown noted she believed she was misinformed regarding expectations for scholarly activity for tenure-track faculty members and that the EDLR PTR committee had clarified the expectations for scholarly activity during their meeting with her. In our meeting, I reiterated the expectations for tenure-track faculty members and share below here the information noted in the Neag School of Education Roles and Responsibilities Document, "the advice is typically given that tenure-earning faculty generate on average two peer-reviewed products per year, including manuscripts that are in-press. This advice represents a heuristic, not an algorithm."

Dr. Brown did not indicate that she has submitted any proposals for internal or external funding to support her scholarship.

Service

In the fall of 2021, Dr. Brown served on the EdD program capstone proposal committee for six EdD students. Dr. Brown also provided a review of courses for the EdD program during fall of 2022. Dr. Brown noted she has served as an ad-hoc reviewer for Educational Research Review and Contemporary Educational Psychology.

Summary

Dr. Brown has not made meaningful or significant progress toward promotion and tenure as evidenced in the PTR materials shared and as noted in the evaluation of those materials by the Department Promotion, Tenure, and Review Committee. As such, I do not support Dr. Brown for reappointment as an Assistant Professor on the tenure-track.

Sincerely,

*Laura J. Burton*

Laura J. Burton
Professor, Sport Management
Department Head

Neag School of Education
Department of Educational Leadership
249 GLENBROOK ROAD, UNIT 3093
STORRS, CT 06269-3093
PHONE 860.486.6278
FAX 860.486.4028
www.edlr.uconn.edu

An NCATE Accredited Institution



Case 3:23-cv-01488    Document 1    Filed 11/10/23    Page 47 of 52

ALM | LAW.COM RADAR

## PTR Letter

**Burton, Laura** <laura.burton@uconn.edu>
To: "Brown, Tiffany" <tiffany.brown@uconn.edu>

Tiffany.

See attached the Dept Head PTR evaluation letter.

You have an opportunity to schedule a meeting with me to discuss this letter. Please reach out to me by November 18th to schedule a meeting to discuss the letter.

Best,

Laura

**Laura J. Burton**
Department Head, Educational Leadership

Professor, Sport Management

Pronouns (she, her, hers)

**University of Connecticut**

**Neag School of Education**
Dept. of Educational Leadership
249 Glenbrook Road Unit 3093
University of Connecticut
Storrs, CT 06269-3093
(860) 486-3095

http://education.uconn.edu/person/laura-burton/

Women In Sport Leadership

Organizational Behavior in Sport Management

*I acknowledge that the land on which the University of Connecticut is located is the territory of the Mohegan, Mashantucket Pequot, Eastern Pequot, Schaghticoke, Golden Hill Paugussett, Nipmuc, and Lenape People of this land and have stewarded this land throughout the generations.*

Brown_Letter_DH.pdf

**PLAINTIFF'S
EXHIBIT**

ALL-STATE LEGAL

*12*



Tiffany Brown <tiffany.brown@uconn.edu

---

## Meeting today

12 messages

---

**Irizarry, Jason** <jason.irizarry@uconn.edu>                                    Tue, Feb 15, 2022 at 9:10 AM
To: "Brown, Tiffany" <tiffany.brown@uconn.edu>, "Burton, Laura" <laura.burton@uconn.edu>

Hi Tiffany,

If you are on campus today, we can meet in my office at 1:00. If not, please let me know and I can send a
TEAMS link for the meeting.

I look forward to speaking with you.

Best,

Jason

Jason G. Irizarry, Ed.D.

Dean, Neag School of Education

249 Glenbrook Rd.

Storrs, CT 06269-3064

860-486-1241

jason.irizarry@uconn.edu

---

**Tiffany Brown** <tiffany.brown@uconn.edu>                                    Tue, Feb 15, 2022 at 2:31 PM
To: "Irizarry, Jason" <jason.irizarry@uconn.edu>
Cc: "Burton, Laura" <laura.burton@uconn.edu>

Laura and Jason -

Thank you again for meeting with me today, I think that conversation was a great start.
Here are lingering questions I hope we can discuss some answers to by our next
meeting:

1. How do I develop analogous summer teaching opportunities to those available to
   the sports management faculty hired at my salary range, given our program

specific needs? The fact that I would have to develop those courses *and* hope for there to be enough student enrollment leaves it unclear for me how else I could effectively supplement my salary in this way, while also having the time to dedicate to growing my research agenda (rather than developing new courses for the department).

2. How do we moderate my vulnerability to the possibility of being assessed/judged differently than more senior faculty who also teach PhD/EdD students given:
   1. differential standards of rigor for doctoral students across the department
   2. my implementing - as the only formally trained organizational scholar - innovative approaches to organizational and DEI related studies which are not well supported by the current "infrastructure" of the department (evidenced by its curricular offerings and current approaches to these disciplines offered through them)?
   3. the expectation that I fill in the gaps by "overassisting" senior faculty who may not have the resources or training to effectively support doctoral students in the study of various forms of research bias (specifically that related to issues of subjectivity and positionality)?

3. Related to question 1: How do I increase or diversify my earnings sources aside from salary given:
   1. that I don't have the same opportunities as folks hired at my base salary to teach at the undergraduate and masters levels?
   2. the lack of collegial respect towards me demonstrated in initial interactions with the Dean of Research, which do not support the assumption that my work will be any more equitably considered than I was equitably treated in the process of being given access to my office?

Please let me know when we can next touch bases on these issues in particular. I look forward to continuing this conversation.

Have a great week,

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

[Quoted text hidden]

---

**Tiffany Brown** <tiffany.brown@uconn.edu>                                        Tue, Feb 15, 2022 at 2:34 PM
To: "Irizarry, Jason" <jason.irizarry@uconn.edu>
Cc: "Burton, Laura" <laura.burton@uconn.edu>

I forgot an important fourth!

4) Under what circumstances could I feasibly teach the EdD course I am currently assigned to cover this fall, given my need to travel safely using public transportation after dark?

ALM I LAW.COM RADAR

Thanks again,
Tiffany

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

[Quoted text hidden]

---

**Tiffany Brown** <tiffany.brown@uconn.edu>                                    Mon, Mar 21, 2022 at 11:14 AM
To: michaelbailey@uconnaaup.org

2

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

[Quoted text hidden]

---

**Mailtrack Reminder** <reminders@mailtrack.io>                                Tue, Mar 22, 2022 at 11:14 AM
Reply-To: michaelbailey@uconnaaup.org
To: tiffany.brown@uconn.edu

Your email to michaelbailey@uconnaaup.org has not been opened yet. Snooze for 24H, 48H or 72H (disable)

---

**Tiffany Brown** <tiffany.brown@uconn.edu>                                    Tue, Mar 22, 2022 at 12:34 PM
To: David Amdur <DavidAmdur@uconnaaup.org>

[Quoted text hidden]

---

**Tiffany Brown** <tiffany.brown@uconn.edu>                                    Thu, Aug 4, 2022 at 3:11 PM
To: tiffanybrownphd@gmail.com

[Quoted text hidden]

Sender notified by
Mailtrack

---

**Mailtrack Reminder** <reminders@mailtrack.io>                                Fri, Aug 5, 2022 at 3:11 PM
Reply-To: tiffanybrownphd@gmail.com
To: tiffany.brown@uconn.edu

Your email to tiffanybrownphd@gmail.com has not been opened yet. Snooze for 24H, 48H or 72H (disable)



**Tiffany Brown** <tiffany.brown@uconn.edu>
To: tiffanybrownphd@gmail.com

Wed, Aug 17, 2022 at 8:45 AM

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

 Sender notified by
Mailtrack

---

**Mailtrack Reminder** <reminders@mailtrack.io>
Reply-To: tiffanybrownphd@gmail.com
To: tiffany.brown@uconn.edu

Thu, Aug 18, 2022 at 8:45 AM

[Quoted text hidden]

---

**Tiffany Brown** <tiffany.brown@uconn.edu>
To: tiffanybrownphd@gmail.com

Fri, Nov 4, 2022 at 7:48 PM

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

 Sender notified by
Mailtrack

---

**Tiffany Brown** <tiffany.brown@uconn.edu>
To: tiffanybrownphd@gmail.com

Tue, Nov 8, 2022 at 1:31 PM

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

---------- Forwarded message ---------
From: **Tiffany Brown** <tiffany.brown@uconn.edu>
Date: Fri, Nov 4, 2022 at 7:48 PM
Subject: Fwd: Meeting today
To: <tiffanybrownphd@gmail.com>



[Quoted text hidden]

 Sender notified by
Mailtrack

ALM | LAW.COM RADAR

# Defendant's Deposition Exhibit 4


**UCONN**
UNIVERSITY OF CONNECTICUT


DEFENDANT'S DEPOSITION EXHIBIT

Tiffany Brown



Dear Tiffany:

I am pleased to offer you employment at the University of Connecticut. Please review the information below that outlines the principal terms of your employment at the University.

| Job Title | Assistant Professor |
|---|---|
| Department | Educational Leadership |
| School/College/Division | Education |
| Supervisor | Laura Burton |
| Executive Division | Provost Academic Affairs |
| Building Location | UOC000093-GENTRY BLDG-ED LEADERSHIP |
| Appointment Term | 9 month |
| Percent Employed | 100 |
| Full-Time Annual Salary | $78,000 |
| Start Date | August 23, 2021 |
| 3rd Year Reappointment Review | Fall 2024 |
| Consideration for Academic Tenure | Fall 2026 |
| Tenure Effective | Fall 2027 |
| Retirement Election Deadline | August 23, 2021 |
| Orientation Date | August 26, 2021 |
| Health Benefits Enrollment Deadline | 31 Days after August 23, 2021 |
| Union Info | http://www.uconnaaup.org/ |

Your salary is based on a 9 month appointment and paid biweekly over twelve months. You will receive the first biweekly paycheck two weeks after the close of the pay period in which you are hired, contingent upon all required documentation being in place.

On occasion, faculty members have an opportunity to earn additional compensation during the winter or summer sessions at our Storrs campus or any one of our regional campuses. Earnings may not exceed the twelve month equivalent of your base annual salary under the "Extra Compensation Policy for Full-time Faculty in AAUP."

This offer of employment is contingent upon successful completion of a criminal background check, and your continued employment is conditional upon the timely completion of an approved I-9 (Employment Eligibility Verification Form). If you do require assistance in extending or obtaining work authorization at the University of Connecticut, please contact your department immediately.

UConn 001738

If you accept our offer, you will soon receive a communication from the Department of Human Resources about several important topics, including Orientation, selecting a retirement plan prior to your first day of employment, and securing your University Network Identifier (NetID).

The duties and expectations of this appointment are consistent with our previous discussions and remain subject to adjustment, in accordance with University policy. Specifically, this position includes teaching, research, and service expectations as outlined in the Neag School's *Faculty Roles and Responsibilities* document.

This position may lead to academic tenure, according to the *By-Laws of the University of Connecticut*. According to procedures, you will be subject to annual reappointment reviews. Your third-year reappointment review consideration for academic tenure will occur as noted in the table on page one.

This offer includes 1 month of summer salary, and a start-up package of $20,000. These start-up funds will be available on 8/23/2021 and must be used by 8/22/2026.

University will provide reimbursement or direct payment for relocation and moving expenses in accordance with the Relocation and Moving Policy. For your move from Brooklyn, NY the department of Educational Leadership will provide up to $2,000. Please refer to the University's Relocation and Moving Procedures for more information. A representative from Signature Relocation will reach out to you within a week of the acceptance of this offer to consult with you regarding your relocation.

Please be aware that the University has a Board of Trustees approved policy regarding consulting. The policy, related documents, and training materials may be found at http://consulting.uconn.edu. You must obtain approval to consult prior to the start of the activity. If you are currently engaged in consulting activities, you may wish to contact the Faculty Consulting Office prior to your hire date in order to ensure you are compliant with these rules.

UConn is Connecticut's only public research extensive university, a prestigious designation that rests firmly on the institution's commitment to the unfettered pursuit of knowledge through research, teaching, and outreach. You are joining a University in which diverse views are welcomed and respected even as we work together to advance our academic mission and to effect constructive change. We are delighted that you will be joining us.

Please indicate your acceptance of the offer electronically no later than five business days from the date you received the letter.

Sincerely,

Laura Burton
Department Head

Jason G. Irizarry
Dean

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 4
Page 2 of 3

By accepting this appointment I agree to the terms described above and to abide by all University policies including, but not limited to, the University's Code of Conduct and the State Code of Ethics.

Policies for review at http://policy.uconn.edu:

"Consulting":                              http://policy.uconn.edu/?p=155
"Extra Compensation":              http://policy.uconn.edu/?p=366
"Code of Conduct" Guide:          http://policy.uconn.edu/?p=140
"PTR":                                         http://s.uconn.edu/4qh

UConn 001740

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 4
Page 3 of 3

# Defendant's Deposition Exhibit 5



## PTR Dossier Checklist (New Form)

---

- The PTR dossier is a cumulative packet, and should include all past professional experience, teaching, and scholarship items, listed in reverse chronological order (present to past).
- All files must be in PDF format
- Everything is submitted electronically

**It is the responsibility of the faculty member to prepare their PTR dossier in accordance with the Provost's instructions, as well as the College and departmental PTR guidelines.**

---

**Faculty Name:** ___Dr. Tiffany Brown_____ **Title:** _Assistant Professor_____

**School/College:** __Neag School of Education_____ **Department:** __Educational Leadership_____

**Action:** ☐ Promotion to _____ ☐ Tenure ☑ Reappointment

**Early Review:** ☐ Yes ☐ No

**Clock Extension (s):** ☐ None ☐ Yes, Years: _____

### Folder 0: PTR Dossier Checklist ☑

### Folder 0: COVID Impact Statement (optional) ☐

### Folder 1-6: PTR Form

   ☑ PTR Form Sections 1-6

   ☑ Statement by Faculty Member (section 6 of PTR form) **requires faculty signature.**

### Folder 7A: Dept Committee Rec

   ☑ Departmental PTR Advisory Committee Recommendation Letter

   ☑ Number of votes noted in letter and on summary sheet

   ☐ Not Applicable (Non-Departmentalized School/College)

### Folder 7B: Joint Appt Rec

   ☐ Joint Appointment Supervisor Letter (if applicable)

   ☐ Position stated in letter and on summary sheet

### Folder 7C: Dept Head Rec

   ☐ Department Head's Recommendation Letter

   ☐ Position stated in letter and on summary sheet

   ☐ Not Applicable (Non-Departmentalized School/College)

### Folder 7D: Dean Council Rec

   ☐ Dean's PTR Advisory Committee Recommendation Letter

   ☐ Number of votes stated in letter and on summary sheet

### Folder 7E: Dean Rec

   ☐ Dean's Recommendation Letter

   ☐ Position stated in letter and on summary sheet

UConn 001776

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 1 of 37

## PTR Dossier Checklist (New Form)

### Folder 7F: External Rec Letters

☐ External Letters of Recommendation Summary

☐ Letters used to solicit recommendations

☐ A minimum of five letters of recommendation are combined with External Letters of Reference Summary and solicitation letters as one PDF.

### Folder 8A: Supporting Materials

☑ All supporting materials submitted by candidate, appropriately labeled

### Folder 8B: Appointment Letter

☑ Copy of Candidate's original letter of appointment

☑ _Alyssa Zellom_ **Staff from the Department/Dean's Office must write their name here to confirm appointment letter validity for faculty hired via the PageUp system.**

### Folder 8C: SETs & Other Teaching Evidence

☑ Include copies of all Student Evaluation of Teaching reports (cumulative). Save as one PDF in *reverse chronological order*.

**Note:** All courses taught, which are listed in section two of the PTR form, must have SET's included in this section. If no SET is available for a course, please insert a page with the course number and the reason why no SET was performed. SETs dated after 2013 should only include pages 1 & 2.

☐ Include additional evidence of teaching (SET Plus). Save as one PDF.

### Folder 8D: CV

☑ Curriculum Vitae (optional)

### Folder 8E: Previous Correspondence

☐ Include previous PTR correspondence from Provost, Dean, or Department Head

**Dossier Reviewed by:** _____



# PROMOTION, TENURE, AND REAPPOINTMENT FORM

NAME: Tiffany Brown

DEPARTMENT: Educational Leadership

SCHOOL/COLLEGE: Neag School of Education

CAMPUS: Storrs

DATE OF HIRE: 08/23/2021

DATE OF TENURE: (awarded/anticipated) Fall 2027

CANDIDATE FOR (Check all that apply):

_____ Promotion to:

_____ Tenure

x Reappointment in a position leading to tenure

_____ Reappointment in a position not leading to tenure

**International Faculty: It is the policy of the University of Connecticut to not grant tenure in the absence of permanent residency.** It is the obligation of the candidate in a tenure-track position to pursue permanent residency status in a timely manner.

(Revised May 2018)                    1

## INSTRUCTIONS

- This PTR form is to be used for promotion, tenure, and reappointment of tenure track faculty in all schools/colleges, except faculty in the School of Medicine and the School of Dental Medicine. The form should also be used for the promotion of individuals who are in positions that do not lead to tenure and may be used for the reappointment of individuals who are not in tenure track positions.
- *Note: For a first year reappointment, the candidate should complete the Cover Page and Section One and the Department Head should complete Section Seven Part C - III: Recommendation of the Department Head. Department Heads are expected to meet with each first year candidate to discuss appropriate goals, responsibilities, and expectations for the first year.*

### For the Candidate:

- The candidate is responsible for completing the Cover Page, Sections One, Two, Three, Four, Five and Six. The candidate should consult with his or her Department Head to ensure that the information in Sections One through Six is complete and in the correct format.
- The accuracy and completeness of these sections are the responsibility of the candidate.
- All supplementary material, including student evaluations of teaching, letters of acceptance for publications, reviews, reprints, etc., should be appropriately labeled and inserted as appendices in Section Eight.
- After completing the relevant sections the candidate should submit the form to the Department Head and retain a copy. The completed PTR form along with all supporting documentation becomes the candidate's dossier.
- Upon request, a candidate may review and/or update his/her PTR dossier during any step of the process.

### For the Department Head:

- The Department Head is responsible for ensuring the completion of Section Seven, Parts A, B & C. The Department Head summary should carefully state the opinion of the Department Head about promotion and/or tenure, as well as those of the candidate's colleagues and students, and others whose opinions may be useful. The written report of the Departmental PTR Advisory Committee should be included as Section Seven, Part A. In cases where the judgment of the Department Head differs from the advice he/she has received, all views should be recorded. The Department Head must inform the candidate in writing of substantive negative findings and of the reasoning behind the negative recommendations. The Department Head must obtain external letters of reference (required for tenure and promotion) and should be inserted in Section Seven, Part F.
- After making his/her recommendation, the Department Head will forward the dossier to the Dean.

### For the Dean:

- The Dean is responsible for ensuring the completion of Section Seven, Parts D and E and forwarding the dossier to the Provost.

*Note: Schools that are non-departmentalized (Law, Nursing and Social Work) use a slightly different procedure for obtaining input from advisory committees other than a Departmental PTR Advisory Committee or a Department Head. This protocol should be disseminated to the faculty in each school.*

(Revised May 2018)          2

UConn 001779

**Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 4 of 37**

## TABLE OF CONTENTS

| Section One, Page 5: | A. Academic Appointment at the University of Connecticut |
|---|---|
| Professional Experience and Education | B. Professional Experience Prior to the University of Connecticut |
| | C. Educational Background |
| | D. Honors and Awards |
| | |
| Section Two, Page 6: | |
| Teaching and Curriculum Development | A. Narrative on Undergraduate and Graduate Teaching |
| | B. Courses Taught |
| | C. Evaluation of Teaching |
| | D. Undergraduate Advisees |
| | E. Other Undergraduate Advising/Mentoring Activities |
| | F. Graduate Student and Postdoctoral & Visiting Scholars Mentorship |
| | |
| Section Three, Page 7: | |
| Research, Scholarship, and Creative Work | A. Narrative on Research, Scholarship and Creative Work |
| | B. Published Books, Books Chapters, & Edited Volumes |
| | C. Refereed Publications & Submitted Articles |
| | D. Other Publications & Creative Products |
| | E. Presentations |
| | F. Grants and Contracts |
| | G. Other Scholarly and Creative Accomplishments |
| | H. Societal and Policy Impacts |
| | I. Other Professional Activities |
| | |
| Section Four, Page 9: | |

UConn 001780

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 5 of 37

| Academic and Professional Service/Engagement | A. Narrative on Academic & Professional Service/Engagement |
|---|---|
| | B. Professional Contributions |
| | C. Institutional Contributions |
| | D. Public & Community Service |
| | |
| Section Five, Page 10: | |
| Joint Appointments | |
| | |
| Section Six, Page 11: | |
| Statement by the Candidate | |
| | |
| Section Seven, Page 12: | |
| Evaluations | A. Departmental Promotion, Tenure, and Reappointment Advisory Committee Recommendation |
| | B. Joint Appointments |
| | C. Department Head's Recommendation |
| | D. Dean's Advisory Council Recommendation |
| | E. Dean's Recommendation |
| | F. External Letters of Review (needed for tenure/promotion only) |
| | |
| Section Eight, Page19: | |
| Appendices | A. All Supporting Materials Submitted by Candidate (appropriately labeled) |
| | B. Copy of Original Letter of Appointment |
| | C. Student Evaluations of Teaching (SETs) and other evidence of Teaching Effectiveness |
| | D. Curriculum Vitae (optional) E. Other (including previous correspondence regarding PTR from Provost, Dean, or Department Head) |

(Revised May 2018)                                    4

| SECTION ONE: PROFESSIONAL EXPERIENCE AND EDUCATION |
|---|

Name: Tiffany Brown

## A. ACADEMIC APPOINTMENTS AT THE UNIVERSITY OF CONNECTICUT

| Present Rank: | **Assistant Professor** | Since:(mm/yy) **08/21** |
|---|---|---|
| Previous Rank: | | Since:(mm/yy) |
| Previous Rank: | | Since:(mm/yy) |

## B. PROFESSIONAL EXPERIENCE PRIOR TO THE UNIVERSITY OF CONNECTICUT (*limit to a period of 10 years*)

| Title and organization | From | To |
|---|---|---|
| Harvard University, Doctoral Researcher | 2016 | 2021 |
| City University of New York, Lecturer | 2015 | 2021 |

## C. EDUCATIONAL BACKGROUND

| Degree | Field | Institution | Date:(mm/yy) |
|---|---|---|---|
| Ph.D. | Education | Harvard University | 05/21 |
| M.Ed | Education Policy and Management Social- | Harvard University | 05/18 |
| M.A. | Organizational Psychology | Columbia University | 05/16 |
| B.S.F.S. | Culture and Politics | Georgetown University | 05/14 |

## D. HONORS AND AWARDS

List all professional honors and awards, such as teaching citations, research awards,
(Revised May 2018)                5

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 7 of 37

honorary degrees, and recognitions for outstanding creative works.

UConn 001783

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 8 of 37

| SECTION TWO: TEACHING AND CURRICULUM DEVELOPMENT |

(Faculty member should complete Section Two parts A-F)

**A. NARRATIVE ON UNDERGRADUATE AND GRADUATE TEACHING:** The narrative on teaching should include a teaching philosophy, goals relative to your instructional responsibilities, and any activities you have undertaken to enhance your teaching (see: https://cetl.uconn.edu/teaching-philosophy/). **(Narrative should not exceed 500 words.)**

I don't think I've been teaching long enough to have developed a teaching philosophy. Especially since something I learned this year is that my teaching style will be perceived and received differently depending on the demographic composition of the institution I am working in. I'm just not a "blank slate" in that way that some of my peers are assumed to "look like" or "be qualified" for the professoriate.

I am also thinking differently about what my teaching philosophy looks like in an environment in which I perceive there to be few social, institutional, or organizational supports for the unique challenges faculty of color experience in the classroom. This shift in my thinking was necessary in response to the realization that efforts to develop teaching supports for faculty of color in the center for teaching and learning do not appear to be currently led by people of color.

Very early on in the Spring semester, I reached out to my department head and dean to ask for a meeting in which I expressed my concerns – based on concerns students had shared in class and office hours about how different courses were adapting differently to the return to campus – that I felt vulnerable teaching the PhD students as a female junior faculty member of color. It was clear to me then that there was a good amount of discretionary decision-making happening amongst my colleagues that was leaving students feeling unsure of what to expect from the semester. Based on my training in the Tavistock tradition of group dynamics, I had an early sense that the group's anxiety might eventually project themselves onto a scapegoat and I figured I would be that scapegoat as the most junior of their professors.

By the time the group's anxieties manifested themselves into a list of concerns a few weeks later (before midterms), those initial conversations I'd had with my dean and department head – a conversation in which I figured their subjectivities might mean they trusted my instincts on how power and privilege may play out differently in the classroom for me than for others teaching the PhD students that semester – seemed to have been completely forgotten. Almost immediately I realized I had no support in my supervisors, who had chosen to support the students in holding me accountable to standards my peers simply weren't being held to. For instance, I was told that other professors had decided discretionarily not to hold their classes in person on some instances throughout the semester with department approval but then scolded for holding class remote on the one day Amtrak rescheduled my train home – which was completely beyond my control. I thought I was imagining this until recently when it

(Revised May 2018)                                7

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 9 of 37

became apparent again that my teaching may inevitably be impacted by an information asymmetry across the department; if it weren't for an email in which the other professor teaching the EdD's asked to check/cross reference the dates for remote sessions I would not have known that the department had planned to offer both types of sessions this semester at all.

I cannot explain how incredibly debilitating it has been to develop my teaching in a department that values your presence in terms of diversity, but little to no regard for the material impact of my difference on my everyday work at UConn. I can't say I was perfect, but I asked for help early on and didn't receive it. As a result, my teaching development suffered greatly this year because it was obvious that I couldn't expect to come to work and be treated as a peer – and I think the students picked up on that. An example of this was at the end of the semester, when a student emailed my department head to report that I had asked for COVID-19 documentation after voluntarily offering the information when asking for an extension the night before a deadline. I was shocked to receive an email from my department telling me I had made a mistake without even asking me if it had occurred. Even when it was proven that the student had offered the documentation – and thus misrepresented our communications to the department head and her advisor – neither of my colleagues even acknowledged they had assumed the worst of me, it was very strange. I am working on developing a teaching philosophy that somehow transcends the reality that I will be seen as less legitimate by some peers and some students and have even come to be grateful for that opportunity in this space.

## B. Courses Taught
List (in reverse chronological order) the courses you have taught at the University of Connecticut by semester and year.

| Semester & Year | Course No. & Title | Solo (Y/N) | Enrollment |
|---|---|---|---|
| Fall 2022 | EDLR 5015: Teacher Leadership and Organizations | Y | 19 |
| Fall 2022 | EDLR 5202: Workplace Learning | Y | 16 |
| Spring 2022 | EDLR 5204: Organizational Learning | Y | 11 |

**C. Evaluation of Teaching** (copies of Student Evaluations of Teaching (SET) must be included in the Appendix - Section 8-C). Do not append individual comment sheets from students.

Evidence of assessment of teaching beyond the SET, such as classroom observations by peers or colleagues, mid-semester surveys, or other evidence of good teaching must also be included in Section 8-C.

I'm not sure how "good teaching" is being measured here, but as detailed above I am learning to do my best given the lack of adequate support and collegial trust I have experienced to date in this environment. I really wish I had more support and have

(Revised May 2018)                                          8

UConn 001785

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 10 of 37

since my first few weeks here.

**D. Undergraduate majors you have advised in each of the past five years.**

| Year | Number of Advisees |
|------|--------------------|
| n/a  | n/a                |

**E. Briefly list other undergraduate student advising or mentoring activities you have been involved in,** including advising Honors students, mentoring undergraduate research projects, advising non-majors, etc.

n/a

**F. Graduate student, postdoctoral fellows and visiting scholar advising/mentorship activities**

n/a

UConn 001786

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 11 of 37

## MASTER DEGREE ADVISING
(in reverse chronological order)

As Major Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
| | | |

As Associate Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
| | | |

## DOCTORAL DEGREE ADVISING
(in reverse chronological order)

As Major Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
| | | |

As Associate Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
| | | |

## MENTORSHIP OF POSTDOCTORAL FELLOWS OR VISITING SCHOLARS
(in reverse chronological order)

| Name of Fellow/Scholar | Year(s) |
|---|---|
| | |

## SECTION THREE: RESEARCH, SCHOLARSHIP, AND CREATIVE WORK

(Faculty member should complete Section Three parts A-I)

## A. NARRATIVE ON RESEARCH, SCHOLARSHIP AND OTHER CREATIVE
**WORK** (Including for example: art exhibits, musical compositions, or dramatic productions, etc.). Summarize your scholarly/creative goals for the next 5 to10 years and the activities you have initiated to achieve them. **(Narrative should not exceed 500 words.)**

This year I spent a lot of time trying to publish the three papers from my dissertation before I realized it was a book. I realized this after getting pages of legitimate feedback through peer review and noting that most of those revisions were too broad in scale to be addressed in depth in article format. I also did a lot of good thinking about how to better position my work as an organizational psychologist in the field. I developed a book

(Revised May 2018)                    10

UConn 001787

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 12 of 37

proposal, am rethinking target journals for upcoming papers in progress, and networking across both the education and organizations communities to learn more.

**B. Published Books, Book Chapters, and Edited Volumes.**

UConn 001788

List your published work in the standard form used in your field for the categories listed below - note if these are published electronically with a URL if appropriate. (Do not include work in progress or submitted for publication.)

### B1. Books or Monographs

Author(s), title, year of publication, publisher

### B2. Refereed Book Chapters

Author(s), title, year of publication, publisher

### B3. Edited Volumes

Author(s), title, year of publication, publisher

### B4. Books or Monographs in Press

Author(s), title, year of publication, publisher

### C. Refereed Publications and Submitted Articles.

List all refereed journal publications, then refereed conference proceedings, and then other refereed materials. Include those accepted or submitted and indicate their status. (Consult your department, school or college standards for what counts as "refereed.")

### C1. Published and Accepted Journal Articles

Author(s), article title, journal title, volume, year of publication, page numbers

### C2. Conference Presentations with Proceedings (Refereed)

Author(s), title, venue, year, page numbers

### C3. Other Refereed Material

Provide detailed description, including author(s), title, venue, year, and page(s) where appropriate.

### C4. Submitted Journal Articles

Author(s), article title, journal title, date submitted

Brown, T., Value Judgements: How Faculty Career Stages Shape Their Orientations for Organizational Learning in an Urban University Context, Journal of Learning Sciences, February 21st, 2022.

UConn 001789

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 14 of 37

Brown, T. 50 Years of Educational Research on Social and Psychological Factors Impacting Urban Teacher Thinking. January 16th, 2022.

**D. Other Publications and Creative Products.**

UConn 001790

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 15 of 37

List all other publications and creative products/activities that are not otherwise included in Sections Three. A – C. Indicate whether these are refereed or not. These products may include exhibitions, competitions, performances, professional practice/studio work, software, patents, designs, compositions, scholarly editions, posters, artifacts, datasets, catalogues, and other non-refereed publications.

### E. Presentations.
List all conference presentations (identify if keynote or invited presentation); invited seminars, scholarly presentations, etc. (Do not list a presentation here if it is listed elsewhere.)

Brown, T. (2022) *Exploring Variance in Faculty Use of Culturally Responsive Classroom Management Strategies at an Urban University.* American Educational Research Association, San Diego, CA.

Brown, T. (2022) *Value Judgements: How Faculty Career Stage Influences One's Propensity for Double-Loop Learning at Work.* American Educational Research Association, San Diego, CA.

### F. Grants and Contracts
List all grants and contracts as principal, co-principal investigator, and senior personnel. List PI and Co-PI for each grant. An example listing of what information should be included is given below:

Title of Project:
Agency/Company:
Total Dollar Amount:
Role: PI, Co-PI, or Senior Personnel
Collaborators: Jane Doe (PI), John Doe (Co-PI), etc.
Period of Contract: month/year – month/year

> **F1. As Principal Investigator**
> **F2. As Co-Principal Investigator**
> **F3. As Senior Personnel or Contributor**
> **F4. Pending Proposals**
> **F5. Proposals Submitted**
> **F6. Proposals not funded**

### G. Other Scholarly and Creative Accomplishments
List all other scholarly and creative accomplishments such as invention disclosures, start-up companies, etc. that are not listed elsewhere.

### H. Societal and Policy Impacts
Present a brief list of the broader impacts of your scholarship, and elaborate on them in your personal statement; include testimony before legislative committees or other public bodies, expert witness roles, and press and media coverage, if appropriate.

### I. Other Professional Activities

(Revised May 2018)                14

UConn 001791

List other professional activities, such as consulting, temporary employment, and visiting professorships.

UConn 001792

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 17 of 37

## SECTION FOUR: ACADEMIC AND PROFESSIONAL SERVICE / ENGAGEMENT

(Faculty member should complete Section Four parts A-D)

### A. NARRATIVE ON ACADEMIC AND PROFESSIONAL SERVICE/ ENGAGEMENT.

Summarize your academic and professional service, your goals relative to your activities, and the impact of your service. **(Narrative should not exceed 500 words.)**

### B. Professional Contributions

List all national and international contributions of service and positions of leadership in the profession.

Ad-Hoc Reviewer: Contemporary Educational Psychology, Educational Research Review

### C. Institutional Contributions
#### C1. University Level Service

| Name of Committee or Assignment | Responsibilities of the Assignment | Dates of Service |
|---|---|---|
|  |  |  |

#### C2. College/School Level Service

| Name of Committee or Assignment | Responsibilities of the Assignment | Dates of Service |
|---|---|---|
|  |  |  |

#### C3. Department Level Service

| Name of Committee or Assignment | Responsibilities of the Assignment | Dates of Service |
|---|---|---|
|  |  |  |

### D. Public and Community Service

List all public and community service activities that are professionally related.

(Revised May 2018)                16

UConn 001793

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 18 of 37

## SECTION FIVE: JOINT APPOINTMENTS

If you hold a joint appointment and your work is supervised by individuals other than your Department Head (e.g., regional campus director or associate vice provost, center or institute director, head of department in which you hold a joint appointment), list their name(s) and title(s) and briefly describe your duties for their program(s) below:

## SECTION SIX: STATEMENT BY THE CANDIDATE

I certify that this information is complete and correct.

Signature:

Name: Tiffany Brown

Date: 08/27/2022

UConn 001794

---

| **SECTION SEVEN: EVALUATIONS** |
| --- |

## A. DEPARTMENTAL PROMOTION, TENURE, AND REAPPOINTMENT ADVISORY COMMITTEE RECOMMENDATION

Provide an evaluation of the candidate as well as any supporting data and dissenting views, if any. What was the vote of the committee regarding its recommendation (see PTR procedures for guidance)? If there was a dissenting opinion regarding the recommendation, provide the reasons for this dissenting opinion.

<u>The recommendation serves as the committee's independent evaluation.</u>

## B. JOINT APPOINTMENTS

When a candidate holds a joint appointment (as indicated in Section 5) an evaluation from the other supervisor (e.g., regional campus director or associate vice provost, center or institute director, etc.) should be included here.

<u>The recommendation serves as the other supervisor's independent evaluation.</u>

## C. DEPARTMENT HEAD'S RECOMMENDATION

### I. DEPARTMENT HEAD'S EVALUATION LETTER

1. Provide your <u>independent</u> evaluation of the candidate's case, comparing and contrasting with the advice of the Departmental PTR Advisory Committee, and, in the case for tenure and promotion to associate or professor, the external letters (<u>Examples to Consider</u>).

    <u>Your recommendation, while it should be informed by the information provided, serves as your own independent evaluation.</u>

2. *For tenure and promotion to associate or professor*: Attach letters from five or more individuals in the candidate's field outside of the University who can speak to the candidate's professional contribution to scholarship. It is important to solicit impartial evaluations of the candidate's scholarly contributions, as well as other work, in the field. These external letters should not be from former mentors or frequent collaborators. Letters of reference for faculty members for promotion

(Revised May 2018)                                          18

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 20 of 37

to professor must be obtained from individuals who hold this or an equivalent rank.
Briefly describe the outside reviewer's affiliation and qualifications to evaluate the candidate.

## II. DEPARTMENTAL PTR ADVISORY COMMITTEE REPORT

1. Describe the procedure for the selection of the Departmental PTR Advisory Committee, its composition and its procedures.

Charge/Purpose: The PTR committee reviews all faculty PTR documents for promotion and reappointment. They discuss the candidate's progress and write a letter that outlines and evaluates the candidate's progress in rank or qualifications for promotion or tenure. In cases of promotion and tenure, they schedule a time for other faculty members to share with them issues related to the candidates' promotion or tenure.

Representation:
2 tenured full professors
2 tenured associate professors
1 non-tenure track (In-Residence) at associate or full level

Term: 3-year term for chairs, 2-year term limit for members

Process:

The committee chair will:

a. Be a tenured TT professor,
b. Serve a three-year term ending with the conclusion of the spring semester of the third year after transitioning the new committee chair into their role,
c. Be replaced in a special election if submitting materials for promotion in a given year,
c. Be replaced in a special election if on leave during the fall semester.

The PTR Committee will meet during the first week of the fall semester to form a work plan according to the deadlines established by the Provost's Office for the PTR process.

https://provost.uconn.edu/faculty-and-staff-resources/promotion-tenure-reappointment/

UConn 001796

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 21 of 37

Each faculty member going through the PTR process will be assigned 2 committee members:

> a. At least one of whom will have substantial expertise in the same area (e.g., program, scholarship focus) as the faculty member being reviewed,

> b. Who will meet with the faculty member to review their materials and discuss the faculty member's progress toward promotion and/or tenure, and their goals for the coming year,
> - These meetings will occur during the first two weeks of the fall semester

> c. Who will review the faculty member's materials and draft a letter:
> a. representing that faculty member's teaching, research,

and

> service accomplishments
> b. including recommendations for further progress toward promotion and/or tenure
> c. to be shared with said faculty member for review and comment before a final copy is voted upon by the entire PTR committee

Tenure and promotion of TT faculty will be voted on by TT members of PTR committee. Promotion of NTT faculty will be voted on by all members of PTR committee.

2. If there was a dissenting opinion on this recommendation within the Departmental PTR Advisory Committee, report the vote, and comment on any views taken by the Committee with which your recommendation disagrees.

3. If you have consulted others beside the Departmental PTR Advisory Committee about this candidate, list the individuals or ad hoc groups consulted and summarize their advice. Comment specifically on any views that differ from your own conclusions.

(Revised May 2018)                    20

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 22 of 37

## III.  RECOMMENDATION OF THE DEPARTMENT HEAD

This report includes my review of the advice I have received from others and clearly states my own opinion.

I recommend that:

Tiffany Brown

Check all statements that apply:

_____ Be promoted to the rank of

_____ Be granted permanent academic tenure

_____ Be given a terminal appointment

_____ Be reappointed for another probationary year

_____ Be reappointed in a position not leading to tenure

_____ Not be promoted

  x   Not be reappointed

Signed: _Laure J Butn_

Date: 11/10/2022

*Note: For a first year reappointment the Department Head only needs to complete this page (Section Seven Part C - III: Recommendation of the Department Head). The Department Head should give a copy of this page to the candidate.*

UConn 001798

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 23 of 37

## IV.  FOR SECOND AND SUBSEQUENT REAPPOINTMENTS

Please add any additional comments you deem necessary for each recommendation of a
second or subsequent reappointment. Be certain that you check the appropriate statement
in each cluster.

This faculty member was reappointed last year. At that time I (or the former department
head) checked the statement that judged the candidate to be:

_____ Performing in superior fashion

_x_ Performing competently

_____ Not performing as well as expected

To date, in my judgment (check the statement that is appropriate):

_____ The candidate's work exceeds expectations; therefore, I
recommend reappointment.

_____ The candidate's work meets expectations therefore, I recommend
reappointment.

_____ The candidate's work is below expectations; nonetheless, I
recommend reappointment for another probationary year with the
expectation that he/she may, in that period, effectively address the
noted weakness(es).

_x_ The faculty member is not performing as expected; therefore, I do
not recommend reappointment.

*(The current academic year is the candidate's_____probationary year.)*

_____ This individual is not in a position leading to tenure; but funding
permitting, I recommend reappointment.

Signed: _James J Button_

Date:  11/10/2022

## *THE DEPARTMENT HEAD SHOULD GIVE A COPY OF SECTION 7 TO THE CANDIDATE*

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 24 of 37

## D. DEAN'S ADVISORY COUNCIL RECOMMENDATION

Provide an <u>independent</u> evaluation of the candidate together with supporting data. What was the vote of the Council regarding its recommendation? If there was a dissenting opinion regarding the recommendation, provide the reasons for the dissent (see PTR procedures for guidance).

UConn 001800

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 25 of 37

## E. DEAN'S RECOMMENDATION

Provide your independent evaluation of the candidate's case, comparing and contrasting with the Department Head's recommendation, the advice of the Departmental PTR Advisory Committee, and the Dean's Advisory Council.

Your recommendation, while it should be informed by the information provided at other steps of review, serves as your own independent evaluation (see PTR procedures for guidance).

*If there was an appeal at the Dean's level, please describe this and report on its outcome.*

Signed: _____

Date:

UConn 001801

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 26 of 37

**F. EXTERNAL LETTERS OF RECOMMENDATION SHOULD BE INSERTED HERE.**

UConn 001802

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 27 of 37

## SECTION EIGHT: APPENDICES

A. **All Supporting Materials Submitted by Candidate** (appropriately labeled)
   (*e.g.,* copies of manuscripts *in press*).

B. **Copy of Original Letter of Appointment**

C. **All Copies of the Student Evaluation of Teaching (SET) Results.** <u>Do not
   append individual comment sheets from students</u>.

   Include other evidence of teaching effectiveness.

D. **Curriculum Vitae** (optional)

E. **Other** (including previous letters regarding PTR from Provost, Dean, or
   Department Head).

(Revised May 2018)                    26

UConn 001803

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 28 of 37

PTR Addendum
Tiffany Brown
October 10th, 2022

I appreciate the opportunity to add an addendum to my original PTR form, and the committee for its interest in procuring a statement which reflects my work productivity over the past year. After my meeting with the initial PTR committee, I realized that I do not want to redo the form because I believe the contextual factors described in those statements have strongly contributed to my perceptions that my work as a scholar is not well recognized or supported by the department. While I did write that statement with very little time upon realizing there had been missing information in my PTR OneDrive folder, upon reflection I realized that my hesitation to share my progress has been somewhat well founded by the sense that I have not been treated equally or fairly as a colleague in my experience here to date. I think subconsciously I withheld the information because I have had a few experiences here that make me feel like my progress would not be well supported.

I would also like to document (and ask that it be clarified somewhere in writing for future reference) that I appear to have been misinformed about tenure expectations. I learned in this year's PTR meeting that though there has been some confusion in the past, two articles a year must be published – not just submitted as I was told repeatedly when I joined the faculty last year. It would really help to be clear on how I'm being evaluated to ensure I am meeting those expectations moving forward.

I am writing this to emphasize that I achieved the following *despite* the concerns I have documented in writing to the Dean and department head since my first semester year, which were largely addressed reactively rather than proactively – and with little to no benefit of the doubt afforded to me that one might expect as a basis for collegial trust and respect. In fact, there were many times last year when I expected to be treated as someone who would contribute the following items and found that I was instead treated with the collegial respect often afforded to doctoral students or postdoctoral fellows. I think it would be irresponsible to not continue documenting this – which I've been doing since my first few weeks here in email to both the Dean and my department head. I sincerely didn't expect support for any of the progress I've made based on the lack of various supports I missed my first year here.

Nevertheless, here are some points Saran and Jennie thought would be helpful to include about my progress:

- **Professional Development:** In Spring 2022 – upon realizing that the supports available for faculty of color on UConn's campus are both still in development and not being spearheaded by a person of color – I reached out to colleagues at another university who told me of the Faculty Women of Color in the Academy conference. It was great to meet other faculty women of color from across the country who understood the ways in which our campus PD supports often fall short in recognizing unique issues of power and privilege that impact our everyday work. I also met some other faculty women of color from UConn, which was great – though I found out after spending some of my startup funds that most of them had had their conference fees taken care of by the DEI office. I had to petition directly for a refund to my startup funds to be reimbursed. It was really

concerning to me that the message about this conference somehow hadn't made its way to the ed school, as I think many of my Neag colleagues would really have benefitted from it as well.

In the process of developing my book proposal (discussed below) I developed some mentoring relationships with organizations and education scholars at other universities – with particular focus in seeking out folks who are "dual discipline" scholars. I got some great advice on how to position my work and refocus my efforts in identifying target journals that helped significantly.

- **Articles in Development:** The two papers I presented at AERA were based on my dissertation research, which became material for my book proposal. I am currently working on two articles based on data I collected in 2017 while working for a high-performing higher education opportunity program. The papers are about professional socialization and essential components of this program's service delivery.

- **Book Proposal Under Review:** My dissertation was originally composed of three papers, which I spent last year submitting individually to journals. I received pages of feedback from across those journals that included very valid feedback, and which I realized around the end of 2021 meant the loose ends left untied amongst them could be addressed by drawing a throughline across them - in book format. So, by the Spring I'd begun developing the book proposal, and by the summer I submitted it with the title *Cultural Learning in Urban Schools and Minority Serving Institutions: For Educators.* The proposal was submitted and is under review by Cambridge University Press.

  I must add that a critical factor which allowed me to work on this proposal during the summer was the ability to pay myself from my startup funds. When I came last year, I was explicitly told by both the Dean and some senior colleagues that I could use my startup funds for everything but to pay myself over the summer. Thankfully, I found out at the FWCA conference from other UConn colleagues that this is incorrect just a few weeks before the Finance department deadline.

- **Conference Submissions:** This year I presented two papers (one paper session, one roundtable session) at AERA. I'm planning to submit my next two papers to organizations journals which feature research on diverse organizational contexts.

- **Teaching Updates:** This year I checked in with students sooner by asking for plus/delta feedback at the end of our first month. We've still got a way to go, but checking in sooner has kept me more responsive to students' needs in real time – which I think is going much better.

- **Service:** I should have mentioned that I served on a few EdD committees last fall, for the following students: ▮▮▮ , ▮▮▮ , ▮▮ (last name not on the spreadsheet Jennie'd sent over that I'm referencing for this), ▮▮▮ , ▮▮ ▮▮ , ▮▮▮ . I also served as a reviewer for Educational Research Review and Contemporary Educational Psychology.

UConn 001805

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 30 of 37

**SET Report Cover Page**

*Note: List in the same order as reports that follow and scan as one document with this summary on top.*

| TEACHING AND CURRICULUM DEVELOPMENT |
| --- |
| Section THREE on the CIRE form, Section TWO on the PTR form. |

**B. Courses Taught**

List (in reverse chronological order) the courses you have taught at the University of Connecticut by semester and year.

Spring 2022 EDLR 5204:

| Semester & Year | Course No. & Title | Solo (Y/N) | Enrollment | SET Included (Y/N) | Reason SET Not Included |
| --- | --- | --- | --- | --- | --- |
| Spring 2022 | EDLR 5204: Organizational Learning | Y | 11 | Y | -- |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**C. Evaluation of Teaching** (copies of Student Evaluations of Teaching (SET) must be included in the Appendix - Section 8-C). SET reports should be combined into one PDF and saved with this page on top. Do not append individual comment sheets from students – *reports should only include the first 1-3 summary pages.*

Evidence of assessment of teaching beyond the SET, such as classroom observations by peers or colleagues, mid-semester surveys, or other evidence of good teaching must also be included in Section 8-C. *These documents should be saved as a separate PDF from the SET reports.*

UConn 001806

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 31 of 37



# University of Connecticut

## Student Evaluation of Teaching
## Spring 2022

## Individual Report for EDLR-5204-001-STORR-Organizational Learning

Instructor: **Tiffany Brown** (SET Primary Instructor)

### Response Table

| Raters | Students |
|---|---|
| Responded | 9 |
| Invited | 11 |
| Response Ratio | 82% |

### What is your overall rating of Tiffany Brown's teaching?

| Question | Course | | Department (EDLR-Course Level 5000-FEIN) | | School (EDUCA-Course Level 5000-FEIN) | | University (Course Level 5000-FEIN) | |
|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| What is your overall rating of the instructor's teaching? | 1.4 | 1.0 | 4.5 | 4.7 | 4.1 | 4.4 | 4.1 | 4.3 |

### What is your overall rating of the course?

| Question | Course | | Department (EDLR-Course Level 5000-FEIN) | | School (EDUCA-Course Level 5000-FEIN) | | University (Course Level 5000-FEIN) | |
|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| What is your overall rating of the course? | 1.8 | 1.0 | 4.3 | 4.5 | 3.9 | 4.0 | 4.0 | 4.1 |

UConn 001807

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 32 of 37

1/15

University of Connecticut: Student Evaluation of Teaching

## Overall Rating



Tiffany Brown - SET Primary Instructor

UConn 001808

2/15

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 33 of 37

University of Connecticut: Student Evaluation of Teaching

## Section 1. Summary

### Please respond to the following questions about instructor Tiffany Brown:

| Question | Course | | Department (EDLR-Course Level 5000-FEIN) | | School (EDUCA-Course Level 5000-FEIN) | | University (Course Level 5000-FEIN) | |
|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| The instructor presented the course material clearly. | 2.2 | 2.0 | 4.6 | 4.7 | 4.3 | 4.5 | 4.4 | 4.5 |
| The instructor was well prepared for class. | 3.7 | 4.0 | 4.8 | 5.0 | 4.5 | 4.8 | 4.5 | 4.6 |
| The instructor responded to questions adequately. | 2.0 | 1.0 | 4.7 | 4.8 | 4.4 | 4.7 | 4.5 | 4.7 |
| The instructor stimulated interest in the subject. | 2.6 | 2.0 | 4.7 | 4.8 | 4.3 | 4.6 | 4.4 | 4.6 |
| The instructor showed interest in helping students learn. | 2.1 | 2.0 | 4.7 | 5.0 | 4.5 | 4.8 | 4.6 | 4.7 |
| The instructor gave clear assignments. | 1.8 | 2.0 | 4.5 | 4.8 | 4.3 | 4.6 | 4.3 | 4.5 |
| The instructor was accessible to students. | 2.4 | 2.0 | 4.7 | 5.0 | 4.4 | 4.7 | 4.5 | 4.7 |
| The instructor gave useful feedback on my performance. | 2.7 | 2.0 | 4.6 | 4.8 | 4.3 | 4.5 | 4.4 | 4.5 |
| The instructor returned graded work in a reasonable amount of time. | 3.7 | 4.0 | 4.4 | 4.5 | 4.3 | 4.6 | 4.4 | 4.6 |
| The instructor used class time effectively. | 2.8 | 3.0 | 4.7 | 4.8 | 4.3 | 4.5 | 4.4 | 4.6 |
| The instructor treated all students with respect. | 1.3 | 1.0 | 4.8 | 5.0 | 4.7 | 4.9 | 4.7 | 4.8 |
| The instructor graded fairly. | 2.1 | 2.0 | 4.6 | 4.9 | 4.5 | 4.7 | 4.5 | 4.7 |
| The instructor's teaching methods promoted student learning. | 1.7 | 1.0 | 4.7 | 5.0 | 4.3 | 4.6 | 4.4 | 4.5 |

### Please respond to the following questions about the course:

| Question | Course | | Department (EDLR-Course Level 5000-FEIN) | | School (EDUCA-Course Level 5000-FEIN) | | University (Course Level 5000-FEIN) | |
|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| The methods of evaluating student learning seemed appropriate. | 2.4 | 2.0 | 4.6 | 4.8 | 4.4 | 4.5 | 4.4 | 4.5 |
| The course content was well organized. | 2.9 | 3.0 | 4.6 | 4.8 | 4.3 | 4.5 | 4.4 | 4.5 |
| The course objectives were clear. | 2.6 | 3.0 | 4.6 | 4.8 | 4.4 | 4.6 | 4.4 | 4.5 |
| The course objectives were met. | 2.9 | 3.0 | 4.6 | 4.7 | 4.4 | 4.6 | 4.4 | 4.5 |
| The course materials made a valuable contribution. | 3.1 | 4.0 | 4.6 | 4.7 | 4.3 | 4.5 | 4.4 | 4.5 |
| The pace of the course seemed appropriate. | 2.2 | 2.0 | 4.6 | 4.7 | 4.3 | 4.5 | 4.4 | 4.5 |

Tiffany Brown - SET Primary Instructor

UConn 001809

3/15

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 34 of 37

# TIFFANY A. BROWN

tiffany.brown@uconn.edu

Department of Educational Leadership
Neag School of Education
Charles B. Gentry Building
249 Glenbrook Road, Unit 3064



## EDUCATION

| | |
|---|---|
| **Harvard University** | Cambridge, MA |
| Ph.D., Education | 2021 |
| M.Ed., Policy and Management | 2018 |
| | |
| **Columbia University** | New York, NY |
| M.A., Social-Organizational Psychology | 2016 |
| Advanced Certificate in Cooperation and Conflict Resolution Studies | |
| | |
| **Georgetown University** | Washington, D.C. |
| B.S.F.S., Culture and Politics; Honors Psychology Program | 2014 |

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| **University of Connecticut** | Storrs, CT |
| Assistant Professor of Educational Leadership | 2021- Present |

## PUBLICATIONS

### MANUSCRIPTS IN PREPARATION
- "Service Climate in a High Performing Higher Education Opportunity Program." Article manuscript in progress, to be submitted for publication in Fall 2022.
- "Professional Socialization in a High Performing Higher Education Opportunity Program." Article manuscript in progress to be submitted for publication in Fall 2022.
- "Employee Motivational Needs in a High Performing Higher Education Opportunity Program." Article manuscript in progress, to be submitted for publication in Winter 2022.

### CONFERENCE PROCEEDINGS
Brown, T. (2022) *Exploring Variance in Faculty Use of Culturally Responsive Classroom Management Strategies at an Urban University.* American Educational Research Association, San Diego, CA.

Brown, T. (2022) *Value Judgements: How Faculty Career Stage Influences One's Propensity for Double-Loop Learning at Work.* American Educational Research Association, San Diego, CA.

Brown, T. (2020). *Relatedness Needs and Employee Engagement in College Remediation.* American

UConn 001810

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 5
Page 35 of 37

Educational Research Association. (Conference Cancelled).

Perry, D., **Brown, T**., Berardino, M., St, Rose, A. *Community Ties, Family Traditions, and Cultural Norms: An Exploration of High School Characteristics That Promote Post-Secondary Success*. American Educational Research Association. (Conference Cancelled).

## TEACHING

### UNIVERSITY OF CONNECTICUT COURSES
- *Organizational Learning (EDLR 5204, PhD seminar)*
  - o Spring 2022, 11 students
- *Workplace Learning (EDLR 5202, EdD seminar)*
  - o Fall 2022, 16 students
- *Teacher Leadership and Organizations (EDLR 5015, MEd Elective)*
  - o Fall 2022, 20 students

### CITY UNIVERSITY OF NEW YORK COURSES
- *Cultural Psychology (undergraduate elective)*
  - o Fall 2019: 25 students
  - o Spring 2020: 25 students
- *Psychological Concepts and Methods: Issues in Organizational Psychology (MA Core)*
  - o Fall 2019, 15 students

## PROFESSIONAL RESEARCH EXPERIENCE

**Metro Center for Research on Equity and the Transformation of Schools**     New York, NY
Qualitative Research Consultant                                             2018-2019

## PROFESSIONAL SERVICE

### AD-HOC REVIEWER
- Contemporary Educational Psychology
- Educational Research Review

## COMMUNITY INVOLVEMENT/OUTREACH

**Brooklyn Tabernacle College Prep Program**     2015-2018
Founder and Director of College Counseling

## ADDITIONAL TEACHING AREAS
- Conflict Resolution in School Organizations
- Intercultural Conflict Resolution

## PROFESSIONAL MEMBERSHIPS
- Academy of Management (AOM)

UConn 001811

- American Psychological Association (APA)
- American Educational Research Association (AERA)
- Society for Industrial and Organizational Psychology (SIOP)
- Society for the Psychological Study of Social Issues (SPSSI)

UConn 001812

# Defendant's Deposition Exhibit 6

DEFENDANT'S DEPOSITION
EXHIBIT
PENGAD 800-631-6989
V IO
10-30-24

| From: | Tiffany Brown |
|---|---|
| To: | Irizarry, Jason |
| Cc: | Burton, Laura |
| Subject: | Re: Fall / summer schedule |
| Date: | Wednesday, March 2, 2022 11:48:48 AM |

Hi Laura and Jason -

Thanks for meeting with me yesterday, I appreciate the clarity I left the meeting with. Just writing to summarize what was accomplished (from my perspective) by its end, and my contributions to how we can move forward.

Laura - I told Jason I can workaround teaching from 4-6.30 PM in the Fall, but I can't in good faith (just about the personal values embedded/integrity I try to keep constant in my own work) teach Social-Justice Leadership. I really appreciate your understanding my hesitance as a scholar of color to be complicit in relegating my work to one dimension of it or risk suppressing my own scholarship by spending time learning DEI related content in order to work here. As mentioned, my initial hesitation was somewhat confirmed when I received an email from a student this week who would like to take that course and stated their research interests "encompass children's social, emotional, and behavioral well-being, and I have become increasingly interested in the ways that educators are prepared to meet students' needs, as well as educators' thinking about such challenges." I really have no idea how I would teach a student with these interests - just based on what I'm trained in in terms of trying to cobble together resources from stuff I've read. I can't spend more time I won't have this fall learning about my departmental colleagues' research interests by reading their work on related topics, and then learning to teach that content to students. I still don't think I should have to shoulder the burden of that kind of load, which is more than "tweaking" because there is little continuity in the doctoral programs in terms of curricular offerings from one cohort to another. I do believe that means we need more concentrated focus on revamping the Ed.D. structure/curriculum, not expecting junior faculty to pick up where the program and senior faculty have dropped the ball. My rationale also considers what options (or lack thereof) I now understand I have in my current role at UConn. While a course might appear on my CV and set precedent for future teaching asks that are not in my wheelhouse or about race in particular, a commute is a bit more short-term an issue.

I am happy to be a team player when I am assigned work that matches my disciplinary expertise, not just my subjectivity or any experience that I am presumed to possess because I focused my first research on study on POC. I want to reiterate that I am not a critical race scholar or social-justice scholar, and it actually diminishes those fields to assume POC who do work with disciplinary training earned outside the DEI realm are the same as those who work to earn sociology or critical studies degrees (or those who don't and do research/teaching on these topics anyway). I do appreciate the 3 course releases (even though, as Jason and I discussed yesterday - I wasn't expecting the third, and certainly am never expecting any "handouts") as a show of good will and intent to support my start here. I also have to push back on the notion that because of this head start - first-semester course releases some folks might arguably reason anyone coming from a first-gen background and adjusting to their first faculty role could benefit from - I should from here on be available to do more than "tweak" syllabi because I had this time upfront. I have taken note of what factors contribute to the diversity of teaching styles in the department and am planning to adjust accordingly.

So,

- If we can find a second course for me to teach in the fall aside from Social-Justice Leadership, I will take summer compensation for the course I'm teaching this summer.
- If we can't find a second course for me to teach in the fall aside from Social-Justice Leadership, I will not take summer compensation and apply the second course for in the fall.

Thanks again for making time to address my concerns.

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education

UConn 000018

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 6
Page 1 of 10

University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

On Fri, Feb 25, 2022 at 5:05 PM Tiffany Brown <tiffany.brown@uconn.edu> wrote:
Hi again -

Thanks for offering to meet Jason. I honestly have spent the last two days thinking about how I imagine managing my time here by spending so much of it redesigning courses for the EdD program - more than "tweaks" after all, since it involves learning the content as well as the work of reframing it from my own disciplinary perspective. Also generally a big ask since I know based on the research, my experience serving on five committees last semester, and impressions I've learned through hallway conversations here with both students and admins that the Ed.D. program needs intensive work in general. After my last talk with Laura I realized I should've learned more about which group of students I would be teaching upfront, or at least explored sooner why I thought it would be masters and PhDs before joining Neag but realized soon after arriving it would also be where EdD course coverage is needed. I can't really say I knew what to ask, but there were hints that my role responsibilities were not clear before I even began teaching in retrospect. Now, this expectation that I be the stand in for both my actual disciplinary expertise and that of others - it feels a lot like role overload.

It doesn't help that a Neag colleague asked me to speak to a prospective new hire who is also a black woman this week and she mentioned she would have to take a pay cut to come to UConn because she learned the salary wasn't negotiable during the process she's experienced to date. It reminded me of hearing last week that there are folks who are being incentivized to come to UConn by having their previous salaries matched or exceeded. I couldn't help but realize she must not have been that candidate and that even though she's already an AP elsewhere, she is being asked to take less. The rationale for my departmental colleague receiving higher pay upon our hire provided to me was that she was coming from an AP position (at a lower ranked school than this prospective hire) elsewhere, so I guess I just wondered why this new person wasn't experiencing her offer negotiations that way. All in all, just a weird week that made me really wonder if I was brought in to succeed based on my own work or just to supplement the work of my senior colleagues in the department. Next week I can talk on Tuesday from 11 am to 2 pm, or Friday from 9-2.

Have a good weekend,

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

On Thu, Feb 24, 2022 at 4:15 PM Irizarry, Jason <jason.irizarry@uconn.edu> wrote:

Thank you for sharing your concerns, Tiffany. I think further conversation would be helpful to address the issues you raise below. Can you please share some potential meeting times that work for you?

Best,

Jason

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 6
Page 2 of 10

Jason G. Irizarry, Ed.D.

Dean, Neag School of Education

249 Glenbrook Rd.

Storrs, CT 06269-3064

860-486-1241

jason.irizarry@uconn.edu

**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Date:** Wednesday, February 23, 2022 at 4:05 PM
**To:** Burton, Laura <laura.burton@uconn.edu>
**Cc:** Irizarry, Jason <jason.irizarry@uconn.edu>
**Subject:** Re: Fall / summer schedule

Hi Laura and Jason -

Jason, Laura and I talked by phone today on this and she recommended I meet with you to talk further about why I can't teach this class in the Fall. I'm going to ask that we have that follow-up conversation once I've had a chance to gather more resources about how to advocate for myself, which I began doing this week. But in the meantime I will mention a few reasons this teaching assignment seems unfair to me:

1. I'm not a race or social justice scholar. When I reminded Laura of this today, she mentioned that because I apply critical frameworks in my work on organizational leadership, she figured the skills are transferable - but they're really not. That rationale assumes that I have pedagogical content knowledge to teach in an area outside my discipline because I know how to teach to diverse student populations (integrating critical frameworks), when in reality PCK requires knowledge of the subject, knowledge of students, and knowledge of how to teach based on those other two factors.

2. Laura explained to me that when she assumed the role of department head, she was asked to have the person who taught this class be someone who has competencies related to the critical frameworks that I am understanding are central to that discipline. The one person in our department who has literally written a book on

UConn 000020

Social Justice Leadership (who I understand works under very different circumstances as a tenured professor) is not being asked to develop the critical competencies required to teach a course in the subject he wrote an entire book on. He is featured on UConn's website for his work in this discipline, and yet the work of integrating critical competencies needed to round out the PCK needed to teach that class is being demanded of junior faculty of color instead. This is really not okay. Having critical competencies without content knowledge doesn't make me any more qualified to teach this than he is to teach with content knowledge and no critical competencies, the difference is he will still be considered the expert on this while I am expected to learn the content and deliver it effectively despite not being trained at all in this. I should also mention this is the same tenured faculty member who wrote to ask me early last semester what qualitative software I used on my own dissertation, and then placed me on two of his students' committees who "so happened" to be using the same software. He's also one of the senior faculty who has asked me to provide resources on positionality and subjectivity issues related to researcher bias. It generally is just not okay to expect folks who are tenured to do so little to sharpen their skills and then recruit people of color to "serve" the department by effectively serving their needs.

3. The undue burden of picking up where that person is not qualified appears to have been passed down from woman of color to woman of color since he stopped teaching it. I know one of them has since left UConn and the other is actually well-trained to do this work, but the latter was seriously overburdened in terms of picking up the slack where other curricular offerings were not covering the program's stated objectives. That's evident both from what she's told me about the difficulty in designing that class so it appeals to both K-12 and higher ed folks (I understand most classes don't) and the fact that - even with a very small sample, current EdD students have made note that this is one of the few classes that actually matches their previous conceptions of what course offerings would be before they matriculated. Just as I mentioned last week, I don't think it's fair to put junior faculty - especially junior faculty of color - in this position.

4. Finally, I simply cannot commute that late at night - and as I mentioned to Laura by phone, having to explain so repeatedly is not only extremely taxing but also makes me feel like the institution cares less about my safety as a person than departmental needs. Especially because you are asking so little of the person who actually wrote the book on this topic in terms of developing the critical competencies needed to teach it, the thought of traveling home so late just to pick up his slack is really awful. I did apply to this position knowing I'd be asked to teach Teacher Prep and PhD students, but I anticipated those classes would be offered during the day (and they are). Being asked to teach courses in the evening - aside from why I'm being asked to teach them while there are tenured faculty who simply don't/won't do the work to acquire the critical competencies needed to supplement their content knowledge - is not what I signed up for. It's pretty much the same thing as what's happened in corporate over the past two years, where companies say they're interested in "diversity," but what they really mean is they want people of color to come in and do the work for them.

I look forward to talking more about this course assignment, and disproportionate departmental expectations that appear to be placed on faculty of color more generally. The latter observation is based both on the departmental research I did recently and the conversation we began last week.

UConn 000021

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 6
Page 4 of 10

**Tiffany Brown, Ph.D.**

Assistant Professor

Department of Educational Leadership

Neag School of Education

University of Connecticut

249 Glenbrook Road, Unit 3093

Storrs, CT 06269

On Wed, Feb 23, 2022 at 11:02 AM Tiffany Brown <tiffany.brown@uconn.edu> wrote:

Laura (and Jason) - Here are some thoughts I have based on Laura's latest email today:

For the fall semester, we cannot move the time of EDLR 6467 any earlier in the day. This course meets in-person concurrently with EDLR 6465 (which begins at 6:30pm). When we do have flexibility in meeting times, we can work together to find a time that works best for you, as we have this spring semester.

**If this is the case, I can't teach this class**. I cannot get home after midnight as travel after that class time would require, it simply isn't safe for me and I'm concerned that folks aren't taking into account my personal safety needs - especially since nothing really qualifies me to teach Social Justice Leadership aside from my subjective experiences as a black woman (I could see Organizational Leadership, which is actually in my wheelhouse). I've already been wondering why I am assigned to teach this following my last check-in with Milagros about it and hearing how her expertise lends itself to the course in ways mine doesn't; I'm also not sure (based on the departmental research data) that the department really has consensus on what Social Justice Leadership means, so - to the point I made in our last conversation with Jason - I'm not sure why I'd be placed in the position to define this as a junior faculty who isn't a race or social-justice oriented scholar.

With regard to summer teaching opportunities. If you teach your 2 fall / 2 spring course load, any summer teaching is compensated.

My understanding - and my preference as I've stated it to you in earlier emails - is that I not be compensated for this course so that I can take one course off my load for the fall. I know we discussed this initially in the context of my teaching two summer courses

UConn 000022

(before Casey clarified Workplace Learning is not being offered this summer), but I stated then that I would prefer more time in the Fall to devote to my research (time I didn't absolutely have this past Fall while performing the service of redesigning Organizational Learning) than to teach two Fall courses. So, happy to teach the 6050 class, but again, it's making me uncomfortable that folks aren't acknowledging I cannot travel that late at night after 6467 and pushing me to teach it without me being qualified to do so.

So this coming academic year (22-23) you could do the following:

Fall:

1 - EDLR 6467 (no, thanks)

2 - Another EDLR course – possibly EDLR 6050 Proposal Development for LLEP students (sure)

Spring:

1 – EDLR 5204

2 – Another EDLR course in the EdD program

Here again I'm a bit confused on the expectations folks are placing on me that seem different than those my peers who are paid the same experience being expected to cover undergraduate and masters courses (during the day). I did not know when I started this job - and perhaps that was my naivete but I was working with typical ideas of courses assigned to junior faculty, how heavily the program would be relying on me to fill in its doctoral curricular offerings. This matters because I cannot travel late at night without a car. It seems really unfair to me that my fellow junior colleagues who are paid at the same base as I am have lower-level course-related expectations on them, which makes it possible for them to leave campus and be home in time for dinner.

Summer 2022 – EDLR 6092 you would be paid (no thanks, for reasons we discussed in prior email threads - I'd like to recoup the time spent redesigning Organizational Learning last fall (and redesigning Workplace Learning as I will have to do by next summer).

In Summer 2023 – we would offer EDLR 5202 for EdD students – you could teach that and be paid.(sure)

Each summer there would be an opportunity to teach and be compensated if you are

teaching your 2/2 load during the academic year. I'm not sure this correlates to the same opportunities my peers have to either choose to teach in the summer and have a release for the Fall. It leaves me locked in to having to choose to be compensated without the same benefit of possibly taking the course release for the following semester (and we all know folks take that option because time is just as important when developing your research agenda).

I'd like to talk more about why I'm considered the most eligible to teach the Social Justice Leadership class, especially after my last conversation with Milagros and knowing that Casey actually wrote a book on this subject. I can't reiterate enough how uncomfortable it is to be placed in a position to ask folks to consider matching me with courses that actually fit my disciplinary expertise, and also don't cause me to risk my safety commuting late at night.

**Tiffany Brown, Ph.D.**

Assistant Professor

Department of Educational Leadership

Neag School of Education

University of Connecticut

249 Glenbrook Road, Unit 3093

Storrs, CT 06269

On Wed, Feb 23, 2022 at 10:39 AM Tiffany Brown <tiffany.brown@uconn.edu> wrote:

Hi Laura -

Can we talk through this email sometime today? I can give you a call at a time that works for you.

Tiffany

UConn 000024

**Tiffany Brown, Ph.D.**

Assistant Professor

Department of Educational Leadership

Neag School of Education

University of Connecticut

249 Glenbrook Road, Unit 3093

Storrs, CT 06269

On Wed, Feb 23, 2022 at 10:29 AM Burton, Laura <laura.burton@uconn.edu> wrote:

Hi, Tiffany.

Leah and Alyssa are asking other colleagues about possible workarounds for Dedoose. Hopefully we can figure out a way for you to pay the fees without expensing out of pocket.

I wanted to follow up on the fall semester schedule and summer teaching questions.

For the fall semester, we cannot move the time of EDLR 6467 any earlier in the day. This course meets in-person concurrently with EDLR 6465 (which begins at 6:30pm). When we do have flexibility in meeting times, we can work together to find a time that works best for you, as we have this spring semester.

With regard to summer teaching opportunities. If you teach your 2 fall / 2 spring course load, any summer teaching is compensated.

So this coming academic year (22-23) you could do the following:

Fall:

1 - EDLR 6467

UConn 000025

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 6
Page 8 of 10

2 - Another EDLR course – possibly EDLR 6050 Proposal Development for LLEP students

Spring:

1 – EDLR 5204

2 – Another EDLR course in the EdD program

Summer 2022 – EDLR 6092 you would be paid.

In Summer 2023 – we would offer EDLR 5202 for EdD students – you could teach that and be paid.

Each summer there would be an opportunity to teach and be compensated if you are teaching your 2/2 load during the academic year.

Details on summer compensation are included in the AAUP Contract – see Article 38 on page 52. Our contract is under negotiation, so we may see a change but at this point, we are still operating under the contract attached.

Happy to answer any questions.

Best,

Laura

**Laura J. Burton**
Department Head, Educational Leadership

Professor, Sport Management

Pronouns (she, her, hers)

UConn 000026

**University of Connecticut**

**Neag School of Education**
Dept. of Educational Leadership
249 Glenbrook Road Unit 3093
University of Connecticut
Storrs, CT 06269-3093
(860) 486-3095

http://education.uconn.edu/person/laura-burton/

Women In Sport Leadership

Organizational Behavior in Sport Management


*I acknowledge that the land on which the University of Connecticut is located is
the territory of the Mohegan, Mashantucket Pequot, Eastern Pequot, Schaghticoke,
Golden Hill Paugussett, Nipmuc, and Lenape Peoples, who are the original
caretakers of this land and have stewarded this land throughout the generations.*

UConn 000027

# Defendant's Deposition Exhibit 8

DEFENDANT'S DEPOSITION
EXHIBIT

PENGAD 800-631-6989

8 ID
10-30-24

| | |
|---|---|
| **From:** | Brown, Tiffany |
| **To:** | Higgins, Monica C. |
| **Subject:** | Re: circling back to check in |
| **Date:** | Wednesday, February 9, 2022 12:05:27 PM |

Thanks for sharing! I'm going to see about tying this research into the intro framing/conclusion for the paper on CRCM, which I am thinking could indeed be a good fit for TCR after all.

Also random but I am having some really gratifying moments teaching this org learning class! Students are getting so into the task of workshopping organizational dilemmas located in schools through the ladder of inference framework and speaking (in office hours, where I've begun talking one on one with them about final project ideas) of how compelling/useful it is to be able to see seemingly intractable issues through a lens that helps them evaluate the culturally accepted meanings and individual/collective actions within a school org that contribute to their chosen problems of practice! It is such an honor to teach the utility of this framework to doctoral students studying educational leadership!! Just geeking out here since few others would get how awesome this is.

Hope you are having a good week too,
tiffany

Sent from my iPhone

> On Feb 9, 2022, at 11:16, Higgins, Monica C.
> <monica_higgins@gse.harvard.edu> wrote:

> *Message sent from a system outside of UConn.*

> Hi there,

> Saw this article – in Ed Week so you may have seen it too – looks like the person who is the author is using CRT in their approach, so thought of you.

> Have a good day!
> -monica

> **Monica C. Higgins**
> Kathleen McCartney Professor of Education Leadership
> Harvard Graduate School of Education
> (617) 496-8826 | she/her/hers |

UConn 002193

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 8
Page 1 of 1

# Defendant's Deposition Exhibit 12

| | |
|---|---|
| **From:** | Bannister, Kelly |
| **To:** | Brown, Tiffany; Irizarry, Jason |
| **Cc:** | David Amdur; Chipman, Sarah |
| **Subject:** | RE: Notice of Fact-Finding Meeting |
| **Date:** | Tuesday, November 8, 2022 3:38:12 PM |

DEFENDANT'S DEPOSITION
EXHIBIT
PENGAD 800-631-6989

Professor Brown,

The letter sent to you by Dean Irizarry is to advise you of an investigatory meeting. The Dean is gathering information and no decisions have been made. At this stage in the process, the Dean is not required to answer questions. Your AAUP representative, David Amdur, is copied here and can advise you about the fact-finding process. If there is information you would like to share with the Dean related to the matters identified in the letter, David can advise you on how to do so.

To the extent you have raised issues of potential harassment, discrimination and/or retaliation, I see that you have copied on your emails today Sarah Chipman in OIE who can advise you about their processes.

Thanks,
Kelly

**Kelly L. Bannister, Esq.**
Associate Director and Labor & Employment Attorney

Office of Faculty & Staff Labor Relations
University of Connecticut
9 Walters Avenue, Unit 5075
Storrs, Connecticut 06269-5075
Tel: (860) 486-2585 (direct)
Tel: (860) 486-5684 (main)
Fax: (860) 486-3390
kelly.bannister@uconn.edu

www.lr.uconn.edu

**PRIVILEGED AND CONFIDENTIAL COMMUNICATION**: The information contained in this electronic message and any attachments to it are intended for the *exclusive use of the addressees* and may contain confidential attorney-client communication and/or privileged information. If you are not the intended recipient, please destroy all copies of this message and attachments and immediately notify this office by sending a reply e-mail to the sender. Thank you.

**From:** Brown, Tiffany <tiffany.brown@uconn.edu>

**Sent:** Tuesday, November 8, 2022 10:25 AM
**To:** Irizarry, Jason <jason.irizarry@uconn.edu>
**Cc:** Bannister, Kelly <kelly.bannister@uconn.edu>; David Amdur <DavidAmdur@uconnaaup.org>;
Chipman, Sarah <sarah.chipman@uconn.edu>
**Subject:** Re: Notice of Fact-Finding Meeting

Hi Jason -

Thanks for this email. Before we meet, will you explain on this thread how what I am being
accused of is any different than what Casey has instructed me to do in order to accommodate
his class schedule as described in this email from August of this year in which he discretionarily
decided to cut my class short to accommodate his mistake in scheduling the EdD courses?

- I had one of the Bridge students email me a few days ago
  asking about the possibility of holding the Aug 30th class
  remotely, due to her and two other students' concerns about
  making class on their first day of school. I didn't think of this
  and probably should have, but I also am not changing the
  schedule. Just making you aware the first day will be hectic and
  people will undoubtedly be late, as some travel from far and
  may not be able to leave school on time that day. In fact,
  expect throughout the semester 1-2 student invariably arrive
  late and are always apologetic. It's just the reality with their
  positions and emergencies come up.

- You'll see in the email below the routine for the back to back
  courses. Our courses are a little shorter than normal because
  of the back to back nature after they work all day. We give
  them a 30 minute break for dinner. So you're course will start
  at 4 and go to 6:15. Throw in a short break as you see fit. Then
  I pick them up at 6:45 and go to 9 pm.

I ask because I'm currently speaking with the OIE about my perception that I am being subject
to harassment and discrimination by continuously being held to different standards than those
of my colleagues.

Thank you,
Tiffany

Sent from my iPhone

UConn 000076

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 12
Page 2 of 4

On Nov 8, 2022, at 10:08, Irizarry, Jason <jason.irizarry@uconn.edu> wrote:

Dear Professor Brown:

A fact-finding meeting has been scheduled with you on Wednesday, November 16, 2022, at 10:00am, via WebEx. You will be provided with credentials to access the meeting.

The purpose of this meeting is to discuss concerns regarding your performance and conduct during the Fall 2022 semester. More specifically, it has been reported that you leave your EDLR 5015 class, scheduled for Thursdays from 5:00pm to 7:30pm, approximately 30 minutes early every week.

These behaviors, if true, may violate University policies including, but not limited to, the *General Rules of Conduct*. They also may demonstrate neglect of assigned responsibilities, failure to fulfill professional commitments, and/or conduct which impairs the rights of students.

In order to conduct a thorough and objective investigation, I would like to meet with you to discuss these allegations in greater detail and to provide you the opportunity to respond and offer documents or other evidence you deem relevant. In the interim, please take a moment to review the University's *Non-Retaliation Policy*, a copy of which can be found here:

https://policy.uconn.edu/2011/05/24/non-retaliation-policy/. Because of the nature of this meeting, you are entitled to AAUP representation, and your union has been copied on this correspondence. A representative from the Office of Faculty and Staff Labor Relations also will be present.

If you are unable to attend, please notify me promptly. If you fail to respond or do not appear, we will proceed based on the information available to us at this time.

Respectfully,
<image001.png>
**Jason G. Irizarry, Ed.D.**
Dean and Professor
Neag School of Education | University of Connecticut
249 Glenbrook Rd, U-3064, Storrs, CT 06269-3064
Office: 860.486.3815 | education.uconn.edu

cc:     Kelly L. Bannister, Associate Director, Office of Faculty & Staff Labor Relations

        David Amdur, Associate Director, AAUP-UConn

UConn 000077

Brown v. UConn - Motion for Summary Judgment
Defendant's Deposition Exhibit 12
Page 3 of 4

<image002.jpg>

<Tiffany Brown EDLR 5015 Nov 2022.docx>

# Defendant's Deposition Exhibit 19

DEFENDANT'S DEPOSITION
EXHIBIT
PENGAD 800-631-6989
19
10-30-24

| | |
|---|---|
| **From:** | Irizarry, Jason |
| **To:** | Brown, Tiffany; Burton, Laura |
| **Cc:** | Stimson, Megan; HR - Human Resources |
| **Subject:** | Re: resignation due to constructive discharge |
| **Date:** | Thursday, May 18, 2023 9:29:50 AM |

Dear Dr. Brown,

This letter confirms receipt of your resignation, effective May 12, 2023. Any benefit-related questions that you may have should be directed to the Department of Human Resources, Employee Benefits at 860-486-0400. Please make arrangements with Cory Joyce (cory.joyce@uconn.edu) to return any University property or materials you have in your possession.

Best,

Jason

**Jason G. Irizarry, Ed.D.**
Dean and Professor
Neag School of Education | University of Connecticut
249 Glenbrook Rd, U-3064, Storrs, CT 06269-3064
Office: 860.486.3815 | education.uconn.edu

# UCONN
NEAG SCHOOL OF EDUCATION

**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Date:** Wednesday, May 10, 2023 at 3:33 PM
**To:** Burton, Laura <laura.burton@uconn.edu>, Irizarry, Jason <jason.irizarry@uconn.edu>
**Cc:** Stimson, Megan <megan.stimson@uconn.edu>, HR - Human Resources <hr@uconn.edu>
**Subject:** resignation due to constructive discharge

Hello -

After nearly two years of enduring documented workplace discrimination and bullying - including pay inequality - I am relieved to follow the legal and medical advice I've received to resign from the position of Assistant Professor of Educational Leadership due to constructive discharge effective 5/12/23.

Please have my name, image and likeness removed from the UConn website as soon as possible. I will return your equipment and library books pending instructions on where to drop off the laptop.

UConn 000106





UConn 000107

# Plaintiff's Deposition Exhibit 5

PLAINTIFF'S
EXHIBIT
5
ALL-STATE LEGAL

Spring:

1 – EDLR 5204

2 – Another EDLR course in the EdD program

Here again I'm a bit confused on the expectations folks are placing on me that seem different than those my peers who are paid the same experience being expected to cover undergraduate and masters courses (during the day). I did not know when I started this job - and perhaps that was my naivete but I was working with typical ideas of courses assigned to junior faculty, how heavily the program would be relying on me to fill in its doctoral curricular offerings. This matters because I cannot travel late at night without a car. It seems really unfair to me that my fellow junior colleagues who are paid at the same base as I am have lower-level course-related expectations on them, which makes it possible for them to leave campus and be home in time for dinner.

Summer 2022 – EDLR 6092 you would be paid (no thanks, for reasons we discussed in prior email threads - I'd like to recoup the time spent redesigning Organizational Learning last fall (and redesigning Workplace Learning as I will have to do by next summer).

In Summer 2023 -- we would offer EDLR 5202 for EdD students – you could teach that and be paid.(sure)

Each summer there would be an opportunity to teach and be compensated if you are teaching your 2/2 load during the academic year. I'm not sure this correlates to the same opportunities my peers have to either choose to teach in the summer and have a release for the Fall. It leaves me locked in to having to choose to be compensated without the same benefit of possibly taking the course release for the following semester (and we all know folks take that option because time is just as important when developing your research agenda).

I'd like to talk more about why I'm considered the most eligible to teach the Social Justice Leadership class, especially after my last conversation with Milagros and knowing that Casey actually wrote a book on this subject. I can't reiterate enough how uncomfortable it is to be placed in a position to ask folks to consider matching me with courses that actually fit my disciplinary expertise, and also don't cause me to risk my safety commuting late at night.

Tiffany Brown, Ph.D.
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

[Quoted text hidden]

---

Tiffany Brown <tiffany.brown@uconn.edu>                                    Wed, Feb 23, 2022 at 4:04 PM
To: "Burton, Laura" <laura.burton@uconn.edu>
Cc: "Irizarry, Jason" <jason.irizarry@uconn.edu>

Hi Laura and Jason –

TB 000211

Jason, Laura and I talked by phone today on this and she recommended I meet with you to talk further about why I can't teach this class in the Fall. I'm going to ask that we have that follow-up conversation once I've had a chance to gather more resources about how to advocate for myself, which I began doing this week. But in the meantime I will mention a few reasons this teaching assignment seems unfair to me:

1. I'm not a race or social justice scholar. When I reminded Laura of this today, she mentioned that because I apply critical frameworks in my work on organizational leadership, she figured the skills are transferable - but they're really not. That rationale assumes that I have pedagogical content knowledge to teach in an area outside my discipline because I know how to teach to diverse student populations (integrating critical frameworks), when in reality PCK requires knowledge of the subject, knowledge of students, and knowledge of how to teach based on those other two factors.

2. Laura explained to me that when she assumed the role of department head, she was asked to have the person who taught this class be someone who has competencies related to the critical frameworks that I am understanding are central to that discipline. The one person in our department who has literally written a book on Social Justice Leadership (who I understand works under very different circumstances as a tenured professor) is not being asked to develop the critical competencies required to teach a course in the subject he wrote an entire book on. He is featured on UConn's website for his work in this discipline, and yet the work of integrating critical competencies needed to round out the PCK needed to teach that class is being demanded of junior faculty of color instead. This is really not okay. Having critical competencies without content knowledge doesn't make me any more qualified to teach this than he is to teach with content knowledge and no critical competencies, the difference is he will still be considered the expert on this while I am expected to learn the content and deliver it effectively despite not being trained at all in this. I should also mention this is the same tenured faculty member who wrote to ask me early last semester what qualitative software I used on my own dissertation, and then placed me on two of his students' committees who "so happened" to be using the same software. He's also one of the senior faculty who has asked me to provide resources on positionality and subjectivity issues related to researcher bias. It generally is just not okay to expect folks who are tenured to do so little to sharpen their skills and then recruit people of color to "serve" the department by effectively serving their needs.

3. The undue burden of picking up where that person is not qualified appears to have been passed down from woman of color to woman of color since he stopped teaching it. I know one of them has since left UConn and the other is actually well-trained to do this work, but the latter was seriously overburdened in terms of picking up the slack where other curricular offerings were not covering the program's stated objectives. That's evident both from what she's told me about the difficulty in designing that class so it appeals to both K-12 and higher ed folks (I understand most classes don't) and the fact that - even with a very small sample, current EdD students have made note that this is one of the few classes that actually matches their previous conceptions of what course offerings would be before they matriculated. Just as I mentioned last week, I don't think it's fair to put junior faculty - especially junior faculty of color - in this position.

4. Finally, I simply cannot commute that late at night - and as I mentioned to Laura by phone, having to explain so repeatedly is not only extremely taxing but also makes me feel like the institution cares less about my safety as a person than departmental needs. Especially because you are asking so little of the person who actually wrote the book on this topic in terms of developing the critical competencies needed to teach it, the thought of traveling home so late just to pick up his slack is really awful. I did apply to this position knowing I'd be asked to teach Teacher Prep and PhD students, but I anticipated those classes would be offered during the day (and they are). Being asked to teach courses in the evening - aside from why I'm being asked to teach them while there are tenured faculty who simply don't/won't do the work to acquire the critical competencies needed to supplement their content knowledge - is not what I signed up for. It's pretty much the same thing as what's happened in corporate over the past two years, where companies say they're interested in "diversity," but what they really mean is they want people of color to come in and do the work for them.

I look forward to talking more about this course assignment, and disproportionate departmental expectations that appear to be placed on faculty of color more generally. The latter observation is based both on the departmental research I did recently and the conversation we began last week.

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

[Quoted text hidden]

Irizarry, Jason <jason.irizarry@uconn.edu>                                    Thu, Feb 24, 2022 at 4:15 PM
To: "Brown, Tiffany" <tiffany.brown@uconn.edu>, "Burton, Laura" <laura.burton@uconn.edu>

Thank you for sharing your concerns, Tiffany. I think further conversation would be helpful to address the issues you raise below. Can you please share some potential meeting times that work for you?


Best,

Jason



Jason G. Irizarry, Ed.D.

Dean, Neag School of Education

249 Glenbrook Rd.

Storrs, CT 06269-3064

860-486-1241

jason.irizarry@uconn.edu


[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

[Quoted text hidden]


On Wed, Feb 23, 2022 at 10:39 AM Tiffany Brown <tiffany.brown@uconn.edu> wrote:

Hi Laura -

Can we talk through this email sometime today? I can give you a call at a time that works for you.

Tiffany

**Tiffany Brown, Ph.D.**

Assistant Professor

Department of Educational Leadership

Neag School of Education

University of Connecticut

249 Glenbrook Road, Unit 3093

Storrs, CT 06269

[Quoted text hidden]

---

**Tiffany Brown** <tiffany.brown@uconn.edu>                                                 Fri, Feb 25, 2022 at 5:05 PM
To: "Irizarry, Jason" <jason.irizarry@uconn.edu>
Cc: "Burton, Laura" <laura.burton@uconn.edu>

Hi again -

Thanks for offering to meet Jason. I honestly have spent the last two days thinking about how I imagine managing my
time here by spending so much of it redesigning courses for the EdD program - more than "tweaks" after all, since it
involves learning the content as well as the work of reframing it from my own disciplinary perspective. Also generally a big
ask since I know based on the research, my experience serving on five committees last semester, and impressions I've
learned through hallway conversations here with both students and admins that the Ed.D. program needs intensive work
in general. After my last talk with Laura I realized I should've learned more about which group of students I would be
teaching upfront, or at least explored sooner why I thought it would be masters and PhDs before joining Neag but realized
soon after arriving it would also be where EdD course coverage is needed. I can't really say I knew what to ask, but there
were hints that my role responsibilities were not clear before I even began teaching in retrospect. Now, this expectation
that I be the stand in for both my actual disciplinary expertise and that of others - it feels a lot like role overload.

It doesn't help that a Neag colleague asked me to speak to a prospective new hire who is also a black woman this week
and she mentioned she would have to take a pay cut to come to UConn because she learned the salary wasn't negotiable
during the process she's experienced to date. It reminded me of hearing last week that there are folks who are being
incentivized to come to UConn by having their previous salaries matched or exceeded. I couldn't help but realize she must
not have been that candidate and that even though she's already an AP elsewhere, she is being asked to take less. The
rationale for my departmental colleague receiving higher pay upon our hire provided to me was that she was coming from
an AP position (at a lower ranked school than this prospective hire) elsewhere, so I guess I just wondered why this new
person wasn't experiencing her offer negotiations that way. All in all, just a weird week that made me really wonder if I was
brought in to succeed based on my own work or just to supplement the work of my senior colleagues in the department.
Next week I can talk on Tuesday from 11 am to 2 pm, or Friday from 9-2.

Have a good weekend,

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

[Quoted text hidden]

---

**Tiffany Brown** <tiffany.brown@uconn.edu>                                               Wed, Mar 2, 2022 at 11:48 AM
To: "Irizarry, Jason" <jason.irizarry@uconn.edu>
Cc: "Burton, Laura" <laura.burton@uconn.edu>

Hi Laura and Jason -

Thanks for meeting with me yesterday, I appreciate the clarity I left the meeting with. Just writing to summarize what was
accomplished (from my perspective) by its end, and my contributions to how we can move forward.

Laura - I told Jason I can workaround teaching from 4-6.30 PM in the Fall, but I can't in good faith (just about the personal
values embedded/integrity I try to keep constant in my own work) teach Social-Justice Leadership. I really appreciate your
understanding my hesitance as a scholar of color to be complicit in relegating my work to one dimension of it or risk
suppressing my own scholarship by spending time learning DEI related content in order to work here. As mentioned, my

TB 000214

Initial hesitation was somewhat confirmed when I received an email from a student this week who would like to take that course and stated their research interests "encompass children's social, emotional, and behavioral well-being, and I have become increasingly interested in the ways that educators are prepared to meet students' needs, as well as educators' thinking about such challenges." I really have no idea how I would teach a student with these interests - just based on what I'm trained in in terms of trying to cobble together resources from stuff I've read. I can't spend more time I won't have this fall learning about my departmental colleagues' research interests by reading their work on related topics, and then learning to teach that content to students. I still don't think I should have to shoulder the burden of that kind of load, which is more than "tweaking" because there is little continuity in the doctoral programs in terms of curricular offerings from one cohort to another. I do believe that means we need more concentrated focus on revamping the Ed.D. structure/curriculum, not expecting junior faculty to pick up where the program and senior faculty have dropped the ball. My rationale also considers what options (or lack thereof) I now understand I have in my current role at UConn. While a course might appear on my CV and set precedent for future teaching asks that are not in my wheelhouse or about race in particular, a commute is a bit more short-term an issue.

I am happy to be a team player when I am assigned work that matches my disciplinary expertise, not just my subjectivity or any experience that I am presumed to possess because I focused my first research on study on POC. I want to reiterate that I am not a critical race scholar or social-justice scholar, and it actually diminishes those fields to assume POC who do work with disciplinary training earned outside the DEI realm are the same as those who work to earn sociology or critical studies degrees (or those who don't and do research/teaching on these topics anyway). I do appreciate the 3 course releases (even though, as Jason and I discussed yesterday - I wasn't expecting the third, and certainly am never expecting any "handouts") as a show of good will and intent to support my start here. I also have to push back on the notion that because of this head start - first-semester course releases some folks might arguably reason anyone coming from a first-gen background and adjusting to their first faculty role could benefit from - I should from here on be available to do more than "tweak" syllabi because I had this time upfront. I have taken note of what factors contribute to the diversity of teaching styles in the department and am planning to adjust accordingly.

So,

- If we can find a second course for me to teach in the fall aside from Social-Justice Leadership, I will take summer compensation for the course I'm teaching this summer.
- If we can't find a second course for me to teach in the fall aside from Social-Justice Leadership, I will not take summer compensation and apply the second course for in the fall.

Thanks again for making time to address my concerns.

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

[Quoted text hidden]

---

**Tiffany Brown** <tiffany.brown@uconn.edu>                        Mon, Mar 21, 2022 at 11:14 AM
To: michaelbailey@uconnaaup.org

3

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

[Quoted text hidden]

---

**Tiffany Brown** <tiffany.brown@uconn.edu>                        Tue, Mar 22, 2022 at 12:34 PM
To: David Amdur <DavidAmdur@uconnaaup.org>

TB 000215

# Plaintiff's Deposition Exhibit 9



To whom it may concern,

We hope this email finds you well.

We, ▮▮▮▮▮, ▮▮▮▮, ▮▮▮▮, ▮▮▮▮, and ▮▮▮▮, are representatives of a collective group of doctoral students in Neag's EDLR department who are currently in the EDLR 5204 course. Of note, we are nine of the eleven students currently in this course. In addition, our former classmate ▮▮▮▮, who needed to drop this course because of a date/time change after UConn's add/drop date deadline (See Previous Letter), joins us in solidarity. We, the class of EDLR 5204 - Organizational Learning, are writing to you in reference to the behaviors and actions of our professor, Dr. Tiffany Brown has taken part in this semester including: (1) lack of course stability, (2) gatekeeping/limiting free sharing of knowledge, (3) institutional policy violations including retaliation towards students for naming such violations, (4) inequitable grading, (5) and poor class climate.

Previously, on March 8th, 2022 a majority of our classmates (seven of eleven) wrote a letter to Jason Irizarry, Dorothea Anagnostopoulos, and Laura Burton to alert our department and school about the class climate, abuse of power, fear of grade retaliation, and withholding of learning resources to the detriment of class performance. **We highly recommend referring to our previously written letter (attached - "PreviousLetter_EDLR5204") to have a full picture and timeline of our class environment and the history of abuse of power.**

Throughout this semester, as individuals and as a collective, we have attempted to take action to address class climate with the intention to find solutions to the: inconsistent communication; last-minute changes to grading policy; changes to course delivery after add/drop deadline; derogatory remarks about other faculty members (refer to letter previously shared and table below), the EDLR department, and other students; hostility towards students when questioned; disregard for student safety during the COVID-19 pandemic; and negative power dynamics. These behaviors have developed into a pattern that have been characteristic of this course.

Individual students have met with Dr. Brown in office hours and used their voices through email correspondence and class dialogue to address these concerns only to be dismissed by Dr. Brown. Similarly, as a collective class we have voiced our concerns with Dr. Brown throughout the course. Despite student attempts, and attempts by our department, to address our concerns with Dr. Brown, the classroom climate, as described above, has not improved and in fact has worsened. We have received retaliation by Dr. Brown for speaking out against policy violations in our course and believe that, unchecked, she will continue to retaliate. This is in violation of the university's non-retaliation policy which states:

> The University encourages individuals to bring forward information and/or complaints about violations of state or federal law, University policy, rules, or regulations. Retaliation against any individual who, in good faith, reports and/or participates in the investigation of alleged violations, or who assists others in making such a report, is strictly forbidden. This policy does not protect an individual who knowingly files a report or provides information as part of an investigation that is false or is filed in bad faith. The

University will take appropriate action, up to and including dismissal, against any employee, student, or affiliated person who violates this policy.

Moreover, the complete disregard to create an equitable classroom environment has caused irreversible mental trauma and has harmed students in their physical and emotional well being; academic status at the University; and professional life.

Since our letter was submitted on March 8th the following events have occurred - please refer to the table below:

| Incident Date | Incident Description |
|---|---|
| March 10, 2022 | The following is an example of how the stability of our course, and therefore our learning, has been disrupted throughout the semester. We were informed that our April 21, 2022 class scheduled from 12:30pm-3pm was rescheduled to April 20, 2022, to a virtual session from 4:00pm-6:30pm to, once again, accommodate Dr. Brown's travel schedule. This is a combined five classes that were held virtually throughout our semester - despite our class being an in-person course. Dr. Brown did not inquire if students could make this adjustment, despite course attendance and participation being a part of our course grade.

There are multiple times throughout the semester students have asked to attend class virtually whether it be for their own conference participation, unexpected issues with transportation, or illness, and their requests for adjustments were denied. While not required, this lack of reciprocity impacted the climate, our sense of stability, and ultimately learning, within the course. |
| March 24, 2022 | Following sending the attached email (to leaders at Neag), during our next scheduled class after spring break, Dr. Brown began class with an extensive speech. During her scripted speech she relayed the following information after we were told that she had spoken with administration regarding our letter: (1) that she should have not shared personal opinions with students individually, (2) that going forward our class would only be allowed to discuss specific course content (3) that she will no longer offer extensions to students, and (4) that if we were to schedule office hours with her in the future, then we subsequently needed to provide detailed descriptions of the purpose of the meeting. These are clear examples of gatekeeping access to office hours and of limiting the free sharing of knowledge. Moreover, as the limitations she placed on the class were not in the best interest of learning and took away opportunities for success, we understood them as retaliation for our speaking out regarding our concerns. |
| April 4, 2022 | Dr. Brown offered bonus points to only two students who received a 100 |

UConn 000043.2

| | |
|---|---|
| | on their assignments, without offering an extra credit opportunity to the rest of the class. This is an institutional policy violation because it creates an inequitable grading system, where not all students were offered an opportunity to receive extra credit. |
| April 14, 2022 | The class witnessed a student being disrespected in front of their peers which further negatively impacted the class climate. Further, in this situation, Dr. Brown prioritized her personal preference versus a student's attempt to increase accessibility in the learning environment. The following event occurred:<br><br>When one of our classmates sat at a desk area near the podium in front of the classroom to see the screen better, Dr. Brown demanded the student to move. She said this was necessary because she (being positioned also at the front of the classroom) would have to turn toward the student throughout the lecture and look at him because he was physically positioned farther from other classmates. Reluctantly, the student moved seats to another part of the classroom where he could not see as well in an attempt to not escalate the situation. |
| April 20, 2022 | Dr. Brown <u>required</u> and <u>forced</u> all students to submit a "course wrap survey" (class feedback form) that she had personally written despite the fact that the SET evaluations had already been sent to the class. We later found that the questions that she asked us to answer were the same questions that Dr. Brown added to her SET evaluation. She required that students stay on during our virtual class while we wrote our evaluations before allowing us to leave. Because of this we felt Dr. Brown had an understanding of who submitted each evaluation. In addition, not all of us felt we could be authentic or honest in this unofficial google feedback form because of these conditions and the feeling of being monitored.<br><br>Next, the following example demonstrates Dr. Brown's pattern of disregarding institutional policy (as demonstrated in the previous letter and below examples), lack of consistency/clarity/structure in the course, all of which contributed to a class climate of instability and anxiety. During this same class meeting Dr. Brown obscurely stated that grades would be submitted "somewhere around the 26th". We were unsure if this meant April 26th, 2022 - which would be before we turned in our final paper or presented our final presentations - or May 26, 2022 - which is after UConn's required date of grade submission - May 10, 2022 by 4pm. Regardless, the date that Dr. Brown plans to submit grades is outside of institutional requirements. |
| April 28, 2022 | Finally, on our last day of class, Dr. Brown required ▮▮▮▮▮▮▮▮ to attend class after a night of being the primary caregiver to her high-risk, COVID positive parents and sister. This was also after informing Dr. |

UConn 000043.3

Brown that ▮ was told by medical professionals she could still potentially transmit COVID, not only exposing classmates with family and children of their own but also exposing Dr. Brown herself. While considering the options for temporary accommodations and in an attempt to work with Dr. Brown due to the rapidly approaching due date of the assignment, ▮ (also a member of this class) reached out to see what was possible. ▮ and ▮ offered to submit medical documentation, and Dr. Brown interpreted this as a requirement to submit medical records directly to her personal OneDrive account instead of following University guidelines to receive that information through the proper institutional channels, ensuring ▮ and ▮'s medical information was secure. Upon learning of their families' positive test results on 04/27/22, ▮ and ▮ asked if they could attend class virtually - Dr. Brown said that this accommodation was not an option.

▮ who currently has COVID and is experiencing severe symptoms, was told to record and turn in a digital recording of her final presentation within 24 hours after the assigned due date without any further accommodation. This forms an inequitable learning environment in multiple ways. First, there were tight timelines listed in the rubric of presentations lasting 10-12 minutes and due to ▮'s severe symptoms, and the fact that she was not given adequate time for recovery from these symptoms, compromised her ability to meet the rubric requirements.

Second, Dr. Brown asked both ▮ and ▮ to provide medical proof that they tested COVID positive, which is inappropriate considering the protection of medical diagnosis disclosure under ADA when requesting accommodations in educational settings. This highlights a serious HIPAA violation of requiring ▮ and ▮ to submit their medical information through Dr. Brown's personal OneDrive account. ▮ informed Dr. Brown that she tested negative but lives with her family, who tested positive for COVID, meaning she was consistently exposed.

In addition, ▮'s medical professional informed her she was asymptomatic and may be carrying the virus. Last, Dr. Brown insisted that ▮ present in person during class the next day. After a late evening in Urgent Care, followed by a full night of being the primary caregiver for her high risk parents and sister, ▮ attended class and presented the following day. Because ▮ felt that she was putting her fellow students at risk of COVID exposure, she sent an email to her classmates informing them that she was directed to attend class after her family tested positive. ▮ advised her classmates to schedule a COVID exam to ensure their safety in the coming days.

| April 29, 2022 | ▮'s COVID symptoms worsened and she returned to Urgent Care with her sister ▮ ▮ after being tested at |

UConn 000043.4

|  | Urgent Care discovered, as she feared and expected, that she too had contracted COVID. Thus, confirming that Dr. Brown unnecessarily exposed our entire class to COVID-19. |
|---|---|

In addition to the above events, as explained in our previous letter, Dr. Brown has still not provided a fully cited list of our required course readings for this semester, as required by university policy. She has also shifted, post our letter, to providing instruction for only one hour of our three hour session. We believe this move to limit interactions with students serves as a retaliatory withholding of content that is impacting our collective success. Furthermore, midway through the course, Dr. Brown removed our weekly group required assignment "Critical Thinking Group Work" that was 20% of our grade. This was done without readjusting the grade weight of our remaining assignments, which has left our class unsure of how we are being evaluated in this course. There has been a history of inconsistent grading practices in this course, where students who meet the same requirements outlined in Dr. Brown's rubrics have received inconsistent grades to their peers. This is a violation of the agreed upon by-laws of the University senate which states:

> In order to minimize student misunderstandings, course requirements must be stated in the syllabus for the course. . .Instructors shall specify what will be taught, when and how it will be taught, when and how learning will be assessed, and how grades will be assigned (p. 24-25).

We request moving forward for a transparent and fair grading process for previous and remaining assignments.

Since we put forth our first letter, the climate and structural inequities of the class remain. The unfolding of new events and the retaliation for speaking out have compelled us to continue to communicate these instances. Throughout the semester we have devoted a significant amount of our time to advocating for ourselves without experiencing any positive change to the course. The additional hours we have spent recording events, writing to leadership, and meeting with departmental leadership, advisors, and as a collective, could have been allocated to this course content, other courses, research, and personal obligations. This is combined with the significant amount of time devoted to deciphering unclear course rubrics, assignments, and evaluations, and on a personal level, the time for coping and seeking support in navigating the continued social, mental, physical, and emotional toll this course has taken.

We plead to you now to take equitable, measurable, and observable actions to prevent further harm and retaliation against us as current students of Dr. Brown and to prevent such circumstances from happening in the future.

Sincerely,
The Class of EDLR 5204, Spring 2022

**Plaintiff's Deposition Exhibit 10**

EXHIBIT

10

ALL-STATE LEGAL

Greetings Dean Irizarry,

I hope this email finds you well. We are writing to you in reference to the EDLR 5204 Organizational Learning course.

We have tried to address these concerns with Dr. Brown during office hours and class, but we have been dismissed on multiple occasions. We write to you now, because we feel uncomfortable addressing Dr. Brown directly for fear of being further dismissed, grade retaliation, ignored, or patronized. It is our hope that by bringing this to your attention our classroom environment can improve by providing support for us as exhausted and distressed students, as well as for Dr. Brown as a new faculty member.

We, ██████████, ██████████, ██████████, ██████████, and ██████████, are representatives of a collective group of the students in the course. We are Ph.D. students in the Education Leadership program. Some members of this group have chosen to remain anonymous, because of fear of grade retaliation and class hostility. Dr. Brown's unprofessionalism, inconsistent communication, last-minute changes to grading policy, changes to course delivery after add/drop deadline, derogatory remarks about other faculty members, the EDLR department, and other students, hostility towards students when questioned, and negative power dynamics. This semester has been challenging, demoralizing, and frustrating and our academic learning, social-emotional and mental health has been negatively impacted by the dynamics and delivery of the course materials by Dr. Brown.

We are requesting the following changes to take place:

1. Provide Dr. Brown with a mentor within the Neag School of Education to support her in developing an inclusive teaching pedagogy to create a conducive learning environment that is supportive of all types of learners.
2. Ensure that students receive appropriate instruction and materials to engage in the course content. Currently, Dr. Brown has not provided a fully cited list of course readings, course readings are removed from HuskyCT after two weeks, class slides are not available to students, and questions about course content and assignments are discouraged during class, with encouragement to seek help during office hours.
3. Departmental intervention to review the rubrics of the assignments. Dr. Brown's assignments and rubrics have not been consistent with the feedback she provides students, conveys during class, or during office hours.
4. Dr. Brown be held accountable for creating an environment for respect for all students, faculty, and administration through both her actions and words. Dr. Brown currently feels free to insult and demean other students, faculty, administrators, the department, and UConn as an entity.

UConn 0000015.1

5. Consistency of delivery of the course. EDLR 5204 is an in-person instructional course, yet we have had over 50% of our classes virtually. Furthermore, the change to virtual delivery happens last minute and no consideration is given to personal circumstances and home situations when the course is virtual. The course delivery cannot be changed after the drop deadline due to the instructors' lack of planning.

6. We ask that new first-year faculty members, if they are assigned a Ph.D. level course, then they are provided with proper pedagogical support.

Below we have outlined a list of events that have led to this class becoming challenging to navigate:

- On December 14th, 2021, Dr. Brown emailed the class asking to move the start class time from 4:30 pm to 4 pm on Wednesdays. The time was changed, and we adjusted our schedules prior to the start of the semester.
  - *Our class sessions are currently scheduled for 4.30 to 7 pm on Wednesdays, but I'd like to move the class 30 minutes earlier if this works for everyone. By the end of this week  - **11.59 pm on December 17th** - will you use <u>this form</u> to indicate whether you can attend class on Wednesdays from 4 - 6.30 PM?*

- On February 1st at 12:22 p.m., after the add/drop deadline, Dr. Brown emailed the class stating:

        ·     *"I do not live in CT and the latest train scheduled to come out of Hartford now leaves at 6.20, which as you know is before our course sessions are currently scheduled to end. I am being this transparent because this is obviously an inconvenience for all of us, and we're going to need to reschedule our course meeting times as a result. As soon as I learned about this today, I spoke with the Department Head (since she has access to/knowledge of most of your schedules) and she suggested we meet on Thursdays from 12.30-3 pm moving forward. <u>Here is a link to a quick survey we are asking you to fill out ASAP to determine if this time works for all of us.</u> The other option would be Fridays, which I don't think anyone wants to do if it can be avoided."*
        ·     *The inconvenience came with Dr. Brown's need to change the time and date due to her lack of planning. All the students in the course had no problem with the original time and date of the course.*

UConn 0000015.2

- And followed up at 6:23 pm on February 1st

  ·       *"Hi folks -*

  *Checking in to be sure you've seen this email. Just FYI - at this point, the majority of the class has voted to meet on Thursdays from 12.30 - 3. So if this doesn't work for you, you'll likely need to drop the course this semester. Totally understandable if so, just a heads up that I will be reorganizing the in-class workgroups based on course attendance for tomorrow's session."*

  ·       As graduate assistants, we are required to maintain full-time enrollment in order to keep our graduate stipend; the drop deadline had already passed, and there was no solution for this inconvenience. As graduate students, we work during the day, some of us have childcare, and outside responsibilities. This inconvenienced the entire class and impacted our schedules, which were already settled for the Spring 2022 semester.

  ·       One of our classmates was encouraged to drop the course because of scheduling conflicts to the new date and time related to their individual medical care established prior to the start of the semester. The student did not want to drop the class because she would not be in university compliance for the Graduate Assistantship, which ties in directly to her tuition waiver, her income, and her health benefits and the course is a required program foundational course.  In correspondence with Dr. Brown to find a solution for the scheduling conflict, Dr. Brown responded that she was "concerned about her progress thus far in the course" - this interaction shows a lack of care for the community and collegial relationships. Furthermore, the student's class partner was forced to join an already established team, increasing labor for both that student and their new teammates to redistribute responsibilities and become accustomed to new group dynamics.

- Class delivery: we have had class virtually on January 19th, January 26th, as per university policy, and were to move to in-person learning. On February 2nd, March 3rd, we met virtually and are scheduled for another virtual class on April 21st. On March 3rd Dr. Brown canceled the March 10th class only to reinstate it virtually on March 4th at 11:58 am, when she emailed the class stating:

  ·       *"On second thought, I am asking everyone to login to the Zoom session I will be hosting next week during our class time from 12.30 pm - 3. You can keep your cameras off, but the point of the session is to provide you the time to*

UConn 0000015.3

*complete writing for this course, and so your attendance will assure there's record this time was intentionally allotted and used to faciliate your progress. As mentioned, I will also be hosting one-on-one mini office hours for folks who want to hop into a breakout session during the session. Zoom link below, and link to Week 7 resources attached."*

    &middot;    This accounts for almost half of the classes being virtual for an in-person learning course.

Hostile learning environment: Dr. Brown has created an uncomfortable learning environment for our peers and us.

- On the **first day of class**, Dr. Brown shared with us that she participated in 3 Neag Doctoral dissertation defenses in the Fall of 2021 and that these defenses were subpar because the Ed.D. candidates started their defenses stating, "in my experience" and this is not "valid research" and she felt that the students did not know how to "think critically."

- During class on **February 24th**, Dr. Brown shared her concerns with the department wanting her to teach a race-based class for the Fall 2022 semester. She shared with the students in the class that she is having a bad day because the previous morning she emailed the Department Head about their discrimination to assign her a race course when she is not a race scholar. No matter her concerns with the department as a whole, or with the department head, airing out her grievances to the class is unprofessional and disrespectful. The time taken to air this grievance reduced our designated class time to work on our group assignments. When a student addressed this concern, she abruptly said she needed to leave class because her Lyft arrived, and we would need to find time after class to finish our assignment.

- On **March 3rd** during another virtual class, a peer's son waved to the class and Dr. Brown stated: "wow that's weird and unacceptable… you know what everyone turn on your cameras. You can't come into the zoom room with weird names". Our peer apologized and informed everyone that she was logging in from the family computer and that it was her son's zoom account and proceeded to change the name on the screen. If the class had been in person, as stated by the syllabus, this situation would not have arisen. Having students zoom from home at the last minute requires that you give the students grace since not everyone has the ability to have a separate learning environment.

- Office hours:
  - When we discuss our concerns about the course during class or office hours, she is dismissive, rude, and does not foster an environment of learning. She has withheld knowledge or clarification on the assignments during class time in order for us to attend office hours. She encourages us to attend office hours, but they

UConn 0000015.4

have been unhelpful. She either does not turn on her camera, or when she does she's eating, reading her emails, or completely appears uninterested.

Consistently throughout the semester, our questions have been met with disdain and condescension. The assignments are vague and when students attend her office hours, we leave more confused than when we arrived. There are 5 students in the class rewriting submitted papers due to her lack of clarity; that is almost half the class rewriting an assignment in addition to the other responsibilities we have. The students are redoing assignments for an expectation that was never on the syllabus or rubrics. Further, this expectation has been applied inconsistently to different students in the course - where multiple students who have not met the unwritten expectation have not been asked to redo or reframe their final projects. She asks for grace from the class but does not provide the students with the same grace.

In one interaction, we asked questions for clarity on multiple assignments and Dr. Brown stated to the student making the inquiry, "you got a good grade on the assignment, so I don't understand what you're confused about". Dr. Brown continued to insist that we must attend office hours if we have questions about the assignment but would not offer feedback during class. Another student asked Dr. Brown a question during consolidation day, a class specifically designed to address student questions, and she said, "We spent 45 minutes in-office hours discussing this, so I guess you did not understand". Dr. Brown proceeded with the class and stated, "everyone should provide constructive feedback the way (a particular student in the class) does". These comments by Dr. Brown are uncalled for, unprofessional, dismissive, and inconsistent.

Since before the semester began the withholding of knowledge and materials has been an issue. Dr. Brown has a policy of not releasing course readings until Thursday at 12 am. These readings are then only available for download for two weeks and then they are removed from Canvas. For two weeks before the course and weeks following the first class, not all readings were posted, with it being the student's burden to inform Dr. Brown that we were not provided with the needed course materials. The withholding of course materials is especially troublesome since we have never received a fully cited list of readings (only author name and year are provided) and the majority of readings are book chapters that are unavailable through UConn's library services. In addition, to course readings being withheld, we do not have access to course slides. Since Dr. Brown reads from a script during class, does not utilize appropriate wait time, and given the speed that she reads from the script - students have been limited in their ability to process and consider the concepts that are covered per slide. Students have adapted by the team taking notes in groups of 4-5, which should not be a requirement of students to engage in-class learning.

Overall, many of our class members have come to find that Dr. Brown is not exemplifying all of the mission, values, and principles statements as provided by the Neag School of Education.

UConn 0000015.5

More specifically, we do not feel as though we are being treated with "respect, dignity, and fairness" as stated in the Community and Collegial Relationships values statement. We also do not feel as though the classroom interactions are those exhibited by "the highest professional standards guided by clear ethical principles," nor are they "honest and respectful and…exhibit humility" as written in the Professionalism and Integrity Principles statement. Ultimately, Dr. Brown has created a toxic and unwelcoming classroom environment that has inhibited us from developing as educators, professionals, and scholars; an imperative part of Neag's mission statement.

Respectfully we ask that our names remain anonymous when sharing this information with Dr. Brown for the protection of all students.

Please let us know if you would like to meet with us in person or via Zoom/Webex to further discuss our experiences. We have provided them here to ensure clarity and documentation for you.

Best,
EDLR 5204 Students

# Exhibit D

**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

TIFFANY A. BROWN        :     **CIVIL NO. 3:22-CV-01488-SFR**
     *Plaintiff*            :
                         :
**UNIVERSITY OF CONNECTICUT,**    :
     *Defendant*          :     **June 16, 2025**

## AFFIDAVIT OF LAURA BURTON

I, Laura Burton, having been duly sworn, depose and say:

1. I am over the age of eighteen and understand the obligations of an oath.

2. I have been employed by the University of Connecticut ("UConn") since 2005.

3. I am currently the Department Head for the Educational Leadership ("EDLR") Department of UConn's Neag School of Education.

4. I have been UConn's EDLR Department Head since 2019.

5. I was elected to serve as Chairperson of UConn's University Senate Executive Committee, beginning in July of 2023. My service in the role of Chairperson of the University Senate Executive Committee ends at the end of June of 2025.

6. This affidavit is based upon my personal knowledge acquired during my employment at UConn as stated herein.

7. My responsibilities as the EDLR Department Head include participating in the Promotion, Tenure, and Reappointment ("PTR") process as the EDLR Department Head, which, among other duties, includes reviewing pre-tenure faculty members in the department seeking reappointment in the tenure-track as an Assistant Professor.

1

8. In my capacity as Department Head of the EDLR Department at UConn, I am familiar with the Plaintiff, Tiffany A. Brown ("Dr. Brown"), and am familiar with her EDLR Department PTR files.

9. On November 12, 2021, I wrote a letter that was created and maintained in the regular course of business, a true and accurate copy of which is attached hereto as Exhibit 1.

10. Attached hereto as Exhibit 2 is a true and accurate copy of a letter that I provided to Dr. Brown on or around June 23, 2022.

11. The letter displayed in Exhibit 2 indicated that Dr. Brown was not recommended for a merit award for 2022. The letter displayed in Exhibit 6 also indicated that Dr. Brown had the ability to formally request a reconsideration, pursuant to the UConn AAUP Collective Bargaining Agreement. I am not aware of Dr. Brown formally requesting a reconsideration on the decision regarding the merit award pursuant to the UConn AAUP Collective Bargaining Agreement.

12. Dr. Brown was provided three course releases during the 2021-2022 academic year to assist Dr. Brown with developing her research. Dr. Brown was only required to teach one course at UConn during the 2021-2022 academic year.

13. Dr. Chen Chen received fewer course releases than Dr. Brown during the 2021-2022 academic year and demonstrated being more actively engaged in research than Dr. Brown in the 2021-2022 academic year.

14. Dr. Alexandra Freidus received fewer course releases than Dr. Brown during the 2021-2022 acadmeic year and demonstrated being more actively engaged in research than Dr. Brown in the 2021-2022 academic.

2

15. Attached hereto as Exhibit 3 includes a true and accurate copy of an email that I received from Dr. Brown on August 27, 2022 (along with some prior emails in the email thread). The email that I received from Dr. Brown on August 27, 2022, which is displayed in Exhibit 3, is an email that I received as the EDLR Department Head at UConn's Neag School of Education.

16. The email displayed in Exhibit 3, which I received from Dr. Brown on August 27, 2022, contained an attachment. A true and accurate copy of the document attached to the email displayed in Exhibit 3, which I received from Dr. Brown on August 27, 2022, is attached hereto as Exhibit 4.

17. Attached hereto as Exhibit 5 is a true and accurate copy of the 2022-2023 PTR timeline that I sent to the EDLR PTR Committee in the Fall of 2022, which was created and maintained in the regular course of business.

18. In my capacity as Department Head of the EDLR Department at UConn's Neag School of Education, I am aware of occasions when the PTR timeline for faculty member PTR reviews were adjusted to help facilitate thorough and appropriate review of PTR files. In the Fall of 2022, I was in regular communication with Dr. Jennifer McGarry regarding appropriate adjustments to the EDLR PTR Committee timeline in the Fall of 2022 for the EDLR PTR Committee's review of Dr. Brown's PTR application.

19. In the Fall of 2022, the EDLR Department PTR Committee did not recommend that Dr. Brown be reappointed to the position of Assistant Professor.

20. After the EDLR Department PTR Committee made their recommendation in the Fall of 2022, I made an independent evaluation of Dr. Brown's PTR application

3

as the EDLR Department head, whereby I did not recommend that Dr. Brown be reappointed to the position of Assistant Professor.

21. My assessment of Dr. Brown's PTR application in the Fall of 2022 was based on the same criteria that I used to assess any other EDLR tenure-track faculty member's PTR application in the Fall of 2022.

22. As the EDLR Department Head, I am familiar with Dr. Brown's 2022-2023 EDLR PTR file. The documents displayed in what is attached hereto as Exhibit 6 are true and accurate copies of certain documents that are contained within Dr. Brown's 2022-20223 EDLR PTR file (with redactions).

23. Any decision regarding Dr. Brown's 2022-2023 PTR application would have also been subject to review from the Neag School PTR Committee (also known as the Dean's Advisory PTR committee) as well as the Dean of UConn's Neag School of Education prior to being finalized.

24. Dr. Brown went out on leave from UConn on or around November 11, 2022, and Dr. Brown resigned from her position with UConn in May of 2023 prior to returning from the leave. I am not aware of the Dean's Advisory Committee reviewing Dr. Brown's 2022-2023 PTR application during the 2022-2023 academic year.

25. During Dr. Brown's employment as a faculty member with UConn, Dr. Brown had access to information regarding the various steps in the PTR review process. For example, UConn holds information sessions regarding the PTR process for tenure-track faculty members that new faculty members are invited to attend.

4

26. Attached hereto as Exhibit 7 is a true and accurate copy of an email that I sent

EDLR faculty members on March 31, 2023, which I sent as the EDLR

Department Head.

27. I have read the foregoing statements and swear that they are true to the best of

my knowledge and belief.

**Laura Burton**
**University of Connecticut**

**STATE OF CONNECTICUT**       )

                              )       **ss.  Tolland County, Connecticut**

**COUNTY OF TOLLAND**          )

Subscribed and sworn before me on this 6 day of June , 2025.

**Commissioner of the Superior Court/Notary**
**Public**

5

# Exhibit 1



November 12, 2021

Dean Jason Irizarry
Dean's Advisory Committee, PTR

Dear Dean Irizarry,

Dr. Tiffany Brown has submitted her PTR form for review as an Assistant Professor in Educational Leadership. Dr. Brown joined the Neag School of Education in fall of 2021. In my role as Department Head, I have reviewed Dr. Brown's PTR form, her CV, and the letter provided to me by the Department of Educational Leadership Promotion, Tenure, and Review committee.

Teaching

During the fall semester, Dr. Brown was provided course releases to allow her to focus on submitting manuscripts she is developing from her dissertation work. In the spring, Dr. Brown will teach a core course, Organizational Learning, in the Learning, Leadership, and Education Policy (LLEP) doctoral degree program. We are excited to have Dr. Brown share her scholarly expertise in the redesign of this important core course in our doctoral program. I support the recommendation put forward by the department PTR committee encouraging Dr. Brown to begin serving as a committee member on capstone project for EdD students. Further, Dr. Brown is also encouraged to consider advising doctoral students in the LLEP, first in a co-advising role and later as a major advisor to students interested in studying with her.

Scholarship

Dr. Brown is actively working to submit manuscripts based on her dissertation research. In the meeting with her colleagues on the department PTR committee, she was encouraged to submit work in leadership and policy journals as aligned with her research. We are excited to see the impact of Dr. Brown's work as she disseminates her research in a variety of scholarly outlets, including educational leadership and policy.

Service

As a new faculty member, Dr. Brown is just beginning service to the academic field, the department, and Neag School. During the fall semester, Dr. Brown is leading an effort to better understand how the EdD program is currently serving student needs and helping to identify areas where improvement is necessary. We are grateful for her leadership of this project. Dr. Brown is encouraged to seek out

Neag Schoo  of Educat on
**Department of Educational Leadership**
249 GLENBROOK ROAD  UN T 3093
STORRS  CT 06269-3093
PHONE 860 486 6278
FAX 860 486 4028
www edlr uconn edu

UConn 001771
*An Equal Opportunity Employer*

opportunities to serve the department and the school. However, I recognize that service, though important, is also time consuming. I will work with Dr. Brown to balance expectations for service for tenure-track faculty while allowing for continued success in scholarship and teaching.

We are very enthusiastic to welcome Dr. Brown to our department. We are confident that Dr. Brown has great potential to have a meaningful impact on the department and the Neag School of Education.

Sincerely,

Laura J. Burton
Professor, Sport Management
Department Head

Neag Schoo of Educat on
**Department of Educational Leadership**
249 GLENBROOK ROAD UN T 3093
STORRS CT 06269-3093
PHONE 860 486 6278
FAX 860 486 4028
www edlr uconn edu

An NCATE Accredited Institution                    An Equal Opportunity Employer

# Exhibit 2



June 23, 2022

Dear Dr. Brown:

I have completed the department merit review process. Based on the recommendations provided to me by the merit review committee and my own review of your materials you were not recommended for a merit award for 2022.

This year the department was allocated $12,660 of department merit to distribute among 13 faculty members who put materials forward for merit review. In addition to this merit increase, faculty will receive a 3.5% general wage increase. Your base salary for next academic year (2022-23) will reflect a combination of any merit you receive and the general wage increase. You will receive a letter from the Provost during the week of Sept. 5, 2022 detailing your new salary (increases will be reflected in the Sept. 9, 2022 paycheck). Per our department's policy, the merit funds were divided into three degrees with domains being teaching, scholarship, service, and outreach.

| Degree of Merit | Criteria | Outcome | # of Tenure-Track Faculty Awarded Merit | # of CIRE Faculty Awarded Merit |
|---|---|---|---|---|
| First degree merit | Exceeds expectations in one domain | Level 1 | 0 | 0 |
| Second degree merit | Exceeds expectations in two domains | Level 2 | 5 | 2 |
| Third degree merit | Exceeds expectations in three domains and meets expectations in one additional domain. | Level 3 Recommendation for Dean's merit | 3 | 2 |

Neag Schoo of Educat on
**Department of Educational Leadership**
249 GLENBROOK ROAD  UN T 3093
STORRS  CT 06269-3093
PHONE 860 486 6278
FAX 860 486 4028
www edlr uconn edu

UConn 001126.1
*An Equal Opportunity Employer*

As a reminder, the CIRE (clinical and in-residence) faculty opted for the Department Head to be the reviewer of their materials. Decisions for CIRE faculty merit awards were based on CIRE faculty job descriptions and expectations of teaching, scholarship, service, and outreach as related to each position.

For tenure earning faculty, the department merit committee reviewed the department tenure-track merit review process and then reviewed both the HuskyDM merit summary and merit memo provided by each faculty member. Based on the table provided above, the committee evaluated four areas of work – teaching, scholarship, service, and outreach. They identified where faculty exceeded expectations on the four areas of work. The committee met with me on Friday, May 20, 2022 to provide me their recommendations. Per the departmental merit review process for tenure-track faculty, I have shared a table with members of the merit review committee that includes the names of the tenure track faculty members who were awarded merit by each degree of merit.

I am very appreciative of the time and thoughtfulness Casey Cobb, Jennie McGarry, and Jennie Weiner brought to this process.

If you have any questions or concerns about the merit review process or you do not agree with the recommendation of merit award you have received, per the UConn AAUP Collective Bargaining Agreement:

> Article 25.2.G., "prior to the department head making a recommendation to the dean, the department head shall inform each bargaining unit member of the merit recommendation for that bargaining unit member," and, "the department head shall inform each bargaining unit member when their merit recommendation is submitted to the dean." A faculty member has 7 calendar days from receipt of the department head's recommendation to request a meeting with the department head and 14 calendar days from the time of the department head's recommendation to the dean to discuss the recommendation with the dean.

If you have any concerns or questions about the process, please do not hesitate to contact me. If you do not agree with my assessment of your merit and would like to formally request a reconsideration, please let me know by Thursday June 30, 2022 at 5:00 p.m. EST. I will submit the merit award recommendations to Dean Irizarry on Monday, June 28, 2022.

I recognize what an incredibly challenging time we all experienced during the past two years. I can't thank you enough for your commitment, dedication, and support of our students and of each other.

Best,

*Laura J. Burton*

Laura J. Burton
Professor and Department Head

Neag Schoo of Educat on
**Department of Educational Leadership**
249 GLENBROOK ROAD  UN T 3093
STORRS  CT 06269-3093
PHONE 860 486 6278
FAX 860 486 4028
www edlr uconn edu

UConn 001126.2
*An Equal Opportunity Employer*

# Exhibit 3

| | |
|---|---|
| **From:** | Tiffany Brown |
| **To:** | Burton, Laura |
| **Cc:** | Dillon, Alyssa |
| **Subject:** | Re: FW: PTR Timeline and Information |
| **Date:** | Saturday, August 27, 2022 10:56:59 PM |
| **Attachments:** | PTR_AY21-22 - Tiffany Brown.pdf |

Hi Laura -

Here's my PTR Form! It simply slipped through the cracks in the transition out of Summer Session and into prep for Fall semester.

Thanks for your understanding,

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269


On Mon, Aug 15, 2022 at 10:37 AM Burton, Laura <laura.burton@uconn.edu> wrote:

> Good morning,
>
> Sharing the email below again as a reminder.
>
> If you need Alyssa to resend the link to your Microsoft Sharepoint PTR folders, let her know.
>
> Reach out with any questions!
>
> I hope you are enjoying these last few weeks of summer.
>
> Best,
>
> Laura

**From:** Burton, Laura <laura.burton@uconn.edu>
**Date:** Wednesday, May 18, 2022 at 9:00 AM
**To:** Brown, Tiffany <tiffany.brown@uconn.edu>, Chen, Chen <cchen@uconn.edu>,
Freidus, Alexandra <alexandra.freidus@uconn.edu>, Mccready, Adam
<adam.mccready@uconn.edu>, Shin, NaRi <nari.shin@uconn.edu>
**Cc:** Dillon, Alyssa <alyssa.dillon@uconn.edu>
**Subject:** PTR Timeline and Information

Good morning.

I wanted to share a few reminders regarding the PTR process for the 2022-23 academic year.

The Provost website has a wealth of information to help you in the process of preparing your materials.

https://provost.uconn.edu/faculty-and-staff-resources/promotion-tenure-reappointment/

As a reminder, your completed PTR form is due to me (and Alyssa CC'd) on August 23, 2022.

During the summer, I am available to answer any questions you may have with the exception of July 30 – August 7, 2022. Please don't hesitate to reach out.

I hope you all take a well-deserved break over the coming weeks, find time to recharge, and enjoy the summer weather.

Best,

Laura

**Laura J. Burton**
Department Head, Educational Leadership

Professor, Sport Management

Pronouns (she, her, hers)

**University of Connecticut**

**Neag School of Education**
Dept. of Educational Leadership
249 Glenbrook Road Unit 3093
University of Connecticut
Storrs, CT 06269-3093
(860) 486-3095

http://education.uconn.edu/person/laura-burton/

Women In Sport Leadership

Organizational Behavior in Sport Management

*I  acknowledge that the land on which the University of Connecticut is located is the territory of the Mohegan, Mashantucket Pequot, Eastern Pequot, Schaghticoke, Golden Hill Paugussett, Nipmuc, and Lenape Peoples, who are the original caretakers of this land and have stewarded this land throughout the generations.*

# Exhibit 4



# PROMOTION, TENURE, AND REAPPOINTMENT FORM

NAME: Tiffany Brown

DEPARTMENT: Educational Leadership

SCHOOL/COLLEGE: Neag School of Education

CAMPUS: Storrs

DATE OF HIRE: 08/23/2021

DATE OF TENURE: (awarded/anticipated) Fall 2027

CANDIDATE FOR (Check all that apply):

\_\_\_\_\_ Promotion to:

\_\_\_\_\_ Tenure

<u>x</u> Reappointment in a position leading to tenure

\_\_\_\_\_ Reappointment in a position not leading to tenure

**International Faculty**:  **It is the policy of the University of Connecticut to not grant tenure in the absence of permanent residency**. It is the obligation of the candidate in a tenure-track position to pursue permanent residency status in a timely manner.

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 17 of 92

UConn 000651.1

| INSTRUCTIONS |
| --- |

- This PTR form is to be used for promotion, tenure, and reappointment of tenure track faculty in all schools/colleges, except faculty in the School of Medicine and the School of Dental Medicine. The form should also be used for the promotion of individuals who are in positions that do not lead to tenure and may be used for the reappointment of individuals who are not in tenure track positions.
- ***Note****: For a first year reappointment, the candidate should complete the Cover Page and Section One and the Department Head should complete Section Seven Part C - III: Recommendation of the Department Head. Department Heads are expected to meet with each first year candidate to discuss appropriate goals, responsibilities, and expectations for the first year.*

**For the Candidate:**
- The candidate is responsible for completing the Cover Page, Sections One, Two, Three, Four, Five and Six. The candidate should consult with his or her Department Head to ensure that the information in Sections One through Six is complete and in the correct format.
- The accuracy and completeness of these sections are the responsibility of the candidate.
- All supplementary material, including student evaluations of teaching, letters of acceptance for publications, reviews, reprints, etc., should be appropriately labeled and inserted as appendices in Section Eight.
- After completing the relevant sections the candidate should submit the form to the Department Head and retain a copy. The completed PTR form along with all supporting documentation becomes the candidate's dossier.
- Upon request, a candidate may review and/or update his/her PTR dossier during any step of the process.

**For the Department Head:**
- The Department Head is responsible for ensuring the completion of Section Seven, Parts A, B & C. The Department Head summary should carefully state the opinion of the Department Head about promotion and/or tenure, as well as those of the candidate's colleagues and students, and others whose opinions may be useful. The written report of the Departmental PTR Advisory Committee should be included as Section Seven, Part A. In cases where the judgment of the Department Head differs from the advice he/she has received, all views should be recorded. The Department Head must inform the candidate in writing of substantive negative findings and of the reasoning behind the negative recommendations. The Department Head must obtain external letters of reference (required for tenure and promotion) and should be inserted in Section Seven, Part F.
- After making his/her recommendation, the Department Head will forward the dossier to the Dean.

**For the Dean:**
- The Dean is responsible for ensuring the completion of Section Seven, Parts D and E and forwarding the dossier to the Provost.

***Note:*** *Schools that are non-departmentalized (Law, Nursing and Social Work) use a slightly different procedure for obtaining input from advisory committees other than a Departmental PTR Advisory Committee or a Department Head. This protocol should be disseminated to the faculty in each school.*

## TABLE OF CONTENTS

| | |
|---|---|
| Section One, Page 5: | A. Academic Appointment at the University of Connecticut |
| Professional Experience and Education | B. Professional Experience Prior to the University of Connecticut |
| | C. Educational Background |
| | D. Honors and Awards |
| | |
| Section Two, Page 6: | |
| Teaching and Curriculum Development | A. Narrative on Undergraduate and Graduate Teaching |
| | B. Courses Taught |
| | C. Evaluation of Teaching |
| | D. Undergraduate Advisees |
| | E. Other Undergraduate Advising/Mentoring Activities |
| | F. Graduate Student and Postdoctoral & Visiting Scholars Mentorship |
| | |
| Section Three, Page 7: | |
| Research, Scholarship, and Creative Work | A. Narrative on Research, Scholarship and Creative Work |
| | B. Published Books, Books Chapters, & Edited Volumes |
| | C. Refereed Publications & Submitted Articles |
| | D. Other Publications & Creative Products |
| | E. Presentations |
| | F. Grants and Contracts |
| | G. Other Scholarly and Creative Accomplishments |
| | H. Societal and Policy Impacts |
| | I. Other Professional Activities |
| | |
| Section Four, Page 9: | |

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 19 of 92

UConn 000651.3

| | |
|---|---|
| Academic and Professional Service/Engagement | A. Narrative on Academic & Professional Service/Engagement |
| | B. Professional Contributions |
| | C. Institutional Contributions |
| | D. Public & Community Service |
| | |
| Section Five, Page 10: | |
| Joint Appointments | |
| | |
| Section Six, Page 11: | |
| Statement by the Candidate | |
| | |
| Section Seven, Page 12: | |
| Evaluations | A. Departmental Promotion, Tenure, and Reappointment Advisory Committee Recommendation |
| | B. Joint Appointments |
| | C. Department Head's Recommendation |
| | D. Dean's Advisory Council Recommendation |
| | E. Dean's Recommendation |
| | F. External Letters of Review (needed for tenure/promotion only) |
| | |
| Section Eight, Page 19: | |
| Appendices | A. All Supporting Materials Submitted by Candidate (appropriately labeled) |
| | B. Copy of Original Letter of Appointment |
| | C. Student Evaluations of Teaching (SETs) and other evidence of Teaching Effectiveness |
| | D. Curriculum Vitae (optional) E. Other (including previous correspondence regarding PTR from Provost, Dean, or Department Head) |

4

| SECTION ONE: PROFESSIONAL EXPERIENCE AND EDUCATION |
|---|

Name: Tiffany Brown

## A.  ACADEMIC APPOINTMENTS AT THE UNIVERSITY OF CONNECTICUT

| Present Rank: | **Assistant Professor** | Since:(mm/yy) | **08/21** |
|---|---|---|---|
| Previous Rank: | | Since:(mm/yy) | |
| Previous Rank: | | Since:(mm/yy) | |

## B.  PROFESSIONAL EXPERIENCE PRIOR TO THE UNIVERSITY OF CONNECTICUT (*limit to a period of 10 years*)

| Title and organization | From | To |
|---|---|---|
| Harvard University, Doctoral Researcher | 2016 | 2021 |
| City University of New York, Lecturer | 2015 | 2021 |

## C.  EDUCATIONAL BACKGROUND

| Degree | Field | Institution | Date:(mm/yy) |
|---|---|---|---|
| Ph.D. | Education | Harvard University | 05/21 |
| M.Ed. | Education Policy and Management | Harvard University | 05/18 |
| M.A. | Social-Organizational Psychology | Columbia University | 05/16 |
| B.S.F.S. | Culture and Politics | Georgetown University | 05/14 |

## D. HONORS AND AWARDS
List all professional honors and awards, such as teaching citations, research awards, honorary degrees, and recognitions for outstanding creative works.

## SECTION TWO: TEACHING AND CURRICULUM DEVELOPMENT
(Faculty member should complete Section Two parts A-F)


**A. NARRATIVE ON UNDERGRADUATE AND GRADUATE TEACHING:** The narrative on teaching should include a teaching philosophy, goals relative to your instructional responsibilities, and any activities you have undertaken to enhance your teaching (see: https://cetl.uconn.edu/teaching-philosophy/). **(Narrative should not exceed 500 words.)**

I don't think I've been teaching long enough to have developed a teaching philosophy. Especially since something I learned this year is that my teaching style will be perceived and received differently depending on the demographic composition of the institution I am working in. I'm just not a "blank slate" in that way that some of my peers are assumed to "look like" or "be qualified" for the professoriate.

I am also thinking differently about what my teaching philosophy looks like in an environment in which I perceive there to be few social, institutional, or organizational supports for the unique challenges faculty of color experience in the classroom. This shift in my thinking was necessary in response to the realization that efforts to develop teaching supports for faculty of color in the center for teaching and learning do not appear to be currently led by people of color.

Very early on in the Spring semester, I reached out to my department head and dean to ask for a meeting in which I expressed my concerns – based on concerns students had shared in class and office hours about how different courses were adapting differently to the return to campus – that I felt vulnerable teaching the PhD students as a female junior faculty member of color. It was clear to me then that there was a good amount of discretionary decision-making happening amongst my colleagues that was leaving students feeling unsure of what to expect from the semester. Based on my training in the Tavistock tradition of group dynamics, I had an early sense that the group's anxiety might eventually project themselves onto a scapegoat and I figured I would be that scapegoat as the most junior of their professors.

By the time the group's anxieties manifested themselves into a list of concerns a few weeks later (before midterms), those initial conversations I'd had with my dean and department head – a conversation in which I figured their subjectivities might mean they trusted my instincts on how power and privilege may play out differently in the classroom for me than for others teaching the PhD students that semester – seemed to have been completely forgotten. Almost immediately I realized I had no support in my supervisors, who had chosen to support the students in holding me accountable to standards my peers simply weren't being held to. For instance, I was told that other professors had decided discretionarily not to hold their classes in person on some instances throughout the semester with department approval but then scolded for holding class remote on the one day Amtrak rescheduled my train home – which was completely beyond my control. I thought I was imagining this until recently when it

became apparent again that my teaching may inevitably be impacted by an information asymmetry across the department; if it weren't for an email in which the other professor teaching the EdD's asked to check/cross reference the dates for remote sessions I would not have known that the department had planned to offer both types of sessions this semester at all.

I cannot explain how incredibly debilitating it has been to develop my teaching in a department that values your presence in terms of diversity, but little to no regard for the material impact of my difference on my everyday work at UConn. I can't say I was perfect, but I asked for help early on and didn't receive it. As a result, my teaching development suffered greatly this year because it was obvious that I couldn't expect to come to work and be treated as a peer – and I think the students picked up on that. An example of this was at the end of the semester, when a student emailed my department head to report that I had asked for COVID-19 documentation after voluntarily offering the information when asking for an extension the night before a deadline. I was shocked to receive an email from my department telling me I had made a mistake without even asking me if it had occurred. Even when it was proven that the student had offered the documentation – and thus misrepresented our communications to the department head and her advisor – neither of my colleagues even acknowledged they had assumed the worst of me, it was very strange. I am working on developing a teaching philosophy that somehow transcends the reality that I will be seen as less legitimate by some peers and some students and have even come to be grateful for that opportunity in this space.

**B. Courses Taught**
List (in reverse chronological order) the courses you have taught at the University of Connecticut by semester and year.

| Semester & Year | Course No. & Title | Solo (Y/N) | Enrollment |
|---|---|---|---|
| Fall 2022 | EDLR 5015: Teacher Leadership and Organizations | Y | 19 |
| Fall 2022 | EDLR 5202: Workplace Learning | Y | 16 |
| Spring 2022 | EDLR 5204: Organizational Learning | Y | 11 |

**C. Evaluation of Teaching** (copies of Student Evaluations of Teaching (SET) must be included in the Appendix - Section 8-C). <u>Do not append individual comment sheets from students</u>.

Evidence of assessment of teaching beyond the SET, such as classroom observations by peers or colleagues, mid-semester surveys, or other evidence of good teaching must also be included in Section 8-C.

I'm not sure how "good teaching" is being measured here, but as detailed above I am learning to do my best given the lack of adequate support and collegial trust I have experienced to date in this environment. I really wish I had more support and have

since my first few weeks here.

**D. Undergraduate majors you have advised in each of the past five years**.

| Year | Number of Advisees |
|------|--------------------|
| n/a  | n/a                |

**E. Briefly list other undergraduate student advising or mentoring activities you have been involved in**, including advising Honors students, mentoring undergraduate research projects, advising non-majors, etc.

n/a

**F. Graduate student, postdoctoral fellows and visiting scholar advising/mentorship activities**

n/a

MASTER DEGREE ADVISING
(in reverse chronological order)

As Major Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
|  |  |  |

As Associate Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
|  |  |  |

DOCTORAL DEGREE ADVISING
(in reverse chronological order)

As Major Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
|  |  |  |

As Associate Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
|  |  |  |

MENTORSHIP OF POSTDOCTORAL FELLOWS OR VISITING SCHOLARS
(in reverse chronological order)

| Name of Fellow/Scholar | Year(s) |
|---|---|
|  |  |

## SECTION THREE: RESEARCH, SCHOLARSHIP, AND CREATIVE WORK
(Faculty member should complete Section Three parts A-I)

**A. NARRATIVE ON RESEARCH, SCHOLARSHIP AND OTHER CREATIVE WORK** (Including for example: art exhibits, musical compositions, or dramatic productions, etc.). Summarize your scholarly/creative goals for the next 5 to10 years and the activities you have initiated to achieve them.  **(Narrative should not exceed 500 words.)**

This year I spent a lot of time trying to publish the three papers from my dissertation before I realized it was a book. I realized this after getting pages of legitimate feedback through peer review and noting that most of those revisions were too broad in scale to be addressed in depth in article format. I also did a lot of good thinking about how to better position my work as an organizational psychologist in the field. I developed a book

proposal, am rethinking target journals for upcoming papers in progress, and networking across both the education and organizations communities to learn more.

**B. Published Books, Book Chapters, and Edited Volumes**.

List your published work in the standard form used in your field for the categories listed below - note if these are published electronically with a URL if appropriate. (Do not include work in progress or submitted for publication.)

### B1. Books or Monographs

Author(s), title, year of publication, publisher

### B2. Refereed Book Chapters

Author(s), title, year of publication, publisher

### B3. Edited Volumes

Author(s), title, year of publication, publisher

### B4. Books or Monographs in Press

Author(s), title, year of publication, publisher

## C. Refereed Publications and Submitted Articles.

List all refereed journal publications, then refereed conference proceedings, and then other refereed materials. Include those accepted or submitted and indicate their status. (Consult your department, school or college standards for what counts as "refereed.")

### C1. Published and Accepted Journal Articles

Author(s), article title, journal title, volume, year of publication, page numbers

### C2. Conference Presentations with Proceedings (Refereed)

Author(s), title, venue, year, page numbers

### C3. Other Refereed Material

Provide detailed description, including author(s), title, venue, year, and page(s) where appropriate.

### C4. Submitted Journal Articles

Author(s), article title, journal title, date submitted

Brown, T., Value Judgements: How Faculty Career Stages Shape Their Orientations for Organizational Learning in an Urban University Context, Journal of Learning Sciences, February 21st, 2022.

Brown, T. 50 Years of Educational Research on Social and Psychological Factors Impacting Urban Teacher Thinking. January 16th, 2022.

**D. Other Publications and Creative Products.**

List all other publications and creative products/activities that are not otherwise included in Sections Three. A – C. Indicate whether these are refereed or not. These products may include exhibitions, competitions, performances, professional practice/studio work, software, patents, designs, compositions, scholarly editions, posters, artifacts, datasets, catalogues, and other non-refereed publications.

**E. Presentations**.
List all conference presentations (identify if keynote or invited presentation); invited seminars, scholarly presentations, etc. (Do not list a presentation here if it is listed elsewhere.)

Brown, T. (2022) *Exploring Variance in Faculty Use of Culturally Responsive Classroom Management Strategies at an Urban University.* American Educational Research Association, San Diego, CA.

Brown, T. (2022) *Value Judgements: How Faculty Career Stage Influences One's Propensity for Double-Loop Learning at Work.* American Educational Research Association, San Diego, CA.

**F. Grants and Contracts**
List all grants and contracts as principal, co-principal investigator, and senior personnel. List PI and Co-PI for each grant. An example listing of what information should be included is given below:

Title of Project:
Agency/Company:
Total Dollar Amount:
Role: PI, Co-PI, or Senior Personnel
Collaborators: Jane Doe (PI), John Doe (Co-PI), etc.
Period of Contract: month/year – month/year

> **F1. As Principal Investigator**
> **F2. As Co-Principal Investigator**
> **F3. As Senior Personnel or Contributor**
> **F4. Pending Proposals**
> **F5. Proposals Submitted**
> **F6. Proposals not funded**

**G. Other Scholarly and Creative Accomplishments**
List all other scholarly and creative accomplishments such as invention disclosures, start-up companies, etc. that are not listed elsewhere.

**H. Societal and Policy Impacts**
Present a brief list of the broader impacts of your scholarship, and elaborate on them in your personal statement; include testimony before legislative committees or other public bodies, expert witness roles, and press and media coverage, if appropriate.

**I. Other Professional Activities**

List other professional activities, such as consulting, temporary employment, and visiting professorships.

UConn 000651.14

**SECTION FOUR: ACADEMIC AND PROFESSIONAL SERVICE / ENGAGEMENT**

(Faculty member should complete Section Four parts A-D)

**A. NARRATIVE ON ACADEMIC AND PROFESSIONAL SERVICE / ENGAGEMENT.**

Summarize your academic and professional service, your goals relative to your activities, and the impact of your service. **(Narrative should not exceed 500 words.)**

**B. Professional Contributions**

List all national and international contributions of service and positions of leadership in the profession.

Ad-Hoc Reviewer: Contemporary Educational Psychology, Educational Research Review

**C. Institutional Contributions**

**C1. University Level Service**

| Name of Committee or Assignment | Responsibilities of the Assignment | Dates of Service |
|---|---|---|
| | | |

**C2. College/School Level Service**

| Name of Committee or Assignment | Responsibilities of the Assignment | Dates of Service |
|---|---|---|
| | | |

**C3. Department Level Service**

| Name of Committee or Assignment | Responsibilities of the Assignment | Dates of Service |
|---|---|---|
| | | |

**D. Public and Community Service**

List all public and community service activities that are professionally related.

(Revised May 2018)

15

UConn 000651.15

## SECTION FIVE: JOINT APPOINTMENTS

If you hold a joint appointment and your work is supervised by individuals other than your Department Head (e.g., regional campus director or associate vice provost, center or institute director, head of department in which you hold a joint appointment), list their name(s) and title(s) and briefly describe your duties for their program(s) below:

## SECTION SIX: STATEMENT BY THE CANDIDATE

I certify that this information is complete and correct.

Signature: _____

Name: Tiffany Brown

Date: 08/27/2022

UConn 000651.16

## SECTION SEVEN: EVALUATIONS

### A. DEPARTMENTAL PROMOTION, TENURE, AND REAPPOINTMENT ADVISORY COMMITTEE RECOMMENDATION

Provide an evaluation of the candidate as well as any supporting data and dissenting views, if any. What was the vote of the committee regarding its recommendation (see PTR procedures for guidance)? If there was a dissenting opinion regarding the recommendation, provide the reasons for this dissenting opinion.

<u>The recommendation serves as the committee's independent evaluation.</u>

### B. JOINT APPOINTMENTS

When a candidate holds a joint appointment (as indicated in Section 5) an evaluation from the other supervisor (e.g., regional campus director or associate vice provost, center or institute director, etc.) should be included here.

<u>The recommendation serves as the other supervisor's independent evaluation.</u>

### C. DEPARTMENT HEAD'S RECOMMENDATION

### I. DEPARTMENT HEAD'S EVALUATION LETTER

1. Provide your <u>independent</u> evaluation of the candidate's case, comparing and contrasting with the advice of the Departmental PTR Advisory Committee, and, in the case for tenure and promotion to associate or professor, the external letters (<u>Examples to Consider</u>).

   <u>Your recommendation, while it should be informed by the information provided, serves as your own independent evaluation.</u>

2. ***For tenure and promotion to associate or professor***: Attach letters from five or more individuals in the candidate's field outside of the University who can speak to the candidate's professional contribution to scholarship. It is important to solicit impartial evaluations of the candidate's scholarly contributions, as well as other work, in the field. These external letters should not be from former mentors or frequent collaborators. Letters of reference for faculty members for promotion

(Revised May 2018)                    17

UConn 000651.17

to professor must be obtained from individuals who hold this or an equivalent rank.
Briefly describe the outside reviewer's affiliation and qualifications to evaluate the candidate.

## II. DEPARTMENTAL PTR ADVISORY COMMITTEE REPORT

1.  Describe the procedure for the selection of the Departmental PTR Advisory Committee, its composition and its procedures.

2.  If there was a dissenting opinion on this recommendation within the Departmental PTR Advisory Committee, report the vote, and comment on any views taken by the Committee with which your recommendation disagrees.

3.  If you have consulted others beside the Departmental PTR Advisory Committee about this candidate, list the individuals or ad hoc groups consulted and summarize their advice. Comment specifically on any views that differ from your own conclusions.

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 34 of 92

### III. RECOMMENDATION OF THE DEPARTMENT HEAD

This report includes my review of the advice I have received from others and clearly states my own opinion.

I recommend that:

          (name of candidate)

Check all statements that apply:

    \_\_\_\_\_ Be promoted to the rank of

    \_\_\_\_\_ Be granted permanent academic tenure

    \_\_\_\_\_ Be given a terminal appointment

    \_\_\_\_\_ Be reappointed for another probationary year

    \_\_\_\_\_ Be reappointed in a position not leading to tenure

    \_\_\_\_\_ Not be promoted

    \_\_\_\_\_ Not be reappointed

Signed: _____

Date:

**Note:** *For a first year reappointment the Department Head only needs to complete this page (Section Seven Part C - III: Recommendation of the Department Head). The Department Head should give a copy of this page to the candidate.*

## IV.   FOR SECOND AND SUBSEQUENT REAPPOINTMENTS

Please add any additional comments you deem necessary for each recommendation of a second or subsequent reappointment.  Be certain that you check the appropriate statement in each cluster.

This faculty member was reappointed last year.  At that time I (or the former department head) checked the statement that judged the candidate to be:

_____ Performing in superior fashion

_____ Performing competently

_____ Not performing as well as expected

To date, in my judgment (check the statement that is appropriate):

_____ The candidate's work exceeds expectations; therefore, I recommend reappointment.

_____ The candidate's work meets expectations therefore, I recommend reappointment.

_____ The candidate's work is below expectations; nonetheless, I recommend reappointment for another probationary year with the expectation that he/she may, in that period, effectively address the noted weakness(es).

_____ The faculty member is not performing as expected; therefore, I do not recommend reappointment.

(*The current academic year is the candidate's _____ probationary year.*)

_____ This individual is not in a position leading to tenure; but funding permitting, I recommend reappointment.

Signed: _____

Date: _____

*THE DEPARTMENT HEAD SHOULD GIVE A COPY OF SECTION 7 TO THE CANDIDATE*

**D.  DEAN'S ADVISORY COUNCIL RECOMMENDATION**

Provide an <u>independent</u> evaluation of the candidate together with supporting data.  What was the vote of the Council regarding its recommendation?  If there was a dissenting opinion regarding the recommendation, provide the reasons for the dissent (see PTR procedures for guidance).

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 37 of 92

UConn 000651.21

**E.  DEAN'S RECOMMENDATION**

Provide your <u>independent</u> evaluation of the candidate's case, comparing and contrasting with the Department Head's recommendation, the advice of the Departmental PTR Advisory Committee, and the Dean's Advisory Council.

<u>Your recommendation, while it should be informed by the information provided at other steps of review, serves as your own independent evaluation (see PTR procedures for guidance).</u>

*If there was an appeal at the Dean's level, please describe this and report on its outcome.*

Signed: _____

Date:

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 38 of 92

**F. EXTERNAL LETTERS OF RECOMMENDATION SHOULD BE INSERTED HERE.**

## SECTION EIGHT: APPENDICES

    **A.  All Supporting Materials Submitted by Candidate** (appropriately labeled) (*e.g.,* copies of manuscripts *in press*).

    **B.  Copy of Original Letter of Appointment**

    **C.  All Copies of the Student Evaluation of Teaching (SET) Results.** <u>Do not append individual comment sheets from students</u>.

        Include other evidence of teaching effectiveness.

    **D.  Curriculum Vitae** (optional)

    **E.  Other** (including previous letters regarding PTR from Provost, Dean, or Department Head).

# Exhibit 5

All Schools/Colleges
2022-2023 Timeline for Completion of PTR and PR Procedures

| Authority | Date | Action |
|-----------|------|--------|
| Departmental Review | Summer 2022 | The department head, departmental review committee, and faculty member will coordinate on the recommendation and solicitation of external letter writers for those faculty members intending to apply for promotion or tenure. Where the faculty member has a joint appointment or reports to a regional campus, the department head must notify the applicable secondary appointment supervisor to provide an evaluation. |
| | August 23, 2022 | The faculty member shall submit the completed PTR/PR form to the department head. |
| | October 3, 2022 | The departmental PTR advisory committee shall report its recommendations and appraisals with supporting evidence in writing to the department head. The department head has the discretion to adjust this deadline internally to a later date to accommodate volume and appropriate review. |
| | October 19, 2022 | The department head shall transmit to the dean of the school/college their recommendations for promotion, tenure, and reappointment, together with those of the departmental PTR advisory committee. The recommendation shall include any dissenting opinions and supporting data. |
| School/College Review | November 9, 2022 | The dean's PTR advisory council shall report its recommendations and appraisals with supporting evidence in writing to the dean. The dean has the discretion to adjust this deadline internally to a later date to accommodate volume and appropriate review. |
| | November 16, 2022 | The dean shall inform the department head and the faculty member of the recommendations to be made by the advisory council and the dean. In case of a negative recommendation, by this date the dean's office shall contact the candidate and provide an opportunity to meet to discuss any substantive negative findings. |
| | November 30, 2022 | The dean shall transmit to the provost their recommendations and those of the department head and the advisory committees. The recommendation shall include any dissenting opinions and supporting data. |
| Provost/ University Review | No later than the week of January 16, 2023 | Deans and department heads will meet individually with the provost's PTR review committee to provide input and discuss identified dossiers within their school/college. |
| | No later than the week of January 23, 2023 | The provost will meet with individual faculty members to discuss negative recommendations. The faculty member, department head, dean, advisory committees, or provost may refer a case to the Faculty Review Board for further review. |
| | April 2023 | The provost submits recommendations to the Board of Trustees for approval at its final spring semester meeting. Following Board of Trustees approval, the Provost will send confirmation letters to faculty members who have been promoted or awarded tenure via their uconn.edu email addresses. |

# Exhibit 6



# PROMOTION, TENURE, AND REAPPOINTMENT FORM

NAME: Tiffany Brown

DEPARTMENT: Educational Leadership

SCHOOL/COLLEGE: Neag School of Education

CAMPUS: Storrs

DATE OF HIRE: 08/23/2021

DATE OF TENURE: (awarded/anticipated) Fall 2027

CANDIDATE FOR (Check all that apply):

\_\_\_\_\_ Promotion to:

\_\_\_\_\_ Tenure

<u>x</u> Reappointment in a position leading to tenure

\_\_\_\_\_ Reappointment in a position not leading to tenure

**International Faculty**: **It is the policy of the University of Connecticut to not grant tenure in the absence of permanent residency**. It is the obligation of the candidate in a tenure-track position to pursue permanent residency status in a timely manner.

(Revised May 2018)

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 44 of 92

UConn 001778

## INSTRUCTIONS

- This PTR form is to be used for promotion, tenure, and reappointment of tenure track faculty in all schools/colleges, except faculty in the School of Medicine and the School of Dental Medicine. The form should also be used for the promotion of individuals who are in positions that do not lead to tenure and may be used for the reappointment of individuals who are not in tenure track positions.
- *Note: For a first year reappointment, the candidate should complete the Cover Page and Section One and the Department Head should complete Section Seven Part C - III: Recommendation of the Department Head. Department Heads are expected to meet with each first year candidate to discuss appropriate goals, responsibilities, and expectations for the first year.*

**For the Candidate:**
- The candidate is responsible for completing the Cover Page, Sections One, Two, Three, Four, Five and Six. The candidate should consult with his or her Department Head to ensure that the information in Sections One through Six is complete and in the correct format.
- The accuracy and completeness of these sections are the responsibility of the candidate.
- All supplementary material, including student evaluations of teaching, letters of acceptance for publications, reviews, reprints, etc., should be appropriately labeled and inserted as appendices in Section Eight.
- After completing the relevant sections the candidate should submit the form to the Department Head and retain a copy. The completed PTR form along with all supporting documentation becomes the candidate's dossier.
- Upon request, a candidate may review and/or update his/her PTR dossier during any step of the process.

**For the Department Head:**
- The Department Head is responsible for ensuring the completion of Section Seven, Parts A, B & C. The Department Head summary should carefully state the opinion of the Department Head about promotion and/or tenure, as well as those of the candidate's colleagues and students, and others whose opinions may be useful. The written report of the Departmental PTR Advisory Committee should be included as Section Seven, Part A. In cases where the judgment of the Department Head differs from the advice he/she has received, all views should be recorded. The Department Head must inform the candidate in writing of substantive negative findings and of the reasoning behind the negative recommendations. The Department Head must obtain external letters of reference (required for tenure and promotion) and should be inserted in Section Seven, Part F.
- After making his/her recommendation, the Department Head will forward the dossier to the Dean.

**For the Dean:**
- The Dean is responsible for ensuring the completion of Section Seven, Parts D and E and forwarding the dossier to the Provost.

*Note: Schools that are non-departmentalized (Law, Nursing and Social Work) use a slightly different procedure for obtaining input from advisory committees other than a Departmental PTR Advisory Committee or a Department Head. This protocol should be disseminated to the faculty in each school.*

(Revised May 2018)

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 45 of 92

UConn 001779

## TABLE OF CONTENTS

| | |
|---|---|
| Section One, Page 5: | A. Academic Appointment at the University of Connecticut |
| Professional Experience and Education | B. Professional Experience Prior to the University of Connecticut |
| | C. Educational Background |
| | D. Honors and Awards |
| | |
| Section Two, Page 6: | |
| Teaching and Curriculum Development | A. Narrative on Undergraduate and Graduate Teaching |
| | B. Courses Taught |
| | C. Evaluation of Teaching |
| | D. Undergraduate Advisees |
| | E. Other Undergraduate Advising/Mentoring Activities |
| | F. Graduate Student and Postdoctoral & Visiting Scholars Mentorship |
| | |
| Section Three, Page 7: | |
| Research, Scholarship, and Creative Work | A. Narrative on Research, Scholarship and Creative Work |
| | B. Published Books, Books Chapters, & Edited Volumes |
| | C. Refereed Publications & Submitted Articles |
| | D. Other Publications & Creative Products |
| | E. Presentations |
| | F. Grants and Contracts |
| | G. Other Scholarly and Creative Accomplishments |
| | H. Societal and Policy Impacts |
| | I. Other Professional Activities |
| | |
| Section Four, Page 9: | |

| | |
|---|---|
| Academic and Professional Service/Engagement | A. Narrative on Academic & Professional Service/Engagement |
| | B. Professional Contributions |
| | C. Institutional Contributions |
| | D. Public & Community Service |
| | |
| Section Five, Page 10: | |
| Joint Appointments | |
| | |
| Section Six, Page 11: | |
| Statement by the Candidate | |
| | |
| Section Seven, Page 12: | |
| Evaluations | A. Departmental Promotion, Tenure, and Reappointment Advisory Committee Recommendation |
| | B. Joint Appointments |
| | C. Department Head's Recommendation |
| | D. Dean's Advisory Council Recommendation |
| | E. Dean's Recommendation |
| | F. External Letters of Review (needed for tenure/promotion only) |
| | |
| Section Eight, Page19: | |
| Appendices | A. All Supporting Materials Submitted by Candidate (appropriately labeled) |
| | B. Copy of Original Letter of Appointment |
| | C. Student Evaluations of Teaching (SETs) and other evidence of Teaching Effectiveness |
| | D. Curriculum Vitae (optional)<br>E. Other (including previous correspondence regarding PTR from Provost, Dean, or Department Head) |

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 47 of 92

UConn 001781

## SECTION ONE: PROFESSIONAL EXPERIENCE AND EDUCATION

Name: Tiffany Brown

### A. ACADEMIC APPOINTMENTS AT THE UNIVERSITY OF CONNECTICUT

| Present Rank: | **Assistant Professor** | Since:(mm/yy) | **08/21** |
| Previous Rank: | | Since:(mm/yy) | |
| Previous Rank: | | Since:(mm/yy) | |

### B. PROFESSIONAL EXPERIENCE PRIOR TO THE UNIVERSITY OF CONNECTICUT (*limit to a period of 10 years*)

| Title and organization | From | To |
| --- | --- | --- |
| Harvard University, Doctoral Researcher | 2016 | 2021 |
| City University of New York, Lecturer | 2015 | 2021 |

### C. EDUCATIONAL BACKGROUND

| Degree | Field | Institution | Date:(mm/yy) |
| --- | --- | --- | --- |
| Ph.D. | Education | Harvard University | 05/21 |
| M.Ed | Education Policy and Management Social- | Harvard University | 05/18 |
| M.A. | Organizational Psychology | Columbia University | 05/16 |
| B.S.F.S. | Culture and Politics | Georgetown University | 05/14 |

### D. HONORS AND AWARDS

List all professional honors and awards, such as teaching citations, research awards,

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 48 of 92

UConn 001782

honorary degrees, and recognitions for outstanding creative works.

UConn 001783

**SECTION TWO: TEACHING AND CURRICULUM DEVELOPMENT**

(Faculty member should complete Section Two parts A-F)

A. **NARRATIVE ON UNDERGRADUATE AND GRADUATE TEACHING:** The
narrative on teaching should include a teaching philosophy, goals relative to your
instructional responsibilities, and any activities you have undertaken to enhance your
teaching (see: https://cetl.uconn.edu/teaching-philosophy/). **(Narrative should not
exceed 500 words.)**

I don't think I've been teaching long enough to have developed a teaching philosophy.
Especially since something I learned this year is that my teaching style will be
perceived and received differently depending on the demographic composition of the
institution I am working in. I'm just not a "blank slate" in that way that some of my
peers are assumed to "look like" or "be qualified" for the professoriate.

I am also thinking differently about what my teaching philosophy looks like in an
environment in which I perceive there to be few social, institutional, or organizational
supports for the unique challenges faculty of color experience in the classroom. This
shift in my thinking was necessary in response to the realization that efforts to develop
teaching supports for faculty of color in the center for teaching and learning do not
appear to be currently led by people of color.

Very early on in the Spring semester, I reached out to my department head and dean to
ask for a meeting in which I expressed my concerns – based on concerns students had
shared in class and office hours about how different courses were adapting differently
to the return to campus – that I felt vulnerable teaching the PhD students as a female
junior faculty member of color. It was clear to me then that there was a good amount
of discretionary decision-making happening amongst my colleagues that was leaving
students feeling unsure of what to expect from the semester. Based on my training in
the Tavistock tradition of group dynamics, I had an early sense that the group's
anxiety might eventually project themselves onto a scapegoat and I figured I would be
that scapegoat as the most junior of their professors.

By the time the group's anxieties manifested themselves into a list of concerns a few
weeks later (before midterms), those initial conversations I'd had with my dean and
department head – a conversation in which I figured their subjectivities might mean
they trusted my peers simply on how power and privilege may play out differently in the
classroom for me than for others teaching the PhD students that semester – seemed to
have been completely forgotten. Almost immediately I realized I had no support in my
supervisors, who had chosen to support the students in holding me accountable to
standards my peers simply weren't being held to. For instance, I was told that other
professors had decided discretionarily not to hold their classes in person on some
instances throughout the semester with department approval but then scolded for
holding class remote on the one day Amtrak rescheduled my train home – which was
completely beyond my control. I thought I was imagining this until recently when it

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 50 of 92

became apparent again that my teaching may inevitably be impacted by an information asymmetry across the department; if it weren't for an email in which the other professor teaching the EdD's asked to check/cross reference the dates for remote sessions I would not have known that the department had planned to offer both types of sessions this semester at all.

I cannot explain how incredibly debilitating it has been to develop my teaching in a department that values your presence in terms of diversity, but little to no regard for the material impact of my difference on my everyday work at UConn. I can't say I was perfect, but I asked for help early on and didn't receive it. As a result, my teaching development suffered greatly this year because it was obvious that I couldn't expect to come to work and be treated as a peer – and I think the students picked up on that. An example of this was at the end of the semester, when a student emailed my department head to report that I had asked for COVID-19 documentation after voluntarily offering the information when asking for an extension the night before a deadline. I was shocked to receive an email from my department telling me I had made a mistake without even asking me if it had occurred. Even when it was proven that the student had offered the documentation – and thus misrepresented our communications to the department head and her advisor – neither of my colleagues even acknowledged they had assumed the worst of me, it was very strange. I am working on developing a teaching philosophy that somehow transcends the reality that I will be seen as less legitimate by some peers and some students and have even come to be grateful for that opportunity in this space.

## B. Courses Taught
List (in reverse chronological order) the courses you have taught at the University of Connecticut by semester and year.

| Semester & Year | Course No. & Title | Solo (Y/N) | Enrollment |
|---|---|---|---|
| Fall 2022 | EDLR 5015: Teacher Leadership and Organizations | Y | 19 |
| Fall 2022 | EDLR 5202: Workplace Learning | Y | 16 |
| Spring 2022 | EDLR 5204: Organizational Learning | Y | 11 |

## C. Evaluation of Teaching (copies of Student Evaluations of Teaching (SET) must be included in the Appendix - Section 8-C). <u>Do not append individual comment sheets from students</u>.

Evidence of assessment of teaching beyond the SET, such as classroom observations by peers or colleagues, mid-semester surveys, or other evidence of good teaching must also be included in Section 8-C.

I'm not sure how "good teaching" is being measured here, but as detailed above I am learning to do my best given the lack of adequate support and collegial trust I have experienced to date in this environment. I really wish I had more support and have

since my first few weeks here.

**D. Undergraduate majors you have advised in each of the past five years**.

| Year | Number of Advisees |
|------|--------------------|
| n/a  | n/a                |

**E. Briefly list other undergraduate student advising or mentoring activities you have been involved in**, including advising Honors students, mentoring undergraduate research projects, advising non-majors, etc.

n/a

**F. Graduate student, postdoctoral fellows and visiting scholar advising/mentorship activities**

n/a

## MASTER DEGREE ADVISING
### (in reverse chronological order)

As Major Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
| | | |

As Associate Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
| | | |

## DOCTORAL DEGREE ADVISING
### (in reverse chronological order)

As Major Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
| | | |

As Associate Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
| | | |

## MENTORSHIP OF POSTDOCTORAL FELLOWS OR VISITING SCHOLARS
### (in reverse chronological order)

| Name of Fellow/Scholar | Year(s) |
|---|---|
| | |

## SECTION THREE: RESEARCH, SCHOLARSHIP, AND CREATIVE WORK
(Faculty member should complete Section Three parts A-I)

**A. NARRATIVE ON RESEARCH, SCHOLARSHIP AND OTHER CREATIVE WORK** (Including for example: art exhibits, musical compositions, or dramatic productions, etc.). Summarize your scholarly/creative goals for the next 5 to10 years and the activities you have initiated to achieve them. **(Narrative should not exceed 500 words.)**

This year I spent a lot of time trying to publish the three papers from my dissertation before I realized it was a book. I realized this after getting pages of legitimate feedback through peer review and noting that most of those revisions were too broad in scale to be addressed in depth in article format. I also did a lot of good thinking about how to better position my work as an organizational psychologist in the field. I developed a book

(Revised May 2018)

proposal, am rethinking target journals for upcoming papers in progress, and networking across both the education and organizations communities to learn more.

**B. Published Books, Book Chapters, and Edited Volumes**.

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 54 of 92

UConn 001788

List your published work in the standard form used in your field for the categories listed below - note if these are published electronically with a URL if appropriate. (Do not include work in progress or submitted for publication.)

### B1. Books or Monographs

Author(s), title, year of publication, publisher

### B2. Refereed Book Chapters

Author(s), title, year of publication, publisher

### B3. Edited Volumes

Author(s), title, year of publication, publisher

### B4. Books or Monographs in Press

Author(s), title, year of publication, publisher

## C. Refereed Publications and Submitted Articles.

List all refereed journal publications, then refereed conference proceedings, and then other refereed materials. Include those accepted or submitted and indicate their status. (Consult your department, school or college standards for what counts as "refereed.")

### C1. Published and Accepted Journal Articles

Author(s), article title, journal title, volume, year of publication, page numbers

### C2. Conference Presentations with Proceedings (Refereed)

Author(s), title, venue, year, page numbers

### C3. Other Refereed Material

Provide detailed description, including author(s), title, venue, year, and page(s) where appropriate.

### C4. Submitted Journal Articles

Author(s), article title, journal title, date submitted

Brown, T., Value Judgements: How Faculty Career Stages Shape Their Orientations for Organizational Learning in an Urban University Context, Journal of Learning Sciences, February 21st, 2022.

Brown, T. 50 Years of Educational Research on Social and Psychological Factors Impacting Urban Teacher Thinking. January 16th, 2022.

**D. Other Publications and Creative Products.**

List all other publications and creative products/activities that are not otherwise included in Sections Three. A – C. Indicate whether these are refereed or not. These products may include exhibitions, competitions, performances, professional practice/studio work, software, patents, designs, compositions, scholarly editions, posters, artifacts, datasets, catalogues, and other non-refereed publications.

**E. Presentations**.
List all conference presentations (identify if keynote or invited presentation); invited seminars, scholarly presentations, etc. (Do not list a presentation here if it is listed elsewhere.)

Brown, T. (2022) *Exploring Variance in Faculty Use of Culturally Responsive Classroom Management Strategies at an Urban University.* American Educational Research Association, San Diego, CA.

Brown, T. (2022) *Value Judgements: How Faculty Career Stage Influences One's Propensity for Double-Loop Learning at Work*. American Educational Research Association, San Diego, CA.

**F. Grants and Contracts**
List all grants and contracts as principal, co-principal investigator, and senior personnel. List PI and Co-PI for each grant. An example listing of what information should be included is given below:

Title of Project:
Agency/Company:
Total Dollar Amount:
Role: PI, Co-PI, or Senior Personnel
Collaborators: Jane Doe (PI), John Doe (Co-PI), etc.
Period of Contract: month/year – month/year

> **F1. As Principal Investigator**
> **F2. As Co-Principal Investigator**
> **F3. As Senior Personnel or Contributor**
> **F4. Pending Proposals**
> **F5. Proposals Submitted**
> **F6. Proposals not funded**

**G. Other Scholarly and Creative Accomplishments**
List all other scholarly and creative accomplishments such as invention disclosures, start-up companies, etc. that are not listed elsewhere.

**H. Societal and Policy Impacts**
Present a brief list of the broader impacts of your scholarship, and elaborate on them in your personal statement; include testimony before legislative committees or other public bodies, expert witness roles, and press and media coverage, if appropriate.

**I. Other Professional Activities**

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 57 of 92
UConn 001791

List other professional activities, such as consulting, temporary employment, and visiting professorships.

**SECTION FOUR: ACADEMIC AND PROFESSIONAL SERVICE / ENGAGEMENT**

(Faculty member should complete Section Four parts A-D)

## A. NARRATIVE ON ACADEMIC AND PROFESSIONAL SERVICE/ ENGAGEMENT.

Summarize your academic and professional service, your goals relative to your activities, and the impact of your service. **(Narrative should not exceed 500 words.)**

## B. Professional Contributions

List all national and international contributions of service and positions of leadership in the profession.

Ad-Hoc Reviewer: Contemporary Educational Psychology, Educational Research Review

## C. Institutional Contributions
### C1. University Level Service

| Name of Committee or Assignment | Responsibilities of the Assignment | Dates of Service |
|---|---|---|
|  |  |  |

### C2. College/School Level Service

| Name of Committee or Assignment | Responsibilities of the Assignment | Dates of Service |
|---|---|---|
|  |  |  |

### C3. Department Level Service

| Name of Committee or Assignment | Responsibilities of the Assignment | Dates of Service |
|---|---|---|
|  |  |  |

## D. Public and Community Service

List all public and community service activities that are professionally related.

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 59 of 92
UConn 001793

## SECTION FIVE: JOINT APPOINTMENTS

If you hold a joint appointment and your work is supervised by individuals other than your Department Head (e.g., regional campus director or associate vice provost, center or institute director, head of department in which you hold a joint appointment), list their name(s) and title(s) and briefly describe your duties for their program(s) below:

## SECTION SIX: STATEMENT BY THE CANDIDATE

I certify that this information is complete and correct.

Signature:

Name: Tiffany Brown

Date: 08/27/2022

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 60 of 92

UConn 001794

## SECTION SEVEN: EVALUATIONS

### A. DEPARTMENTAL PROMOTION, TENURE, AND REAPPOINTMENT ADVISORY COMMITTEE RECOMMENDATION

Provide an evaluation of the candidate as well as any supporting data and dissenting views, if any. What was the vote of the committee regarding its recommendation (see PTR procedures for guidance)? If there was a dissenting opinion regarding the recommendation, provide the reasons for this dissenting opinion.

> The recommendation serves as the committee's independent evaluation.

### B. JOINT APPOINTMENTS

When a candidate holds a joint appointment (as indicated in Section 5) an evaluation from the other supervisor (e.g., regional campus director or associate vice provost, center or institute director, etc.) should be included here.

> The recommendation serves as the other supervisor's independent evaluation.

### C. DEPARTMENT HEAD'S RECOMMENDATION

### I. DEPARTMENT HEAD'S EVALUATION LETTER

1. Provide your underline independent evaluation of the candidate's case, comparing and contrasting with the advice of the Departmental PTR Advisory Committee, and, in the case for tenure and promotion to associate or professor, the external letters (Examples to Consider).

   Your recommendation, while it should be informed by the information provided, serves as your own independent evaluation.

2. *For tenure and promotion to associate or professor*: Attach letters from five or more individuals in the candidate's field outside of the University who can speak to the candidate's professional contribution to scholarship. It is important to solicit impartial evaluations of the candidate's scholarly contributions, as well as other work, in the field. These external letters should not be from former mentors or frequent collaborators. Letters of reference for faculty members for promotion

(Revised May 2018)                          18

to professor must be obtained from individuals who hold this or an equivalent rank.
Briefly describe the outside reviewer's affiliation and qualifications to evaluate the candidate.

## II. DEPARTMENTAL PTR ADVISORY COMMITTEE REPORT

1. Describe the procedure for the selection of the Departmental PTR Advisory Committee, its composition and its procedures.

Charge/Purpose: The PTR committee reviews all faculty PTR documents for promotion and reappointment. They discuss the candidate's progress and write a letter that outlines and evaluates the candidate's progress in rank or qualifications for promotion or tenure. In cases of promotion and tenure, they schedule a time for other faculty members to share with them issues related to the candidates' promotion or tenure.

Representation:
2 tenured full professors
2 tenured associate professors
1 non-tenure track (In-Residence) at associate or full level

Term: 3-year term for chairs, 2-year term limit for members

Process:

The committee chair will:
    a. Be a tenured TT professor,
    b. Serve a three-year term ending with the conclusion of the spring semester of the third year after transitioning the new committee chair into their role,
    c. Be replaced in a special election if submitting materials for promotion in a given year,
    c. Be replaced in a special election if on leave during the fall semester.

The PTR Committee will meet during the first week of the fall semester to form a work plan according to the deadlines established by the Provost's Office for the PTR process.

https://provost.uconn.edu/faculty-and-staff-resources/promotion-tenure-reappointment/

(Revised May 2018)

19

Each faculty member going through the PTR process will be assigned 2 committee members:

      a.  At least one of whom will have substantial expertise in the same area (e.g., program, scholarship focus) as the faculty member being reviewed,

      b.  Who will meet with the faculty member to review their materials and discuss the faculty member's progress toward promotion and/or tenure, and their goals for the coming year,
- These meetings will occur during the first two weeks of the fall semester

      c. Who will review the faculty member's materials and draft a letter:
         a. representing that faculty member's teaching, research, and

         service accomplishments
         b. including recommendations for further progress toward promotion and/or tenure
         c. to be shared with said faculty member for review and comment before a final copy is voted upon by the entire PTR committee

Tenure and promotion of TT faculty will be voted on by TT members of PTR committee. Promotion of NTT faculty will be voted on by all members of PTR committee.

2. If there was a dissenting opinion on this recommendation within the Departmental PTR Advisory Committee, report the vote, and comment on any views taken by the Committee with which your recommendation disagrees.

3. If you have consulted others beside the Departmental PTR Advisory Committee about this candidate, list the individuals or ad hoc groups consulted and summarize their advice. Comment specifically on any views that differ from your own conclusions.

### III.   RECOMMENDATION OF THE DEPARTMENT HEAD

This report includes my review of the advice I have received from others and clearly states my own opinion.

I recommend that:
                    Tiffany Brown

Check all statements that apply:

   \_\_\_\_\_ Be promoted to the rank of

   \_\_\_\_\_ Be granted permanent academic tenure

   \_\_\_\_\_ Be given a terminal appointment

   \_\_\_\_\_ Be reappointed for another probationary year

   \_\_\_\_\_ Be reappointed in a position not leading to tenure

   \_\_\_\_\_ Not be promoted

    x \_\_\_\_ Not be reappointed

Signed: _Laura J Burton_ _____

Date: 11/10/2022

***Note:*** *For a first year reappointment the Department Head only needs to complete this page (Section Seven Part C - III: Recommendation of the Department Head). The Department Head should give a copy of this page to the candidate.*

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 64 of 92

UConn 001798

## IV.   FOR SECOND AND SUBSEQUENT REAPPOINTMENTS

Please add any additional comments you deem necessary for each recommendation of a second or subsequent reappointment. Be certain that you check the appropriate statement in each cluster.

This faculty member was reappointed last year. At that time I (or the former department head) checked the statement that judged the candidate to be:

\_\_\_\_\_ Performing in superior fashion

 x \_\_\_\_ Performing competently

\_\_\_\_\_ Not performing as well as expected

To date, in my judgment (check the statement that is appropriate):

\_\_\_\_\_ The candidate's work exceeds expectations; therefore, I
         recommend reappointment.

\_\_\_\_\_ The candidate's work meets expectations therefore, I recommend
         reappointment.

\_\_\_\_\_ The candidate's work is below expectations; nonetheless, I
         recommend reappointment for another probationary year with the
         expectation that he/she may, in that period, effectively address the
         noted weakness(es).

 x \_\_\_\_ The faculty member is not performing as expected; therefore, I do
         not recommend reappointment.

(*The current academic year is the candidate's\_\_\_\_\_probationary year.*)

\_\_\_\_\_ This individual is not in a position leading to tenure; but funding
         permitting, I recommend reappointment.

Signed: *Laura J Burton*

Date:  11/10/2022

***THE DEPARTMENT HEAD SHOULD GIVE A COPY OF SECTION 7 TO THE
CANDIDATE***

**D.   DEAN'S ADVISORY COUNCIL RECOMMENDATION**

Provide an <u>independent</u> evaluation of the candidate together with supporting data. What was the vote of the Council regarding its recommendation? If there was a dissenting opinion regarding the recommendation, provide the reasons for the dissent (see PTR procedures for guidance).

**E.  DEAN'S RECOMMENDATION**

Provide your <u>independent</u> evaluation of the candidate's case, comparing and contrasting with the Department Head's recommendation, the advice of the Departmental PTR Advisory Committee, and the Dean's Advisory Council.

<u>Your recommendation, while it should be informed by the information provided at other steps of review, serves as your own independent evaluation (see PTR procedures for guidance).</u>

*If there was an appeal at the Dean's level, please describe this and report on its outcome.*

Signed: _____

Date:

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 67 of 92

UConn 001801

## F. EXTERNAL LETTERS OF RECOMMENDATION SHOULD BE INSERTED HERE.

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 68 of 92

UConn 001802

## SECTION EIGHT: APPENDICES

**A. All Supporting Materials Submitted by Candidate** (appropriately labeled) (*e.g.,* copies of manuscripts *in press*).

**B. Copy of Original Letter of Appointment**

**C. All Copies of the Student Evaluation of Teaching (SET) Results.** <u>Do not append individual comment sheets from students</u>.

Include other evidence of teaching effectiveness.

**D. Curriculum Vitae** (optional)

**E. Other** (including previous letters regarding PTR from Provost, Dean, or Department Head).

Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 69 of 92                                    UConn 001803

PTR Addendum
Tiffany Brown
October 10th, 2022

I appreciate the opportunity to add an addendum to my original PTR form, and the committee for its interest in procuring a statement which reflects my work productivity over the past year. After my meeting with the initial PTR committee, I realized that I do not want to redo the form because I believe the contextual factors described in those statements have strongly contributed to my perceptions that my work as a scholar is not well recognized or supported by the department. While I did write that statement with very little time upon realizing there had been missing information in my PTR OneDrive folder, upon reflection I realized that my hesitation to share my progress has been somewhat well founded by the sense that I have not been treated equally or fairly as a colleague in my experience here to date. I think subconsciously I withheld the information because I have had a few experiences here that make me feel like my progress would not be well supported.

I would also like to document (and ask that it be clarified somewhere in writing for future reference) that I appear to have been misinformed about tenure expectations. I learned in this year's PTR meeting that though there has been some confusion in the past, two articles a year must be published – not just submitted as I was told repeatedly when I joined the faculty last year. It would really help to be clear on how I'm being evaluated to ensure I am meeting those expectations moving forward.

I am writing this to emphasize that I achieved the following *despite* the concerns I have documented in writing to the Dean and department head since my first semester year, which were largely addressed reactively rather than proactively – and with little to no benefit of the doubt afforded to me that one might expect as a basis for collegial trust and respect. In fact, there were many times last year when I expected to be treated as someone who would contribute the following items and found that I was instead treated with the collegial respect often afforded to doctoral students or postdoctoral fellows. I think it would be irresponsible to not continue documenting this – which I've been doing since my first few weeks here in email to both the Dean and my department head. I sincerely didn't expect support for any of the progress I've made based on the lack of various supports I missed my first year here.

Nevertheless, here are some points Saran and Jennie thought would be helpful to include about my progress:
- **Professional Development:** In Spring 2022 – upon realizing that the supports available for faculty of color on UConn's campus are both still in development and not being spearheaded by a person of color – I reached out to colleagues at another university who told me of the Faculty Women of Color in the Academy conference. It was great to meet other faculty women of color from across the country who understood the ways in which our campus PD supports often fall short in recognizing unique issues of power and privilege that impact our everyday work. I also met some other faculty women of color from UConn, which was great – though I found out after spending some of my startup funds that most of them had had their conference fees taken care of by the DEI office. I had to petition directly for a refund to my startup funds to be reimbursed. It was really

concerning to me that the message about this conference somehow hadn't made its way to the ed school, as I think many of my Neag colleagues would really have benefitted from it as well.

In the process of developing my book proposal (discussed below) I developed some mentoring relationships with organizations and education scholars at other universities – with particular focus in seeking out folks who are "dual discipline" scholars. I got some great advice on how to position my work and refocus my efforts in identifying target journals that helped significantly.

- **Articles in Development:** The two papers I presented at AERA were based on my dissertation research, which became material for my book proposal. I am currently working on two articles based on data I collected in 2017 while working for a high-performing higher education opportunity program. The papers are about professional socialization and essential components of this program's service delivery.

- **Book Proposal Under Review:** My dissertation was originally composed of three papers, which I spent last year submitting individually to journals. I received pages of feedback from across those journals that included very valid feedback, and which I realized around the end of 2021 meant the loose ends left untied amongst them could be addressed by drawing a throughline across them - in book format. So, by the Spring I'd begun developing the book proposal, and by the summer I submitted it with the title *Cultural Learning in Urban Schools and Minority Serving Institutions: For Educators.* The proposal was submitted and is under review by Cambridge University Press.

  I must add that a critical factor which allowed me to work on this proposal during the summer was the ability to pay myself from my startup funds. When I came last year, I was explicitly told by both the Dean and some senior colleagues that I could use my startup funds for everything but to pay myself over the summer. Thankfully, I found out at the FWCA conference from other UConn colleagues that this is incorrect just a few weeks before the Finance department deadline.

- **Conference Submissions:** This year I presented two papers (one paper session, one roundtable session) at AERA. I'm planning to submit my next two papers to organizations journals which feature research on diverse organizational contexts.

- **Teaching Updates:** This year I checked in with students sooner by asking for plus/delta feedback at the end of our first month. We've still got a way to go, but checking in sooner has kept me more responsive to students' needs in real time – which I think is going much better.

- **Service:** I should have mentioned that I served on a few EdD committees last fall, for the following students: ████████████, ████████████, ████ (last name not on the spreadsheet Jennie'd sent over that I'm referencing for this), ████████████, ████████ ████████, ████████. I also served as a reviewer for Educational Research Review and Contemporary Educational Psychology.

**SET Report Cover Page**

*Note: List in the same order as reports that follow and scan as one document with this summary on top.*

| TEACHING AND CURRICULUM DEVELOPMENT |
| Section THREE on the CIRE form, Section TWO on the PTR form. |

**B. Courses Taught**
List (in reverse chronological order) the courses you have taught at the University of Connecticut by semester and year.

Spring 2022 EDLR 5204:

| Semester & Year | Course No. & Title | Solo (Y/N) | Enrollment | SET Included (Y/N) | Reason SET Not Included |
|---|---|---|---|---|---|
| Spring 2022 | EDLR 5204: Organizational Learning | Y | 11 | Y | -- |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**C. Evaluation of Teaching** (copies of Student Evaluations of Teaching (SET) must be included in the Appendix - Section 8-C). SET reports should be combined into one PDF and saved with this page on top. <u>Do not append individual comment sheets from students</u> – *reports should only include the first 1-3 summary pages.*

Evidence of assessment of teaching beyond the SET, such as classroom observations by peers or colleagues, mid-semester surveys, or other evidence of good teaching must also be included in Section 8-C. *These documents should be saved as a separate PDF from the SET reports.*

University of Connecticut: Student Evaluation of Teaching



# University of Connecticut

## Student Evaluation of Teaching
## Spring 2022

## Individual Report for EDLR-5204-001-STORR-Organizational Learning

Instructor: **Tiffany Brown** (SET Primary Instructor)

### Response Table

| Raters | Students |
|---|---|
| Responded | 9 |
| Invited | 11 |
| Response Ratio | 82% |

### What is your overall rating of Tiffany Brown's teaching?

| Question | Course | | Department (EDLR- Course Level 5000-FEIN) | | School (EDUCA- Course Level 5000-FEIN) | | University (Course Level 5000-FEIN) | |
|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| What is your overall rating of the instructor's teaching? | 1.4 | 1.0 | 4.5 | 4.7 | 4.1 | 4.4 | 4.1 | 4.3 |

### What is your overall rating of the course?

| Question | Course | | Department (EDLR- Course Level 5000-FEIN) | | School (EDUCA- Course Level 5000-FEIN) | | University (Course Level 5000-FEIN) | |
|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| What is your overall rating of the course? | 1.8 | 1.0 | 4.3 | 4.5 | 3.9 | 4.0 | 4.0 | 4.1 |

University of Connecticut: Student Evaluation of Teaching

## Overall Rating



Brown v. UConn - Motion for Summary Judgment
Exhibit D - Affidavit of Laura Burton
Page 74 of 92

UConn 001808

2/15

## Section 1. Summary

**Please respond to the following questions about instructor Tiffany Brown:**

| Question | Course | | Department (EDLR-Course Level 5000-FEIN) | | School (EDUCA-Course Level 5000-FEIN) | | University (Course Level 5000-FEIN) | |
|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| The instructor presented the course material clearly. | 2.2 | 2.0 | 4.6 | 4.7 | 4.3 | 4.5 | 4.4 | 4.5 |
| The instructor was well prepared for class. | 3.7 | 4.0 | 4.8 | 5.0 | 4.5 | 4.8 | 4.5 | 4.6 |
| The instructor responded to questions adequately. | 2.0 | 1.0 | 4.7 | 4.8 | 4.4 | 4.7 | 4.5 | 4.7 |
| The instructor stimulated interest in the subject. | 2.6 | 2.0 | 4.7 | 4.8 | 4.3 | 4.6 | 4.4 | 4.6 |
| The instructor showed interest in helping students learn. | 2.1 | 2.0 | 4.7 | 5.0 | 4.5 | 4.8 | 4.6 | 4.7 |
| The instructor gave clear assignments. | 1.8 | 2.0 | 4.5 | 4.8 | 4.3 | 4.6 | 4.3 | 4.5 |
| The instructor was accessible to students. | 2.4 | 2.0 | 4.7 | 5.0 | 4.4 | 4.7 | 4.5 | 4.7 |
| The instructor gave useful feedback on my performance. | 2.7 | 2.0 | 4.6 | 4.8 | 4.3 | 4.5 | 4.4 | 4.5 |
| The instructor returned graded work in a reasonable amount of time. | 3.7 | 4.0 | 4.4 | 4.5 | 4.3 | 4.6 | 4.4 | 4.6 |
| The instructor used class time effectively. | 2.8 | 3.0 | 4.7 | 4.8 | 4.3 | 4.5 | 4.4 | 4.6 |
| The instructor treated all students with respect. | 1.3 | 1.0 | 4.8 | 5.0 | 4.7 | 4.9 | 4.7 | 4.8 |
| The instructor graded fairly. | 2.1 | 2.0 | 4.6 | 4.9 | 4.5 | 4.7 | 4.5 | 4.7 |
| The instructor's teaching methods promoted student learning. | 1.7 | 1.0 | 4.7 | 5.0 | 4.3 | 4.6 | 4.4 | 4.5 |

**Please respond to the following questions about the course:**

| Question | Course | | Department (EDLR-Course Level 5000-FEIN) | | School (EDUCA-Course Level 5000-FEIN) | | University (Course Level 5000-FEIN) | |
|---|---|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
| The methods of evaluating student learning seemed appropriate. | 2.4 | 2.0 | 4.6 | 4.8 | 4.4 | 4.5 | 4.4 | 4.5 |
| The course content was well organized. | 2.9 | 3.0 | 4.6 | 4.8 | 4.3 | 4.5 | 4.4 | 4.5 |
| The course objectives were clear. | 2.6 | 3.0 | 4.6 | 4.8 | 4.4 | 4.6 | 4.4 | 4.5 |
| The course objectives were met. | 2.9 | 3.0 | 4.6 | 4.7 | 4.4 | 4.6 | 4.4 | 4.5 |
| The course materials made a valuable contribution. | 3.1 | 4.0 | 4.6 | 4.7 | 4.3 | 4.5 | 4.4 | 4.5 |
| The pace of the course seemed appropriate. | 2.2 | 2.0 | 4.6 | 4.7 | 4.3 | 4.5 | 4.4 | 4.5 |

# TIFFANY A. BROWN

tiffany.brown@uconn.edu

Department of Educational Leadership                                    (917) 846-2535
Neag School of Education
Charles B. Gentry Building
249 Glenbrook Road, Unit 3064

## EDUCATION

**Harvard University**                                                  Cambridge, MA
Ph.D., Education                                                               2021
M.Ed., Policy and Management                                                   2018

**Columbia University**                                                    New York, NY
M.A., Social-Organizational Psychology                                         2016
Advanced Certificate in Cooperation and Conflict Resolution Studies

**Georgetown University**                                             Washington, D.C.
B.S.F.S., Culture and Politics; Honors Psychology Program                      2014

## ACADEMIC APPOINTMENTS

**University of Connecticut**                                               Storrs, CT
Assistant Professor of Educational Leadership                         2021- Present

## PUBLICATIONS

### MANUSCRIPTS IN PREPARATION

- "Service Climate in a High Performing Higher Education Opportunity Program." Article manuscript in progress, to be submitted for publication in Fall 2022.
- "Professional Socialization in a High Performing Higher Education Opportunity Program." Article manuscript in progress to be submitted for publication in Fall 2022.
- "Employee Motivational Needs in a High Performing Higher Education Opportunity Program." Article manuscript in progress, to be submitted for publication in Winter 2022.

### CONFERENCE PROCEEDINGS

Brown, T. (2022) *Exploring Variance in Faculty Use of Culturally Responsive Classroom Management Strategies at an Urban University.* American Educational Research Association, San Diego, CA.

Brown, T. (2022) *Value Judgements: How Faculty Career Stage Influences One's Propensity for Double-Loop Learning at Work.* American Educational Research Association, San Diego, CA.

Brown, T. (2020). *Relatedness Needs and Employee Engagement in College Remediation.* American

Educational Research Association. (Conference Cancelled).

Perry, D., **Brown, T.**, Berardino, M., St, Rose, A. *Community Ties, Family Traditions, and Cultural Norms: An Exploration of High School Characteristics That Promote Post-Secondary Success.* American Educational Research Association. (Conference Cancelled).

## TEACHING

### UNIVERSITY OF CONNECTICUT COURSES
- *Organizational Learning (EDLR 5204, PhD seminar)*
  - Spring 2022, 11 students
- *Workplace Learning (EDLR 5202, EdD seminar)*
  - Fall 2022, 16 students
- *Teacher Leadership and Organizations (EDLR 5015, MEd Elective)*
  - Fall 2022, 20 students

### CITY UNIVERSITY OF NEW YORK COURSES
- *Cultural Psychology (undergraduate elective)*
  - Fall 2019: 25 students
  - Spring 2020: 25 students
- *Psychological Concepts and Methods: Issues in Organizational Psychology (MA Core)*
  - Fall 2019, 15 students

## PROFESSIONAL RESEARCH EXPERIENCE

**Metro Center for Research on Equity and the Transformation of Schools**    New York, NY
Qualitative Research Consultant                                              2018-2019

## PROFESSIONAL SERVICE

### AD-HOC REVIEWER
- Contemporary Educational Psychology
- Educational Research Review

## COMMUNITY INVOLVEMENT/OUTREACH

**Brooklyn Tabernacle College Prep Program**                                2015-2018
Founder and Director of College Counseling

### ADDITIONAL TEACHING AREAS
- Conflict Resolution in School Organizations
- Intercultural Conflict Resolution

## PROFESSIONAL MEMBERSHIPS
- Academy of Management (AOM)

- American Psychological Association (APA)
- American Educational Research Association (AERA)
- Society for Industrial and Organizational Psychology (SIOP)
- Society for the Psychological Study of Social Issues (SPSSI)



Tiffany Brown



Dear Tiffany:

I am pleased to offer you employment at the University of Connecticut. Please review the information below that outlines the principal terms of your employment at the University.

| Job Title | Assistant Professor |
|---|---|
| Department | Educational Leadership |
| School/College/Division | Education |
| Supervisor | Laura Burton |
| Executive Division | Provost Academic Affairs |
| Building Location | UOC000093-GENTRY BLDG-ED LEADERSHIP |
| Appointment Term | 9 month |
| Percent Employed | 100 |
| Full-Time Annual Salary | $78,000 |
| Start Date | August 23, 2021 |
| 3rd Year Reappointment Review | Fall 2024 |
| Consideration for Academic Tenure | Fall 2026 |
| Tenure Effective | Fall 2027 |
| Retirement Election Deadline | August 23, 2021 |
| Orientation Date | August 26, 2021 |
| Health Benefits Enrollment Deadline | 31 Days after August 23, 2021 |
| Union Info | http://www.uconnaaup.org/ |

Your salary is based on a 9 month appointment and paid biweekly over twelve months. You will receive the first biweekly paycheck two weeks after the close of the pay period in which you are hired, contingent upon all required documentation being in place.

On occasion, faculty members have an opportunity to earn additional compensation during the winter or summer sessions at our Storrs campus or any one of our regional campuses. Earnings may not exceed the twelve month equivalent of your base annual salary under the "Extra Compensation Policy for Full-time Faculty in AAUP."

This offer of employment is contingent upon successful completion of a criminal background check, and your continued employment is conditional upon the timely completion of an approved I-9 (Employment Eligibility Verification Form). If you do require assistance in extending or obtaining work authorization at the University of Connecticut, please contact your department immediately.

If you accept our offer, you will soon receive a communication from the Department of Human Resources about several important topics, including Orientation, selecting a retirement plan prior to your first day of employment, and securing your University Network Identifier (NetID).

The duties and expectations of this appointment are consistent with our previous discussions and remain subject to adjustment, in accordance with University policy. Specifically, this position includes teaching, research, and service expectations as outlined in the Neag School's *Faculty Roles and Responsibilities* document.

This position may lead to academic tenure, according to the *By-Laws of the University of Connecticut.* According to procedures, you will be subject to annual reappointment reviews. Your third-year reappointment review consideration for academic tenure will occur as noted in the table on page one.

This offer includes 1 month of summer salary, and a start-up package of $20,000. These start-up funds will be available on 8/23/2021 and must be used by 8/22/2026.

University will provide reimbursement or direct payment for relocation and moving expenses in accordance with the Relocation and Moving Policy. For your move from Brooklyn, NY the department of Educational Leadership will provide up to $2,000. Please refer to the University's Relocation and Moving Procedures for more information.  A representative from Signature Relocation will reach out to you within a week of the acceptance of this offer to consult with you regarding your relocation.

Please be aware that the University has a Board of Trustees approved policy regarding consulting. The policy, related documents, and training materials may be found at http://consulting.uconn.edu. You must obtain approval to consult prior to the start of the activity. If you are currently engaged in consulting activities, you may wish to contact the Faculty Consulting Office prior to your hire date in order to ensure you are compliant with these rules.

UConn is Connecticut's only public research extensive university, a prestigious designation that rests firmly on the institution's commitment to the unfettered pursuit of knowledge through research, teaching, and outreach. You are joining a University in which diverse views are welcomed and respected even as we work together to advance our academic mission and to effect constructive change. We are delighted that you will be joining us.

Please indicate your acceptance of the offer electronically no later than five business days from the date you received the letter.


Sincerely,


Laura Burton                                                        Jason G. Irizarry
Department Head                                              Dean

By accepting this appointment I agree to the terms described above and to abide by all University policies including, but not limited to, the University's Code of Conduct and the State Code of Ethics.

Policies for review at http://policy.uconn.edu:

 "Consulting":                        http://policy.uconn.edu/?p=155
"Extra Compensation":                 http://policy.uconn.edu/?p=366
"Code of Conduct" Guide:              http://policy.uconn.edu/?p=140
"PTR":                                http://s.uconn.edu/4qh

October 5, 2022

Dr. Laura Burton
Department Head
Department of Educational Leadership
Neag School of Education

Dear Dr. Burton,

The Department of Educational Leadership (EDLR) Faculty Promotion and Tenure Review (PTR) Committee has reviewed Dr. Tiffany Brown's submitted materials for consideration for reappointment as an Assistant Professor in the Department of Educational Leadership. Two members of the Committee (Drs. Saran Stewart and Jennie McGarry) met with Dr. Brown on October 5, 2022 to discuss her dossier and to address questions she had about the PTR process.

We discussed the gaps in information on Dr. Brown's PTR form and encouraged her to update the form, as faculty can update their PTR materials throughout the review process. Dr. Brown shared an addendum (see file in supporting materials folder in shared drive) with us. We also discussed what the PTR Committee can do better to support faculty preparation for the review process as well as how we can support faculty accessing resources that can assist them in progressing toward tenure and promotion. As a result of that conversation, Dr. Stewart shared examples of teaching statements with Dr. Brown.

Below is a summary of our review of Dr. Brown's materials, including the addendum, and our discussion with her on October 5.

**Scholarship**

We began the conversation with Dr. Brown by asking if there have been any additional developments in her scholarship since she completed the PTR form in late August. She provided us with an update of the book proposal she has in review with Cambridge University Press, titled *Cultural Learning in Urban Schools and Minority Serving Institutions: For Educators*. Originally, she had submitted individual papers from her dissertation (please note these are the two papers submitted for publication on the PTR form), presented the work at AERA, and received feedback leading her to combine the papers/presentations into a book proposal. We encouraged her to continue to submit peer-reviewed papers while she is working on the book since those will have impact sooner than the book, and for tenure she will need to show that impact and her trajectory beyond tenure. She acknowledged our advice and shared that she has two manuscripts in progress based on data collected in 2017 from a high-performing higher education opportunity program. The papers are about professional socialization and essential components of the program's service delivery. We advised her to document the two papers on her PTR form as works in progress as well as encouraged her to provide samples of the work in the supporting materials folder. Her goal is to submit both papers by the end of Fall 2022.

Dr. Brown acknowledged that she has a different sense of how to use her negotiated course release time (0:1 load for 2021-22) last year and feels that she is making progress in her scholarly pursuits. She also shared that she is gaining a better understanding of where her work belongs and spoke of organizational psychology journals.

Dr. Brown has not indicated any proposal submissions for internal or external funding.

Finally, we had the opportunity to clarify Dr. Brown's understanding of the expectations for promotion, tenure and reappointment related to the publication of peer-reviewed journal articles, or other scholarly products. She shared that she had been told that the expectation was two submissions per year, not two accepted or published products. We've included an excerpt from the Neag School Faculty Roles and Responsibilities (p. 21) that speaks to the expectation for publications here:

> Although the Neag School does not have as a metric [related to] the total number of products a tenure-earning faculty is expected to generate, the advice is typically given that tenure-earning faculty generate on average two peer-reviewed products per year, including manuscripts that are in-press.

**Teaching**

Dr. Brown expressed that last year was hard for everyone, and particularly for her as a new female faculty member of color. The recent LLEP meeting helped her understand more about possible improvements to the program and connected with some of the concerns she heard from students last year in EDLR 5204: Organizational Learning. Dr. Brown provided her SET scores from Spring 2022 (EDLR 5204) and should also speak explicitly to her negotiated course release for Fall 2021 and Spring 2022 to account for only SET scores for one course. Her EDLR 5204 SET scores were notably low and she expressed that the PTR form and the SET did not address systemic issues impacting her and the students she taught. We spoke about potential SET+ options for Dr. Brown including formative assessments in her courses, the National Center for Faculty Diversity and Development, and inviting a colleague to observe and provide feedback on her teaching. Specifically, we suggested that Dr. Brown should share anonymized concept maps and memos that the students submit as evidence of their learning in her courses. We also recommended that Dr. Brown re-write her teaching statement and integrate information about how she approaches teaching and learning including identifying  the mentors and scholars who have informed her teaching. While Dr. Brown has expressed her dissatisfaction with teaching and learning resources available through CETL, she shared that the Women of Color in the Academy conference she attended in the spring was beneficial. She acknowledged that she has engaged colleagues she met at the conference about course materials and course structure. Dr. Brown feels the Fall 2022 semester is going better for her and the students in her course because she has scaled back her expectations and is adapting to students' needs in real time. She is using course objectives that have been used before rather than trying to create them herself as she recognizes that she is still learning about the program objectives and how each class fits in.

**Service**

In our conversation with Dr. Brown, we learned that while she is not being asked to serve on department, school, or university committees as a new, pre-tenure faculty member, she has engaged in program level service.  She served on EdD committees last fall for the following students: █████ ███████, █████████, ███████████, █████████████, █████████████, and ████████. Additionally, external to UConn, Dr. Brown has served as a reviewer for Educational Research Review and Contemporary Educational Psychology.

In summary, Dr. Brown has been asked to revise her PTR form to reflect her scholarship, teaching, and service to date. Related to scholarship, Dr. Brown does not have any published, accepted or in press manuscripts to date. She is awaiting notification of the status of a submitted book proposal. With teaching, Dr. Brown has been advised to revise her teaching statement to reflect her pedagogical process,  teaching philosophy, goals relative to instructional responsibilities and activities undertaken to enhance teaching. The committee has also requested that Dr. Brown add language to her PTR form to account for her negotiated course release in Fall 2021 and Spring 2022. Lastly, based on the addendum Dr. Brown submitted following her meeting with the PTR committee representatives, there is an indication of program-level and professional association service. We also made specific recommendations and clarifications related to her scholarship, teaching, and service.

With a vote of ___yes, ___no, ___abstain, and ___absent the Department of Educational Leadership PTR Committee (unanimously recommends, recommends by x # of votes, does not recommend, etc. depending on the outcome of the vote) that Dr. Tiffany Brown be reappointed to the position of Assistant Professor.

Sincerely,

October 5, 2022

Dr. Laura Burton
Department Head
Department of Educational Leadership
Neag School of Education

Dear Dr. Burton,

The Department of Educational Leadership (EDLR) Faculty Promotion and Tenure Review (PTR) Committee has reviewed Dr. Tiffany Brown's submitted materials for consideration for reappointment as an Assistant Professor in the Department of Educational Leadership. Two members of the Committee (Drs. Saran Stewart and Jennie McGarry) met with Dr. Brown on October 5, 2022 to discuss her dossier and to address questions she had about the PTR process.

We discussed the gaps in information on Dr. Brown's PTR form and encouraged her to update the form, as faculty can update their PTR materials throughout the review process. Dr. Brown shared an addendum (see file in supporting materials folder in shared drive) with us. We also discussed what the PTR Committee can do better to support faculty preparation for the review process as well as how we can support faculty accessing resources that can assist them in progressing toward tenure and promotion. As a result of that conversation, Dr. Stewart shared examples of teaching statements with Dr. Brown.

Below is a summary of our review of Dr. Brown's materials, including the addendum, and our discussion with her on October 5.

**Scholarship**

We began the conversation with Dr. Brown by asking if there have been any additional developments in her scholarship since she completed the PTR form in late August. She provided us with an update of the book proposal she has in review with Cambridge University Press, titled *Cultural Learning in Urban Schools and Minority Serving Institutions: For Educators.* Originally, she had submitted individual papers from her dissertation (please note these are the two papers submitted for publication on the PTR form), presented the work at AERA, and received feedback leading her to combine the papers/presentations into a book proposal. We encouraged her to continue to submit peer-reviewed papers while she is working on the book since those will have impact sooner than the book, and for tenure she will need to show that impact and her trajectory beyond tenure. She acknowledged our advice and shared that she has two manuscripts in progress based on data collected in 2017 from a high-performing higher education opportunity program. The papers are about professional socialization and essential components of the program's service delivery. We advised her to document the two papers on her PTR form as works in progress as well as encouraged her to provide samples of the work in the supporting materials folder. Her goal is to submit both papers by the end of Fall 2022.

Dr. Brown acknowledged that she has a different sense of how to use her negotiated course release time (0:1 load for 2021-22) last year and feels that she is making progress in her scholarly pursuits. She also shared that she is gaining a better understanding of where her work belongs and spoke of organizational psychology journals.

Dr. Brown has not indicated any proposal submissions for internal or external funding.

Finally, we had the opportunity to clarify Dr. Brown's understanding of the expectations for promotion, tenure and reappointment related to the publication of peer-reviewed journal articles, or other scholarly products. She shared that she had been told that the expectation was two submissions per year, not two accepted or published products. We've included an excerpt from the Neag School Faculty Roles and Responsibilities (p. 21) that speaks to the expectation for publications here:

> Although the Neag School does not have as a metric [related to] the total number of products a tenure-earning faculty is expected to generate, the advice is typically given that tenure-earning faculty generate on average two peer-reviewed products per year, including manuscripts that are in-press.

**Teaching**

Dr. Brown expressed that last year was hard for everyone, and particularly for her as a new female faculty member of color. The recent LLEP meeting helped her understand more about possible improvements to the program and connected with some of the concerns she heard from students last year in EDLR 5204: Organizational Learning. Dr. Brown provided her SET scores from Spring 2022 (EDLR 5204) and should also speak explicitly to her negotiated course release for Fall 2021 and Spring 2022 to account for only SET scores for one course. Her EDLR 5204 SET scores were notably low and she expressed that the PTR form and the SET did not address systemic issues impacting her and the students she taught. We spoke about potential SET+ options for Dr. Brown including formative assessments in her courses, the National Center for Faculty Diversity and Development, and inviting a colleague to observe and provide feedback on her teaching. Specifically, we suggested that Dr. Brown should share anonymized concept maps and memos that the students submit as evidence of their learning in her courses. We also recommended that Dr. Brown re-write her teaching statement and integrate information about how she approaches teaching and learning including identifying  the mentors and scholars who have informed her teaching. While Dr. Brown has expressed her dissatisfaction with teaching and learning resources available through CETL, she shared that the Women of Color in the Academy conference she attended in the spring was beneficial. She acknowledged that she has engaged colleagues she met at the conference about course materials and course structure. Dr. Brown feels the Fall 2022 semester is going better for her and the students in her course because she has scaled back her expectations and is adapting to students' needs in real time. She is using course objectives that have been used before rather than trying to create them herself as she recognizes that she is still learning about the program objectives and how each class fits in.

**Service**

In our conversation with Dr. Brown, we learned that while she is not being asked to serve on department, school, or university committees as a new, pre-tenure faculty member, she has engaged in program level service.  She served on EdD committees last fall for the following students: ██████ ██████, ████████, ████████████, ████████████, ████████████, and ████████. Additionally, external to UConn, Dr. Brown has served as a reviewer for Educational Research Review and Contemporary Educational Psychology.

In summary, Dr. Brown has been asked to revise her PTR form to reflect her scholarship, teaching, and service to date. Related to scholarship, Dr. Brown does not have any published, accepted or in press manuscripts to date. She is awaiting notification of the status of a submitted book proposal. With teaching, Dr. Brown has been advised to revise her teaching statement to reflect her pedagogical process,  teaching philosophy, goals relative to instructional responsibilities and activities undertaken to enhance teaching. The committee has also requested that Dr. Brown add language to her PTR form to account for her negotiated course release in Fall 2021 and Spring 2022. Lastly, based on the addendum Dr. Brown submitted following her meeting with the PTR committee representatives, there is an indication of program-level and professional association service. We also made specific recommendations and clarifications related to her scholarship, teaching, and service.

With a vote of 0 yes, 3 no, 0 abstain, and 1 absent the Department of Educational Leadership PTR Committee does not recommend that Dr. Tiffany Brown be reappointed to the position of Assistant Professor.

 Sincerely,

_Jennifer C. McGarry_
Dr. Jennifer McGarry

_H. Kenny Nienhusser_
Dr. H. Kenny Nienhusser

_SK Stewart_
Dr. Saran Stewart

_____
 (absent)
Dr. Casey Cobb

UConn 001821



November 10, 2022

Dean Jason Irizarry
Dean's Advisory Committee, PTR

Dear Dean Irizarry,

Dr. Tiffany Brown has submitted her PTR materials for review as she begins her second year as an Assistant Professor in Educational Leadership. Dr. Brown joined the Neag School of Education in fall of 2021.  In my role as Department Head, I have reviewed Dr. Brown's submitted materials and the letter provided to me by the Department of Educational Leadership Promotion, Tenure, and Review committee.  I also met with Dr. Brown on Monday, October 17, 2022 to discuss her progress toward promotion and tenure.

Teaching

Dr. Brown shared in her teaching philosophy statement that she does not feel she has had enough time teaching to be able to develop a teaching philosophy. Dr. Brown also noted that she perceived a lack of "social, institutional, or organizational supports for the unique challenges faculty of color experience in the classroom".  Dr. Brown received two course releases in the fall 2021 semester to support her scholarly activities. In the spring of 2022, Dr. Brown taught EDLR 5204 Organizational Learning for students in the LLEP doctoral program. She also received one course release in the spring of 2022 to support her scholarly activities.

One measure of success in teaching is captured by student evaluations of teaching (SETs). And on this measure, in EDLR 5204 (spring 2022) Dr. Brown received scores of 1.4 (1 – 5 scale) for overall rating of instructors teaching and 1.8 (1 – 5 scale) on overall rating of the course.

Dr. Brown did not share evidence of development of her teaching in her PTR materials but noted in our meeting that she has implemented new structures into her instruction for her fall 2022 courses including shortening her lectures, conducting more in-class group discussions, and providing updated readings. Dr. Brown noted she also now seeking feedback from her students earlier in the semester. Dr. Brown is encouraged to continue to develop and share evidence of teaching excellence (formerly SET+) and to utilize the many resources available through the Center for Excellence in Teaching (CETL), through engagement with colleagues in the department, and the resources shared through the office of the Associate Dean for Academic Affairs in the Neag School.

Neag Schoo  of Educat on
**Department of Educational Leadership**
249 GLENBROOK ROAD  UN T 3093
STORRS  CT 06269-3093
PHONE 860 486 6278
FAX 860 486 4028
www edlr uconn edu

UConn 001822
*An Equal Opportunity Employer*

Scholarship

Dr. Brown indicated on her PTR form that she submitted two manuscripts, one in January of 2022 and one in February of 2002. Based on feedback she has received from the two manuscripts submitted in spring of 2022, Dr. Brown indicated she has taken that feedback and submitted a book proposal "Cultural Learning in Urban Schools and Minority Serving Institutions: For Educators" that is under review at Cambridge University Press. Dr. Brown also noted that she is developing two manuscripts for submission that are based on data collected during her dissertation work from 2017.

In our meeting, Dr. Brown noted she believed she was misinformed regarding expectations for scholarly activity for tenure-track faculty members and that the EDLR PTR committee had clarified the expectations for scholarly activity during their meeting with her. In our meeting, I reiterated the expectations for tenure-track faculty members and share below here the information noted in the Neag School of Education Roles and Responsibilities Document, "the advice is typically given that tenure-earning faculty generate on average two peer-reviewed products per year, including manuscripts that are in-press. This advice represents a heuristic, not an algorithm."

Dr. Brown did not indicate that she has submitted any proposals for internal or external funding to support her scholarship.

Service

In the fall of 2021, Dr. Brown served on the EdD program capstone proposal committee for six EdD students. Dr. Brown also provided a review of courses for the EdD program during fall of 2022. Dr. Brown noted she has served as an ad-hoc reviewer for Educational Research Review and Contemporary Educational Psychology.

Summary

Dr. Brown has not made meaningful or significant progress toward promotion and tenure as evidenced in the PTR materials shared and as noted in the evaluation of those materials by the Department Promotion, Tenure, and Review Committee. As such, I do not support Dr. Brown for reappointment as an Assistant Professor on the tenure-track.

Sincerely,

*Laura J Burton*

Laura J. Burton
Professor, Sport Management
Department Head

Neag Schoo  of Educat on
**Department of Educational Leadership**
249 GLENBROOK ROAD  UN T 3093
STORRS  CT 06269-3093
PHONE 860 486 6278
FAX 860 486 4028
www edlr uconn edu

UConn 001823

# Exhibit 7

| From: | Burton, Laura <laura.burton@uconn.edu> |
|---|---|
| Sent: | Friday, March 31, 2023 2:12 PM |
| To: | Burton, Laura |
| Cc: | Brown, Tiffany; Castillo-Montoya, Milagros; Chen, Chen; Cobb, Casey; DeRosa, Danielle; Evanovich, Justin; Donaldson, Morgaen; Freidus, Alexandra; Green, Preston; robin.grenier; Lyman, Kelly; Mccready, Adam; McGarry, Jennifer; Nienhusser, Kenny; Stewart, Saran; Weiner, Jennie |
| Subject: | FY24 Provost Fund Equity Reporting |

Dear colleagues,

Below is information provided to me by the Office of the Provost.

As outlined in the FY24 Provost Fund Guidance, "Faculty may request a salary adjustment for compression/inversion or special achievement by emailing their department head (copy dean or designee) between **April 1, 2023 and June 1, 2023.** This request should include any relevant supporting documentation (i.e. evidence of compression/inversion or major prize/award)." Please refer to the guidance for further criteria and procedures.

In advance of the FY24 Collective Bargaining Increase cycle, the Office of the Provost will provide the following resource to support transparent and consistent evaluation of equity-based salary increase requests. Please contact me if you have questions regarding Core-CT data.

**Faculty Salary Table**

**What is it?:** A collection of departmental tables featuring faculty compensation data for all full-time tenured, tenure track, and non-tenure track faculty.

**Purpose:** For individual faculty to have access to accurate, complete salary data for themselves and their departmental peers. To increase transparency and promote equity-based decision-making.

**Availability:** These tables will be available upon request as of April 1, 2023.

**Access:** Individual faculty can request access to view their department's faculty salary table by following the below steps:
1. Access the link specific to the department's dataset: 📊 EDLR_EDU_FY24 CBI Faculty Salary Table.xlsx
2. OneDrive will prompt users to "Request Access".
3. The "Request Access" form asks users to submit a request. In this box, users should indicate "For equity-based data gathering related to the FY24 Collective Bargaining Increase cycle" as the justification.
   a. Faculty members will only be granted access to the dataset for their primary academic home. If a faculty member requests access to a dataset for a department that is not their primary academic home, (i.e. a joint appointment or secondary department) relevant additional justification for access must be provided.
4. Once access is granted, users will be able to access the dataset through June 1, 2023.

**About the data:**
- Salaries are full-time annual salary as of 1/19/23, reported as of 1/19/23, derived from Core-CT. Only compensation on regular payroll is reflected.
- All faculty are assigned to their home academic department.

- Salaries are reported as the 9-month equivalent of the faculty base (= faculty base / appointment term * 9), which is the most-standardized and recommended metric for comparison. The dataset also includes 9-month equivalent of the annual salary (= annual salary / appointment term * 9) and full-time annual salary.
- These data include associate deans, reported under their home academic departments. Associate deans are grouped as "Associate Dean" in the "Faculty Role" category.

If you have any questions about this information or the processes regarding the guidance for requests for salary adjustments, please reach out to schedule a meeting.


Best,

Laura


**Laura J. Burton**
Department Head, Educational Leadership
Professor, Sport Management
Pronouns (she, her, hers)

**University of Connecticut**
**Neag School of Education**
Dept. of Educational Leadership
249 Glenbrook Road Unit 3093
University of Connecticut
Storrs, CT 06269-3093
(860) 486-3095
http://education.uconn.edu/person/laura-burton/
Women In Sport Leadership
Organizational Behavior in Sport Management

*I acknowledge that the land on which the University of Connecticut is located is the territory of the Mohegan, Mashantucket Pequot, Eastern Pequot, Schaghticoke, Golden Hill Paugussett, Nipmuc, and Lenape Peoples, who are the original caretakers of this land and have stewarded this land throughout the generations.*

# Exhibit E

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TIFFANY A. BROWN              :      CIVIL NO. 3:22-CV-01488-SFR
    *Plaintiff*                        :
                                          :
                                          :
UNIVERSITY OF CONNECTICUT,    :
    *Defendant*                      :      **MAY 27, 2025**

### AFFIDAVIT OF CASEY COBB

I, Casey Cobb, having been duly sworn, depose and say:

1. I am over the age of eighteen and understand the obligations of an oath.

2. I have been employed by the University of Connecticut ("UConn") as a faculty member for more than 20 years.

3. This affidavit is based upon my personal knowledge acquired during my employment at UConn as stated herein.

4. I began working for UConn in 2003 as an Assistant Professor in the Department of Educational Leadership ("EDLR") in UConn's Neag School of Education.

5. Additional job titles within UConn's Neag School of Education I have held include Director of the Center for Education Policy Analysis, Associate Professor, Professor, Department Head of the EDLR Department, Associate Dean for Academic Affairs, and Raymond Neag Endowed Professor of Educational Policy.

6. My current role as Raymond Neag Endowed Professor of Educational Policy in UConn's Neag School of Education began on or around February 24, 2016.

7. My responsibilities include, but are not limited to, conducting scholarly research, teaching, and engaging in service to the department, school, university and academic communities.

8. My responsibility to engage in service to the school community can include participating in the Promotion, Tenure, and Reappointment ("PTR") process as a member of the EDLR PTR Committee, which, among other duties, includes reviewing pre-tenure faculty members in the department seeking reappointment in the tenure track as an Assistant Professor.

9. In my capacity as Raymond Neag Endowed Professor of Educational Policy in UConn's Neag School of Education, I am familiar with the Plaintiff, Tiffany A. Brown and am familiar with the allegations of the Complaint filed by Plaintiff dated November 10, 2023.

10. During the entirety of the Plaintiff's employment with UConn as an Assistant Professor, my role was Raymond Neag Endowed Professor of Educational Policy in UConn's Neag of School Education.

11. As a member of the EDLR PTR Committee, I collaborated with a colleague (Dr. Jennifer Weiner) in the creation of a letter to the Plaintiff on or about October 4, 2021, which was created and maintained in the regular course of business.

12. A true and accurate copy of the letter referenced in paragraph 11 of this affidavit is attached hereto as Exhibit 1.

13. On August 18, 2022, I sent an email to the Plaintiff, Tiffany A. Brown, which I sent in my capacity as a UConn faculty member in the regular course of business.

14. A true and accurate copy of the email referenced in paragraph 13 of this affidavit is attached hereto as Exhibit 2, with redactions to student names.

2

15. To the extent that the email displayed in <u>Exhibit 2</u> discussed the scheduling of two adjacently scheduled courses, such content was written based on my typical experience with teaching such courses in the EDLR department.

16. After I sent the email displayed in <u>Exhibit 2</u>, I received an email response from the Plaintiff, Tiffany A, Brown, on August 18, 2022, to which I subsequently responded with another email on August 18, 2022.

17. The subsequent email correspondence referred to in paragraph 16 of this affidavit was sent or received by me in the regular course of business.

18. A true and accurate copy of the email correspondence referenced in paragraph 16 of this affidavit, with redactions to student names, is attached hereto as <u>Exhibit 3</u>.

19. Although I was initially planning to participate in the EDLR Department PTR Committee process in the Fall of 2022, personal challenges (including death in my family) resulted in my absence from participating in the EDLR Department Committee's PTR decisions in the Fall of 2022.

20. I did not participate in the recommendation decision made by the EDLR PTR Committee regarding Tiffany A. Brown in the Fall of 2022, nor did I participate in the EDLR PTR Committee recommendation decisions regarding any other faculty member in the Fall of 2022.

21. I have read the foregoing statements and swear that they are true to the best of my knowledge and belief.

**THE REST OF THIS PAGE IS INTENTIONALLY LEFT BLANK**

3

**Casey Cobb, Raymond Neag Endowed
Professor of Educational Policy
University of Connecticut**

**STATE OF CONNECTICUT** )
                          )   **ss. Tolland County, Connecticut**
**COUNTY OF TOLLAND** )

Subscribed and sworn before me on this 29 day of May , 2025.

**Commissioner of the Superior Court/Notary
Public**
Zachary J. Broughton, Esq.
Commissioner of the Superior Court
CT Juris# 441581

4

# Exhibit 1

Brown v. UConn - Motion for Summary Judgment
Exh bit E - Affidavit of Casey Cobb
Page 5 of 14


UNIVERSITY OF CONNECTICUT

October 4, 2021

Dr. Laura Burton, Department Head
Department of Educational Leadership
Neag School of Education


Dear Dr. Burton:

On September 28th, 2021 we (Drs. Cobb and Weiner) met with Dr. Tiffany Brown as representatives of the EDLR PTR Committee. Dr. Brown joined the EDLR faculty this fall (2021) as a new assistant professor. The purpose of the meeting was to discuss the PTR process, her materials, and future trajectory. We also addressed questions and offered guidance. Dr. Brown is currently receiving course releases to develop her scholarship and settle into our community. Below is a summary of our conversation.

**Scholarship**

Dr. Brown is currently working on translating her dissertation into publishable papers. She is planning to submit these pieces this semester and we look forward to seeing them move towards publication over time. She also has a number of studies in development that sound very exciting and orientated towards practical implications for school leaders, as well as schools and school systems more broadly. On that note, we spoke about how to ensure such work can be placed in leadership and policy journals and other outlets of interest. There was also a discussion regarding collaborations and outlets for research using organizational behavior theories and Dr. Weiner provided a list of journals that have been more open to such theories while simultaneously being oriented towards educational leadership.

Dr. Brown also expressed interest in acquiring grant funding and we spoke about internal grant opportunities as well as some ideas for external funding. This included discussion about evaluation work as well as funding self-directed research. We encouraged Dr. Brown to feel comfortable taking her time in this arena and to continue to connect with colleagues regarding collaboration and ongoing work.

**Teaching**

Dr. Brown is not yet teaching in the program, but is working to tailor our core leadership and organizations doctoral course to extend from her expertise and to focus on issues of equity. We

Neag School of Education
**Department of Educational Leadership**
249 GLENBROOK ROAD, UNIT 3093
STORRS, CT 06269-3093
PHONE 860.486.6278
FAX 860.486.4028
www.edlr.uconn.edu

UConn 001768
*An Equal Opportunity Employer*

are excited for the students to have the opportunity to learn with Dr. Brown and anticipate a positive spring ahead.

We also discussed how Dr. Brown might facilitate advising relationships with students and she plans to get involved with serving on capstone committees with the EdD students this year.

**Service**

Again, as a new member of the department and school Dr. Brown is, as appropriate, just beginning to get involved with service efforts. We are grateful to say that she will be leading an effort to better understand whether and how the EdD program as currently formulated is serving the needs of our different student constituencies. We appreciate these efforts and look forward to the outcomes.

**Summary**

Dr. Brown is doing all she needs to build her career and we look forward to great things ahead.

Neag School of Education
**Department of Educational Leadership**
249 GLENBROOK ROAD, UNIT 3093
STORRS, CT 06269-3093
PHONE 860.486.6278
FAX 860.486.4028
www.edlr.uconn.edu

*An NCATE Accredited Institution*

UConn 001769

Neag School of Education
**Department of Educational Leadership**
249 GLENBROOK ROAD, UNIT 3093
STORRS, CT 06269-3093
PHONE 860.486.6278
FAX 860.486.4028
www.edlr.uconn.edu

*An NCATE Accredited Institution*

Brown v. UConn - Motion for Summary Judgment
Exh bit E - Affidavit of Casey Cobb
Page 8 of 14

UConn 001770

# Exhibit 2

Brown v. UConn - Motion for Summary Judgment
Exh bit E - Affidavit of Casey Cobb
Page 9 of 14

| | |
|---|---|
| **From:** | Cobb, Casey |
| **To:** | Brown, Tiffany |
| **Subject:** | Fall email to EdD cohort |
| **Date:** | Thursday, August 18, 2022 11:41:37 AM |
| **Attachments:** | Copy of EdD 2022 cohort emails.xlsx |

Hi Tiffany,

We are getting close to starting the semester; I can't believe it. I wanted to share a few things with you about the fall. As EdD coordinator I'm a little late getting an email out to the cohort, but pasted below is what I plan to send to them by tomorrow if not sooner. A few quick bits of information:

- One of our students, ███████ is deaf and receives accommodations. The Center for Disabilities may have reached out to you or perhaps ██ did himself. They make arrangements to have an ASL interpreter in class (or online when remote). They have been great to work with, as has ██ It helps if you can send the interpreter a ppt or even provide access to HuskyCT if you use it, so they review some terminology, etc. Again, they should in theory be reaching out to you.
- I had one of the Bridge students email me a few days ago asking about the possibility of holding the Aug 30th class remotely, due to her and two other students' concerns about making class on their first day of school. I didn't think of this and probably should have, but I also am not changing the schedule. Just making you aware the first day will be hectic and people will undoubtedly be late, as some travel from far and may not be able to leave school on time that day. In fact, expect throughout the semester 1-2 student invariably arrive late and are always apologetic. It's just the reality with their positions and emergencies come up.
- You'll see in the email below the routine for the back to back courses. Our courses are a little shorter than normal because of the back to back nature after they work all day. We give them a 30 minute break for dinner. So you're course will start at 4 and go to 6:15. Throw in a short break as you see fit. Then I pick them up at 6:45 and go to 9 pm.
- Jennie emailed us a while ago about the new Bridge students. They will not have met the cohort so if you want to do an icebreaker, go for it. If you do something more regular like introductions, that works too. Maybe let me know if you plan to do anything special so I don't duplicate efforts.
- I'm attaching the up to date list of students in the cohort. One of the students, ███████████, asked yesterday to rejoin the cohort after a leave. I'm waiting on Morgaen's reply but I assume it's not a problem.
- Here is that email I plan to send out. Let me know if you see that I missed something:

Hi All,

I hope you are all doing well and were able to get some rest and relaxation this summer. There is still a little bit left . Soon you will launch into Year 2 of the EdD. You are making great progress.

I'm writing with information on the two courses for which you should be registering. We made a switch on one of the courses on the master schedule – we are swapping 5202 and 6467. So these are the two fall courses:

Brown v. UConn - Motion for Summary Judgment
Exh bit E - Affidavit of Casey Cobb
Page 10 of 14

UConn 001270

EDLR 5202 Workplace Learning (Dr. Tiffany Brown)
EDLR 6465 Educational Administration Issues and Research (stuck with me again...requires a permission # for some reason, which Alyssa has sent you)

The first day of your semester is Tuesday, August 30th. I know it's a crazy busy time with the start of your school years. However, I'd like us to meet in person that day.

The schedule will be similar to Year 1 with the exception we are holding more in-person courses. I know that can be difficult for folks to travel to Storrs so we are incorporating at least four remote classes throughout the semester. If I can arrange for more remote classes, I will. We are somewhat bound by university policies on holding more in-person. The course that I'm teaching is actually very challenging to take remotely, so it will help in that respect.

EDLR 5202 will start at 4 pm. Per our established routine, you'll meet until 6:15 for a 30-minute dinner break. EDLR 6465 will begin at 6:45 and finished by 9.

I'm so pleased that five new students will join the cohort in Year 2. They all participated in the Executive Leadership Program (093 Superintendent Certification) and applied to our ELP-EdD "Bridge" program. They took similar courses in ELP that coincide with Year 1 EdD courses and enrolled in a special course this summer to fill in any gaps and catch them up on key aspects of the program such as "problem of practice." Looking forward to introducing you all to each other.

If you have any questions, let me know. Again, looking forward to working with you again.

Best,
Casey

Let me know if you have any questions at all about the fall.

Casey

**Casey D. Cobb**
Neag Endowed Professor of Education Policy
Neag School of Education
University of Connecticut

Brown v. UConn - Motion for Summary Judgment
Exh bit E - Affidavit of Casey Cobb
Page 11 of 14

UConn 001271

# Exhibit 3

Brown v. UConn - Motion for Summary Judgment
Exh bit E - Affidavit of Casey Cobb
Page 12 of 14

| | |
|---|---|
| **From:** | Cobb, Casey |
| **To:** | Brown, Tiffany |
| **Subject:** | Re: Fall email to EdD cohort |
| **Date:** | Thursday, August 18, 2022 1:44:25 PM |

Great, thank you.

Sent from my iPhone

> On Aug 18, 2022, at 1:19 PM, Tiffany Brown <tiffany.brown@uconn.edu> wrote:

Hi Casey -

This looks good to me. You can also let them know in the email the 5202 syllabus will be available by the end of the week on HuskyCT (finalizing it and have been planning to post today, but just in case). Re your other points:

- One of our students, ▮▮▮▮▮ is deaf and receives accommodations. The Center for Disabilities may have reached out to you or perhaps ▮ did himself. They make arrangements to have an ASL interpreter in class (or online when remote). They have been great to work with, as has ▮ It helps if you can send the interpreter a ppt or even provide access to HuskyCT if you use it, so they review some terminology, etc. Again, they should in theory be reaching out to you.
  - **Thanks for letting me know. I have some experience with the needs of deaf students in the classroom from a time I took a course at Gallaudet. I will look out for an email from the Center for Disabilities or contact them myself if I haven't heard from them by the start of the semester.**
- I had one of the Bridge students email me a few days ago asking about the possibility of holding the Aug 30th class remotely, due to her and two other students' concerns about making class on their first day of school. I didn't think of this and probably should have, but I also am not changing the schedule. Just making you aware the first day will be hectic and people will undoubtedly be late, as some travel from far and may not be able to leave school on time that day. In fact, expect throughout the semester 1-2 student invariably arrive late and are always apologetic. It's just the reality with their positions and emergencies come up.
  - **Got it.**
- You'll see in the email below the routine for the back to back courses. Our courses are a little shorter than normal because of the back to back nature after they work all day. We give them a 30 minute break for dinner. So you're course will start at 4 and go to 6:15. Throw in a short break as you see fit. Then I pick them up at 6:45 and go to 9 pm.

- - **Thanks for letting me know this.**
- Jennie emailed us a while ago about the new Bridge students. They will not have met the cohort so if you want to do an icebreaker, go for it. If you do something more regular like introductions, that works too. Maybe let me know if you plan to do anything special so I don't duplicate efforts.
  - - **Thinking of an icebreaker - will let you know when it's confirmed to avoid duplicating efforts.**
- I'm attaching the up to date list of students in the cohort. One of the students, ████████, asked yesterday to rejoin the cohort after a leave. I'm waiting on Morgaen's reply but I assume it's not a problem.
  - - **Alrighty.**
- Here is that email I plan to send out. Let me know if you see that I missed something:

Thanks for the update,

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

On Thu, Aug 18, 2022 at 11:42 AM Cobb, Casey <casey.cobb@uconn.edu> wrote:

Hi Tiffany,

We are getting close to starting the semester; I can't believe it. I wanted to share a few things with you about the fall. As EdD coordinator I'm a little late getting an email out to the cohort, but pasted below is what I plan to send to them by tomorrow if not sooner. A few quick bits of information:

- One of our students, ████████ is deaf and receives accommodations. The Center for Disabilities may have reached out to you or perhaps ██ did himself. They make arrangements to have an ASL interpreter in class (or online when remote). They have been great to work with, as has ██ It helps if you can send the interpreter a ppt or even provide access to HuskyCT if you use it, so they review some terminology, etc. Again, they should in theory be reaching out to you.
- I had one of the Bridge students email me a few days ago asking about the possibility of holding the Aug 30th class remotely, due to her and two other students' concerns about making class on their first day of school. I

# Exhibit F

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

TIFFANY A. BROWN                   :        CIVIL NO. 3:22-CV-01488-SFR
   *Plaintiff*                     :
                                   :
                                   :
UNIVERSITY OF CONNECTICUT,         :
   *Defendant*                     :        MAY 27, 2025

## AFFIDAVIT OF JENNIFER MCGARRY

I, Jennifer McGarry, having been duly sworn, depose and say:

1. I am over the age of eighteen and understand the obligations of an oath.

2. I have been employed by the University of Connecticut ("UConn") as a faculty member since the year 2002, beginning as an Assistant Professor.

3. I have been employed as a Professor at the Department of Educational Leadership ("EDLR") of UConn's Neag School of Education since the year 2013.

4. This affidavit is based upon my personal knowledge acquired during my employment at UConn as stated herein.

5. My responsibilities as a Professor include, but are not limited to, conducting scholarly research, teaching, and engaging in service to the department, school, university, and academic communities.

6. My responsibility to engage in service to the department can include participating in the Promotion, Tenure, and Reappointment ("PTR") process as a member of the EDLR PTR Committee, which, among other duties, includes reviewing pre-tenure faculty members in the department seeking reappointment in the tenure-track as an Assistant Professor.

1

7. In my capacity as a Professor at UConn, I am familiar with the Plaintiff, Tiffany A. Brown ("Dr. Brown").

8. In the Fall of 2022, I participated in the EDLR PTR Committee's recommendation process regarding reappointment of Dr. Brown as an Assistant Professor.

9. The EDLR PTR process requires the tenure-track faculty member undergoing the PTR review to submit materials which are shared with the EDLR PTR Committee.

10. Dr. Brown submitted her PTR application to the EDLR PTR Committee, a true and accurate copy of which is attached hereto as **Exhibit 1**, which was received and maintained in the regular course of business.

11. On October 5, 2022, Dr. Saran Stewart and I spoke with Dr. Brown about her PTR application.

12. Following the meeting on October 5, 2022, Dr. Brown was given the opportunity to supplement her PTR file in the Fall of 2022.

13. After reviewing Dr. Brown's PTR application, I was unable to conclude that she demonstrated sufficient scholarly research or successful course instruction to justify reappointment. I waited to complete a draft letter to be shared with Dr. Brown until after Dr. Brown supplemented her PTR file and Dr. Saran Stewart and I had the opportunity to review the supplement.

14. On October 10, 2022, Dr. Brown submitted an addendum to the EDLR PTR Committee, a true and accurate copy of which is attached hereto as **Exhibit 2** (with student names redacted), which was received and maintained in the regular course of business.

2

15. On October 20, 2022, I sent Dr. Brown a draft letter for her review. A true and accurate copy of the draft letter that I sent to Dr. Brown on October 20, 2022, which was created and maintained in the regular course of business, is attached hereto as **Exhibit 3** (with student names redacted).

16. Reviewing both **Exhibit 2** and **Exhibit 3** demonstrates that the draft letter displayed within **Exhibit 3** includes additional content resulting from reviewing Dr. Brown's addendum that Dr. Brown submitted on October 10, 2022. Although the draft letter (**Exhibit 3**) displays a date of October 5, 2022, that is not the date that all content in this draft was written.

17. I received confirmation from Dr. Brown, on October 21, 2022, that Dr. Brown received the draft letter referred to in paragraph 15 of this affidavit.

18. On October 26, 2022, additional email correspondence occurred between Dr. Brown and me, whereby Dr. Brown confirmed the substantive accuracy of the content in the draft letter that was shared with her. Although Dr. Brown's email offered additional comments, such comments were beyond the scope of the PTR review, to which I replied. A true and accurate copy of certain emails that were included in the email correspondence that occurred on October 26, 2022, which were sent and received in the regular course of business, are attached hereto as **Exhibit 4**.

19. As a member of the EDLR PTR Committee reviewing Dr. Brown's PTR file in the Fall of 2022, I, along with Dr. Saran Stewart and Dr. H. Kenny Nienhusser, recommended that Dr. Brown not be reappointed.

3

20. The collective decision by Dr. Saran Stewart, Dr. H. Kenny Nienhusser, and me not to recommend that Dr. Brown be reappointed was made on October 31, 2022.

21. My recommendation (as one of the members of the PTR Committee) regarding Dr. Brown's PTR file in the Fall of 2022 was based on my assessment of Dr. Brown's PTR file.

22. Based on my review of the materials that Dr. Brown submitted for her PTR review, including the addendum that Dr. Brown submitted, I concluded that Dr. Brown failed to demonstrate sufficient scholarly research or successful course instruction to justify reappointment.

23. On November 4, 2022, I sent an email to Dr. Brown, and copied Dr. Saran Stewart and Dr. H. Kenny Nienhusser, which was sent in the regular course of business. A true and accurate copy of the email that I sent to Dr. Brown on November 4, 2022 is attached hereto as **Exhibit 5**.

24. The email displayed in **Exhibit 5**, included an email attachment, a true and accurate copy of which is attached hereto as **Exhibit 6** (with student names redacted), which was created and sent in the regular course of business.

25. The letter displayed within **Exhibit 6** reflects that the EDLR Committee did not recommend that Dr. Brown be reappointed, and the letter includes my electronic signature. Despite the date, October 5, 2022, at the top of the letter displayed in **Exhibit 6**, as indicated by prior paragraphs of this affidavit explaining the timeline, that date is not the date that all content in this letter was written.

4

26. The EDLR PTR Committee's recommendation regarding Dr. Brown in the Fall of 2022 did not receive any input from Dr. Casey Cobb as part of the decision to not recommend reappointment for Dr. Brown.

27. After the EDLR PTR Committee's recommendation, the Department Head (Dr. Laura Burton) was tasked with providing an independent evaluation of Dr. Brown's PTR application.

28. As demonstrated in **Exhibit 5**, I sent Dr. Brown an email with a link containing information relating to the PTR process.

29. Additional email correspondence took place between Dr. Brown and me, regarding the opportunity for Dr. Brown to meet with the EDLR PTR Committee to further explain the EDLR PTR Committee's recommendation decision. However, Dr. Brown declined to participate in a meeting with the EDLR PTR Committee following the November 4, 2022 email. Attached hereto as **Exhibit 7** is a true and accurate copy of certain email correspondence between Dr. Brown and me from November 4, 2022, November 7, 2022, and November 8, 2022, which were sent or received in the regular course of business.

30. In the Fall of 2022, I was in regular communication with Laura Burton, the EDLR Department Head, regarding adjustments to the EDLR PTR Committee timeline in the Fall of 2022 for the EDLR PTR Committee's review of Dr. Brown's PTR application. Allowing Dr. Brown to supplement her PTR application, allowing Dr. Brown to review a draft letter, and otherwise ensuring a complete and appropriate review were among the reasons for adjusting the PTR timeline in the Fall 2022 EDLR PTR Committee's review of Dr. Brown's PTR application.

5

31. I have read the foregoing statements and swear that they are true to the best of my knowledge and belief.

_Jennifer E. McGarry_

Jennifer McGarry, Professor,
University of Connecticut

COMMONWEALTH OF MASSACHUSETTS )
COUNTY OF _Middlesex_ )  ss. _Middlesex_ County,
                                               )  Massachusetts

On this _30_ day of _MAY_, 2025, before me, the undersigned, personally appeared Jennifer McGarry, proved to me through satisfactory evidence of identification, which were _MA license_, to be the person who signed the preceding or attached document in my presence, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of her knowledge and belief.



_Vernie E. Wolf_

Notary Public/Commissioner of Court



THOMAS E. WOLF
NOTARY PUBLIC
Commonwealth of Massachusetts
My Commission Expires
March 22, 2030



6

# Exhibit 1



# PROMOTION, TENURE, AND REAPPOINTMENT FORM

NAME: Tiffany Brown

DEPARTMENT: Educational Leadership

SCHOOL/COLLEGE: Neag School of Education

CAMPUS: Storrs

DATE OF HIRE: 08/23/2021

DATE OF TENURE: (awarded/anticipated) Fall 2027

CANDIDATE FOR (Check all that apply):

_____ Promotion to:

_____ Tenure

<u>x</u> Reappointment in a position leading to tenure

_____ Reappointment in a position not leading to tenure

**International Faculty**: **It is the policy of the University of Connecticut to not grant tenure in the absence of permanent residency**. It is the obligation of the candidate in a tenure-track position to pursue permanent residency status in a timely manner.

(Revised May 2018)

1

| INSTRUCTIONS |
| --- |

- This PTR form is to be used for promotion, tenure, and reappointment of tenure track faculty in all schools/colleges, except faculty in the School of Medicine and the School of Dental Medicine. The form should also be used for the promotion of individuals who are in positions that do not lead to tenure and may be used for the reappointment of individuals who are not in tenure track positions.
- *Note: For a first year reappointment, the candidate should complete the Cover Page and Section One and the Department Head should complete Section Seven Part C - III: Recommendation of the Department Head. Department Heads are expected to meet with each first year candidate to discuss appropriate goals, responsibilities, and expectations for the first year.*

**For the Candidate:**
- The candidate is responsible for completing the Cover Page, Sections One, Two, Three, Four, Five and Six. The candidate should consult with his or her Department Head to ensure that the information in Sections One through Six is complete and in the correct format.
- The accuracy and completeness of these sections are the responsibility of the candidate.
- All supplementary material, including student evaluations of teaching, letters of acceptance for publications, reviews, reprints, etc., should be appropriately labeled and inserted as appendices in Section Eight.
- After completing the relevant sections the candidate should submit the form to the Department Head and retain a copy. The completed PTR form along with all supporting documentation becomes the candidate's dossier.
- Upon request, a candidate may review and/or update his/her PTR dossier during any step of the process.

**For the Department Head:**
- The Department Head is responsible for ensuring the completion of Section Seven, Parts A, B & C. The Department Head summary should carefully state the opinion of the Department Head about promotion and/or tenure, as well as those of the candidate's colleagues and students, and others whose opinions may be useful. The written report of the Departmental PTR Advisory Committee should be included as Section Seven, Part A. In cases where the judgment of the Department Head differs from the advice he/she has received, all views should be recorded. The Department Head must inform the candidate in writing of substantive negative findings and of the reasoning behind the negative recommendations. The Department Head must obtain external letters of reference (required for tenure and promotion) and should be inserted in Section Seven, Part F.
- After making his/her recommendation, the Department Head will forward the dossier to the Dean.

**For the Dean:**
- The Dean is responsible for ensuring the completion of Section Seven, Parts D and E and forwarding the dossier to the Provost.

*Note: Schools that are non-departmentalized (Law, Nursing and Social Work) use a slightly different procedure for obtaining input from advisory committees other than a Departmental PTR Advisory Committee or a Department Head. This protocol should be disseminated to the faculty in each school.*

(Revised May 2018)                                          2

**TABLE OF CONTENTS**

| | |
|---|---|
| Section One, Page 5: | A. Academic Appointment at the University of Connecticut |
| Professional Experience and Education | B. Professional Experience Prior to the University of Connecticut |
| | C. Educational Background |
| | D. Honors and Awards |
| | |
| Section Two, Page 6: | |
| Teaching and Curriculum Development | A. Narrative on Undergraduate and Graduate Teaching |
| | B. Courses Taught |
| | C. Evaluation of Teaching |
| | D. Undergraduate Advisees |
| | E. Other Undergraduate Advising/Mentoring Activities |
| | F. Graduate Student and Postdoctoral & Visiting Scholars Mentorship |
| | |
| Section Three, Page 7: | |
| Research, Scholarship, and Creative Work | A. Narrative on Research, Scholarship and Creative Work |
| | B. Published Books, Books Chapters, & Edited Volumes |
| | C. Refereed Publications & Submitted Articles |
| | D. Other Publications & Creative Products |
| | E. Presentations |
| | F. Grants and Contracts |
| | G. Other Scholarly and Creative Accomplishments |
| | H. Societal and Policy Impacts |
| | I. Other Professional Activities |
| | |
| Section Four, Page 9: | |

| Academic and Professional Service/Engagement | A. Narrative on Academic & Professional Service/Engagement |
|---|---|
| | B. Professional Contributions |
| | C. Institutional Contributions |
| | D. Public & Community Service |
| | |
| Section Five, Page 10: | |
| Joint Appointments | |
| | |
| Section Six, Page 11: | |
| Statement by the Candidate | |
| | |
| Section Seven, Page 12: | |
| Evaluations | A. Departmental Promotion, Tenure, and Reappointment Advisory Committee Recommendation |
| | B. Joint Appointments |
| | C. Department Head's Recommendation |
| | D. Dean's Advisory Council Recommendation |
| | E. Dean's Recommendation |
| | F. External Letters of Review (needed for tenure/promotion only) |
| | |
| Section Eight, Page19: | |
| Appendices | A. All Supporting Materials Submitted by Candidate (appropriately labeled) |
| | B. Copy of Original Letter of Appointment |
| | C. Student Evaluations of Teaching (SETs) and other evidence of Teaching Effectiveness |
| | D. Curriculum Vitae (optional) E. Other (including previous correspondence regarding PTR from Provost, Dean, or Department Head) |

## SECTION ONE: PROFESSIONAL EXPERIENCE AND EDUCATION

Name: Tiffany Brown

## A.  ACADEMIC APPOINTMENTS AT THE UNIVERSITY OF CONNECTICUT

| | | | |
|---|---|---|---|
| Present Rank: | **Assistant Professor** | Since:(mm/yy) | **08/21** |
| Previous Rank: | | Since:(mm/yy) | |
| Previous Rank: | | Since:(mm/yy) | |

## B.  PROFESSIONAL EXPERIENCE PRIOR TO THE UNIVERSITY OF CONNECTICUT (*limit to a period of 10 years*)

| Title and organization | From | To |
|---|---|---|
| Harvard University, Doctoral Researcher | 2016 | 2021 |
| City University of New York, Lecturer | 2015 | 2021 |

## C.  EDUCATIONAL BACKGROUND

| Degree | Field | Institution | Date:(mm/yy) |
|---|---|---|---|
| Ph.D. | Education | Harvard University | 05/21 |
| M.Ed. | Education Policy and Management | Harvard University | 05/18 |
| M.A. | Social-Organizational Psychology | Columbia University | 05/16 |
| B.S.F.S. | Culture and Politics | Georgetown University | 05/14 |

## D. HONORS AND AWARDS
List all professional honors and awards, such as teaching citations, research awards, honorary degrees, and recognitions for outstanding creative works.

**SECTION TWO: TEACHING AND CURRICULUM DEVELOPMENT**
(Faculty member should complete Section Two parts A-F)

A. **NARRATIVE ON UNDERGRADUATE AND GRADUATE TEACHING:** The
narrative on teaching should include a teaching philosophy, goals relative to your
instructional responsibilities, and any activities you have undertaken to enhance your
teaching (see: https://cetl.uconn.edu/teaching-philosophy/). **(Narrative should not
exceed 500 words.)**

I don't think I've been teaching long enough to have developed a teaching philosophy.
Especially since something I learned this year is that my teaching style will be
perceived and received differently depending on the demographic composition of the
institution I am working in. I'm just not a "blank slate" in that way that some of my
peers are assumed to "look like" or "be qualified" for the professoriate.

I am also thinking differently about what my teaching philosophy looks like in an
environment in which I perceive there to be few social, institutional, or organizational
supports for the unique challenges faculty of color experience in the classroom. This
shift in my thinking was necessary in response to the realization that efforts to develop
teaching supports for faculty of color in the center for teaching and learning do not
appear to be currently led by people of color.

Very early on in the Spring semester, I reached out to my department head and dean to
ask for a meeting in which I expressed my concerns – based on concerns students had
shared in class and office hours about how different courses were adapting differently
to the return to campus – that I felt vulnerable teaching the PhD students as a female
junior faculty member of color. It was clear to me then that there was a good amount
of discretionary decision-making happening amongst my colleagues that was leaving
students feeling unsure of what to expect from the semester. Based on my training in
the Tavistock tradition of group dynamics, I had an early sense that the group's
anxiety might eventually project themselves onto a scapegoat and I figured I would be
that scapegoat as the most junior of their professors.

By the time the group's anxieties manifested themselves into a list of concerns a few
weeks later (before midterms), those initial conversations I'd had with my dean and
department head – a conversation in which I figured their subjectivities might mean
they trusted my instincts on how power and privilege may play out differently in the
classroom for me than for others teaching the PhD students that semester – seemed to
have been completely forgotten. Almost immediately I realized I had no support in my
supervisors, who had chosen to support the students in holding me accountable to
standards my peers simply weren't being held to. For instance, I was told that other
professors had decided discretionarily not to hold their classes in person on some
instances throughout the semester with department approval but then scolded for
holding class remote on the one day Amtrak rescheduled my train home – which was
completely beyond my control. I thought I was imagining this until recently when it

(Revised May 2018)                                                6

became apparent again that my teaching may inevitably be impacted by an information asymmetry across the department; if it weren't for an email in which the other professor teaching the EdD's asked to check/cross reference the dates for remote sessions I would not have known that the department had planned to offer both types of sessions this semester at all.

I cannot explain how incredibly debilitating it has been to develop my teaching in a department that values your presence in terms of diversity, but little to no regard for the material impact of my difference on my everyday work at UConn. I can't say I was perfect, but I asked for help early on and didn't receive it. As a result, my teaching development suffered greatly this year because it was obvious that I couldn't expect to come to work and be treated as a peer – and I think the students picked up on that. An example of this was at the end of the semester, when a student emailed my department head to report that I had asked for COVID-19 documentation after voluntarily offering the information when asking for an extension the night before a deadline. I was shocked to receive an email from my department telling me I had made a mistake without even asking me if it had occurred. Even when it was proven that the student had offered the documentation – and thus misrepresented our communications to the department head and her advisor – neither of my colleagues even acknowledged they had assumed the worst of me, it was very strange. I am working on developing a teaching philosophy that somehow transcends the reality that I will be seen as less legitimate by some peers and some students and have even come to be grateful for that opportunity in this space.

### B. Courses Taught

List (in reverse chronological order) the courses you have taught at the University of Connecticut by semester and year.

| Semester & Year | Course No. & Title | Solo (Y/N) | Enrollment |
|---|---|---|---|
| Fall 2022 | EDLR 5015: Teacher Leadership and Organizations | Y | 19 |
| Fall 2022 | EDLR 5202: Workplace Learning | Y | 16 |
| Spring 2022 | EDLR 5204: Organizational Learning | Y | 11 |

### C. Evaluation of Teaching (copies of Student Evaluations of Teaching (SET) must be included in the Appendix - Section 8-C). Do not append individual comment sheets from students.

Evidence of assessment of teaching beyond the SET, such as classroom observations by peers or colleagues, mid-semester surveys, or other evidence of good teaching must also be included in Section 8-C.

I'm not sure how "good teaching" is being measured here, but as detailed above I am learning to do my best given the lack of adequate support and collegial trust I have experienced to date in this environment. I really wish I had more support and have

since my first few weeks here.

**D. Undergraduate majors you have advised in each of the past five years**.

| Year | Number of Advisees |
|------|--------------------|
| n/a  | n/a                |

**E. Briefly list other undergraduate student advising or mentoring activities you have been involved in**, including advising Honors students, mentoring undergraduate research projects, advising non-majors, etc.

n/a

**F. Graduate student, postdoctoral fellows and visiting scholar advising/mentorship activities**

n/a

## MASTER DEGREE ADVISING
### (in reverse chronological order)

As Major Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
| | | |

As Associate Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
| | | |

## DOCTORAL DEGREE ADVISING
### (in reverse chronological order)

As Major Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
| | | |

As Associate Advisor:

| Name of Advisee | Year Admitted | Year Degree Awarded |
|---|---|---|
| | | |

## MENTORSHIP OF POSTDOCTORAL FELLOWS OR VISITING SCHOLARS
### (in reverse chronological order)

| Name of Fellow/Scholar | Year(s) |
|---|---|
| | |

## SECTION THREE: RESEARCH, SCHOLARSHIP, AND CREATIVE WORK
(Faculty member should complete Section Three parts A-I)

**A. NARRATIVE ON RESEARCH, SCHOLARSHIP AND OTHER CREATIVE WORK** (Including for example: art exhibits, musical compositions, or dramatic productions, etc.). Summarize your scholarly/creative goals for the next 5 to 10 years and the activities you have initiated to achieve them. **(Narrative should not exceed 500 words.)**

This year I spent a lot of time trying to publish the three papers from my dissertation before I realized it was a book. I realized this after getting pages of legitimate feedback through peer review and noting that most of those revisions were too broad in scale to be addressed in depth in article format. I also did a lot of good thinking about how to better position my work as an organizational psychologist in the field. I developed a book

(Revised May 2018)

proposal, am rethinking target journals for upcoming papers in progress, and networking across both the education and organizations communities to learn more.

**B. Published Books, Book Chapters, and Edited Volumes**.

Brown v. UConn - Motion for Summary Judgment
Exhibit F - Affidavit of Jennifer McGarry
Page 17 of 52

List your published work in the standard form used in your field for the categories listed below - note if these are published electronically with a URL if appropriate. (Do not include work in progress or submitted for publication.)

### B1. Books or Monographs

Author(s), title, year of publication, publisher

### B2. Refereed Book Chapters

Author(s), title, year of publication, publisher

### B3. Edited Volumes

Author(s), title, year of publication, publisher

### B4. Books or Monographs in Press

Author(s), title, year of publication, publisher

## C. Refereed Publications and Submitted Articles.

List all refereed journal publications, then refereed conference proceedings, and then other refereed materials. Include those accepted or submitted and indicate their status. (Consult your department, school or college standards for what counts as "refereed.")

### C1. Published and Accepted Journal Articles

Author(s), article title, journal title, volume, year of publication, page numbers

### C2. Conference Presentations with Proceedings (Refereed)

Author(s), title, venue, year, page numbers

### C3. Other Refereed Material

Provide detailed description, including author(s), title, venue, year, and page(s) where appropriate.

### C4. Submitted Journal Articles

Author(s), article title, journal title, date submitted

Brown, T., Value Judgements: How Faculty Career Stages Shape Their Orientations for Organizational Learning in an Urban University Context, Journal of Learning Sciences, February 21st, 2022.

Brown, T. 50 Years of Educational Research on Social and Psychological Factors Impacting Urban Teacher Thinking. January 16th, 2022.

**D. Other Publications and Creative Products.**

List all other publications and creative products/activities that are not otherwise included in Sections Three. A – C. Indicate whether these are refereed or not. These products may include exhibitions, competitions, performances, professional practice/studio work, software, patents, designs, compositions, scholarly editions, posters, artifacts, datasets, catalogues, and other non-refereed publications.

**E. Presentations**.
List all conference presentations (identify if keynote or invited presentation); invited seminars, scholarly presentations, etc. (Do not list a presentation here if it is listed elsewhere.)

Brown, T. (2022) *Exploring Variance in Faculty Use of Culturally Responsive Classroom Management Strategies at an Urban University.* American Educational Research Association, San Diego, CA.

Brown, T. (2022) *Value Judgements: How Faculty Career Stage Influences One's Propensity for Double-Loop Learning at Work.* American Educational Research Association, San Diego, CA.

**F. Grants and Contracts**
List all grants and contracts as principal, co-principal investigator, and senior personnel. List PI and Co-PI for each grant. An example listing of what information should be included is given below:

Title of Project:
Agency/Company:
Total Dollar Amount:
Role: PI, Co-PI, or Senior Personnel
Collaborators: Jane Doe (PI), John Doe (Co-PI), etc.
Period of Contract: month/year – month/year

      **F1. As Principal Investigator**
      **F2. As Co-Principal Investigator**
      **F3. As Senior Personnel or Contributor**
      **F4. Pending Proposals**
      **F5. Proposals Submitted**
      **F6. Proposals not funded**

**G. Other Scholarly and Creative Accomplishments**
List all other scholarly and creative accomplishments such as invention disclosures, start-up companies, etc. that are not listed elsewhere.

**H. Societal and Policy Impacts**
Present a brief list of the broader impacts of your scholarship, and elaborate on them in your personal statement; include testimony before legislative committees or other public bodies, expert witness roles, and press and media coverage, if appropriate.

**I. Other Professional Activities**

(Revised May 2018)         13

List other professional activities, such as consulting, temporary employment, and visiting professorships.

14

## SECTION FOUR: ACADEMIC AND PROFESSIONAL SERVICE / ENGAGEMENT

(Faculty member should complete Section Four parts A-D)

### A. NARRATIVE ON ACADEMIC AND PROFESSIONAL SERVICE / ENGAGEMENT.

Summarize your academic and professional service, your goals relative to your activities, and the impact of your service. **(Narrative should not exceed 500 words.)**

### B. Professional Contributions

List all national and international contributions of service and positions of leadership in the profession.

Ad-Hoc Reviewer: Contemporary Educational Psychology, Educational Research Review

### C. Institutional Contributions
#### C1. University Level Service

| Name of Committee or Assignment | Responsibilities of the Assignment | Dates of Service |
|---|---|---|
|  |  |  |

#### C2. College/School Level Service

| Name of Committee or Assignment | Responsibilities of the Assignment | Dates of Service |
|---|---|---|
|  |  |  |

#### C3. Department Level Service

| Name of Committee or Assignment | Responsibilities of the Assignment | Dates of Service |
|---|---|---|
|  |  |  |

### D. Public and Community Service

List all public and community service activities that are professionally related.

(Revised May 2018)

15

**SECTION FIVE: JOINT APPOINTMENTS**

If you hold a joint appointment and your work is supervised by individuals other than your Department Head (e.g., regional campus director or associate vice provost, center or institute director, head of department in which you hold a joint appointment), list their name(s) and title(s) and briefly describe your duties for their program(s) below:


**SECTION SIX: STATEMENT BY THE CANDIDATE**

I certify that this information is complete and correct.

Signature:

Name: Tiffany Brown

Date: 08/27/2022

## SECTION SEVEN: EVALUATIONS

### A. DEPARTMENTAL PROMOTION, TENURE, AND REAPPOINTMENT ADVISORY COMMITTEE RECOMMENDATION

Provide an evaluation of the candidate as well as any supporting data and dissenting views, if any. What was the vote of the committee regarding its recommendation (see PTR procedures for guidance)? If there was a dissenting opinion regarding the recommendation, provide the reasons for this dissenting opinion.

<u>The recommendation serves as the committee's independent evaluation.</u>

### B. JOINT APPOINTMENTS

When a candidate holds a joint appointment (as indicated in Section 5) an evaluation from the other supervisor (e.g., regional campus director or associate vice provost, center or institute director, etc.) should be included here.

<u>The recommendation serves as the other supervisor's independent evaluation.</u>

### C. DEPARTMENT HEAD'S RECOMMENDATION

### I. DEPARTMENT HEAD'S EVALUATION LETTER

1.  Provide your <u>independent</u> evaluation of the candidate's case, comparing and contrasting with the advice of the Departmental PTR Advisory Committee, and, in the case for tenure and promotion to associate or professor, the external letters (<u>Examples to Consider</u>).

    <u>Your recommendation, while it should be informed by the information provided, serves as your own independent evaluation.</u>

2.  ***For tenure and promotion to associate or professor***: Attach letters from five or more individuals in the candidate's field outside of the University who can speak to the candidate's professional contribution to scholarship. It is important to solicit impartial evaluations of the candidate's scholarly contributions, as well as other work, in the field. These external letters should not be from former mentors or frequent collaborators. Letters of reference for faculty members for promotion

(Revised May 2018)                        17

to professor must be obtained from individuals who hold this or an equivalent rank.
Briefly describe the outside reviewer's affiliation and qualifications to evaluate the candidate.


## II. DEPARTMENTAL PTR ADVISORY COMMITTEE REPORT

1.  Describe the procedure for the selection of the Departmental PTR Advisory Committee, its composition and its procedures.


2.  If there was a dissenting opinion on this recommendation within the Departmental PTR Advisory Committee, report the vote, and comment on any views taken by the Committee with which your recommendation disagrees.


3.  If you have consulted others beside the Departmental PTR Advisory Committee about this candidate, list the individuals or ad hoc groups consulted and summarize their advice. Comment specifically on any views that differ from your own conclusions.

(Revised May 2018)

Brown v. UConn - Motion for Summary Judgment
Exhibit F - Affidavit of Jennifer McGarry
Page 25 of 52

### III.  RECOMMENDATION OF THE DEPARTMENT HEAD

This report includes my review of the advice I have received from others and clearly states my own opinion.


I recommend that:
                    (name of candidate)


Check all statements that apply:

    \_\_\_\_\_ Be promoted to the rank of

    \_\_\_\_\_ Be granted permanent academic tenure

    \_\_\_\_\_ Be given a terminal appointment

    \_\_\_\_\_ Be reappointed for another probationary year

    \_\_\_\_\_ Be reappointed in a position not leading to tenure

    \_\_\_\_\_ Not be promoted

    \_\_\_\_\_ Not be reappointed


Signed: _____


Date:


***Note:*** *For a first year reappointment the Department Head only needs to complete this page (Section Seven Part C - III: Recommendation of the Department Head).  The Department Head should give a copy of this page to the candidate.*

Brown v. UConn - Motion for Summary Judgment
Exhibit F - Affidavit of Jennifer McGarry
Page 26 of 52

## IV.   FOR SECOND AND SUBSEQUENT REAPPOINTMENTS

Please add any additional comments you deem necessary for each recommendation of a second or subsequent reappointment.  Be certain that you check the appropriate statement in each cluster.

This faculty member was reappointed last year.  At that time I (or the former department head) checked the statement that judged the candidate to be:

     \_\_\_\_\_ Performing in superior fashion

     \_\_\_\_\_ Performing competently

     \_\_\_\_\_ Not performing as well as expected

To date, in my judgment (check the statement that is appropriate):

     \_\_\_\_\_ The candidate's work exceeds expectations; therefore, I recommend reappointment.

     \_\_\_\_\_ The candidate's work meets expectations therefore, I recommend reappointment.

     \_\_\_\_\_ The candidate's work is below expectations; nonetheless, I recommend reappointment for another probationary year with the expectation that he/she may, in that period, effectively address the noted weakness(es).

     \_\_\_\_\_ The faculty member is not performing as expected; therefore, I do not recommend reappointment.

*(The current academic year is the candidate's \_\_\_\_\_ probationary year.)*

     \_\_\_\_\_ This individual is not in a position leading to tenure; but funding permitting, I recommend reappointment.

Signed: _____

Date:

***THE DEPARTMENT HEAD SHOULD GIVE A COPY OF SECTION 7 TO THE CANDIDATE***

(Revised May 2018)

## D.  DEAN'S ADVISORY COUNCIL RECOMMENDATION

Provide an <u>independent</u> evaluation of the candidate together with supporting data.  What was the vote of the Council regarding its recommendation?  If there was a dissenting opinion regarding the recommendation, provide the reasons for the dissent (see PTR procedures for guidance).

**E.  DEAN'S RECOMMENDATION**

Provide your <u>independent</u> evaluation of the candidate's case, comparing and contrasting with the Department Head's recommendation, the advice of the Departmental PTR Advisory Committee, and the Dean's Advisory Council.

<u>Your recommendation, while it should be informed by the information provided at other steps of review, serves as your own independent evaluation (see PTR procedures for guidance).</u>


*If there was an appeal at the Dean's level, please describe this and report on its outcome.*




Signed: _____

Date:

Brown v. UConn - Motion for Summary Judgment
Exhibit F - Affidavit of Jennifer McGarry
Page 29 of 52

**F. EXTERNAL LETTERS OF RECOMMENDATION SHOULD BE INSERTED HERE.**

**SECTION EIGHT: APPENDICES**

    **A.  All Supporting Materials Submitted by Candidate** (appropriately labeled)
        (*e.g.,* copies of manuscripts *in press*).

    **B.  Copy of Original Letter of Appointment**

    **C.  All Copies of the Student Evaluation of Teaching (SET) Results.** <u>Do not</u>
        <u>append individual comment sheets from students</u>.

        Include other evidence of teaching effectiveness.

    **D.  Curriculum Vitae** (optional)

    **E.  Other** (including previous letters regarding PTR from Provost, Dean, or
        Department Head).

Brown v. UConn - Motion for Summary Judgment
Exhibit F - Affidavit of Jennifer McGarry
Page 31 of 52

# Exhibit 2

PTR Addendum
Tiffany Brown
October 10th, 2022

I appreciate the opportunity to add an addendum to my original PTR form, and the committee for its interest in procuring a statement which reflects my work productivity over the past year. After my meeting with the initial PTR committee, I realized that I do not want to redo the form because I believe the contextual factors described in those statements have strongly contributed to my perceptions that my work as a scholar is not well recognized or supported by the department. While I did write that statement with very little time upon realizing there had been missing information in my PTR OneDrive folder, upon reflection I realized that my hesitation to share my progress has been somewhat well founded by the sense that I have not been treated equally or fairly as a colleague in my experience here to date. I think subconsciously I withheld the information because I have had a few experiences here that make me feel like my progress would not be well supported.

I would also like to document (and ask that it be clarified somewhere in writing for future reference) that I appear to have been misinformed about tenure expectations. I learned in this year's PTR meeting that though there has been some confusion in the past, two articles a year must be published – not just submitted as I was told repeatedly when I joined the faculty last year. It would really help to be clear on how I'm being evaluated to ensure I am meeting those expectations moving forward.

I am writing this to emphasize that I achieved the following *despite* the concerns I have documented in writing to the Dean and department head since my first semester year, which were largely addressed reactively rather than proactively – and with little to no benefit of the doubt afforded to me that one might expect as a basis for collegial trust and respect. In fact, there were many times last year when I expected to be treated as someone who would contribute the following items and found that I was instead treated with the collegial respect often afforded to doctoral students or postdoctoral fellows. I think it would be irresponsible to not continue documenting this – which I've been doing since my first few weeks here in email to both the Dean and my department head. I sincerely didn't expect support for any of the progress I've made based on the lack of various supports I missed my first year here.

Nevertheless, here are some points Saran and Jennie thought would be helpful to include about my progress:
- **Professional Development:** In Spring 2022 – upon realizing that the supports available for faculty of color on UConn's campus are both still in development and not being spearheaded by a person of color – I reached out to colleagues at another university who told me of the Faculty Women of Color in the Academy conference. It was great to meet other faculty women of color from across the country who understood the ways in which our campus PD supports often fall short in recognizing unique issues of power and privilege that impact our everyday work. I also met some other faculty women of color from UConn, which was great – though I found out after spending some of my startup funds that most of them had had their conference fees taken care of by the DEI office. I had to petition directly for a refund to my startup funds to be reimbursed. It was really

concerning to me that the message about this conference somehow hadn't made its way to the ed school, as I think many of my Neag colleagues would really have benefitted from it as well.

In the process of developing my book proposal (discussed below) I developed some mentoring relationships with organizations and education scholars at other universities – with particular focus in seeking out folks who are "dual discipline" scholars. I got some great advice on how to position my work and refocus my efforts in identifying target journals that helped significantly.

- **Articles in Development:** The two papers I presented at AERA were based on my dissertation research, which became material for my book proposal. I am currently working on two articles based on data I collected in 2017 while working for a high-performing higher education opportunity program. The papers are about professional socialization and essential components of this program's service delivery.

- **Book Proposal Under Review:** My dissertation was originally composed of three papers, which I spent last year submitting individually to journals. I received pages of feedback from across those journals that included very valid feedback, and which I realized around the end of 2021 meant the loose ends left untied amongst them could be addressed by drawing a throughline across them - in book format. So, by the Spring I'd begun developing the book proposal, and by the summer I submitted it with the title *Cultural Learning in Urban Schools and Minority Serving Institutions: For Educators.* The proposal was submitted and is under review by Cambridge University Press.

  I must add that a critical factor which allowed me to work on this proposal during the summer was the ability to pay myself from my startup funds. When I came last year, I was explicitly told by both the Dean and some senior colleagues that I could use my startup funds for everything but to pay myself over the summer. Thankfully, I found out at the FWCA conference from other UConn colleagues that this is incorrect just a few weeks before the Finance department deadline.

- **Conference Submissions:** This year I presented two papers (one paper session, one roundtable session) at AERA. I'm planning to submit my next two papers to organizations journals which feature research on diverse organizational contexts.

- **Teaching Updates:** This year I checked in with students sooner by asking for plus/delta feedback at the end of our first month. We've still got a way to go, but checking in sooner has kept me more responsive to students' needs in real time – which I think is going much better.

- **Service:** I should have mentioned that I served on a few EdD committees last fall, for the following students: ████████████, ████████████, ████ (last name not on the spreadsheet Jennie'd sent over that I'm referencing for this), ████████████, ████████, ████████, ████████. I also served as a reviewer for Educational Research Review and Contemporary Educational Psychology.

# Exhibit 3

October 5, 2022

Dr. Laura Burton
Department Head
Department of Educational Leadership
Neag School of Education

Dear Dr. Burton,

The Department of Educational Leadership (EDLR) Faculty Promotion and Tenure Review (PTR) Committee has reviewed Dr. Tiffany Brown's submitted materials for consideration for reappointment as an Assistant Professor in the Department of Educational Leadership. Two members of the Committee (Drs. Saran Stewart and Jennie McGarry) met with Dr. Brown on October 5, 2022 to discuss her dossier and to address questions she had about the PTR process.

We discussed the gaps in information on Dr. Brown's PTR form and encouraged her to update the form, as faculty can update their PTR materials throughout the review process. Dr. Brown shared an addendum (see file in supporting materials folder in shared drive) with us. We also discussed what the PTR Committee can do better to support faculty preparation for the review process as well as how we can support faculty accessing resources that can assist them in progressing toward tenure and promotion. As a result of that conversation, Dr. Stewart shared examples of teaching statements with Dr. Brown.

Below is a summary of our review of Dr. Brown's materials, including the addendum, and our discussion with her on October 5.

**Scholarship**

We began the conversation with Dr. Brown by asking if there have been any additional developments in her scholarship since she completed the PTR form in late August. She provided us with an update of the book proposal she has in review with Cambridge University Press, titled *Cultural Learning in Urban Schools and Minority Serving Institutions: For Educators.* Originally, she had submitted individual papers from her dissertation (please note these are the two papers submitted for publication on the PTR form), presented the work at AERA, and received feedback leading her to combine the papers/presentations into a book proposal. We encouraged her to continue to submit peer-reviewed papers while she is working on the book since those will have impact sooner than the book, and for tenure she will need to show that impact and her trajectory beyond tenure. She acknowledged our advice and shared that she has two manuscripts in progress based on data collected in 2017 from a high-performing higher education opportunity program. The papers are about professional socialization and essential components of the program's service delivery. We advised her to document the two papers on her PTR form as works in progress as well as encouraged her to provide samples of the work in the supporting materials folder. Her goal is to submit both papers by the end of Fall 2022.

Dr. Brown acknowledged that she has a different sense of how to use her negotiated course release time (0:1 load for 2021-22) last year and feels that she is making progress in her scholarly pursuits. She also shared that she is gaining a better understanding of where her work belongs and spoke of organizational psychology journals.

Dr. Brown has not indicated any proposal submissions for internal or external funding.

Finally, we had the opportunity to clarify Dr. Brown's understanding of the expectations for promotion, tenure and reappointment related to the publication of peer-reviewed journal articles, or other scholarly products. She shared that she had been told that the expectation was two submissions per year, not two accepted or published products. We've included an excerpt from the Neag School Faculty Roles and Responsibilities (p. 21) that speaks to the expectation for publications here:

> Although the Neag School does not have as a metric [related to] the total number of products a tenure-earning faculty is expected to generate, the advice is typically given that tenure-earning faculty generate on average two peer-reviewed products per year, including manuscripts that are in-press.

**Teaching**

Dr. Brown expressed that last year was hard for everyone, and particularly for her as a new female faculty member of color. The recent LLEP meeting helped her understand more about possible improvements to the program and connected with some of the concerns she heard from students last year in EDLR 5204: Organizational Learning. Dr. Brown provided her SET scores from Spring 2022 (EDLR 5204) and should also speak explicitly to her negotiated course release for Fall 2021 and Spring 2022 to account for only SET scores for one course. Her EDLR 5204 SET scores were notably low and she expressed that the PTR form and the SET did not address systemic issues impacting her and the students she taught. We spoke about potential SET+ options for Dr. Brown including formative assessments in her courses, the National Center for Faculty Diversity and Development, and inviting a colleague to observe and provide feedback on her teaching. Specifically, we suggested that Dr. Brown should share anonymized concept maps and memos that the students submit as evidence of their learning in her courses. We also recommended that Dr. Brown re-write her teaching statement and integrate information about how she approaches teaching and learning including identifying  the mentors and scholars who have informed her teaching. While Dr. Brown has expressed her dissatisfaction with teaching and learning resources available through CETL, she shared that the Women of Color in the Academy conference she attended in the spring was beneficial. She acknowledged that she has engaged colleagues she met at the conference about course materials and course structure. Dr. Brown feels the Fall 2022 semester is going better for her and the students in her course because she has scaled back her expectations and is adapting to students' needs in real time. She is using course objectives that have been used before rather than trying to create them herself as she recognizes that she is still learning about the program objectives and how each class fits in.

**Service**

In our conversation with Dr. Brown, we learned that while she is not being asked to serve on department, school, or university committees as a new, pre-tenure faculty member, she has engaged in program level service.  She served on EdD committees last fall for the following students: ███ ████████, █████████, ████████████, █████████████, █████████████, and █████████. Additionally, external to UConn, Dr. Brown has served as a reviewer for Educational Research Review and Contemporary Educational Psychology.

In summary, Dr. Brown has been asked to revise her PTR form to reflect her scholarship, teaching, and service to date. Related to scholarship, Dr. Brown does not have any published, accepted or in press manuscripts to date. She is awaiting notification of the status of a submitted book proposal. With teaching, Dr. Brown has been advised to revise her teaching statement to reflect her pedagogical process,  teaching philosophy, goals relative to instructional responsibilities and activities undertaken to enhance teaching. The committee has also requested that Dr. Brown add language to her PTR form to account for her negotiated course release in Fall 2021 and Spring 2022. Lastly, based on the addendum Dr. Brown submitted following her meeting with the PTR committee representatives, there is an indication of program-level and professional association service. We also made specific recommendations and clarifications related to her scholarship, teaching, and service.

With a vote of ___yes, ___no, ___abstain, and ___absent the Department of Educational Leadership PTR Committee (unanimously recommends, recommends by x # of votes, does not recommend, etc. depending on the outcome of the vote) that Dr. Tiffany Brown be reappointed to the position of Assistant Professor.

Sincerely,

# Exhibit 4

| From: | McGarry, Jennifer |
|---|---|
| To: | Brown, Tiffany |
| Cc: | Stewart, Saran |
| Subject: | Re: Checking in |
| Date: | Wednesday, October 26, 2022 12:02:23 PM |

Tiffany –

Thank you for the quick response, and your additional comments.

I appreciate your perspective on wages, although addressing that aspect of the AAUP Collective Bargaining Agreement is not explicitly part of the charge of the PTR committee. Preston Green is our department representative for the AAUP and would be the person to talk with in terms of the new collective bargaining agreement related to wage increases.

Hope that is helpful -

Jennie

**From:** Brown, Tiffany <tiffany.brown@uconn.edu>
**Date:** Wednesday, October 26, 2022 at 10:30 AM
**To:** McGarry, Jennifer <jennifer.mcgarry@uconn.edu>
**Cc:** Stewart, Saran <saran.stewart@uconn.edu>
**Subject:** Re: Checking in

Hi Jennie -

The letter looks accurate to me. I would like to add that writing this letter and these PTR discussions more generally should be considered against the context of me currently struggling financially because there's been no cost of living adjustment made to our salaries to account for the rising costs of inflation. I think it's really
Important to document that our basic needs aren't being accounted for in such tough times.

I think (and know, based both on the orgs literature and speaking with other colleagues) that it is incredibly demoralizing and demotivating to be expected to conduct business as usual when our basic needs are not being met. I'm feeling that way this semester with the rising costs of commuting in particular. It seems obvious to folks at other institutions/across industries that everyone needs more money to live - but not here at UConn for some reason. Thus I think it's important to include an impact statement of some sort about this important workplace hygiene factor.

Thanks again,
Tiffany

Sent from my iPhone

<!--[if !supportLineBreakNewLine]-->
<!--[endif]-->

      On Oct 26, 2022, at 09:25, McGarry, Jennifer <jennifer.mcgarry@uconn.edu> wrote:


Hi, Tiffany. Hope you are doing well this week.

I wanted to check in to see if you had time to review the PTR Committee letter.

We were hoping to have the letter shared with the committee for vote and signature early this week.

Thanks –

Jennie

# Exhibit 5

| | |
|---|---|
| **From:** | McGarry, Jennifer |
| **To:** | Brown, Tiffany |
| **Cc:** | Stewart, Saran; Nienhusser, H. Kenny |
| **Subject:** | PTR Review |
| **Date:** | Friday, November 4, 2022 5:06:50 PM |
| **Attachments:** | PTR_Tiffany Brown_Vote.pdf |

Dear Tiffany:

As chair of the EDLR PTR Committee, I am informing you of the negative findings regarding your reappointment. I have attached the letter from the Committee that you have previously read, now including the vote.

Per the Provost's Office guidelines, the Committee is providing you with the opportunity to meet to discuss our findings:

> The Committee, after its review, shall provide the faculty member with an opportunity to appear before the committee to discuss substantive negative findings (https://provost.uconn.edu/faculty-and-staff-resources/promotion-tenure-reappointment/).

Please provide days/times you are available to meet during the week of November 7, either in person or virtually.

Jennie

# Exhibit 6

October 5, 2022

Dr. Laura Burton
Department Head
Department of Educational Leadership
Neag School of Education

Dear Dr. Burton,

The Department of Educational Leadership (EDLR) Faculty Promotion and Tenure Review (PTR) Committee has reviewed Dr. Tiffany Brown's submitted materials for consideration for reappointment as an Assistant Professor in the Department of Educational Leadership. Two members of the Committee (Drs. Saran Stewart and Jennie McGarry) met with Dr. Brown on October 5, 2022 to discuss her dossier and to address questions she had about the PTR process.

We discussed the gaps in information on Dr. Brown's PTR form and encouraged her to update the form, as faculty can update their PTR materials throughout the review process. Dr. Brown shared an addendum (see file in supporting materials folder in shared drive) with us. We also discussed what the PTR Committee can do better to support faculty preparation for the review process as well as how we can support faculty accessing resources that can assist them in progressing toward tenure and promotion. As a result of that conversation, Dr. Stewart shared examples of teaching statements with Dr. Brown.

Below is a summary of our review of Dr. Brown's materials, including the addendum, and our discussion with her on October 5.

**Scholarship**

We began the conversation with Dr. Brown by asking if there have been any additional developments in her scholarship since she completed the PTR form in late August. She provided us with an update of the book proposal she has in review with Cambridge University Press, titled *Cultural Learning in Urban Schools and Minority Serving Institutions: For Educators.* Originally, she had submitted individual papers from her dissertation (please note these are the two papers submitted for publication on the PTR form), presented the work at AERA, and received feedback leading her to combine the papers/presentations into a book proposal. We encouraged her to continue to submit peer-reviewed papers while she is working on the book since those will have impact sooner than the book, and for tenure she will need to show that impact and her trajectory beyond tenure. She acknowledged our advice and shared that she has two manuscripts in progress based on data collected in 2017 from a high-performing higher education opportunity program. The papers are about professional socialization and essential components of the program's service delivery. We advised her to document the two papers on her PTR form as works in progress as well as encouraged her to provide samples of the work in the supporting materials folder. Her goal is to submit both papers by the end of Fall 2022.

Dr. Brown acknowledged that she has a different sense of how to use her negotiated course release time (0:1 load for 2021-22) last year and feels that she is making progress in her scholarly pursuits. She also shared that she is gaining a better understanding of where her work belongs and spoke of organizational psychology journals.

Dr. Brown has not indicated any proposal submissions for internal or external funding.

Finally, we had the opportunity to clarify Dr. Brown's understanding of the expectations for promotion, tenure and reappointment related to the publication of peer-reviewed journal articles, or other scholarly products. She shared that she had been told that the expectation was two submissions per year, not two accepted or published products. We've included an excerpt from the Neag School Faculty Roles and Responsibilities (p. 21) that speaks to the expectation for publications here:

> Although the Neag School does not have as a metric [related to] the total number of products a tenure-earning faculty is expected to generate, the advice is typically given that tenure-earning faculty generate on average two peer-reviewed products per year, including manuscripts that are in-press.

**Teaching**

Dr. Brown expressed that last year was hard for everyone, and particularly for her as a new female faculty member of color. The recent LLEP meeting helped her understand more about possible improvements to the program and connected with some of the concerns she heard from students last year in EDLR 5204: Organizational Learning. Dr. Brown provided her SET scores from Spring 2022 (EDLR 5204) and should also speak explicitly to her negotiated course release for Fall 2021 and Spring 2022 to account for only SET scores for one course. Her EDLR 5204 SET scores were notably low and she expressed that the PTR form and the SET did not address systemic issues impacting her and the students she taught. We spoke about potential SET+ options for Dr. Brown including formative assessments in her courses, the National Center for Faculty Diversity and Development, and inviting a colleague to observe and provide feedback on her teaching. Specifically, we suggested that Dr. Brown should share anonymized concept maps and memos that the students submit as evidence of their learning in her courses. We also recommended that Dr. Brown re-write her teaching statement and integrate information about how she approaches teaching and learning including identifying  the mentors and scholars who have informed her teaching. While Dr. Brown has expressed her dissatisfaction with teaching and learning resources available through CETL, she shared that the Women of Color in the Academy conference she attended in the spring was beneficial. She acknowledged that she has engaged colleagues she met at the conference about course materials and course structure. Dr. Brown feels the Fall 2022 semester is going better for her and the students in her course because she has scaled back her expectations and is adapting to students' needs in real time. She is using course objectives that have been used before rather than trying to create them herself as she recognizes that she is still learning about the program objectives and how each class fits in.

**Service**

In our conversation with Dr. Brown, we learned that while she is not being asked to serve on department, school, or university committees as a new, pre-tenure faculty member, she has engaged in program level service.  She served on EdD committees last fall for the following students: ███ ████████, █████████, ██████████████, ████████████████, ████████████, and ████████. Additionally, external to UConn, Dr. Brown has served as a reviewer for Educational Research Review and Contemporary Educational Psychology.

In summary, Dr. Brown has been asked to revise her PTR form to reflect her scholarship, teaching, and service to date. Related to scholarship, Dr. Brown does not have any published, accepted or in press manuscripts to date. She is awaiting notification of the status of a submitted book proposal. With teaching, Dr. Brown has been advised to revise her teaching statement to reflect her pedagogical process,  teaching philosophy, goals relative to instructional responsibilities and activities undertaken to enhance teaching. The committee has also requested that Dr. Brown add language to her PTR form to account for her negotiated course release in Fall 2021 and Spring 2022. Lastly, based on the addendum Dr. Brown submitted following her meeting with the PTR committee representatives, there is an indication of program-level and professional association service. We also made specific recommendations and clarifications related to her scholarship, teaching, and service.

With a vote of 0 yes, 3 no, 0 abstain, and 1 absent the Department of Educational Leadership PTR Committee does not recommend that Dr. Tiffany Brown be reappointed to the position of Assistant Professor.

 Sincerely,

*Jennifer C. McGarry*
Dr. Jennifer McGarry


_____
Dr. H. Kenny Nienhusser


_____
Dr. Saran Stewart


 (absent)
_____
Dr. Casey Cobb

# Exhibit 7

| From: | McGarry, Jennifer |
|---|---|
| To: | Brown, Tiffany |
| Cc: | Stewart, Saran; Nienhusser, H. Kenny |
| Subject: | Re: PTR Review |
| Date: | Tuesday, November 8, 2022 9:43:03 AM |

Hi, Tiffany.

Wanted to follow up and let you know that we will wait until Friday before moving the process to Laura in the event that you decide you'd like to talk with us.

Jennie, Kenny, and Saran

---

**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Date:** Monday, November 7, 2022 at 11:31 AM
**To:** McGarry, Jennifer <jennifer.mcgarry@uconn.edu>
**Cc:** Stewart, Saran <saran.stewart@uconn.edu>, Nienhusser, H. Kenny
<h._kenny.nienhusser@uconn.edu>
**Subject:** Re: PTR Review

Alrighty, well I certainly want to respect the amount of time it's taken the committee to make your decision. I've received notice of your vote, and I understand that the process will be moving to Laura next despite my not having received her letter at the time of our initial PTR conversation as outlined in the standard PTR procedures.

Thank you very much for explaining the purpose of the meeting,

Tiffany

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269


On Mon, Nov 7, 2022 at 11:04 AM McGarry, Jennifer <jennifer.mcgarry@uconn.edu> wrote:

> Hi, Tiffany.
>
> No, the conversation would not change our vote. It would be an opportunity to discuss why our vote was what it was.

What I can point you to is more information about your rights and responsibilities at each stage of the PTR process at the link I shared before (https://provost.uconn.edu/faculty-and-staff-resources/promotion-tenure-reappointment/) including a section related to what Saran and I had shared when we met with you and in our email follow up:

- Any supplementary materials, including student evaluations of teaching, teaching portfolios, other evidence of teaching effectiveness, letters of acceptance for publications, reviews, reprints, etc., should be appropriately labeled and inserted as appendices in the Appendices section of the corresponding PTR-PR form, or provided through a URL.
- May add supplemental information to his or her Promotion, Tenure, and Reappointment (PTR) File at any time. Such information must be dated. No materials may be removed from a Promotion, Tenure, and Reappointment (PTR) File.

Jennie

---

**From:** Brown, Tiffany <tiffany.brown@uconn.edu>
**Date:** Monday, November 7, 2022 at 10:23 AM
**To:** McGarry, Jennifer <jennifer.mcgarry@uconn.edu>
**Cc:** Stewart, Saran <saran.stewart@uconn.edu>, Nienhusser, H. Kenny <h._kenny.nienhusser@uconn.edu>
**Subject:** Re: PTR Review

Hi again -

Thanks for clarifying. So just to confirm - nothing I shared in this meeting would change the committee's decision, right? After our conversations and the written statements I've submitted, just not sure what else would do it...I never received the letter Laura promised to share before our one-on-one so just trying to get a sense of where things are headed as they progress.

Thanks for your patience,
Tiffany

Sent from my iPhone

> On Nov 7, 2022, at 08:51, McGarry, Jennifer <jennifer.mcgarry@uconn.edu> wrote:
>
> Tiffany -
>
> The meeting would be an opportunity to speak with Saran, Kenny, and me as the voting members of the EDLR PTR committee concerning the negative findings. You

can ask questions to understand our findings better, and/or gain additional clarity on what we based our findings. After the meeting, the PTR process moves to the department head who will formulate and share findings and also provide an opportunity to meet to discuss those findings.

Jennie

> On Nov 4, 2022, at 7:10 PM, Brown, Tiffany <tiffany.brown@uconn.edu> wrote:
>
>  Hi all -
>
> When someone is able will you explain the implications of this meeting? Not sure what I should be prepared to share in this next meeting or if it will be with the same folks as before.
>
> Have a good weekend,
> Tiffany
>
> Sent from my iPhone

>> On Nov 4, 2022, at 17:07, McGarry, Jennifer <jennifer.mcgarry@uconn.edu> wrote:
>>
>> Dear Tiffany:
>>
>> As chair of the EDLR PTR Committee, I am informing you of the negative findings regarding your reappointment. I have attached the letter from the Committee that you have previously read, now including the vote.
>>
>> Per the Provost's Office guidelines, the Committee is providing you with the opportunity to meet to discuss our findings:
>>
>>> The Committee, after its review, shall provide the faculty member with an opportunity to appear before the committee to discuss substantive negative findings (https://provost.uconn.edu/faculty-and-staff-resources/promotion-tenure-reappointment/).

Please provide days/times you are available to meet during the week of November 7, either in person or virtually.

Jennie

<PTR_Tiffany Brown_Vote.pdf>

UConn 001550

# Exhibit G

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **TIFFANY A. BROWN** | : | **CIVIL NO. 3:22-CV-01488-SFR** |
| *Plaintiff* | : | |
| | : | |
| | : | |
| **UNIVERSITY OF CONNECTICUT,** | : | |
| *Defendant* | : | **MAY 28, 2025** |

## AFFIDAVIT OF SARAH CHIPMAN

I, Sarah Chipman, having been duly sworn, depose and say:

1. I am over the age of eighteen and understand the obligations of an oath.

2. I have been employed by the University of Connecticut ("UConn") in the Office of Institutional Equity ("OIE") since 2014.

3. In addition to holding certain interim positions, my current permanent role is Director of Equity Response and Education in the OIE at UConn.

4. In 2022, my permanent role was Director of Investigations and Deputy Title IX Coordinator in the OIE at UConn.

5. This affidavit is based upon my personal knowledge acquired during my employment at UConn as stated herein.

6. In my capacity as a UConn employee in UConn's OIE, I am familiar with the Plaintiff, Tiffany A. Brown ("Dr. Brown").

7. Although UConn's OIE received some emails and phone calls from Dr. Brown during the Spring 2022 semester, Dr. Brown did not file a formal complaint with UConn's OIE during the Spring 2022 semester.

8. After the Spring 2022 semester, UConn's OIE was not contacted by Dr. Brown again until November of 2022.

1

9.  On November 1, 2022, I received an email from Susan Hoge, Executive
    Assistant in UConn's OIE, which was sent in the regular course of business on
    November 1, 2022. A true and accurate (redacted) copy of that email is attached
    hereto as **Exhibit 1**.

10. Additional email correspondence took place between Dr. Brown and me on
    November 1, 2022, and such emails were sent or received in the regular course
    of business. Attached hereto as **Exhibit 2** includes a true and accurate copy of
    certain emails, including emails that were sent or received in the regular course
    of business on November 1, 2022. As demonstrated in **Exhibit 2**, I provided Dr.
    Brown with potential times to speak the next day, as well as information on the
    Employee Assistance Program ("EAP"). As further demonstrated in **Exhibit 2**, Dr.
    Brown replied by stating that she would call the next day, and that she did not
    "think EAP is the appropriate resources here, there's a departmental issue that's
    impacted my teaching."

11. Additional email correspondence took place between Dr. Brown and me on
    November 2, 2022, and such emails were sent or received in the regular course
    of business. Attached hereto as **Exhibit 3** includes a true and accurate copy of
    certain emails, including certain emails that were sent or received in the regular
    course of business on November 2, 2022.

12. A subsequent email thread was forwarded to me by Dr. Brown on November 2,
    2022, to which I replied on November 3, 2022. These emails were sent or
    received in the regular course of business. Attached hereto as **Exhibit 4** includes
    a true and accurate copy (with a redaction) of certain emails that were sent or

2

received in the regular course of business, including an email thread that Dr.

Brown forwarded me on November 2, 2022, and my response on November 3,

2022.

13. As demonstrated in **Exhibit 4**, as of November 3, 2022, it was unclear to me

whether the issues being raised by Dr. Brown implicated OIE's jurisdiction.

However, as further demonstrated in **Exhibit 4**, I indicated availability to discuss

it further with Dr. Brown.

14. After emailing Dr. Brown and indicating it was unclear to me whether the issues

raised implicated OIE's jurisdiction, OIE subsequently received an electronic

submission from Dr. Brown later that afternoon, on November 3, 2022, which

was subsequently forwarded to me by email. The submission by Dr. Brown, and

the email forwarding Dr. Brown's submission to me, were received in the regular

course of business. A true and accurate (redacted) copy of the submission, and

the email forwarding the submission to me, are attached hereto as **Exhibit 5**.

15. Additional correspondence took place between Dr. Brown and me on November

3, 2022, November 4, 2022, and November 7, 2022. Attached hereto as **Exhibit**

**6** is a true and accurate copy (with a redaction) of certain emails that were sent

or received in the regular course of business, including certain emails that were

sent or received on November 3, 2022, November 4, 2022, and November 7,

2022.

16. On November 4, 2022, I received an email from Dr. Brown's union representative

(David Amdur) informing me that Dr. Brown requested that he serve as her

support person when Dr. Brown participates in an interview with OIE. On

3

November 7, 2022, I responded to that email from Dr. Brown's union
representative. A true and accurate copy of these emails, which were sent or
received in the regular course of business, are attached hereto as **Exhibit 7**.

17. On November 7, 2022, I spoke with Dr. Brown, who indicated that she was
interested in pursuing a complaint through OIE's process. I informed Dr. Brown
that I would review the information she provided.

18. Dr. Brown sent me several additional emails and/or email threads on the evening
of November 7, 2022, and copied me on emails on November 8, 2022. I
subsequently reviewed all the additional correspondence that I received from Dr.
Brown.

19. On November 11, 2022, I sent Dr. Brown an email, which was sent in the regular
course of business. A true and accurate copy of the email that I sent to Dr.
Brown, on November 11, 2022, is attached hereto as **Exhibit 8**.

20. Based on the information received from Dr. Brown, I was looking to obtain
additional information through an interview with Dr. Brown prior to initiating an
investigation. As demonstrated in **Exhibit 8**, I requested to schedule a meeting
with Dr. Brown (and invited her union representative).

21. On November 14, 2022, Dr. Brown sent me an additional email (and an
accompanying email thread), informing me that she was out on leave. On
November 15, 2022, I sent an email to Dr. Brown thanking her for letting me
know about the leave, wishing her well, stating that I can meet with her when she
returns, and indicating that I would wait to hear from her about scheduling.
Attached hereto as **Exhibit 9** is a true and accurate copy of certain email

4

correspondence that was sent or received in the regular course of business, including an email I received from Dr. Brown on November 14, 2022, and an email that I sent to Dr. Brown on November 15, 2022.

22. I am not aware of Dr. Brown contacting OIE at UConn again at any point on or after November 15, 2022.

23. OIE did not contact Casey Cobb or Laura Burton in November of 2022 regarding Dr. Brown's correspondence with OIE in November 2022.

24. I have read the foregoing statements and swear that they are true to the best of my knowledge and belief.

Sarah Chipman,
Office of Institutional Equity,
University of Connecticut

**STATE OF CONNECTICUT** )
) **ss. Tolland County, Connecticut**
**COUNTY OF TOLLAND** )

Subscribed and sworn before me on this _2_ day of ___June___, 2025.

Commissioner of the Superior Court/Notary
Public   Joseph A. Smiga
Juris # 426288

5

# Exhibit 1

| | |
|---|---|
| **From:** | Hoge, Susan |
| **To:** | Chipman, Sarah |
| **Subject:** | Call on main line |
| **Date:** | Tuesday, November 1, 2022 1:02:45 PM |

Hi Sarah,

Tiffany Brown, Asst. Professor in Educational Leadership, just called our main line asking to speak with someone in our office regarding her work-place conditions. She stated that she is looking for some support. Tiffany can be reached at ▮▮▮▮▮▮▮.

Thank you,
Susan

**SUSAN HOGE**
EXECUTIVE ASSISTANT
**OFFICE OF INSTITUTIONAL EQUITY**
PRONOUNS: SHE – HER – HERS
UNIVERSITY OF CONNECTICUT | WOOD HALL
241 GLENBROOK ROAD, UNIT 4175 | STORRS, CT 06269-4175
OFFICE: 860.486.0633 | FAX: 860.486.5943
WEBSITES: WWW.EQUITY.UCONN.EDU | WWW.TITLEIX.UCONN.EDU | WWW.ACCESSIBILITY.UCONN.EDU
E-MAIL: SUSAN.HOGE@UCONN.EDU

# Exhibit 2

| From: | Tiffany Brown |
|---|---|
| To: | Chipman, Sarah |
| Subject: | Re: OIE- Phone Call |
| Date: | Tuesday, November 1, 2022 5:13:22 PM |

Hi again Sarah - thanks, I will reach out to you at 4 pm tomorrow. I don't think EAP is the appropriate resource here, it's a departmental issue that's impacted my teaching.

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

On Tue, Nov 1, 2022 at 4:47 PM Chipman, Sarah <sarah.chipman@uconn.edu> wrote:

Hello Tiffany,

I received the message that you called.  I can speak with you tomorrow at 9:00 am if you're available then.  You can reach me by phone at the office (860-486-2943).  If that time doesn't work for you, I will be in meetings much of the day, but should be available again at 4:00 pm, so you can try me then as well.

If you need support, one resource that is available to you 24/7 is the Employee Assistance Program (https://hr.uconn.edu/employee-assistance-program/).  You can reach them by phone at 888-993-7650.  I would also encourage you to connect with your union for support.

Thank you,

Sarah

**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Sent:** Tuesday, November 1, 2022 3:22 PM
**To:** Chipman, Sarah <sarah.chipman@uconn.edu>
**Subject:** Re: OIE- Phone Call

Hi Sarah -

I called a few hours ago and got a colleague at your front desk. She mentioned the person she wanted me to speak to was in a meeting (not sure if it was you) but I haven't heard back yet and I need urgent support. I have class at 4, but can we talk sometime tomorrow?

Thanks as always,

**Tiffany Brown, Ph.D.**

Assistant Professor

Department of Educational Leadership

Neag School of Education

University of Connecticut

249 Glenbrook Road, Unit 3093

Storrs, CT 06269

On Tue, May 3, 2022 at 12:13 PM Chipman, Sarah <sarah.chipman@uconn.edu> wrote:

> Sorry about that. I have your number and will call you back now.
>
> Thank you,
>
> Sarah
>
> **From:** Tiffany Brown <tiffany.brown@uconn.edu>

**Sent:** Tuesday, May 3, 2022 12:12 PM
**To:** Chipman, Sarah <sarah.chipman@uconn.edu>
**Subject:** Re: OIE- Phone Call

Trying to get through now...the person taking calls says there's phone trouble that's making it difficult for her to transfer me?

**Tiffany Brown, Ph.D.**

Assistant Professor

Department of Educational Leadership

Neag School of Education

University of Connecticut

249 Glenbrook Road, Unit 3093

Storrs, CT 06269

On Tue, May 3, 2022 at 12:04 PM Chipman, Sarah <sarah.chipman@uconn.edu> wrote:

> Hello Tiffany,
>
> I should be available anytime now until 3pm.  Please call at your convenience.
>
> Thank you,
>
> Sarah

**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Sent:** Tuesday, May 3, 2022 8:55 AM
**To:** Chipman, Sarah <sarah.chipman@uconn.edu>
**Subject:** Re: OIE- Phone Call

Hi Sarah -

I do think I need to talk with you as the semester closes. I will try giving you a call today, and I'm also pretty flexibly free - so if I don't get you, will you just let me know 1-2 times that might work for you today?

Thank you,

**Tiffany Brown, Ph.D.**

Assistant Professor

Department of Educational Leadership

Neag School of Education

University of Connecticut

249 Glenbrook Road, Unit 3093

Storrs, CT 06269

On Thu, Apr 14, 2022 at 11:53 AM Chipman, Sarah <sarah.chipman@uconn.edu> wrote:

> Dear Tiffany,
>
> I received a message that you called for me this morning.  I just tried calling you

back, but your voicemail is full.  Please feel free to call me at 860-486-2943.  I understand you will be teaching at 12:30 today.  If you get this email and have some time to talk before then, I will be sure to be available.


Thank you,


Sarah


**Sarah Chipman, J.D.**

**Director of Investigations & Deputy Title IX Coordinator**

**Pronouns: She – Her – Hers**


## OFFICE OF INSTITUTIONAL EQUITY

University of Connecticut | Wood Hall

241 Glenbrook Road, Unit 4175 | Storrs, CT 06269-4175
Office: 860.486.2943 | Fax: 860.486.6771


UConn Health | 16 Munson Road, 4TH Floor

263 Farmington Avenue, MC 5310 | Farmington, CT 06030-5310
Office: 860.679.3563 | Fax: 860.679.6512


WEBSITES: WWW.EQUITY.UCONN.EDU | WWW.TITLEIX.UCONN.EDU | WWW.ACCESSIBILITY.UCONN.EDU

e-mail: sarah.chipman@uconn.edu

# Exhibit 3

| | |
|---|---|
| **From:** | Tiffany Brown |
| **To:** | Chipman, Sarah |
| **Subject:** | Re: OIE- Phone Call |
| **Date:** | Wednesday, November 2, 2022 7:46:09 PM |

Hi Sarah -

I'm about to forward you a thread/message I sent to HR/Labor Relations just a short while ago. If this falls under the purview of ensuring employment equity (I describe it there as escalated workplace aggression and bullying), please let me know when we can talk.

Thank you,

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269


On Wed, Nov 2, 2022 at 11:06 AM Chipman, Sarah <sarah.chipman@uconn.edu> wrote:

> Hi Tiffany,
>
>
> Sorry I missed you this morning.  Please don't hesitate circle back with me if you need further assistance after you connect with your union.
>
>
> Thank you,
>
>
> Sarah
>
> ---
>
> **From:** Brown, Tiffany <tiffany.brown@uconn.edu>
> **Sent:** Wednesday, November 2, 2022 9:10 AM
> **To:** Chipman, Sarah <sarah.chipman@uconn.edu>
> **Subject:** Re: OIE- Phone Call
>
>
> Hi again -

I tried calling this morning and no one picked up. I'll skip the call and try reaching out to my union for support instead per your recommendation.

Tiffany

Sent from my iPhone

> On Nov 1, 2022, at 16:47, Chipman, Sarah <sarah.chipman@uconn.edu> wrote:

> Hello Tiffany,

> I received the message that you called.  I can speak with you tomorrow at 9:00 am if you're available then.  You can reach me by phone at the office (860-486-2943).  If that time doesn't work for you, I will be in meetings much of the day, but should be available again at 4:00 pm, so you can try me then as well.

> If you need support, one resource that is available to you 24/7 is the Employee Assistance Program (https://hr.uconn.edu/employee-assistance-program/).  You can reach them by phone at 888-993-7650.  I would also encourage you to connect with your union for support.

> Thank you,

> Sarah

---

**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Sent:** Tuesday, November 1, 2022 3:22 PM
**To:** Chipman, Sarah <sarah.chipman@uconn.edu>
**Subject:** Re: OIE- Phone Call

Hi Sarah -

I called a few hours ago and got a colleague at your front desk. She mentioned the person she wanted me to speak to was in a meeting (not sure if it was you) but I haven't heard back yet and I need urgent support. I have class at 4, but can we talk sometime tomorrow?

Thanks as always,

**Tiffany Brown, Ph.D.**

Assistant Professor

Department of Educational Leadership

Neag School of Education

University of Connecticut

249 Glenbrook Road, Unit 3093

Storrs, CT 06269

<~WRD0003.jpg>

On Tue, May 3, 2022 at 12:13 PM Chipman, Sarah <sarah.chipman@uconn.edu> wrote:

> Sorry about that.  I have your number and will call you back now.
>
> Thank you,
>
> Sarah
>
> **From:** Tiffany Brown <tiffany.brown@uconn.edu>
> **Sent:** Tuesday, May 3, 2022 12:12 PM
> **To:** Chipman, Sarah <sarah.chipman@uconn.edu>

**Subject:** Re: OIE- Phone Call

Trying to get through now...the person taking calls says there's phone trouble that's making it difficult for her to transfer me?

**Tiffany Brown, Ph.D.**

Assistant Professor

Department of Educational Leadership

Neag School of Education

University of Connecticut

249 Glenbrook Road, Unit 3093

Storrs, CT 06269

<~WRD0003.jpg>

On Tue, May 3, 2022 at 12:04 PM Chipman, Sarah <sarah.chipman@uconn.edu> wrote:

> Hello Tiffany,
>
> I should be available anytime now until 3pm.  Please call at your convenience.
>
> Thank you,
>
> Sarah
>
> **From:** Tiffany Brown <tiffany.brown@uconn.edu>
> **Sent:** Tuesday, May 3, 2022 8:55 AM
> **To:** Chipman, Sarah <sarah.chipman@uconn.edu>
> **Subject:** Re: OIE- Phone Call

Hi Sarah -

I do think I need to talk with you as the semester closes. I will try giving you a call today, and I'm also pretty flexibly free - so if I don't get you, will you just let me know 1-2 times that might work for you today?

Thank you,

**Tiffany Brown, Ph.D.**

Assistant Professor

Department of Educational Leadership

Neag School of Education

University of Connecticut

249 Glenbrook Road, Unit 3093

Storrs, CT 06269

<~WRD0003.jpg>

On Thu, Apr 14, 2022 at 11:53 AM Chipman, Sarah <sarah.chipman@uconn.edu> wrote:

> Dear Tiffany,
>
> I received a message that you called for me this morning. I just tried calling you back, but your voicemail is full. Please feel free to call me at 860-486-2943. I understand you will be teaching at 12:30 today. If you get this email and have some time to talk before then, I will be sure to be available.
>
> Thank you,

Sarah

**SARAH CHIPMAN, J.D.**

DIRECTOR OF INVESTIGATIONS & DEPUTY TITLE IX COORDINATOR

PRONOUNS: SHE – HER – HERS

## OFFICE OF INSTITUTIONAL EQUITY

UNIVERSITY OF CONNECTICUT | WOOD HALL

241 GLENBROOK ROAD, UNIT 4175 | STORRS, CT 06269-4175
OFFICE: 860.486.2943 | FAX: 860.486.6771

UCONN HEALTH | 16 MUNSON ROAD, 4TH FLOOR

263 FARMINGTON AVENUE, MC 5310 | FARMINGTON, CT 06030-5310
OFFICE: 860.679.3563 | FAX: 860.679.6512

WEBSITES: WWW.EQUITY.UCONN.EDU | WWW.TITLEIX.UCONN.EDU |
WWW.ACCESSIBILITY.UCONN.EDU

e-mail: SARAH.CHIPMAN@UCONN.EDU

# Exhibit 4

| From: | Chipman, Sarah |
| --- | --- |
| To: | Tiffany Brown |
| Subject: | RE: edlr 5202's scheduled remote sessions |
| Date: | Thursday, November 3, 2022 2:38:00 PM |
| Attachments: | image002.png |

Hi Tiffany,

I reviewed the emails below. It is unclear to me from the information below if the issues around class modality/schedule that you describe implicate OIE's jurisdiction. OIE addresses matters involving discrimination or harassment based on protected identities (such as race, sex, disability, national origin, etc.) under the Policy Against Discrimination, Harassment and Related Interpersonal Violence. If you believe this situation might fall within the scope of that policy, I'd be happy to discuss. Otherwise, your union might be best situated to assist. You can also try reaching out to the University's Ombudsperson, Jim Wohl, for a confidential consultation: https://ombuds.uconn.edu/.

Thank you,

Sarah

**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Sent:** Wednesday, November 2, 2022 7:46 PM
**To:** Chipman, Sarah <sarah.chipman@uconn.edu>
**Subject:** Fwd: edlr 5202's scheduled remote sessions

Here's the message/thread.

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

---------- Forwarded message ---------
From: **Tiffany Brown** <tiffany.brown@uconn.edu>
Date: Wed, Nov 2, 2022 at 6:47 PM
Subject: Fwd: edlr 5202's scheduled remote sessions
To: <laborrelations@uconn.edu>, HR - Human Resources <hr@uconn.edu>

Cc: Burton, Laura <laura.burton@uconn.edu>, Cobb, Casey <casey.cobb@uconn.edu>

Hi HR/Labor Relations -

I'm a second-year faculty member at Neag currently being put in a very tough spot by my department, and I need support for what I am experiencing as a hostile workplace environment bordering workplace bullying. In the thread I forward below, I begin by explaining to my departmental colleagues that the EdD students in my class are consistently late to class because it starts at 4 pm, when many of them are technically still on the clock. One of my senior colleagues responsible for decision-making in the EdD program - Casey Cobb - actually wrote in August this year to let me know that he actually foresaw students would not be able to make this course on time because of the time it is scheduled long before the semester began. At the time, he acknowledged receiving student concerns about not being able to make class on time, but writes here that he is choosing to keep the class scheduled as is. Here's the excerpt:

- *I had one of the Bridge students email me a few days ago asking about the possibility of holding the Aug 30th class remotely, due to her and two other students' concerns about making class on their first day of school. I didn't think of this and probably should have, but I also am not changing the schedule. Just making you aware the first day will be hectic and people will undoubtedly be late, as some travel from far and may not be able to leave school on time that day. In fact, expect throughout the semester 1-2 student invariably arrive late and are always apologetic. It's just the reality with their positions and emergencies come up.*

I was cc'd on a second email Casey received from students asking for remote classes in early September, but he did not respond. For the past few days, I've been on a thread with two senior colleagues and our department head about the students' inability to get to class on time for very valid reasons (usually workplace emergencies at the end of the day). For example, yesterday two students arrived late to class because one of them got into a car accident rushing from work to be on time. I've also mentioned to my colleagues that it is harder for me - given the increased commuting costs - to pay extra for cabs to and from Harford/campus only (to be on time) only to consistently arrive to class with only half the group there. Both Casey and my department head (cc'd) said that we couldn't offer any more remote sessions because students preferred in person, but yesterday when polled an overwhelming majority said that they needed remote options in order to assure they would be able to attend my class on time. Today my department head said that despite the students' preferences and the pedagogical challenges which have arisen, we must have the sessions students asked be remote in-person.

I am experiencing this interaction as escalated workplace aggression and bullying. My senior colleagues are not only ignoring my needs as their coworker (knowing students would get to

my class late and continuing to plan for it), but they're forcing me to ignore the students' clearly expressed needs too. I explained to my senior colleagues repeatedly that it makes me feel uncomfortable to make decisions that are against the students' best interests and my own, and it's been seriously troubling to see admission in writing that we know in-person is not what's best for students and are doing it anyway. I've framed from every angle possible how demoralizing it is to know that the department wouldn't simply either schedule the class at a time everyone can make it or offer remote sessions to demonstrate better support for my teaching. I feel stuck forcing students to diminish their own learning by rushing the end of their workdays when the reason they are missing course material is because of an administrative oversight. Here's an email I received from a student today shortly before my department head said she would not support the students' ask for remote sessions:

*Dr. Brown -*

*hope all is well with you today. Just a quick thank you for providing some options regarding class setting. I imagine there was a fair amount of thought and discussion, both on your own and with the EdD program staff, that had to take place to arrive at that place.*

*I appreciate that awareness, acknowledgement of the challenges, and collaboration in trying to create a better situation for us for the last part of the semester.*

*Take care and see you next week,*

Can someone support me in your office? I will be reaching out to others but I just don't know what else to do with this situation. I thought we were all making student-centric decisions and I feel as though I am being forced to act against everyone's best interest but the one person who made a mistake in mis-scheduling the class time.

Thank you,

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269


---------- Forwarded message ---------
From: **Tiffany Brown** <tiffany.brown@uconn.edu>
Date: Wed, Nov 2, 2022 at 6:10 PM

Subject: Re: edlr 5202's scheduled remote sessions
To: Burton, Laura <laura.burton@uconn.edu>
Cc: Cobb, Casey <casey.cobb@uconn.edu>, Weiner, Jennie <jennie.weiner@uconn.edu>


Alrighty, I'll forward your email to the students.

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269


On Wed, Nov 2, 2022 at 5:55 PM Burton, Laura <laura.burton@uconn.edu> wrote:

Hi, all.

After reviewing what has been shared, it makes sense to offer the Nov. 8th course remotely.

The final two classes (11/15 and 12/6) must meet in person.

If students have concerns, please have them contact me directly.

Laura

---

**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Date:** Tuesday, November 1, 2022 at 5:54 PM
**To:** Cobb, Casey <casey.cobb@uconn.edu>
**Cc:** Burton, Laura <laura.burton@uconn.edu>, Weiner, Jennie <jennie.weiner@uconn.edu>
**Subject:** Re: edlr 5202's scheduled remote sessions

As promised, the results of today's in-class poll (I stepped out of the room for 15 minutes and let the students discuss their options/vote on their own):



Two people are missing, but as you can see there's an overwhelming majority. The results support that we should grant their request that the sessions on **11/8** and **11/15** meet remotely.

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

On Tue, Nov 1, 2022 at 4:16 PM Tiffany Brown <tiffany.brown@uconn.edu> wrote:

> P.S. I am in class now at our start time only 8 students are here. One of them just
> informed me ▇▇▇ got into a car accident on her way here and is waiting to be picked up

by another classmate to get to class.

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

On Tue, Nov 1, 2022 at 3:14 PM Tiffany Brown <tiffany.brown@uconn.edu> wrote:

> Casey -
>
> The problem is that you have known since before the semester started that students regularly cannot make my class on time and don't want to hold remote sessions to better serve their needs. You've ignored both their needs and mine (as an individual and as your colleague) by proposing we simply swap times knowing that the issue is arising because of a consistent timing conflict for the students.
>
> I cannot join you in knowing that this does not work for them and choosing against their best interests. The students will get to vote today, because I want to know what they think. Depending on their responses (which I am happy to share), I will get back to you on the plan for how to best support them moving forward.
>
> Tiffany
>
> **Tiffany Brown, Ph.D.**
> Assistant Professor
> Department of Educational Leadership
> Neag School of Education
> University of Connecticut
> 249 Glenbrook Road, Unit 3093
> Storrs, CT 06269
>
> On Tue, Nov 1, 2022 at 3:09 PM Cobb, Casey <casey.cobb@uconn.edu> wrote:
>
>> Why don't you pick another remote class. Let me know the date.
>>
>> **From:** Tiffany Brown <tiffany.brown@uconn.edu>
>> **Date:** Tuesday, November 1, 2022 at 3:03 PM
>> **To:** Cobb, Casey <casey.cobb@uconn.edu>

**Cc:** Burton, Laura <laura.burton@uconn.edu>, Weiner, Jennie <jennie.weiner@uconn.edu>
**Subject:** Re: edlr 5202's scheduled remote sessions

Hi again -

I just re-read one of Casey's emails from earlier this semester in which he foresaw that students would be regularly late to my class:

- *I had one of the Bridge students email me a few days ago asking about the possibility of holding the Aug 30th class remotely, due to her and two other students' concerns about making class on their first day of school. I didn't think of this and probably should have, but I also am not changing the schedule. Just making you aware the first day will be hectic and people will undoubtedly be late, as some travel from far and may not be able to leave school on time that day. In fact, expect throughout the semester 1-2 student invariably arrive late and are always apologetic. It's just the reality with their positions and emergencies come up.*

I am coming from the perspective of making student-centered decisions. I hope you will support my efforts to do so despite this initial stance, as again - it's not fair to me or to them (I lecture in the first 30 minutes of class, so many regularly miss it).

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

On Tue, Nov 1, 2022 at 12:53 PM Tiffany Brown <tiffany.brown@uconn.edu> wrote:

Hi Casey -

This doesn't help, and I don't agree that the time slot is the issue. The issue is this time slot happens at the end of the students' workday because most schools let out around 3-4 pm. Even folks in higher ed know this is still technically time they are on the clock. I don't remember seeing a response to the students' email about the scheduling issue that was addressed to you directly in August, but the issue remains. I think it's strange we are choosing to focus on some students' preferences rather than the general consensus that this time was not well scheduled for the demographic of students served by this program.

I don't live in CT and cannot afford to incur further costs to stay overnight and the last train leaves CT for NY at 7.59 pm. Hence the $50 cabs to get to Harford right after class. I also don't think it would help to change the students' schedule since they've got enough going on right now/it would add more uncertainty at a time no one needs it.

By my count, we have four classes left after today - one of which is remote. I still think we need at least one more for the reasons I've mentioned. My plan was to survey the students in class today as well, so let's see what their preferences are. My plan is to have them record their responses anonymously.

I'm absolutely not able to take your time slot, so I appreciate your helping to make this work for both the students and for me.

Thank you,
Tiffany

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

On Tue, Nov 1, 2022 at 9:04 AM Cobb, Casey <casey.cobb@uconn.edu> wrote:

> Dear Tiffany,
> The most pressing issue appears to be the time slot you are teaching. I am more than willing to swap time slots the rest of the way. I have taught both the first and second Tuesday sessions since the EdD program started and am used to either one. Just say the word and send me your room number and we can start as early as today.
>
> In the meantime in terms of remote classes I am planning to ask the class tonight specifically about Nov 8. Election Day can affect school schedules. So if they lean toward having difficulty getting here in person we can conceivably switch that to online. By my count we have 5 sessions left, one of which is already scheduled online. We have to be somewhat careful as some students have expressed preference for all in person.
>
> Hope this helps.

Casey

Sent from my iPhone

> On Oct 29, 2022, at 11:40 AM, Brown, Tiffany <tiffany.brown@uconn.edu> wrote:
>
> Hi Casey -
>
> Condolences for your loss and I hope you and your family are doing alright.
>
> I need support for EDLR 5202. I talked with Laura last week about the scheduled remote dates and she let me know that she wasn't involved in the conversation in which the decision to offer remote courses was made.  When she mentioned that I should ask my EdD colleagues, I remembered that I wasn't made aware we were offering remote classes until you emailed to cross reference the dates you'd selected with me in August. I didn't receive an invite for the initial planning conversation.
>
> Anyhow, at this point the students and I both need more remote sessions this semester to better support their learning. You'll recall in August some wrote an email explaining how the current schedule conflicts with many of their work responsibilities. For most of this semester folks have arrived to my class between 15 minutes to an hour late (or not at all) because of various emergencies or urgent matters at the end of their work day. I was sick a week ago and had to change class to the remote option; two people who said they couldn't make the session initially were able to attend once the option was made available. There are folks who will have to miss upcoming classes (and course material related to their final papers) entirely because of work required travel. It's impacting them and my own pedagogical goals to have to hope that folks can make this class work into their schedule. They seem noticeably more engaged when they are settled in remotely rather than rushing to my class from work. I don't think you experience this because your class starts later in the evening.
>
> From my perspective- I hope you understand how demoralizing it is for me to travel without a car and get to campus ready to start class only to have most of them show up when they can (not blaming them at all). I have to spend $50 both ways to get from Hartford to Storrs every time I commute - that's excluding the cost of the Amtrak itself. There has been no cost of living adjustment to my salary, and I'm managing inflated costs of everything on pretty much the same salary as before this recession was set into motion. I'm not saying you can do anything about my salary, but having to delay paying some of my bills because my commute costs have increased is a challenge exacerbated by the fact that students are not able to be in class when it starts for various valid reasons. It's not fair to me or them, and it seems impractical for me to keep traveling to campus to begin with half a class or consistent lateness as students finish their workdays.
>
> I feel as though my teaching is not being well supported because no one seems to

care that my class is scheduled at a time that's inconvenient for most of the students. Maybe I need to teach only masters' courses moving forward, but something has to give. I've asked other colleagues who recall teaching mostly masters classes in their first few years and thus not having to deal with the implications of the doctoral program's organizational issues (the ones we regularly focus on in faculty meetings) in their early teaching experiences here. If the department values my teaching in the EdD program it would help to show it by scheduling my courses at a time when folks aren't rushing from work as a start.

>

> Can I be part of the next conversation on EdD scheduling? Either way, I'm proposing that we make at least one or two more of the sessions this semester remote as students have been asking for since August. I think I'll have no choice but to do so considering my finances simply aren't flexible enough to continue with the $50 cabs only to arrive to partial attendance.

>

> Thanks as always,

> Tiffany

>

>

> Sent from my iPhone

>

# Exhibit 5

| From: | Equity – General |
|---|---|
| To: | Chipman, Sarah |
| Cc: | Reid, Letissa |
| Subject: | FW: New Report Submission |
| Date: | Thursday, November 3, 2022 4:46:13 PM |

Forwarding from the GM.

Thank you,
Susan

---

**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Sent:** Thursday, November 3, 2022 3:07 PM
**To:** Equity – General <equity@uconn.edu>
**Subject:** New Report Submission

**Your Name**

Tiffany Brown

**Your Affiliation with the University**

- Faculty

**Department**

EDLR

**Your Phone**



**Email**

tiffany.brown@uconn.edu

**Nature of the Report**

- Discrimination
- Other/Unknown

**Description of Incident/Concern**

I believe I am experience escalated workplace aggression and borderline bullying based on a recent response I received to an inquiry I made of my department head and senior colleagues on behalf of our doctoral students.

**Individuals Involved:**

Casey Cobb
Laura Burton

**Reporting**

- Yes

**If yes, please specify**

I reported it to HR who redirected me here. I also am talking with my union and the Provost's office.

UConn 001410

# Exhibit 6

| | |
|---|---|
| **From:** | Chipman, Sarah |
| **To:** | Tiffany Brown |
| **Subject:** | RE: edlr 5202's scheduled remote sessions |
| **Date:** | Monday, November 7, 2022 8:10:00 AM |
| **Attachments:** | image002.png |

Hi Tiffany,

I am at my office at UConn Health today, so a phone or virtual meeting is probably the best option. I will set us up with a WebEx meeting so you will be able to either connect virtually or call in.

Thank you,

Sarah

**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Sent:** Friday, November 4, 2022 7:40 PM
**To:** Chipman, Sarah <sarah.chipman@uconn.edu>
**Subject:** Re: edlr 5202's scheduled remote sessions

Hi Sarah,

3 pm on Monday works for me. Please let me know how you'd prefer to connect.

Thank you,

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

On Fri, Nov 4, 2022 at 4:46 PM Chipman, Sarah <sarah.chipman@uconn.edu> wrote:

Hello Tiffany,

Would you like to schedule a call for Monday? I can speak with you at 3:00 pm if that might work

for you.

Thank you,

Sarah

---

**From:** Brown, Tiffany <tiffany.brown@uconn.edu>
**Sent:** Thursday, November 3, 2022 3:05 PM
**To:** Chipman, Sarah <sarah.chipman@uconn.edu>
**Subject:** Fwd: edlr 5202's scheduled remote sessions

Hi Sarah -

Based on this email I received from Labor Relations I do need to speak with you about making a formal complaint through your office. Please let me know when we can talk, I'm most flexibly free on Mondays, Wednesdays, and Fridays.

Thanks again,
Tiffany

Sent from my iPhone

Begin forwarded message:

> **From:** "Brierley, Kristen" <kristen.brierley@uconn.edu>
> **Date:** November 3, 2022 at 14:57:29 EDT
> **To:** "Brown, Tiffany" <tiffany.brown@uconn.edu>
> **Subject: RE: edlr 5202's scheduled remote sessions**
>
>
> Good afternoon,
>
> I am in receipt of your below emails and understand that you also spoke with our administrative assistant earlier this week seeking assistance.  If you believe that you are being subjected to a hostile work environment or other prohibited conduct based on your membership in a protected class, I encourage you to contact the Office of Institutional Equity to make a report or formal complaint.  More information about how to do so can be found here: https://equity.uconn.edu/reporting-form/.
>
> Decisions about course modality and timing are matters of academic concern that should be addressed through your departmental leadership.
>
> Thank you,
> Kristen

**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Sent:** Thursday, November 3, 2022 12:15 PM
**To:** Labor Relations <laborrelations@uconn.edu>
**Cc:** HR - Human Resources <hr@uconn.edu>; Burton, Laura
<laura.burton@uconn.edu>; Cobb, Casey <casey.cobb@uconn.edu>
**Subject:** Re: edlr 5202's scheduled remote sessions

Thank you, adding another student email Laura and I both received this
morning to the thread for the record.

*I am one of the students in the Ed.D cohort and would love the option of having
the 11/15 class remote. Most of us are working professionals who travel far for
classes. This has been a hard year for schools with the pressure to respond to
the experiences of the past couple of years. Many of us do not check our Uconn
email frequently hence the at times lack of coherent communication as a group.
Many of us travel quite a distance to get to class and get home late to start
another day early. We have discussed how welcome one more remote class will
be to take the pressure off at this time.*

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

On Thu, Nov 3, 2022 at 9:00 AM Labor Relations <laborrelations@uconn.edu> wrote:

Good morning Tiffany,

Your information has been acknowledged and received by our associates. They
will be handling this matter at their next availability.

Thank you,

**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Sent:** Wednesday, November 2, 2022 6:47 PM
**To:** Labor Relations <laborrelations@uconn.edu>; HR - Human Resources
<hr@uconn.edu>
**Cc:** Burton, Laura <laura.burton@uconn.edu>; Cobb, Casey
<casey.cobb@uconn.edu>
**Subject:** Fwd: edlr 5202's scheduled remote sessions

Hi HR/Labor Relations -

I'm a second-year faculty member at Neag currently being put in a very tough spot by my department, and I need support for what I am experiencing as a hostile workplace environment bordering workplace bullying. In the thread I forward below, I begin by explaining to my departmental colleagues that the EdD students in my class are consistently late to class because it starts at 4 pm, when many of them are technically still on the clock. One of my senior colleagues responsible for decision-making in the EdD program - Casey Cobb - actually wrote in August this year to let me know that he actually foresaw students would not be able to make this course on time because of the time it is scheduled long before the semester began. At the time, he acknowledged receiving student concerns about not being able to make class on time, but writes here that he is choosing to keep the class scheduled as is. Here's the excerpt:

1. *I had one of the Bridge students email me a few days ago asking about the possibility of holding the Aug 30th class remotely, due to her and two other students' concerns about making class on their first day of school. I didn't think of this and probably should have, but I also am not changing the schedule. Just making you aware the first day will be hectic and people will undoubtedly be late, as some travel from far and may not be able to leave school on time that day. In fact, expect throughout the semester 1-2 student invariably arrive late and are always apologetic. It's just the reality with their positions and emergencies come up.*

I was cc'd on a second email Casey received from students asking for remote classes in early September, but he did not respond. For the past few days, I've been on a thread with two senior colleagues and our department head about the students' inability to get to class on time for very valid reasons (usually workplace emergencies at the end of the day). For example, yesterday two students arrived late to class because one of them got into a car accident rushing from work to be on time. I've also mentioned to my colleagues that it is harder for me - given the increased commuting costs - to pay extra for cabs to and from Harford/campus only (to be on time) only to consistently arrive to class with only half the group there. Both Casey and my department head (cc'd) said that we couldn't offer any more remote sessions because students preferred in person, but yesterday when polled an overwhelming majority said that they needed remote options in order to assure they would be able to attend my class on time. Today my department head said that despite the students' preferences and the pedagogical

challenges which have arisen, we must have the sessions students asked be remote in-person.

I am experiencing this interaction as escalated workplace aggression and bullying. My senior colleagues are not only ignoring my needs as their coworker (knowing students would get to my class late and continuing to plan for it), but they're forcing me to ignore the students' clearly expressed needs too. I explained to my senior colleagues repeatedly that it makes me feel uncomfortable to make decisions that are against the students' best interests and my own, and it's been seriously troubling to see admission in writing that we know in-person is not what's best for students and are doing it anyway. I've framed from every angle possible how demoralizing it is to know that the department wouldn't simply either schedule the class at a time everyone can make it or offer remote sessions to demonstrate better support for my teaching. I feel stuck forcing students to diminish their own learning by rushing the end of their workdays when the reason they are missing course material is because of an administrative oversight. Here's an email I received from a student today shortly before my department head said she would not support the students' ask for remote sessions:

*Dr. Brown -*

*hope all is well with you today. Just a quick thank you for providing some options regarding class setting. I imagine there was a fair amount of thought and discussion, both on your own and with the EdD program staff, that had to take place to arrive at that place.*

*I appreciate that awareness, acknowledgement of the challenges, and collaboration in trying to create a better situation for us for the last part of the semester.*

*Take care and see you next week,*

Can someone support me in your office? I will be reaching out to others but I just don't know what else to do with this situation. I thought we were all making student-centric decisions and I feel as though I am being forced to act against everyone's best interest but the one person who made a mistake in mis-scheduling the class time.

Thank you,

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269


---------- Forwarded message ---------
From: **Tiffany Brown** <tiffany.brown@uconn.edu>
Date: Wed, Nov 2, 2022 at 6:10 PM
Subject: Re: edlr 5202's scheduled remote sessions
To: Burton, Laura <laura.burton@uconn.edu>
Cc: Cobb, Casey <casey.cobb@uconn.edu>, Weiner, Jennie
<jennie.weiner@uconn.edu>


Alrighty, I'll forward your email to the students.

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269


On Wed, Nov 2, 2022 at 5:55 PM Burton, Laura <laura.burton@uconn.edu> wrote:

Hi, all.

After reviewing what has been shared, it makes sense to offer the Nov. 8th course remotely.

The final two classes (11/15 and 12/6) must meet in person.

If students have concerns, please have them contact me directly.

Laura

**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Date:** Tuesday, November 1, 2022 at 5:54 PM
**To:** Cobb, Casey <casey.cobb@uconn.edu>

**Cc:** Burton, Laura <laura.burton@uconn.edu>, Weiner, Jennie
<jennie.weiner@uconn.edu>
**Subject:** Re: edlr 5202's scheduled remote sessions

As promised, the results of today's in-class poll (I stepped out of the room
for 15 minutes and let the students discuss their options/vote on their
own):



Two people are missing, but as you can see there's an overwhelming
majority. The results support that we should grant their request that the
sessions on **11/8** and **11/15** meet remotely.

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut

249 Glenbrook Road, Unit 3093
Storrs, CT 06269

On Tue, Nov 1, 2022 at 4:16 PM Tiffany Brown <tiffany.brown@uconn.edu>
wrote:

> P.S. I am in class now at our start time only 8 students are here. One of
> them just informed me ▮▮▮▮ got into a car accident on her way here and
> is waiting to be picked up by another classmate to get to class.
>
> **Tiffany Brown, Ph.D.**
> Assistant Professor
> Department of Educational Leadership
> Neag School of Education
> University of Connecticut
> 249 Glenbrook Road, Unit 3093
> Storrs, CT 06269
>
>
> On Tue, Nov 1, 2022 at 3:14 PM Tiffany Brown <tiffany.brown@uconn.edu>
> wrote:
>
>> Casey -
>>
>> The problem is that you have known since before the semester
>> started that students regularly cannot make my class on time and
>> don't want to hold remote sessions to better serve their needs. You've
>> ignored both their needs and mine (as an individual and as your
>> colleague) by proposing we simply swap times knowing that the issue
>> is arising because of a consistent timing conflict for the students.
>>
>> I cannot join you in knowing that this does not work for them and
>> choosing against their best interests. The students will get to vote
>> today, because I want to know what they think. Depending on their
>> responses (which I am happy to share), I will get back to you on the
>> plan for how to best support them moving forward.
>>
>> Tiffany
>>
>> **Tiffany Brown, Ph.D.**
>> Assistant Professor
>> Department of Educational Leadership
>> Neag School of Education
>> University of Connecticut

249 Glenbrook Road, Unit 3093
Storrs, CT 06269

On Tue, Nov 1, 2022 at 3:09 PM Cobb, Casey <[casey.cobb@uconn.edu](mailto:casey.cobb@uconn.edu)>
wrote:

> Why don't you pick another remote class. Let me know the date.
>
> ---
>
> **From:** Tiffany Brown <[tiffany.brown@uconn.edu](mailto:tiffany.brown@uconn.edu)>
> **Date:** Tuesday, November 1, 2022 at 3:03 PM
> **To:** Cobb, Casey <[casey.cobb@uconn.edu](mailto:casey.cobb@uconn.edu)>
> **Cc:** Burton, Laura <[laura.burton@uconn.edu](mailto:laura.burton@uconn.edu)>, Weiner, Jennie
> <[jennie.weiner@uconn.edu](mailto:jennie.weiner@uconn.edu)>
> **Subject:** Re: edlr 5202's scheduled remote sessions
>
> Hi again -
>
> I just re-read one of Casey's emails from earlier this semester in
> which he foresaw that students would be regularly late to my class:
>
> 1. *I had one of the Bridge students email me a few days ago asking
>    about the possibility of holding the Aug 30th class remotely, due to
>    her and two other students' concerns about making class on their
>    first day of school. I didn't think of this and probably should have,
>    but I also am not changing the schedule. Just making you aware
>    the first day will be hectic and people will undoubtedly be late, as
>    some travel from far and may not be able to leave school on time
>    that day. In fact, expect throughout the semester 1-2 student
>    invariably arrive late and are always apologetic. It's just the reality
>    with their positions and emergencies come up.*
>
> I am coming from the perspective of making student-centered
> decisions. I hope you will support my efforts to do so despite this
> initial stance, as again - it's not fair to me or to them (I lecture in the
> first 30 minutes of class, so many regularly miss it).
>
> **Tiffany Brown, Ph.D.**
> Assistant Professor
> Department of Educational Leadership
> Neag School of Education
> University of Connecticut
> 249 Glenbrook Road, Unit 3093

Storrs, CT 06269


On Tue, Nov 1, 2022 at 12:53 PM Tiffany Brown
<tiffany.brown@uconn.edu> wrote:

Hi Casey -

This doesn't help, and I don't agree that the time slot is the issue.
The issue is this time slot happens at the end of the students'
workday because most schools let out around 3-4 pm. Even folks
in higher ed know this is still technically time they are on the
clock.  I don't remember seeing a response to the students' email
about the scheduling issue that was addressed to you directly in
August, but the issue remains. I think it's strange we are choosing
to focus on some students' preferences rather than the general
consensus that this time was not well scheduled for the
demographic of students served by this program.

I don't live in CT and cannot afford to incur further costs to stay
overnight and the last train leaves CT for NY at 7.59 pm. Hence
the $50 cabs to get to Harford right after class.  I also don't think
it would help to change the students' schedule since they've got
enough going on right now/it would add more uncertainty at a
time no one needs it.

By my count, we have four classes left after today - one of which
is remote. I still think we need at least one more for the reasons
I've mentioned. My plan was to survey the students in class today
as well, so let's see what their preferences are. My plan is to have
them record their responses anonymously.

I'm absolutely not able to take your time slot, so I appreciate your
helping to make this work for both the students and for me.

Thank you,
Tiffany


**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut

249 Glenbrook Road, Unit 3093
Storrs, CT 06269

On Tue, Nov 1, 2022 at 9:04 AM Cobb, Casey
<casey.cobb@uconn.edu> wrote:

> Dear Tiffany,
> The most pressing issue appears to be the time slot you are
> teaching. I am more than willing to swap time slots the rest of the
> way. I have taught both the first and second Tuesday sessions since
> the EdD program started and am used to either one. Just say the
> word and send me your room number and we can start as early as
> today.
>
> In the meantime in terms of remote classes I am planning to ask
> the class tonight specifically about Nov 8. Election Day can affect
> school schedules. So if they lean toward having difficulty getting
> here in person we can conceivably switch that to online. By my
> count we have 5 sessions left, one of which is already scheduled
> online. We have to be somewhat careful as some students have
> expressed preference for all in person.
>
> Hope this helps.
>
> Casey
>
> Sent from my iPhone
>
> > On Oct 29, 2022, at 11:40 AM, Brown, Tiffany
> <tiffany.brown@uconn.edu> wrote:
> >
> > Hi Casey -
> >
> > Condolences for your loss and I hope you and your family are
> doing alright.
> >
> > I need support for EDLR 5202. I talked with Laura last week about
> the scheduled remote dates and she let me know that she wasn't
> involved in the conversation in which the decision to offer remote
> courses was made.  When she mentioned that I should ask my EdD
> colleagues, I remembered that I wasn't made aware we were
> offering remote classes until you emailed to cross reference the
> dates you'd selected with me in August. I didn't receive an invite
> for the initial planning conversation.
> >

> Anyhow, at this point the students and I both need more remote sessions this semester to better support their learning. You'll recall in August some wrote an email explaining how the current schedule conflicts with many of their work responsibilities. For most of this semester folks have arrived to my class between 15 minutes to an hour late (or not at all) because of various emergencies or urgent matters at the end of their work day. I was sick a week ago and had to change class to the remote option; two people who said they couldn't make the session initially were able to attend once the option was made available. There are folks who will have to miss upcoming classes (and course material related to their final papers) entirely because of work required travel. It's impacting them and my own pedagogical goals to have to hope that folks can make this class work into their schedule. They seem noticeably more engaged when they are settled in remotely rather than rushing to my class from work. I don't think you experience this because your class starts later in the evening.

>

> From my perspective- I hope you understand how demoralizing it is for me to travel without a car and get to campus ready to start class only to have most of them show up when they can (not blaming them at all). I have to spend $50 both ways to get from Hartford to Storrs every time I commute - that's excluding the cost of the Amtrak itself. There has been no cost of living adjustment to my salary, and I'm managing inflated costs of everything on pretty much the same salary as before this recession was set into motion. I'm not saying you can do anything about my salary, but having to delay paying some of my bills because my commute costs have increased is a challenge exacerbated by the fact that students are not able to be in class when it starts for various valid reasons. It's not fair to me or them, and it seems impractical for me to keep traveling to campus to begin with half a class or consistent lateness as students finish their workdays.

>

> I feel as though my teaching is not being well supported because no one seems to care that my class is scheduled at a time that's inconvenient for most of the students. Maybe I need to teach only masters' courses moving forward, but something has to give. I've asked other colleagues who recall teaching mostly masters classes in their first few years and thus not having to deal with the implications of the doctoral program's organizational issues (the ones we regularly focus on in faculty meetings) in their early teaching experiences here. If the department values my teaching in the EdD program it would help to show it by scheduling my courses at a time when folks aren't rushing from work as a start.

>
> Can I be part of the next conversation on EdD scheduling? Either way, I'm proposing that we make at least one or two more of the sessions this semester remote as students have been asking for since August. I think I'll have no choice but to do so considering my finances simply aren't flexible enough to continue with the $50 cabs only to arrive to partial attendance.
>
> Thanks as always,
> Tiffany
>
>
> Sent from my iPhone
>

# Exhibit 7

| From: | Chipman, Sarah |
|---|---|
| To: | David Amdur |
| Subject: | RE: Potential new OIE complaint from a faculty member |
| Date: | Monday, November 7, 2022 8:21:00 AM |

Hi David,

Thanks for reaching out.  I was in contact with Tiffany separately and just scheduled a meeting with her for this afternoon.  I'm happy to have you join if she would like to share the meeting invite with you.

Thanks,

Sarah

**From:** David Amdur <davidamdur@uconnaaup.org>
**Sent:** Friday, November 4, 2022 7:44 PM
**To:** Chipman, Sarah <sarah.chipman@uconn.edu>
**Cc:** Michael Bailey <michaelbailey@uconnaaup.org>; Barbara Kratochvil <barbarak@uconnaaup.org>
**Subject:** Potential new OIE complaint from a faculty member

*Message sent from a system outside of UConn.*

Hello Sarah,

I trust you're well. I am aware that Tiffany Brown, faculty in NEAG, has filed or will be filing an OIE complaint that will name Laura Burton, her department head, and Casey Cobb. Tiffany requested that I be her support person when she has an interview with your office. For that reason I'll need to recuse myself from representing the other two faculty. Please reach out to Michael Bailey when you may have to issue official notification of the investigation. Thank you for your understanding.

Yours,
David

David Amdur
Associate Director
UConn-AAUP
1875 Storrs Rd.
Storrs, CT 06268
860-487-0450-phone
860-487-0341-fax

# Exhibit 8

| From: | Chipman, Sarah |
|---|---|
| To: | Brown, Tiffany |
| Subject: | OIE- Meeting |
| Date: | Friday, November 11, 2022 10:56:00 AM |

Hi Tiffany,

I reviewed the information you recently provided, as well as our prior communications.  I would like to schedule a meeting with you to discuss your concerns in further detail.  I saw that David Amdur was copied on the most recent correspondence you cc'ed me on.  You are welcome to have David join our meeting, and I am happy to meet either virtually or in-person, whichever you prefer.  If you'd like to have David join us, please send me a few times next week that might work for you both.  I suggest we set aside 90 minutes if possible so we can go through the questions I have for you, as well as discuss any questions you might have.  I can be fairly flexible in scheduling next week apart from Wednesday afternoon.  If we need to look to the following week, Monday, November 21 is open for me as well.

Thank you,

Sarah

**Sarah Chipman, J.D.**
Director of Investigations
Deputy Title IX Coordinator
Pronouns: She – Her – Hers

**OFFICE OF INSTITUTIONAL EQUITY**

University of Connecticut | Wood Hall
241 Glenbrook Road, Unit 4175 | Storrs, CT 06269-4175
Office: 860.486.2943 | Fax: 860.486.6771

UConn Health | 16 Munson Road, 4TH Floor
263 Farmington Avenue, MC 5310 | Farmington, CT 06030-5310
Office: 860.679.3563 | Fax: 860.679.6512

WEBSITES: WWW.EQUITY.UCONN.EDU | WWW.TITLEIX.UCONN.EDU | WWW.ACCESSIBILITY.UCONN.EDU
e-mail: sarah.chipman@uconn.edu

# Exhibit 9

| | |
|---|---|
| **From:** | Chipman, Sarah |
| **To:** | Tiffany Brown |
| **Subject:** | RE: Notice of Fact-Finding Meeting |
| **Date:** | Tuesday, November 15, 2022 9:05:00 AM |
| **Attachments:** | image002.png |

Hi Tiffany,

Thank you for letting me know.  I hope you're doing well.  I'd be happy to meet with you when you return, and will wait to hear from you about scheduling.

Thank you,

Sarah

**From:** Tiffany Brown <tiffany.brown@uconn.edu>
**Sent:** Monday, November 14, 2022 2:26 PM
**To:** Chipman, Sarah <sarah.chipman@uconn.edu>
**Subject:** Fwd: Notice of Fact-Finding Meeting

Hi Sarah -

Just sending this update along. I'm on medical leave as of Friday, so not sure if we'd meet upon my return.

Thank you,

**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269

---------- Forwarded message ---------
From: **Tiffany Brown** <tiffany.brown@uconn.edu>
Date: Mon, Nov 14, 2022 at 9:59 AM
Subject: Re: Notice of Fact-Finding Meeting

To: Bannister, Kelly <kelly.bannister@uconn.edu>
Cc: Irizarry, Jason <jason.irizarry@uconn.edu>, David Amdur <DavidAmdur@uconnaaup.org>


Hello -

I am out on leave beginning November 11th, 2022. If you have questions about your courses in Fall 2022 or Spring 2023 with me currently listed as the instructor, please email the EDLR department head Laura Burton at laura.burton@uconn.edu.

Thank you,


**Tiffany Brown, Ph.D.**
Assistant Professor
Department of Educational Leadership
Neag School of Education
University of Connecticut
249 Glenbrook Road, Unit 3093
Storrs, CT 06269


On Mon, Nov 14, 2022 at 9:12 AM Bannister, Kelly <kelly.bannister@uconn.edu> wrote:

> Professor Brown,
>
>
> We have been made aware that you contacted Human Resources about a medical leave. In light of the foregoing, we will postpone the fact-finding meeting through November 24, 2022, the deadline for providing medical documentation to HR for approval of your leave.
>
>
> Thanks,
>
> Kelly
>
>
>
> **Kelly L. Bannister, Esq.**
> Associate Director and Labor & Employment Attorney
>
> Office of Faculty & Staff Labor Relations
> University of Connecticut

9 Walters Avenue, Unit 5075

Storrs, Connecticut 06269-5075

Tel: (860) 486-2585 (direct)

Tel: (860) 486-5684 (main)

Fax: (860) 486-3390

kelly.bannister@uconn.edu


www.lr.uconn.edu

**PRIVILEGED AND CONFIDENTIAL COMMUNICATION**: The information contained in this electronic message and any attachments to it are intended for the *exclusive use of the addressees* and may contain confidential attorney-client communication and/or privileged information. If you are not the intended recipient, please destroy all copies of this message and attachments and immediately notify this office by sending a reply e-mail to the sender. Thank you.

**From:** Irizarry, Jason <jason.irizarry@uconn.edu>
**Sent:** Tuesday, November 8, 2022 10:05 AM
**To:** Brown, Tiffany <tiffany.brown@uconn.edu>
**Cc:** Bannister, Kelly <kelly.bannister@uconn.edu>; David Amdur <DavidAmdur@uconnaaup.org>
**Subject:** Notice of Fact-Finding Meeting


Dear Professor Brown:

A fact-finding meeting has been scheduled with you on Wednesday, November 16, 2022, at 10:00am, via WebEx. You will be provided with credentials to access the meeting.

The purpose of this meeting is to discuss concerns regarding your performance and conduct during the Fall 2022 semester. More specifically, it has been reported that you leave your EDLR 5015 class, scheduled for Thursdays from 5:00pm to 7:30pm, approximately 30 minutes early every week.

These behaviors, if true, may violate University policies including, but not limited to, the *General Rules of Conduct*. They also may demonstrate neglect of assigned responsibilities, failure to fulfill professional commitments, and/or conduct which impairs the rights of students.

In order to conduct a thorough and objective investigation, I would like to meet with you to discuss these allegations in greater detail and to provide you the opportunity to respond and offer documents or other evidence you deem relevant. In the interim, please take a moment to review the University's *Non-Retaliation Policy*, a copy of which can be found here: https://policy.uconn.edu/2011/05/24/non-retaliation-policy/. Because of the nature of this meeting, you are entitled to AAUP representation, and your union has been copied on this correspondence. A representative from the Office of Faculty and Staff Labor Relations also will be present.

If you are unable to attend, please notify me promptly. If you fail to respond or do not appear, we will proceed based on the information available to us at this time.

Respectfully,



**Jason G. Irizarry, Ed.D.**
Dean and Professor
Neag School of Education | University of Connecticut
249 Glenbrook Rd, U-3064, Storrs, CT 06269-3064
Office: 860.486.3815 | education.uconn.edu

cc:    Kelly L. Bannister, Associate Director, Office of Faculty & Staff Labor Relations
       David Amdur, Associate Director, AAUP-UConn

**UCONN**
NEAG SCHOOL OF EDUCATION

# Exhibit H

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **TIFFANY A. BROWN** | : | **CIVIL NO. 3:22-CV-01488-SFR** |
| *Plaintiff* | : | |
| | : | |
| | : | |
| **UNIVERSITY OF CONNECTICUT,** | : | |
| *Defendant* | : | **JUNE 3, 2025** |

## <u>AFFIDAVIT OF MEGAN STIMSON</u>

I, Megan Stimson, having been duly sworn, depose and say:

1. I am over the age of eighteen and understand the obligations of an oath.

2. I have been employed by the University of Connecticut ("UConn") in the Absence Management Unit of UConn's Department of Human Resources since December of 2018. I began as a Human Resources Assistant in the Absence Management Unit of UConn's Department of Human Resources in December of 2018. In November of 2019, I became a Leave Administrator in the Absence Management Unit of UConn's Department of Human Resources, which is the role I currently hold.

3. This affidavit is based upon my personal knowledge acquired during my employment at UConn as stated herein.

4. In my capacity as a Leave Administrator with UConn, I am familiar with the Plaintiff, Tiffany A. Brown ("Dr. Brown").

5. Dr. Brown requested a six-month paid leave of absence from UConn. The leave of absence began on November 11, 2022.

1

6.  On December 7, 2022, I sent an email to Dr. Brown with a subject line of "Medical Leave approval – 11/11/22 – 5/11/23," which I sent in the regular course of business. A true and accurate copy of the email referred to in this paragraph is attached hereto as <u>Exhibit 1</u>.

7.  The email displayed in <u>Exhibit 1</u> contained an email attachment, a true and accurate copy of which is attached hereto as <u>Exhibit 2</u> (with redaction), which was created and sent in the regular course of business.

8.  On December 7, 2022, I sent another email to Dr. Brown, with other UConn employees copied, which I sent in the regular course of business pursuant to my role in UConn's Department of Human Resources, notifying her of a one-year extension of the tenure clock. A true and accurate of the email referred to in this paragraph is attached hereto as <u>Exhibit 3</u>.

9.  Dr. Brown's leave of absence, which began on November 11, 2022, consisted of twelve weeks of Family and Medical Leave Act ("FMLA") leave, followed by fourteen weeks of leave under the State Employees Bargaining Agent Coalition ("SEBAC") supplemental benefits. The leave was paid pursuant to the medical leave guidelines in Appendix B of the collective bargaining agreement between UConn and the University of Connecticut Chapter of the American Association of University Professors.

10. On May 1, 2023, I sent Dr. Brown an email, which was sent in the regular course of business, a true and accurate copy of which is attached hereto as <u>Exhibit 4</u>. In that email, I reminded Dr. Brown that her approved leave was concluding on May 11, 2023, and that an Employee Fitness for Duty Certification is required prior to

2

returning to work. In that email, I also indicated that if she needed additional leave beyond May 11, 2023, she could submit a new or revised Medical Certificate.

11. The email displayed in <u>Exhibit 4</u> contained an email attachment, a true and accurate copy of which is attached hereto as <u>Exhibit 5</u>, which was created and sent in the regular course of business.

12. I am not aware of Dr. Brown submitting an Employee Fitness for Duty form to UConn's Human Resources Department after November 11, 2022, and prior to May 11, 2023.

13. I am not aware of UConn's Human Resources Department receiving documentation demonstrating the need for Dr. Brown to receive a continued leave of absence beyond May 11, 2023.

14. If UConn's Human Resources Department received documentation demonstrating the necessity for a continued leave of absence beyond May 11, 2023, Dr. Brown could have utilized up to ten additional weeks of unpaid SEBAC supplemental leave that were still available during contracted employment time, if necessity for the additional weeks of leave was demonstrated.

15. Attached hereto as <u>Exhibit 6</u> is a true and accurate copy of an email I received on May 10, 2023, containing a subject line of "resignation due to constructive discharge," which I received while working as a Leave Administrator in the Absence Management Unit of UConn's Department of Human Resources.

16. I have read the foregoing statements and swear that they are true to the best of my knowledge and belief.

3

_(signature)_

**Megan Stimson, Leave Administrator**
**University of Connecticut**

| | |
|---|---|
| STATE OF CONNECTICUT | ) |
| | ) ss. Tolland County, Connecticut |
| COUNTY OF TOLLAND | ) |

Subscribed and sworn before me on this 3ʳᵈ day of June , 2025.

_(signature)_

**Commissioner of the Superior Court/Notary**
~~Public~~ Jurrs # 424648
Kelly Bannister

4

# Exhibit 1

Brown v. UConn - Motion for Summary Judgment
Exh bit H - Affidavit of Megan Stimson
Page 5 of 24

**From:**       Stimson, Megan <megan.stimson@uconn.edu>
**Sent:**        Wednesday, December 7, 2022 12:44 PM
**To:**          Tiffany Brown
**Cc:**          Brown, Tiffany
**Subject:**     Medical Leave approval - 11/11/22 - 5/11/23
**Attachments:**  Tiffany Brown -  FMLA HR2b.pdf

Dear Tiffany,

Human Resources has received the sufficient medical documentation and has made a leave determination.  Attached is the **Agency Response: Designation Notice (FMLA-HR2b)** approving your block medical leave from 11/11/22 through 05/11/23 (*per the Medical Certificate*) as follows:

- Federal FMLA:

  o 11/11/22 – 02/02/23 – Block leave; this will exhaust the 12-week entitlement in the applicable 12-month period.

- State FMLA (C.G.S. 31-51kk):

  o 11/11/22 – 02/02/23 – Block leave; this will exhaust the 12-week entitlement in the applicable 12-month period.

- SEBAC Supplemental Leave:

  o 02/03/23 – 05/11/23 – Block leave; this leave will use 14 weeks of the 24-week entitlement in the applicable 2-year period.

Please note the following:

- **An Employee Fitness for Duty Certification (*page 4 of the medical certificate*), completed by your doctor, is required and is due to HR before you are authorized to return to work in any capacity.**  This form must outline, specifically, any restrictions that you may have related to your job duties.

- Your medical provider certified your need for leave through 05/11/23.   Updated medical  documentation will be required if you need additional leave beyond that date.

- In accordance with Article XIV,L, 4 of the By-Laws of the University of Connecticut titled "Sick Leave for Faculty With or Without Pay" and  the "Members of the Bargaining Unit Medical Leave Guidelines (Appendix B of the AAUP agreement), your leave from 11/11/22 through 05/11/23 will be paid.   Time taken will be deducted from the benefit outlined in medical leave guidelines.

- I will notify your department of your leave approval and update them regarding your work status throughout the leave.

For further information regarding personal illness leaves for AAUP members, please visit the following link, http://hr.uconn.edu/lt_aaup_pi/.
Under the Americans with Disabilities Act (ADA) and relevant federal and state laws, UConn provides reasonable accommodations to the known physical or mental limitations of qualified employees. If you have an underlying medical condition, you can explore a reasonable Workplace Accommodation. To learn more about Workplace Accommodations, please contact Ryan Bangham in Human Resources at 860-486-2036 or ryan.bangham@uconn.edu. You can also learn more about Workplace Accommodations by visiting the UConn HR Website.

Please contact me with any questions.

Best,
Megan

**Megan Stimson**
Leave Administrator - Absence Management/ADA Unit
Department of Human Resources | University of Connecticut
9 Walters Ave, U-5075 | Storrs, CT 06269
Fax 860-486-0406

This communication, together with any attachments hereto or links contained herein, is for the sole use of the intended recipient(s) and may contain information that is confidential or legally protected.  If you are not the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of this communication is STRICTLY PROHIBITED.  If you have received this communication in error, please notify the sender immediately by return e-mail message and delete the original and all copies of the communication, along with any attachments hereto or links herein, from your system.

2
Brown v. UConn - Motion for Summary Judgment
Exh bit H - Affidavit of Megan Stimson
Page 7 of 24

# Exhibit 2

Brown v. UConn - Motion for Summary Judgment
Exh bit H - Affidavit of Megan Stimson
Page 8 of 24

**State of Connecticut Human Resources**
## Designation Notice
### Response to Employee Request for Medical Leave, Family Leave or Military Family Leave
*(To be completed by Human Resources)*

Form # **FMLA-HR2b**
Revision Effective Date: 1/1/2022

**TO:** Tiffany Brown  EE # ▮
(Employee Name)

University of Connecticut
(Agency)

**FROM:** Megan Stimson
(Human Resources Representative)

860-486-0408
(Telephone Number)

**DATE:** 12/07/22

---

## REASON FOR LEAVE:

| | |
|---|---|
| **Personal Medical Leave (for your own serious health condition):**<br>☒ My own illness or injury<br>_ Disability period related to my pregnancy and childbirth<br>    **Organ donation**<br>    **Bone marrow donation** | **Caregiver Leave (care for family member in connection with the disability period related to pregnancy and childbirth, organ or bone marrow donation, or other serious health condition):**<br>____ **Spouse**<br>_ _ **Parent**<br>____ **Child  Age of child** _____<br>    **If the Child is age 18 or older, are they incapable of self-care due to a mental or physical disability as defined by the ADA?**<br>    ___ _ _ Yes __  ____ No<br>_ _ **Spouse's parent** *(State FMLA only)*<br>____ **Sibling** *(State FMLA only)*<br>____ **Sibling-in-law** *(State FMLA only)*<br>____ **Grandparent** *(State FMLA only)*<br>____ **Spouse's grandparent** *(State FMLA only)*<br>_ _ **Grandchild** *(State FMLA only)*<br>_ _   **An individual related by blood or affinity whose close association with the employee is the equivalent to one of the above listed family relationships.** *(State FMLA only)* |
| **Bonding Leave:**<br>____ **Birth of child**<br>____ **Adoption of child**<br>____ **Placement of foster child**<br>    *(Federal or state FMLA only)* | **Military Family Leave:**<br>____ **Qualifying Exigency arising out of the covered active duty of your spouse, parent, or son or daughter**<br>    **Military Caregiver leave for your spouse, parent, son, daughter or next of kin who is a covered servicemember**<br>____ **Military Caregiver leave for your spouse, parent, son, daughter or next of kin who is a covered veteran** *(Federal FMLA only)* |

**Read this entire document thoroughly for critical information about your leave entitlements, responsibilities, and accrual usage.**

We have reviewed your request for leave and any supporting documentation that you have provided. We received your most recent information on *(date)* 12/05/22_____and determined:

☒ **You are approved to take leave pursuant to one or more of the following leave entitlements:**
    _☒_ Federal FMLA
    _☒_ State FMLA
    _ _ Pregnancy Disability Leave under C.G.S. 46a-60(a)(7)
    _☒_ SEBAC Supplemental Leave
    _ _ Bone Marrow or Organ Donation Leave

*This form provided by the Department of Administrative Services*

Brown v. UConn - Motion for Summary Judgment
Exhibit H - Affidavit of Megan Stimson
Page 9 of 24

___ **Additional information is needed in order to determine whether your leave request can be approved.** See pages 4-5 for an explanation of the additional information that will be needed.

✕ **You are not approved to take leave pursuant to one or more of the following leave entitlements:**
- _ _ Federal FMLA
- _ _ State FMLA
- _ ✕ _ Pregnancy Disability Leave under C.G.S. 46a-60(a)(7)
- _ _ SEBAC Supplemental Leave
- _ ✕ _ Bone Marrow or Organ Donation Leave

# *PART A: APPROVED LEAVES*

## **You are approved to take leave under one or more of the following leave entitlements:**

✕ _ **Leave under federal FMLA has been approved and all leave taken for this reason will be designated as federal FMLA leave.**
- Your annual federal leave entitlement will begin/began on (*date*) 11/11/22 _____.
- Your federal FMLA leave will run concurrently with a worker's compensation leave. _ _ Yes _ ✕ _ No
- Your spouse _ _ *works/* ✕ *does not work* for the State of Connecticut.
  - o Spouse _ *_will/____will not* be taking leave for the same purpose.
- You are required to use your **paid sick leave accruals** if the absence is for **your own serious illness**.
- You have requested to use paid leave accruals during your leave. Any paid leave taken for this reason will count against your federal FMLA leave entitlement. (*See pages 6 and 7*)
- You are required to notify us as soon as practicable if the dates of scheduled leave change or are extended, or were initially unknown. Based on the information you have provided to date, we are providing the following information about the amount of time that will be counted against your federal FMLA leave entitlement:

  _ ✕ _ Provided there is no deviation from your anticipated leave schedule, the following number of hours, days, or weeks will be counted against your leave entitlement: This leave will use 12 weeks and exhaust the entitlement. _____

  _ _ Because the leave you will need will be unscheduled, it is not possible to provide the hours, days, or weeks that will be counted against your federal FMLA entitlement at this time. You have the right to request this information once in a 30-day period (if leave was taken in the 30-day period).

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

✕ _ **Leave under C.G.S. 31-51kk has been approved and all leave taken for this reason will be designated as "state FMLA leave."**
- Your annual state leave entitlement will begin/began on (*date*) 11/11/22 _____.
- Your state FMLA leave will run concurrently with a worker's compensation leave. _ _ Yes _ ✕ _ No
- Your spouse _ *works/* ✕ *does not work* for the State of Connecticut.
  - o Spouse _ *__will/_ _will not* be taking leave for the same purpose.
- You are required to use your **paid sick leave accruals** if the absence is for **your own serious illness**.
  - o _ _ You have requested to use paid leave accruals during your leave. Any paid leave taken for this reason will count against your state FMLA leave entitlement. (*See pages 6 and 7*)
  - o _ _ You have elected to retain _____ days/weeks of accrued sick leave accruals up to a maximum of two weeks (applicable if leave is approved under state FMLA and you do not have other accruals available to use.)

*This form provided by the Department of Administrative Services*
Brown v. UConn - Motion for Summary Judgment
Exhibit H - Affidavit of Megan Stimson
Page 10 of 24

- You are required to notify us as soon as practicable if the dates of scheduled leave change or are extended or were initially unknown. Based on the information you have provided to date; we are providing the following information about the amount of time that will be counted against your federal FMLA leave entitlement:

  _✕_ Provided there is no deviation from your anticipated leave schedule, the following number of hours, days, or weeks will be counted against your state FMLA leave entitlement:
  This leave will use 12 weeks and exhaust the entitlement.

  _ _ You may also be eligible for up to 2 additional weeks of leave for a serious health condition resulting in incapacitation that occurs <u>during</u> a pregnancy.

  _ _ Because the leave you will need will be unscheduled, it is not possible to provide the hours, days, or weeks that will be counted against your state FMLA entitlement at this time. You have the right to request this information once in a 30-day period (if leave was taken in the 30-day period).

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

_ **_ Leave under C.G.S. 46a-60(a)(7) leave has been approved and all leave taken for this reason will will be designated as "pregnancy disability leave."**
- Your pregnancy disability leave entitlement will begin/began on (*date*) _____.
- You are required to use your **paid sick leave accruals** during your pregnancy disability leave.
- You have requested to use paid leave accruals during your leave. Any paid leave taken for this reason will count against your pregnancy disability leave entitlement. (*See pages 6 and 7*)
- You are required to notify us as soon as practicable if the dates of scheduled leave change or are extended, or were initially unknown. Based on the information you have provided to date, we are providing the following information about the amount of time that will be counted against your pregnancy disability leave entitlement:

  _____ Provided there is no deviation from your anticipated leave schedule, the following number of hours, days, or weeks will be counted against your leave entitlement:

  _____

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

_✕_ **Leave under the 2017 SEBAC Agreement has been approved and all leave taken for this reason will be designated as "SEBAC Supplemental leave."**
- Your SEBAC Supplemental leave will begin/began 02/03/23 _____.
- You have requested to use paid leave accruals during your leave. Any paid leave taken for this reason will count against your SEBAC Supplemental leave entitlement. (*See pages 6 and 7*)
- You are required to notify us as soon as practicable if the dates of scheduled leave change or are extended or were initially unknown. Based on the information you have provided to date; we are providing the following information about the amount of time that will be counted against your SEBAC Supplemental leave entitlement:

  _✕_ Provided there is no deviation from your anticipated leave schedule, the following number of hours, days, or weeks will be counted against your leave entitlement:
  14 weeks

  _____ Because the leave you will need will be unscheduled, it is not possible to provide the hours, days, or weeks that will be counted against your SEBAC Supplemental entitlement at this time. You have the right to request this information once in a 30-day period (if leave was taken in the 30-day period).

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

*This form provided by the Department of Administrative Services*
Brown v. UConn - Motion for Summary Judgment
Exhibit H - Affidavit of Megan Stimson
Page 11 of 24

4

_____ **Bone Marrow or Organ Donation leave has been approved.** *(Available after January 1, 2018)*
- Your bone marrow or organ donation leave entitlement will begin/began on *(date)* _____ and will end on _____.
- You must notify us as soon as practicable if the dates of scheduled leave change or are extended or were initially unknown.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

__✗__ **Fitness for Duty: You will be required to return page 4 of the Medical Certificate (Form P33a)** certifying your fitness-for-duty prior to being restored to employment. If such certification is not timely received, your return to work may be delayed until certification is provided.

A list of the essential functions of your position _____ *is* __✗__ *is not* attached.
If attached, the fitness-for-duty certification must address your ability to perform these functions.

**Note:** *Failure to return to work at the end of your leave period may be treated as a resignation unless an extension has been requested, agreed upon and approved in writing by Human Resources.*

## *PART B: ADDITIONAL INFORMATION REQUIRED*

**Additional information is needed to determine if your leave request can be approved.**
You must provide the following information no later than _____ (provide at least 7 calendar days), unless it is not practicable under the particular circumstances despite your diligent good faith efforts, or your leave may be denied

_____ **Incomplete/Insufficient Certification (**The certification you have provided is **incomplete or insufficient** to determine whether your leave request can be approved.**)**
Specific information needed to make the certificate complete and sufficient:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

*This form provided by the Department of Administrative Services*
Brown v. UConn - Motion for Summary Judgment
Exhibit H - Affidavit of Megan Stimson
Page 12 of 24

_____ **Additional Information Required:**

_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____
_____ _____


___   _ **Second/Third Opinion:**
      We are exercising our right to have you obtain a second or third opinion medical certification at our expense, and we will provide further details at a later date.


## *PART C: LEAVE REQUESTS NOT APPROVED*

_   _ **Federal FMLA leave is denied because:**
     ____ The federal FMLA does not apply to your leave.
               _____
               _____
               _____

      _ You have exhausted your federal FMLA leave entitlement in the applicable 12-month period.

_____ **State family/medical leave (C.G.S. 31-51kk) is denied because:**
     ____ The state family/medical leave does not apply to your leave request.
               _____
               _____
               _____

      _ You have exhausted your state family/medical leave entitlement in the applicable 12-month period.

✗  **Leave under C.G.S. 46a-60(a)(7) is denied because this statute does not apply to your leave request.**

_   _ **SEBAC Supplemental Leave is denied because:**
     _ _ SEBAC Supplemental leave does not apply to your leave request.
               _____
               _____

     _ _ You have exhausted your SEBAC Supplemental entitlement in the applicable two-year period.

✗  **Bone Marrow/Organ Donation Leave is denied because this statute does not apply to your leave request.**

*This form provided by the Department of Administrative Services*
Brown v. UConn - Motion for Summary Judgment
Exhibit H - Affidavit of Megan Stimson
Page 13 of 24

# *PART D: USE OF ACCRUALS*

- **The choice to use your accruals must be made before you begin your leave.**
  - ○ **If you want change your accrual designation, you must contact Human Resources.**
  - ○ **Accrual changes will be applied prospectively.**
- **If the reason for leave is for your own serious illness:**
  - ○ **Sick leave accruals must be used.**
  - ○ **Sick leave accruals must be exhausted before other accruals can be used.**
  - ○ **Under State FMLA, you may retain two weeks of accrued leave.   If you do not have at least two weeks of accrued leave other than sick, you may retain the number of sick leave days that when combined with your other non-sick accrued leave time equals two weeks.**
- **If you do not elect to use your accruals, the leave will be unpaid.**
- **If you choose not to use all of your accruals or if your accruals are exhausted before the leave ends, the remainder of the leave will be unpaid.**
- **If you elect to use your accruals, that paid time must be spent down completely before you go into unpaid status.**
- **You cannot intermingle unpaid time with paid time.**

**Based on the information you provided to date, your accruals will be used as follows:**

| USE OF ACCRUALS | Sick Leave Accruals | Vacation Accruals | Personal Leave | Comp Time Accruals | Sick Family Days *(based on bargaining unit contract)* | Parental Days *(based on bargaining unit contract)* |
|---|---|---|---|---|---|---|
| **REASON** | **Days/Hours & Priority #** | **Days/Hours & Priority #** | **Days/Hours & Priority #** | **Days/Hours & Priority #** | **Days/Hours & Priority #** | **Days/Hours & Priority #** |
| **PERSONAL MEDICAL LEAVE** | | | | | | |
| My own illness or injury | | | | | *Not Applicable* | *Not Applicable* |
| Disability period related to my pregnancy & childbirth | | | | | *Not Applicable* | *Not Applicable* |
| Organ donation *(after exhaustion of paid leave entitlement of 15 days)* | | | | | *Not Applicable* | *Not Applicable* |
| Bone marrow donation *(after exhaustion of paid leave entitlement of 7 days)* | | | | | *Not Applicable* | *Not Applicable* |

*This form provided by the Department of Administrative Services*

| USE OF ACCRUALS | Sick Leave Accruals | Vacation Accruals | Personal Leave | Comp Time Accruals | Sick Family Days *(based on bargaining unit contract)* | Parental Days *(based on bargaining unit contract)* |
|---|---|---|---|---|---|---|
| **REASON** | **Days/Hours & Priority #** | **Days/Hours & Priority #** | **Days/Hours & Priority #** | **Days/Hours & Priority #** | **Days/Hours & Priority #** | **Days/Hours & Priority #** |
| **CAREGIVER LEAVE** | | | | | | |
| Spouse *(including providing care to your wife during the disability period associated pregnancy and childbirth)* | | | | | | *Not Applicable* |
| Parent | | | | | | *Not Applicable* |
| Parent-in-law | | | | | *Not Applicable* | *Not Applicable* |
| Child | | | | | | Not Applicable |
| Sibling | | | | | | Not Applicable |
| Sibling-in-law | | | | | Not Applicable | Not Applicable |
| Grandparent | | | | | Not Applicable | Not Applicable |
| Spouse's Grandparent | | | | | Not Applicable | Not Applicable |
| Grandchild | | | | | Not Applicable | Not Applicable |
| An individual related by blood or affinity is equivalent to a "family member" | | | | | Not Applicable | Not Applicable |
| **BONDING LEAVE** | | | | | | |
| Birth of child | | | | | *Not Applicable* | |
| Adoption of child | | | | | *Not Applicable* | |
| Placement of foster child | | | | | *Not Applicable* | *Not Applicable* |
| **MILITARY FAMILY LEAVE** | | | | | | |
| Military Caregiver - Covered Servicemember | | | | | | *Not Applicable* |
| Military Caregiver - Covered Veteran | | | | | | *Not Applicable* |
| Qualifying Exigency leave | | | | | *Not Applicable* | *Not Applicable* |

**See Form FMLA-HR2c for more information about coding your time.**

*This form provided by the Department of Administrative Services*

# Exhibit 3

Brown v. UConn - Motion for Summary Judgment
Exh bit H - Affidavit of Megan Stimson
Page 16 of 24

| From: | Stimson, Megan |
| --- | --- |
| To: | Brown, Tiffany; Brown, Tiffany |
| Cc: | Wice, Rachel; Burton, Leslie; Irizarry, Jason; Lombardo, Marci |
| Subject: | Tenure Clock Extension - Prof. Tiffany Brown |
| Date: | Wednesday, December 7, 2022 1:01:35 PM |

Dear Professor Brown,

Your major life event on 11/11/22 qualifies under article 19.6.I of the AAUP contract for an automatic one-year extension of the tenure clock.  We are adjusting our records to reflect the adjustment of the tenure clock from 2027 to 2028.

If you do not need the tenure extension, please be aware that you are eligible to apply for tenure early. Note that whether you utilize this extension or apply early, you will be evaluated for tenure only once. If you choose to apply early, please inform your dean and department head, as well as Rachel Wice (Cc'd).

Please contact me with any questions.

Best,
Megan

**Megan Stimson**
Leave Administrator - Absence Management/ADA Unit
Department of Human Resources l University of Connecticut
9 Walters Ave, U-5075 l Storrs, CT 06269
Fax 860-486-0406

This communication, together with any attachments hereto or links contained herein, is for the sole use of the intended recipient(s) and may contain information that is confidential or legally protected.  If you are not the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of this communication is STRICTLY PROHIBITED.  If you have received this communication in error, please notify the sender immediately by return e-mail message and delete the original and all copies of the communication, along with any attachments hereto or links herein, from your system.

# Exhibit 4

Brown v. UConn - Motion for Summary Judgment
Exh bit H - Affidavit of Megan Stimson
Page 18 of 24

| | |
|---|---|
| **From:** | Stimson, Megan <megan.stimson@uconn.edu> |
| **Sent:** | Monday, May 1, 2023 1:27 PM |
| **To:** | Tiffany Brown |
| **Cc:** | Brown, Tiffany |
| **Subject:** | Employee Fitness for Duty Certificate reminder |
| **Attachments:** | Employee Fitness for Duty Certification - Copy.pdf |

Dear Tiffany,

I hope you're doing well.  I'm writing as your approved FMLA leave is concluding on 05/11/23.  As a gentle reminder, an **Employee Fitness for Duty Certification** (*page 4 of the medical certificate*), to be completed by your doctor, is required and is due to HR before you are authorized to return to work in any capacity.  This form must outline, specifically, any restrictions that you may have related to your job duties.  If you are cleared to return to work on Friday, 05/12/23, please ensure that this completed form certifying such, is received in HR by **Thursday, 05/11/23**.

If you need additional leave beyond 05/11/23, please submit a new or revised Medical Certificate by the close of business on **Thursday, 05/11/23.**

Any documentation can be scanned to my email or faxed to my attention at 860-486-0406.

Please reach out with any questions.

Best,
Megan

**Megan Stimson**
Absence Management/ADA Unit
Department of Human Resources l University of Connecticut
9 Walters Ave, U-5075 l Storrs, CT 06269
Direct 860-486-0408 l Fax 860-486-0406

**UCONN** | UNIVERSITY OF CONNECTICUT

This communication, together with any attachments hereto or links contained herein, is for the sole use of the intended recipient(s) and may contain information that is confidential or legally protected.  If you are not the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of this communication is STRICTLY PROHIBITED.  If you have received this communication in error, please notify the sender immediately by return e-mail message and delete the original and all copies of the communication, along with any attachments hereto or links herein, from your system.

**From:** Stimson, Megan
**Sent:** Wednesday, December 7, 2022 12:44 PM
**To:** 'Tiffany Brown' <tab2152@tc.columbia.edu>
**Cc:** Brown, Tiffany <tiffany.brown@uconn.edu>
**Subject:** Medical Leave approval - 11/11/22 - 5/11/23

Dear Tiffany,

Human Resources has received the sufficient medical documentation and has made a leave determination.  Attached is the **Agency Response: Designation Notice (FMLA-HR2b)** approving your block medical leave from 11/11/22 through 05/11/23 (*per the Medical Certificate*) as follows:

- <u>Federal FMLA</u>:

  o 11/11/22 – 02/02/23 – Block leave; this will exhaust the 12-week entitlement in the applicable 12-month period.

- <u>State FMLA (C.G.S. 31-51kk)</u>:

  o 11/11/22 – 02/02/23 – Block leave; this will exhaust the 12-week entitlement in the applicable 12-month period.

- <u>SEBAC Supplemental Leave</u>:

  o 02/03/23 – 05/11/23 – Block leave; this leave will use 14 weeks of the 24-week entitlement in the applicable 2-year period.

Please note the following:

- **<u>An Employee Fitness for Duty Certification (*page 4 of the medical certificate*), completed by your doctor, is required and is due to HR before you are authorized to return to work in any capacity.</u>**  This form must outline, specifically, any restrictions that you may have related to your job duties.

- Your medical provider certified your need for leave through 05/11/23.   Updated medical  documentation will be required if you need additional leave beyond that date.

- In accordance with Article XIV,L, 4 of the By-Laws of the University of Connecticut titled "Sick Leave for Faculty With or Without Pay" and  the "Members of the Bargaining Unit Medical Leave Guidelines (Appendix B of the AAUP agreement), your leave from 11/11/22 through 05/11/23 will be paid.   Time taken will be deducted from the benefit outlined in medical leave guidelines.

- I will notify your department of your leave approval and update them regarding your work status throughout the leave.

For further information regarding personal illness leaves for AAUP members, please visit the following link, http://hr.uconn.edu/lt_aaup_pi/.

Under the Americans with Disabilities Act (ADA) and relevant federal and state laws, UConn provides reasonable accommodations to the known physical or mental limitations of qualified employees. If you have an underlying medical condition, you can explore a reasonable Workplace Accommodation. To learn more about Workplace Accommodations, please contact Ryan Bangham in Human Resources at 860-486-2036 or ryan.bangham@uconn.edu. You can also learn more about Workplace Accommodations by visiting the UConn HR Website.

Please contact me with any questions.

Best,
Megan

**Megan Stimson**
Leave Administrator - Absence Management/ADA Unit
Department of Human Resources l University of Connecticut
9 Walters Ave, U-5075 l Storrs, CT 06269
Fax 860-486-0406

This communication, together with any attachments hereto or links contained herein, is for the sole use of the intended recipient(s) and may contain information that is confidential or legally protected.  If you are not the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of this communication is STRICTLY PROHIBITED.  If you have received this communication in error, please notify the sender immediately by return e-mail message and delete the original and all copies of the communication, along with any attachments hereto or links herein, from your system.

2
Brown v. UConn - Motion for Summary Judgment
Exh bit H - Affidavit of Megan Stimson
Page 20 of 24

# Exhibit 5

Brown v. UConn - Motion for Summary Judgment
Exh bit H - Affidavit of Megan Stimson
Page 21 of 24

## EMPLOYEE FITNESS-FOR-DUTY CERTIFICATION

The employee's treating health care provider must complete this fitness-for-duty certification.

The employee must provide the completed fitness-for-duty certification to Human Resources **before** reporting to their department or unit.

| Employee's Name | Employee's ID Number |
|---|---|
| Employee's Job Title | Department/Unit |

I have examined _____ and certify that they are able to return to work.
(employee's name)

Date the employee will be able to return from leave: _____

Will the employee have any restrictions when they return to work? _____ NO   _____ YES

If YES, describe the restrictions (If additional space is needed, please attach a separate sheet:

_____
_____
_____
_____
_____
_____
_____
_____
_____

| Name of Physician or Practitioner (*please type or print*) | Physician or Practitioner License Number | |
|---|---|---|
| Address | | |
| Phone Number | Fax Number | |
| Signed (*Physician or Practitioner*) | | Date |

# Exhibit 6

Brown v. UConn - Motion for Summary Judgment
Exh bit H - Affidavit of Megan Stimson
Page 23 of 24

| | |
|---|---|
| **From:** | Tiffany Brown |
| **To:** | Burton, Laura; Irizarry, Jason |
| **Cc:** | Stimson, Megan; HR - Human Resources |
| **Subject:** | resignation due to constructive discharge |
| **Date:** | Wednesday, May 10, 2023 3:33:33 PM |

Hello -

After nearly two years of enduring documented workplace discrimination and bullying - including pay inequality - I am relieved to follow the legal and medical advice I've received to resign from the position of Assistant Professor of Educational Leadership due to constructive discharge effective 5/12/23.

Please have my name, image and likeness removed from the UConn website as soon as possible. I will return your equipment and library books pending instructions on where to drop off the laptop.



# Exhibit I

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TIFFANY A. BROWN           :     CIVIL NO. 3:22-CV-01488-SFR
    *Plaintiff*             :
                            :
                            :

UNIVERSITY OF CONNECTICUT,  :
    *Defendant*          :     MAY 27, 2025

## AFFIDAVIT OF MELODY WILLIAMSON

I, Melody Williamson, having been duly sworn, depose and say:

1. I am over the age of eighteen and understand the obligations of an oath.

2. I have been employed by the University of Connecticut ("UConn") since 2008.

3. I am currently working as an Operations Team Manager in UConn's Human Resources Department.

4. This affidavit is based upon my personal knowledge acquired during my employment at UConn as stated herein.

5. In my capacity as UConn Human Resources Operations Team Manager, I have access to records pertaining UConn faculty member salaries.

6. Attached hereto as **Exhibit 1** is a true and accurate copy of a letter offering employment to Alexandra Freidus for the position of Assistant Professor (with redaction), indicating a scheduled start date of August 23, 2021, which was created and maintained in the regular course of business.

7. Attached hereto as **Exhibit 2** is a true and accurate copy of an email that was sent on September 7, 2022, from UConn's Human Resources Department to Alexandra Freidus, which was sent in the regular course of business.

8. Attached hereto as **<u>Exhibit 3</u>** is a true and accurate copy of a letter offering employment to Chen Chen for the position of Assistant Professor in Sport Management (with redaction), indicating a scheduled start date of August 23, 2021, which was created and maintained in the regular course of business.

9. Attached hereto as **<u>Exhibit 4</u>** is a true and accurate copy of an email that was sent on September 7, 2022, from UConn's Human Resources Department to Chen Chen, which was sent in the regular course of business.

10. Attached hereto as **<u>Exhibit 5</u>** is a true and accurate copy of a letter offering employment to Nari Shin for the position of Assistant Professor in Sport Management (with redaction), indicating a scheduled start date of August 23, 2021, which was created and maintained in the regular course of business.

11. Attached hereto as **<u>Exhibit 6</u>** is a true and accurate copy of an email that was sent on September 7, 2022, from UConn's Human Resources Department to Nari Shin, which was sent in the regular course of business.

12. Attached hereto as **<u>Exhibit 7</u>** is a true and accurate copy of a letter that was created on or around July 25, 2019, addressed to Adam McCready (with redaction), which was created and maintained in the regular course of business.

13. Attached hereto as **<u>Exhibit 8</u>** is a true and accurate copy of a letter offering employment to Adam McCready for the position of Assistant Professor in Residence in Higher Education and Student Affairs (with redactions), indicating a scheduled start date of August 23, 2020, which was created and maintained in the regular course of business.

2

14. Attached hereto as **<u>Exhibit 9</u>** is a true and accurate copy of a letter dated July 6, 2021 (with redactions), that was created on or around July 6, 2021, which was created and maintained in the regular course of business.

15. Attached hereto as **<u>Exhibit 10</u>** is a true and accurate copy of an email that sent on September 7, 2022, from UConn's Human Resources Department to Adam McCready, which was sent in the regular course of business.

16. Attached hereto as **<u>Exhibit 11</u>** is a true and accurate copy of a letter offering employment to Tiffany Brown for the position of Assistant Professor in the Department of Educational Leadership (with redactions), indicating a scheduled start date of August 23, 2021, which was created and maintained in the regular course of business.

17. Attached hereto as **<u>Exhibit 12</u>** is a true and accurate copy of an email that was sent on September 7, 2022, from UConn's Human Resources Department to Tiffany Brown, which was sent in the regular course of business.

18. I have read the foregoing statements and swear that they are true to the best of my knowledge and belief.

THE REST OF THIS PAGE IS INTENTIONALLY LEFT BLANK

3

_____

**Melody Williamson, Operations Team Manager, Human Resources Department, University of Connecticut**

**STATE OF CONNECTICUT )**

**)   ss.  Tolland County, Connecticut**

**COUNTY OF TOLLAND )**

Subscribed and sworn before me on this 27 day of _May_ , 2025.

_____

**Commissioner of the Superior Court/Notary Public**

Brooke Grant, Juris # 435259

4

# Exhibit 1



Alexandra Freidus



Dear Alexandra:

I am pleased to offer you employment at the University of Connecticut. Please review the information below that outlines the principal terms of your employment at the University.

| Job Title | Assistant Professor |
| --- | --- |
| Department | Educational Leadership |
| School/College/Division | Education |
| Supervisor | Laura Burton |
| Executive Division | Provost Academic Affairs |
| Building Location | UOC000093-GENTRY BLDG-ED LEADERSHIP |
| Appointment Term | 9 month |
| Percent Employed | 100 |
| Start Date | August 23, 2021 |
| Full-Time Annual Salary | $82,500.00 |
| 3rd Year Reappointment Review | Fall 2022 |
| Consideration for Academic Tenure | Fall 2024 |
| Tenure Effective | Fall 2025 |
| Health Benefits Enrollment Deadline | 31 Days after August 23, 2021 |
| Retirement Election Deadline | August 23, 2021 |
| Orientation Date | August 26, 2021 |
| Union Info | http://www.uconnaaup.org/ |

Your salary is based on a 9 month appointment and paid biweekly over twelve months. You will receive the first biweekly paycheck two weeks after the close of the pay period in which you are hired, contingent upon all required documentation being in place.

On occasion, faculty members have an opportunity to earn additional compensation during the winter or summer sessions at our Storrs campus or any one of our regional campuses. Earnings may not exceed the twelve month equivalent of your base annual salary under the "Extra Compensation Policy for Full-time Faculty in AAUP."

This offer of employment is contingent upon successful completion of a criminal background check, and your continued employment is conditional upon the timely completion of an approved I-9 (Employment Eligibility Verification Form). If you do require assistance in extending or obtaining work authorization at the University of Connecticut, please contact your department immediately.

If you accept our offer, you will soon receive a communication from the Department of Human Resources about several important topics, including Orientation, selecting a retirement plan prior to your first day of employment, and securing your University Network Identifier (NetID).

The duties and expectations of this appointment are consistent with our previous discussions and remain subject to adjustment, in accordance with University policy. Specifically, this position includes teaching, research, and service expectations as outlined in the Neag School's *Faculty Roles and Responsibilities* document.

This position may lead to academic tenure, according to the *By-Laws of the University of Connecticut.* According to procedures, you will be subject to annual reappointment reviews. Your third-year reappointment review consideration for academic tenure will occur as noted in the table on page one. These dates are inclusive of 2 years of credit granted towards the tenure probationary period for your service at a prior institution.

This offer includes 1 month of summer salary, and a start-up package of $20,000. These start-up funds will be available on 8/23/2021 and must be used by 8/22/2026.

Please be aware that the University has a Board of Trustees approved policy regarding consulting. The policy, related documents, and training materials may be found at http://consulting.uconn.edu. You must obtain approval to consult prior to the start of the activity. If you are currently engaged in consulting activities, you may wish to contact the Faculty Consulting Office prior to your hire date in order to ensure you are compliant with these rules.

University will provide reimbursement or direct payment for relocation and moving expenses in accordance with the Relocation and Moving Policy. For your move from Brooklyn, NY the department of Educational Leadership will provide up to $2,000. Please refer to the University's Relocation and Moving Procedures for more information. A representative from Signature Relocation will reach out to you within a week of the acceptance of this offer to consult with you regarding your relocation.

UConn is Connecticut's only public research extensive university, a prestigious designation that rests firmly on the institution's commitment to the unfettered pursuit of knowledge through research, teaching, and outreach. You are joining a University in which diverse views are welcomed and respected even as we work together to advance our academic mission and to effect constructive change. We are delighted that you will be joining us.

Please indicate your acceptance of the offer electronically no later than five business days from the date you received the letter.

Sincerely,

Laura Burton
Department Head

Jason G. Irizarry
Dean

By accepting this appointment I agree to the terms described above and to abide by all University policies including, but not limited to, the University's Code of Conduct and the State Code of Ethics.

Policies for review at http://policy.uconn.edu:

| | |
|---|---|
| "Consulting": | http://policy.uconn.edu/?p=155 |
| "Extra Compensation": | http://policy.uconn.edu/?p=366 |
| "Code of Conduct" Guide: | http://policy.uconn.edu/?p=140 |
| "PTR": | http://s.uconn.edu/4qh |

# Exhibit 2

 Outlook

---

**AAUP FY23 Salary Increase**

---

**From** HR - Info Systems & Data <HRITDataMgmt@uconn.edu>
**Date** Wed 9/7/2022 4:53 PM
**To**    Freidus, Alexandra <alexandra.freidus@uconn.edu>

Freidus, Alexandra Jeanne
Education
Educational Leadership

September 7, 2022

Dear Alexandra,

You are receiving this letter to inform you of the increase component(s) applied to your annual salary, effective August 23, 2022.

You have received the following:

General Wage Increase: $2,887.50
Merit Increase: $950.00

Your resulting full-time 9 month annual salary is $86,338.00. This increase is based on your salary as of August 23, 2022, prior to any appointment or term changes also beginning August 23, 2022. Appointment or term changes would have been subsequently processed by your department, and therefore are not reflected in this notification.

These pay increases will be reflected in your paycheck dated September 9, 2022.

If you have questions, please consult the Provost's FAQ on FY23 AAUP Collective Bargaining Increases for Faculty for guidance or contacts.

Our best wishes to you.

Regards,

Christopher Delello
Chief Human Resources Officer

Anne D'Alleva, Ph.D.
Interim Provost and Executive Vice President for Academic Affairs

# Exhibit 3



Neag School of Education
Office of the Dean
Gladis Kersaint, Ph.D.
Dean

Chen Chen


Dear Chen:

I am pleased to offer you employment at the University of Connecticut. Please review the information below that outlines the principal terms of your employment at the University.

| Job Title | Assistant Professor in Sport Management |
|---|---|
| Department | Educational Leadership |
| Supervisor | Laura Burton |
| Executive Division | Provost Academic Affairs |
| Building Location | UOC000093-GENTRY BLDG-ED LEADERSHIP |
| Appointment Term | 9 month |
| Start Date | August 23, 2021 |
| Full-Time Annual Salary | $78,000.00 |
| 3rd Year Reappointment Review | Fall 2024 |
| Consideration for Academic Tenure | Fall 2026 |
| Tenure Effective | Fall 2027 |
| Health Benefits Enrollment Deadline | 31 Days after August 23, 2021 |
| Retirement Election Deadline | August 23, 2021 |
| Orientation Date | To be determined |
| Union Info | http://www.uconnaaup.org/ |

Your salary is paid biweekly over twelve months. You will receive the first biweekly paycheck two weeks after the close of the pay period in which you are hired, contingent upon all required documentation being in place. On occasion, faculty members have an opportunity to earn additional compensation during the winter or summer sessions at our Storrs campus or any one of our regional campuses. Earnings may not exceed the twelve-month equivalent of your nine-month faculty base salary under the "Extra Compensation Policy for Full-time Faculty in AAUP."

This offer of employment is contingent upon successful completion of a criminal background check, and your continued employment is conditional upon the timely completion of an approved I-9 (Employment Eligibility Verification Form). If you do require assistance in extending or obtaining work authorization at the University of Connecticut, please contact the International Student & Scholar Services (ISSS)

249 GLENBROOK ROAD, UNIT 3064
STORRS CT 06269-3064
PHONE 860 486 3616
kersaint@uconn.edu
education.uconn.edu

UConn 001946

immediately at (860) 486-3855 or international@uconn.edu.

If you accept our offer, you will soon receive a communication from the Department of Human Resources about several important topics, including New Faculty Orientation, selecting a retirement plan prior to your first day of employment, and securing your University Network Identifier (NetID).

The duties and expectations of this appointment are consistent with our previous discussions and remain subject to adjustment, in accordance with University policy. Specifically, this position includes teaching, research, and service expectations as outlined in the Neag School's *Faculty Roles and Responsibilities* document.

In your capacity as a faculty member, you are eligible for academic tenure according to the *By-Laws of the University of Connecticut,* contingent upon favorable review by the Department of Educational Leadership, Neag School of Education, the Provost, and approval by the Board of Trustees. According to procedures, you will be subject to annual reappointment reviews. Your third-year reappointment review consideration for academic tenure will occur as noted in the table on page one.

This offer includes a start-up package of **$20,000.00** (Dean's Office funding) to be used within five years. These funds will be available **08/23/2021** and must be used by **08/22/2026**. You will also receive a 1-course release during your first year and a second course release to be determined based on course needs within the Sport Management program and communication with the Department Head in Educational Leadership.

Please be aware that the University has a Board of Trustees approved policy regarding consulting. The policy, related documents, and training materials may be found at http://consulting.uconn.edu. You must obtain approval to consult prior to the start of the activity. If you are currently engaged in consulting activities, you may wish to contact the Faculty Consulting Office prior to your hire date in order to ensure you are compliant with these rules.

The University may provide a reimbursement for moving expenses in accordance with the policy and subject to appropriate documentation and required receipts. Please contact your department for assistance.

UConn is Connecticut's only public research extensive university, a prestigious designation that rests firmly on the institution's commitment to the unfettered pursuit of knowledge through research, teaching, and outreach. You are joining a University in which diverse views are welcomed and respected even as we work together to advance our academic mission and to effect constructive change. We are delighted that you will be joining us.

Sincerely,

Laura Burton
Department Head

Gladis Kersaint
Dean

249 GLENBROOK ROAD, UNIT 3064
STORRS, CT 06269-3064

Brown v. UConn - Motion for Summary Judgment
Exhibit I - Affidavit of Melody Williamson
Page 13 of 41

UConn 001947

I ACCEPT THIS APPOINTMENT UNDER THE TERMS DESCRIBED ABOVE.

By accepting this appointment I agree to abide by all University policies including, but not limited to, the University's Code of Conduct and the State Code of Ethics.
Policies for review at http://policy.uconn.edu:

"Moving" Expenses Reimbursement: http://s.uconn.edu/4po
"Consulting":                            http://policy.uconn.edu/?p=155
"Extra Compensation":              http://policy.uconn.edu/?p=366
"Code of Conduct" Guide:          http://policy.uconn.edu/?p=140
"PTR":                                    http://s.uconn.edu/4qh

249 GLENBROOK ROAD, UNIT 3064
STORRS, CT 06269-3064

Brown v. UConn - Motion for Summary Judgment
Exhibit I - Affidavit of Melody Williamson
Page 14 of 41

UConn 001948

# Exhibit 4

 Outlook

---

**AAUP FY23 Salary Increase**

---

**From** HR - Info Systems & Data <HRITDataMgmt@uconn.edu>
**Date** Wed 9/7/2022 4:53 PM
**To**    Chen, Chen <cchen@uconn.edu>

Chen, Chen
Education
Educational Leadership

September 7, 2022

Dear Chen,

You are receiving this letter to inform you of the increase component(s) applied to your annual salary, effective August 23, 2022.

You have received the following:

General Wage Increase: $2,730.00
Merit Increase: $950.00

Your resulting full-time 9 month annual salary is $81,680.00. This increase is based on your salary as of August 23, 2022, prior to any appointment or term changes also beginning August 23, 2022. Appointment or term changes would have been subsequently processed by your department, and therefore are not reflected in this notification.

These pay increases will be reflected in your paycheck dated September 9, 2022.

If you have questions, please consult the Provost's FAQ on FY23 AAUP Collective Bargaining Increases for Faculty for guidance or contacts.

Our best wishes to you.

Regards,

Christopher Delello
Chief Human Resources Officer

Anne D'Alleva, Ph.D.
Interim Provost and Executive Vice President for Academic Affairs

# Exhibit 5



Neag School of Education
**Office of the Dean**
Gladis Kersaint, Ph.D.
Dean

NaRi Shin



Dear NaRi:

I am pleased to offer you employment at the University of Connecticut. Please review the information below that outlines the principal terms of your employment at the University.

| Job Title | Assistant Professor in Sport Management |
|---|---|
| Department | Educational Leadership |
| School/College | Education |
| Department Head | Laura Burton |
| Executive Division | Provost Academic Affairs |
| Building Location | UOC000093-GENTRY BLDG-ED LEADERSHIP |
| Appointment Term | 9 month |
| Start Date | August 23, 2021 |
| Full-Time Annual Salary | $78,000.00 |
| 3rd Year Reappointment Review | Fall 2023 |
| Consideration for Academic Tenure | Fall 2025 |
| Tenure Effective | Fall 2026 |
| Health Benefits Enrollment Deadline | 31 Days after August 23, 2021 |
| Retirement Election Deadline | August 23, 2021 |
| Orientation Date | To be determined |
| Union Info | http://www.uconnaaup.org/ |

Your salary is paid biweekly over twelve months. You will receive the first biweekly paycheck two weeks after the close of the pay period in which you are hired, contingent upon all required documentation being in place. On occasion, faculty members have an opportunity to earn additional compensation during the winter or summer sessions at our Storrs campus or any one of our regional campuses. Earnings may not exceed the twelve-month equivalent of your nine-month faculty base salary under the "Extra Compensation Policy for Full-time Faculty in AAUP."

This offer of employment is contingent upon successful completion of a criminal background check, and your continued employment is conditional upon the timely completion of an approved I-9 (Employment Eligibility Verification Form). If you do require assistance in extending or obtaining work authorization at the University of Connecticut, please contact the International Student & Scholar Services (ISSS) immediately at (860) 486-3855 or international@uconn.edu.

249 GLENBROOK ROAD, UNIT 3064
STORRS, CT 06269-3064
PHONE 860.486.3815
kersaint@uconn.edu
education.uconn.edu

Brown v. UConn - Motion for Summary Judgment
Exhibit I - Affidavit of Melody Williamson
Page 18 of 41

UConn 002014

If you accept our offer, you will soon receive a communication from the Department of Human Resources about several important topics, including New Faculty Orientation, selecting a retirement plan prior to your first day of employment, and securing your University Network Identifier (NetID).

The duties and expectations of this appointment are consistent with our previous discussions and remain subject to adjustment, in accordance with University policy. Specifically, this position includes teaching, research, and service expectations as outlined in the Neag School's *Faculty Roles and Responsibilities* document.

In your capacity as a faculty member, you are eligible for academic tenure according to the *By-Laws of the University of Connecticut,* contingent upon favorable review by the Department of Educational Leadership, Neag School of Education, the Provost, and approval by the Board of Trustees. According to procedures, you will be subject to annual reappointment reviews. Your third-year reappointment review consideration for academic tenure will occur as noted in the table on page one, which includes 1-year of credit towards tenure.

This offer includes a start-up package of **$30,000.00** (Dean's Office: $20,000.00 and EDLR: $10,000.00) to be used within five years. These funds will be available **08/23/2021** and must be used by **08/22/2026**. You will also receive a 1-course release during your first year determined based on course needs within the Sport Management program and communication with the Department Head in Educational Leadership.

Please be aware that the University has a Board of Trustees approved policy regarding consulting. The policy, related documents, and training materials may be found at http://consulting.uconn.edu. You must obtain approval to consult prior to the start of the activity. If you are currently engaged in consulting activities, you may wish to contact the Faculty Consulting Office prior to your hire date in order to ensure you are compliant with these rules.

The University may provide a reimbursement for moving expenses in accordance with the policy and subject to appropriate documentation and required receipts. The Department of Educational Leadership will cover the difference in moving expenses not reimbursed by the University. Please contact your department for assistance.

UConn is Connecticut's only public research extensive university, a prestigious designation that rests firmly on the institution's commitment to the unfettered pursuit of knowledge through research, teaching, and outreach. You are joining a University in which diverse views are welcomed and respected even as we work together to advance our academic mission and to effect constructive change. We are delighted that you will be joining us.

Sincerely,

*L J Burton*

Laura Burton
Department Head

*Gladis Kersaint*

Gladis Kersaint
Dean

249 GLENBROOK ROAD, UNIT 3064
STORRS, CT 06269-3064
PHONE 860 486 3815
kersaint@uconn.edu
education.uconn.edu

An Equal Opportunity Employer

I ACCEPT THIS APPOINTMENT UNDER THE TERMS DESCRIBED ABOVE.

By accepting this appointment I agree to abide by all University policies including, but not limited to, the University's Code of Conduct and the State Code of Ethics.

Policies for review at http://policy.uconn.edu:

"Moving" Expenses Reimbursement: http://s.uconn.edu/4po
"Consulting":                    http://policy.uconn.edu/?p=155
"Extra Compensation":            http://policy.uconn.edu/?p=366
"Code of Conduct" Guide:         http://policy.uconn.edu/?p=140
"PTR":                           http://s.uconn.edu/4qh

249 GLENBROOK ROAD, UNIT 3064
STORRS, CT 06269-3064
PHONE 860.486.3815
kersaint@uconn.edu
education.uconn.edu

An NCATE-Accredited Institution
An Equal Opportunity Employer

Brown v. UConn - Motion for Summary Judgment
Exhibit I - Affidavit of Melody Williamson
Page 20 of 41

UConn 002016

# Exhibit 6

**Williamson, Melody**

| | |
|---|---|
| **From:** | HR - Info Systems & Data |
| **Sent:** | Wednesday, September 7, 2022 4:59 PM |
| **To:** | Shin, NaRi |
| **Subject:** | AAUP FY23 Salary Increase |

Shin, NaRi
Education
Educational Leadership

September 7, 2022

Dear NaRi,

You are receiving this letter to inform you of the increase component(s) applied to your annual salary, effective August 23, 2022.

You have received the following:

General Wage Increase: $2,730.00

Your resulting full-time 9 month annual salary is $80,730.00. This increase is based on your salary as of August 23, 2022, prior to any appointment or term changes also beginning August 23, 2022. Appointment or term changes would have been subsequently processed by your department, and therefore are not reflected in this notification.

These pay increases will be reflected in your paycheck dated September 9, 2022.

If you have questions, please consult the Provost's FAQ on FY23 AAUP Collective Bargaining Increases for Faculty for guidance or contacts.

Our best wishes to you.

Regards,

Christopher Delello
Chief Human Resources Officer

Anne D'Alleva, Ph.D.
Interim Provost and Executive Vice President for Academic Affairs

# Exhibit 7



**UNIVERSITY OF CONNECTICUT**

July 25, 2019
Adam McCready



Dear Adam:

I am pleased to offer you the position of **Visiting Assistant Professor** in the **Department of Educational Leadership** of the **Neag School of Education** at the University of Connecticut with a start date of **August 23, 2019.** This position reports to **the Educational Leadership Department Head** and is a full-time **nine-month** position with a starting salary of **$72,000.00.** This appointment does not lead to permanent academic tenure and must be specifically renewed in order to continue your employment beyond **August 22, 2020.**

Your salary will be based on a **nine-month** appointment and paid biweekly over twelve months. You will receive the first biweekly pay check two weeks after the close of the pay period in which you are hired, contingent upon all required documentation being in place. On occasion faculty have an opportunity to earn additional compensation during the winter or summer sessions at our Storrs campus or any one of our regional campuses. Earnings may not exceed the equivalent of a twelve month salary under the "Extra Compensation Policy for Faculty.

This offer of employment is contingent upon successful completion of a criminal background check, and your continued employment is conditional upon the timely completion of an approved I-9 (Employment Eligibility Verification Form).

Please be aware that the University has a Board of Trustees approved policy regarding consulting. The policy, related documents, and training materials may be found at consulting.uconn.edu. Approval to consult must be obtained prior to the start of the activity. If you are currently engaged in consulting activities, you may wish to contact the Faculty Consulting Office on your campus prior to your hire date in order to ensure you are compliant with this rule.

If you accept our offer, we ask that you plan to attend the New Faculty Orientation sponsored by the Office of the Provost and the Department of Human Resources. The orientation will be held on **August 22, 2019.** Information regarding the time and location will be forthcoming. At the orientation, you will have an opportunity to meet members of UConn's academic administration, learn about university expectations of research, teaching, service and outreach, and be introduced to relevant, specific State of Connecticut and University policies.

If you are unable to attend New Faculty Orientation, information regarding the University's comprehensive benefits programs, including health, life and disability insurance as well as retirement plans, is available at http://www.hr.uconn.edu. A representative from the Employee Benefits Unit is available to discuss enrollment in these benefits. Please contact the Employee Benefits Unit at benefits@uconn.edu or (860) 486-0400 to schedule an enrollment session. Other terms and conditions of your employment are contained in the collective bargaining agreement between the University of Connecticut and the American Association of University Professors (AAUP). A copy of the collective bargaining agreement may be found on the AAUP Website at: http://www.uconnaaup.org/.

It is important to note that new employees are required to make an irrevocable retirement election on or before their first day of employment. Information regarding the retirement election process as well as helpful information regarding the retirement program options is available on the Human Resources website

Neag School of Education
**Department of Educational Leadership**
249 GLENBROOK ROAD, UNIT 3093
STORRS, CT 06269-3093
PHONE 860.486.0250
FAX 860.486.4028
www.edlr.uconn.edu

UConn 3083

*An Equal Opportunity Employer*

at: http://hr.uconn.edu/retirement-election/. Employees who fail to make a voluntary irrevocable retirement plan selection by the first day of employment will be automatically defaulted into a Plan as described in the resources available on the Human Resources website. The automatic defaults will be irrevocable.

You will be issued a University network identifier, known as a NetID, which allows access to various computing services at the University. There are multiple methods by which you may learn your NetID: (1) You will receive a letter via mail to your home providing you with your NetID and instructions for activation (your Department will also be informed of your NetID); or (2) Retrieve your NetID by visiting http://netid.uconn.edu; selecting *Find your NetID*; and then selecting *Activate your NetID*. If you have difficulty with any of the above NetID procedures, and need access to University resources, please call the University Information Technology Services (UITS) Help Center for assistance at 860-486-4357 and select option 3. If your NetID is available, they will verify your identity and help you resolve your initial NetID needs. More NetID information can be found at http://netid.uconn.edu.

You are joining a University hallmarked by a sense of community in which diverse views are welcomed and respected and in which there is a sense of unity which comes from working together to effect constructive change. UConn is Connecticut's only public research extensive university, a prestigious designation shared by only the nation's top higher education institutions. UConn emphasizes the discovery of knowledge through research and through the dissemination of that knowledge in learning and outreach. We have one goal: assuring the vitality and viability of the University of Connecticut for the benefit of the state and its citizens. We are delighted that you will be joining us in this effort.

Please indicate your acceptance of the offer by signing below and returning one copy of this letter to me, with your original signature, no later than **August 7, 2019.**

Sincerely,

Jennifer P. McGarry
_____
Jennifer McGarry
Department Head, Educational Leadership

Gladis Kersaint
_____
Gladis Kersaint
Dean, Neag School of Education

I ACCEPT THIS APPOINTMENT UNDER THE TERMS DESCRIBED ABOVE.

By accepting this appointment I agree to abide by all University policies including, but not limited to, the University's Code of Conduct.

_____          8/5/2019
Signature of Acceptance            _____
                                    Date

X    I am a U.S. citizen/permanent resident or an individual who has proper U.S. work authorization that will not require assistance/visa sponsorship from the University of Connecticut in the future.

     I DO require assistance in extending or obtaining work authorization at the University of Connecticut to begin employment on the start date stated in this letter or in the future.

My current visa status is: _____.

Neag School of Education
**Department of Educational Leadership**
249 GLENBROOK ROAD, UNIT 3093
STORRS, CT 06269-3093
PHONE 860.486.6278
FAX 860.486.4028
www.edlr.uconn.edu

*An NCATE Accredited Institution*

UConn 3084
*An Equal Opportunity Employer*

My work authorization is valid until: _____.

If you do require assistance in extending or obtaining work authorization at the University of Connecticut, please contact the Department of International Services and Programs (DISP) immediately at (860) 486-3855 and /or disp@uconn.edu.


cc:    Provost
        Dean
         Department Head
        Payroll Department
        DISP (if applicable)


Enclosure: Form I-9, Employment Eligibility Verification http://www.uscis.gov/files/form/i-9.pdf

Policies for review at http://policy.uconn.edu:

   "Moving" Expenses Reimbursement:    http://policy.uconn.edu/?p=987
   "Consulting":                       http://policy.uconn.edu/?p=155
   "Extra Compensation":                    http://policy.uconn.edu/?p=366
   "Code of Conduct" Guide:            http://policy.uconn.edu/?p=140


**Additional Information**
s Faculty and Staff Resource Guide (http://resource.uconn.edu/new_fac_staff/index.html)
s Affordable Care Act Notice (http://hr.uconn.edu/docs/affordable_care_act_notice_2013.pdf)

*Last updated, March 2014*

Neag School of Education
**Department of Educational Leadership**
249 GLENBROOK ROAD, UNIT 3093
STORRS, CT 06269-3093
PHONE 860.486.6278
FAX 860.486.4028
www.edlr.uconn.edu

*An NCATE Accredited Institution*
Brown v. UConn - Motion for Summary Judgment
Exhibit I - Affidavit of Melody Williamson
Page 26 of 41

UConn 3085
*An Equal Opportunity Employer*

# Exhibit 8

Adam McCready

█████████████

Dear Adam McCready:

I am pleased to offer you employment at the University of Connecticut. Please review the information below that outlines the principal terms of your employment at the University.

| | |
|---|---|
| Job Title | Assistant Professor in Residence in Higher Education and Student Affairs |
| Department | Educational Leadership |
| School/College | Education |
| Supervisor | Laura Burton |
| Executive Division | Provost Academic Affairs |
| Building Location | UOC000093-GENTRY BLDG-ED LEADERSHIP |
| Appointment Term | 9 month |
| Percent Employed | 100 |
| Start Date | August 23, 2020 |
| End Date | August 22, 2021 |
| Full-Time Annual Salary | $75,870.00 |
| Union Info | http://www.uconnaaup.org/ |

This appointment does not lead to permanent academic tenure. Your current Visiting appointment will serve as your probationary year. You will be eligible for additional annual appointments, up to a maximum of five one-year appointments.   Beginning the seventh year you will be eligible for multi-year appointments of between three and five years in duration.

Your salary is based on a 9 month appointment and paid biweekly over twelve months. You will receive the first biweekly paycheck two weeks after the close of the pay period in which you are hired, contingent upon all required documentation being in place. On occasion, faculty members have an opportunity to earn additional compensation during the winter or summer sessions at our Storrs campus or any one of our regional campuses. Earnings may not exceed the twelve month equivalent of your base annual salary under the "Extra Compensation Policy for Full-time Faculty in AAUP."

Your benefits and retirement elections will continue unchanged. Please contact the Employee Benefits Department at benefits@uconn.edu or (860) 486-0400 should you have any questions. Your University Network Identifier, known as a Net ID, will remain the same.

UConn 3077
An Equal Opportunity Employer

The duties and expectations of this appointment are consistent with our previous discussions and remain subject to adjustment, in accordance with University policy. Specifically, this position includes teaching, research, public engagement, and service expectations as outlined in the Neag School's Faculty Roles and responsibility document.

This offer includes a start-up package of **$5,000**. These funds will be available on **August 23, 2020** and must be used by **August 22, 2021**.

Other terms and conditions of your employment are contained in the collective bargaining agreement between the University of Connecticut and the American Association of University Professors (AAUP). A copy of the collective bargaining agreement may be found on the AAUP Website at: http://www.uconnaaup.org/.

Please be aware that the University has a Board of Trustees approved policy regarding consulting. The policy, related documents, and training materials may be found at http://consulting.uconn.edu. You must obtain approval to consult prior to the start of the activity. If you are currently engaged in consulting activities, you may wish to contact the Faculty Consulting Office prior to your hire date in order to ensure you are compliant with these rules.

UConn is Connecticut's only public research extensive university, a prestigious designation that rests firmly on the institution's commitment to the unfettered pursuit of knowledge through research, teaching, and outreach. You are joining a University in which diverse views are welcomed and respected even as we work together to advance our academic mission and to effect constructive change. We are delighted that you will be joining us.

Sincerely,

Laura Burton
EDLR Department Head

Gladis Kersaint
Dean, Neag School of Education

I ACCEPT THIS APPOINTMENT UNDER THE TERMS DESCRIBED ABOVE.

By accepting this appointment I agree to abide by all University policies including, but not limited to, the University's Code of Conduct and the State Code of Ethics.

Policies for review at http://policy.uconn.edu:

UConn 3078

"Consulting":                  http://policy.uconn.edu/?p=155
"Extra Compensation":          http://policy.uconn.edu/?p=366
"Code of Conduct" Guide:       http://policy.uconn.edu/?p=140

# Exhibit 9

July 6, 2021

Adam Mccready

██████████████

██████████████████

Dear Adam:

I am pleased to offer you a continuation of your employment at the University of Connecticut. Please review the information below that outlines the principal terms of your employment at the University.

| Posting/Internal Job Title | Assistant Professor in Residence in Higher Education and Student Affairs |
|---|---|
| Department | Educational Leadership |
| Supervisor | Laura Burton |
| Executive Division | Provost Academic Affairs |
| Building Location | UOC000093-GENTRY BLDG-ED LEADERSHIP |
| Work Department/Non-Academic | UOC01216-Educational Leadership |
| Appointment Term | 9-month |
| Start Date | August 23, 2021 |
| End Date | August 22, 2022 |
| Full-Time Annual Salary | $75,870 |
| Union Info | http://www.uconnaaup.org/ |

This appointment does not lead to permanent academic tenure. You will be eligible for additional annual appointments, up to a maximum of five one-year appointments. Beginning the seventh year you will be eligible for multi-year appointments of between three and five years in duration.

Your salary is based on a 9 month appointment and paid biweekly over twelve months. You will receive the first biweekly paycheck two weeks after the close of the pay period in which you are hired, contingent upon all required documentation being in place. On occasion, faculty members have an opportunity to earn additional compensation during the winter or summer sessions at our Storrs campus or any one of our regional campuses. Earnings may not exceed the twelve month equivalent of your base annual salary under the "Extra Compensation Policy for Full-time Faculty in AAUP."

Your benefits and retirement elections will continue unchanged. Please contact the Employee Benefits Department at benefits@uconn.edu or (860) 486-0400 should you have any questions. Your University Network Identifier, known as a Net ID, will remain the same.

The duties and expectations of this appointment are consistent with our previous discussions and remain subject to adjustment, in accordance with University policy. Specifically, this position includes

teaching, research, public engagement, and service expectations as outlined in the Neag School's Faculty Roles and responsibility document.

Other terms and conditions of your employment are contained in the collective bargaining agreement between the University of Connecticut and the American Association of University Professors (AAUP). A copy of the collective bargaining agreement may be found on the AAUP Website at: http://www.uconnaaup.org/.

Please be aware that the University has a Board of Trustees approved policy regarding consulting. The policy, related documents, and training materials may be found at http://consulting.uconn.edu. You must obtain approval to consult prior to the start of the activity. If you are currently engaged in consulting activities, you may wish to contact the Faculty Consulting Office prior to your hire date in order to ensure you are compliant with these rules.

Sincerely,

Laura Burton
Department Head

I ACCEPT THIS APPOINTMENT UNDER THE TERMS DESCRIBED ABOVE.

Signature                                                      7/6/2021

                                                              Date

By accepting this appointment I agree to abide by all University policies including, but not limited to, the University's Code of Conduct and the State Code of Ethics.
Policies for review at http://policy.uconn.edu:

"Consulting":
"Extra Compensation":
"Code of Conduct" Guide:
last updated November 2019

http://policy.uconn.edu/?p=155
http://policy.uconn.edu/?p=366
http://policy.uconn.edu/?p=140

UConn 3082

# Exhibit 10

 **Outlook**

---

## AAUP FY23 Salary Increase

**From** HR - Info Systems & Data <HRITDataMgmt@uconn.edu>

**Date** Wed 9/7/2022 4:53 PM

**To** Mccready, Adam <adam.mccready@uconn.edu>

Mccready, Adam M.
Education
Educational Leadership

September 7, 2022

Dear Adam,

You are receiving this letter to inform you of the increase component(s) applied to your annual salary, effective August 23, 2022.

You have received the following:

General Wage Increase: $2,774.98
Merit Increase: $2,874.01

Your resulting full-time 9 month annual salary is $84,934.00. This increase is based on your salary as of August 23, 2022, prior to any appointment or term changes also beginning August 23, 2022. Appointment or term changes would have been subsequently processed by your department, and therefore are not reflected in this notification.

These pay increases will be reflected in your paycheck dated September 9, 2022.

If you have questions, please consult the Provost's FAQ on FY23 AAUP Collective Bargaining Increases for Faculty for guidance or contacts.

Our best wishes to you.

Regards,

Christopher Delello
Chief Human Resources Officer

Anne D'Alleva, Ph.D.
Interim Provost and Executive Vice President for Academic Affairs

UConn 3074

about:blank    Brown v. UConn - Motion for Summary Judgment
Exhibit I - Affidavit of Melody Williamson
Page 35 of 41    1/1

# Exhibit 11



**UNIVERSITY OF CONNECTICUT**

Tiffany Brown



Dear Tiffany:

I am pleased to offer you employment at the University of Connecticut. Please review the information below that outlines the principal terms of your employment at the University.

| Job Title | Assistant Professor |
|---|---|
| Department | Educational Leadership |
| School/College/Division | Education |
| Supervisor | Laura Burton |
| Executive Division | Provost Academic Affairs |
| Building Location | UOC000093-GENTRY BLDG-ED LEADERSHIP |
| Appointment Term | 9 month |
| Percent Employed | 100 |
| Full-Time Annual Salary | $78,000 |
| Start Date | August 23, 2021 |
| 3rd Year Reappointment Review | Fall 2024 |
| Consideration for Academic Tenure | Fall 2026 |
| Tenure Effective | Fall 2027 |
| Retirement Election Deadline | August 23, 2021 |
| Orientation Date | August 26, 2021 |
| Health Benefits Enrollment Deadline | 31 Days after August 23, 2021 |
| Union Info | http://www.uconnaaup.org/ |

Your salary is based on a 9 month appointment and paid biweekly over twelve months. You will receive the first biweekly paycheck two weeks after the close of the pay period in which you are hired, contingent upon all required documentation being in place.

On occasion, faculty members have an opportunity to earn additional compensation during the winter or summer sessions at our Storrs campus or any one of our regional campuses. Earnings may not exceed the twelve month equivalent of your base annual salary under the "Extra Compensation Policy for Full-time Faculty in AAUP."

This offer of employment is contingent upon successful completion of a criminal background check, and your continued employment is conditional upon the timely completion of an approved I-9 (Employment Eligibility Verification Form). If you do require assistance in extending or obtaining work authorization at the University of Connecticut, please contact your department immediately.

If you accept our offer, you will soon receive a communication from the Department of Human Resources about several important topics, including Orientation, selecting a retirement plan prior to your first day of employment, and securing your University Network Identifier (NetID).

The duties and expectations of this appointment are consistent with our previous discussions and remain subject to adjustment, in accordance with University policy. Specifically, this position includes teaching, research, and service expectations as outlined in the Neag School's *Faculty Roles and Responsibilities* document.

This position may lead to academic tenure, according to the *By-Laws of the University of Connecticut.* According to procedures, you will be subject to annual reappointment reviews. Your third-year reappointment review consideration for academic tenure will occur as noted in the table on page one.

This offer includes 1 month of summer salary, and a start-up package of $20,000. These start-up funds will be available on 8/23/2021 and must be used by 8/22/2026.

University will provide reimbursement or direct payment for relocation and moving expenses in accordance with the Relocation and Moving Policy. For your move from Brooklyn, NY the department of Educational Leadership will provide up to $2,000. Please refer to the University's Relocation and Moving Procedures for more information. A representative from Signature Relocation will reach out to you within a week of the acceptance of this offer to consult with you regarding your relocation.

Please be aware that the University has a Board of Trustees approved policy regarding consulting. The policy, related documents, and training materials may be found at http://consulting.uconn.edu. You must obtain approval to consult prior to the start of the activity. If you are currently engaged in consulting activities, you may wish to contact the Faculty Consulting Office prior to your hire date in order to ensure you are compliant with these rules.

UConn is Connecticut's only public research extensive university, a prestigious designation that rests firmly on the institution's commitment to the unfettered pursuit of knowledge through research, teaching, and outreach. You are joining a University in which diverse views are welcomed and respected even as we work together to advance our academic mission and to effect constructive change. We are delighted that you will be joining us.

Please indicate your acceptance of the offer electronically no later than five business days from the date you received the letter.

Sincerely,

Laura Burton
Department Head

Jason G. Irizarry
Dean

By accepting this appointment I agree to the terms described above and to abide by all University policies including, but not limited to, the University's Code of Conduct and the State Code of Ethics.

Policies for review at http://policy.uconn.edu:

"Consulting":                http://policy.uconn.edu/?p=155
"Extra Compensation":        http://policy.uconn.edu/?p=366
"Code of Conduct" Guide:     http://policy.uconn.edu/?p=140
"PTR":                       http://s.uconn.edu/4qh

# Exhibit 12

## Williamson, Melody

| | |
|---|---|
| **From:** | HR - Info Systems & Data |
| **Sent:** | Wednesday, September 7, 2022 4:59 PM |
| **To:** | Brown, Tiffany |
| **Subject:** | AAUP FY23 Salary Increase |

Brown, Tiffany
Education
Educational Leadership

September 7, 2022

Dear Tiffany,

You are receiving this letter to inform you of the increase component(s) applied to your annual salary, effective August 23, 2022.

You have received the following:

General Wage Increase: $2,730.00

Your resulting full-time 9 month annual salary is $80,730.00. This increase is based on your salary as of August 23, 2022, prior to any appointment or term changes also beginning August 23, 2022. Appointment or term changes would have been subsequently processed by your department, and therefore are not reflected in this notification.

These pay increases will be reflected in your paycheck dated September 9, 2022.

If you have questions, please consult the Provost's FAQ on FY23 AAUP Collective Bargaining Increases for Faculty for guidance or contacts.

Our best wishes to you.

Regards,

Christopher Delello
Chief Human Resources Officer

Anne D'Alleva, Ph.D.
Interim Provost and Executive Vice President for Academic Affairs

# Exhibit J

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

### A F F I D A V I T OF CERTIFICATION

I, Charles Perry, being duly affirmed, hereby depose and say that:

1.   My name is Charles Perry; I am over the age of eighteen (18) and understand the obligation of an affirmation.

2.   I am employed as a Paralegal Specialist/Freedom of Information Officer by the Connecticut Commission on Human Rights and Opportunities.

3.   As such, I have access to all complaint files maintained by the Connecticut Commission on Human Rights and Opportunities.

4.   In response to a request from **Colleen Valentine, AAG,** I have obtained the case file in the matter of **Tiffany Brown v. University of Connecticut,** CHRO Case No. **2340319, EEOC Fed No. 16A202300940**.

5.   I hereby certify that the enclosed copies are true and accurate copies as they appear in the above noted complaint file, as further described below.

a)  Affidavit of Illegal Discrimination filed/received March 21, 2023 (7 pages).

b)  Amended Complaint filed/received April 5, 2023 (2 pages).

6.   The copies of items sent by us are true and accurate copies of documents maintained in the above noted case file in the regular course of business of the Connecticut Commission on Human Rights and Opportunities.

_____          6/11/2025
Charles Perry                                          Date
Paralegal Specialist/FOI Officer

On this the ___11th___ day of ___June___, 2025 before me, Jonathan Sykes, the undersigned Officer, personally appeared Charles Perry, Paralegal Specialist/FOI Officer for the Connecticut Commission on Human Rights and Opportunities, known to me to be the person noted in the foregoing instrument, who acknowledged that he executed the certification of same in the capacity therein stated and for the purposes therein contained.

Subscribed and sworn to before me, Jonathan Sykes, this ___11th___ day of ___June___, 2025.

_____
Commission of the Superior Court

Jonathan Sykes
juris no. 443631

**STATE OF CONNECTICUT**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**

### AFFIDAVIT OF ILLEGAL DISCRIMINATION

| For CHRO Office Use Only | | |
|---|---|---|
| **Date Filed:** 3/21/23 | **Case No.** | 2340319 |
| **EEOC No.** 16A202300940 | | |

My Name is <u>Tiffany Brown</u>
My Address is ███████████ New York, New York ███
My Mailing address is (if different)
My telephone number is    Home: ███████████    Cell:
My email address is: ████████
The Respondent is <u>University of Connecticut (UConn): Neag School of Education</u>
Whose business address is Charles B. Gentry Building 249 Glenbrook Road U-3064, Storrs, Connecticut, 06269.
The alleged discriminatory practice took place in Storrs, Connecticut.
The last discriminatory action took place on or about November 10, 2022
I was

| | | | | | |
|---|---|---|---|---|---|
| ☐ | Denied a reasonable Accommodation on | | ☐ | Suspended on | |
| ☐ | Terminated on | | ☒ | Not reappointed on | 11/10/2022 |
| ☐ | Laid off on | | ☐ | Harassed on | |
| ☐ | Demoted on | | ☐ | Warned on | |
| ☐ | Poorly evaluated on | | ☐ | Denied a raise on | |
| ☐ | Sexually harassed on | | ☐ | Transferred on | |
| ☐ | Earning a different rate of pay on | | ☐ | Constructively discharged on | |
| ☐ | Delegated unequal duties on | | ☐ | Not hired on | |
| ☒ | Delegated difficult assignments on | | ☐ | Not promoted on | |
| ☐ | Placed on probation on | | ☐ | Trained less on | |
| ☐ | Given reduced hours on | | ☒ | Retaliated against on | |
| ☐ | Denied equal services on | | | | |
| ☒ | Discriminated against in terms and conditions of employment on August 18, 2022 and continuing | | | | |
| ☐ | Other : | | | | |

and I believe that my

| | | | | | |
|---|---|---|---|---|---|
| ☒ | Age   30 DOB:06/13/92 | | ☐ | Marital Status | |
| ☐ | Physical Disability (identify) | | ☒ | Race | African American |
| ☐ | Learning Disability (Identify) | | ☒ | Color | Black |
| ☐ | Mental disorder (Identify) | | ☐ | National Origin | |
| ☐ | Sexual orientation (Identify) | | ☐ | Ancestry | |

## STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ | Gender Identity/Expression | | | ☐ | Alienage | |
| ☐ | Sex (Identify) | Female | | ☐ | Intellectual disability | |
| ☐ | Religion/Creed (Identify | | | ☐ | Sex Pregnancy | |
| ☐ | Previously opposed, Filed or Assisted | | | ☐ | Prior Conviction of a crime (state employment only) | |
| ☐ Other | | | | | | |

was in part a factor in this action.

I believe that the respondent violated the following statutes and acts listed below, as amended, enforced through CONN. GEN. STAT. § 46a-58(a) if applicable:

| | | | |
|---|---|---|---|
| ☒ | CONN. GEN. STAT. § 46a-60(b)(1) | ☒ | Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (cite for 15 or more individuals employed) |
| ☐ | CONN. GEN. STAT. § 46a-60(b)(4) | | |
| ☐ | CONN. GEN. STAT. § 46a-60(b)(5) | | |
| ☐ | CONN. GEN. STAT. § 46a-60(b)(7) | ☐ | Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (cite for 20 or more individuals employed) |
| ☐ | CONN. GEN. STAT. § 46a-60(b)(8) | | |
| ☐ | CONN. GEN. STAT. § 46a-64 | | |
| ☐ | CONN. GEN. STAT. § 46a-70 | ☐ | Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. |
| ☐ | CONN. GEN. STAT. § 46a-71 | | |
| ☐ | CONN. GEN. STAT. § 46a-80 | ☐ | Equal Pay Act of 1964, U.S.C. § 206 |
| ☐ | CONN. GEN. STAT. § 46a-81 | ☐ | Section 504 of the Rehabilitation Act of 1973 |
| ☐ Other | | | |

**I provide the following particulars:**

1. **The Respondent employs more than 20 people.**
2. **The following is my statement:**
3. **Involved Parties**: • Tiffany Brown (myself, referred to as TB throughout), Assistant Professor of Educational Leadership, University of Connecticut • Jason Irizarry (JI throughout), Dean and Professor, Neag School of Education, University of Connecticut • Laura Burton (LB throughout), Department Head, Educational Leadership and Professor, Sports Management, University of Connecticut • Casey Cobb (CC throughout), Neag Endowed Professor of Education Policy, University of Connecticut
4. Incident Timeline: August 18th, 2022 (context): CC sends TB an email with the subject line "Fall email to EdD cohort". TB and CC are both scheduled to teach the EdD students in Fall 2022; the email appears to be a summary of decisions made about the composition of and scheduling of classes for the EdD cohort. There had been no in-person or virtual meetings arranged with regards to these details.
5. In the email, CC describes a scheduling conflict he has noticed in the EdD students' schedule: • "I had one of the Bridge students email me a few days ago asking about the possibility of holding the Aug 30th class remotely, due to her and two other students' concerns about making class on their first day of school. I didn't think of this and probably should have, but I also am not changing the schedule. Just making you aware the first day will be hectic and

## STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

people will undoubtedly be late, as some travel from far and may not be able to leave school on time that day. In fact, expect throughout the semester 1-2 student invariably arrive late and are always apologetic. It's just the reality with their positions and emergencies come up."

6. CC also describes how we make accommodations in our scheduling courses for our students, who mostly work full-time during the day: • "You'll see in the email below the routine for the back to back courses. Our courses are a little shorter than normal because of the back-to-back nature after they work all day. We give them a 30-minute break for dinner. So, you're (sic) course will start at 4 and go to 6:15. Throw in a short break as you see fit. Then I pick them up at 6:45 and go to 9 pm."

7. November 1st, 2022 (incident begins): TB has been teaching the EdD cohort a course titled "Workplace Learning (EDLR 5202)," scheduled from 4:15 to 6:15 PM as CC's email detailed in August 2022. TB writes to LB and CC with concerns based on two months' worth of classroom observations, in which she describes that – as CC predicted – the students are not able to make class on time when coming from their workplace commitments.

8. Some important details from the thread – to which both LB and CC respond – is summarized below. • TB informs CC and LB that students are regularly unable to make class on time, also describes impact on her as employee given her increased commuting costs to campus. 2 o CC suggests that TB and CC "swap time slots," noting that "Some students have expressed preference for all in person." o TB notes that swapping time slots does not solve the issue of the time slot itself being scheduled at a time most students are still technically on the clock.

9. TB reiterates (in response to CC noting that he lives just a few minutes away from campus) that the time slot works does not work for students who are commuting from other states to be on time. o TB sends Excerpt 1 to the thread and reminds CC that he has known since before the semester started that this time slot would not work for students. TB writes; "I am coming from the perspective of making student-centered decisions. I hope you will support my efforts to do so…it's not fair to me or to them (I lecture in the first 30 minutes of class, so many regularly miss it." o

10. CC responds to TB: "Why don't you pick another remote class. Let me know the date." TB responds and reiterates that CC has admitted in writing the schedule would not work for students and did nothing to change it. TB adds: "I cannot join you in knowing that this does not work for them and choosing against their best interests. The students will get to vote today, because I want to know what they think. Depending on their responses (which I am happy to share), I will get back to you on the plan for how to best support them moving forward." •

11. TB attends class on November 1st, 2022 and finds that – as usual – only 8 of the 19 students are there by the start of class at 4.15. TB learns that two students are delayed because one got into a car accident rushing to class and a second stopped along the highway to pick her up. o TB waits until the students arrive, let them know they should vote on which sessions they would like to be remote for the remainder of the semester, and leaves the room while they do.

12. TB returns to the thread started with LB and CC to report that 60-80% of the students have said they need at least two more remote sessions. o TB forwards student emails in which students also petition for remote classes, and in which student who got into car accident describes her experience. o

**STATE OF CONNECTICUT**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**

13. LB responds for the first time: "After reviewing what has been shared, it makes sense to offer the Nov. 8th course remotely. The final two classes (11/15 and 12/6) must meet in person. If students have concerns, please have them contact me directly."

14. November 3rd, 2022: TB writes a note to JB and CC, with JI cc'd letting them know she will be reporting the incident to the Office of Institutional Equity based on her perception that the students' rights have been violated by the internal decision-making process.

15. November 4th, 2022: TB receives notice from the Promotion and Tenure Review Committee, on which CC sits, that they have voted not to reappoint her. CC is part of this committee, though his signature does not appear on the letter (his name does). TB's union rep notes that the letter they have sent is dated from October 4th, 2022 – which is off cycle for the Union's outlined procedures for the PTR process.

16. 3 November 8th, 2022: TB receives her first response from JI since including him on the thread notifying LB, an HR "Notice of Fact-Finding Meeting." JI describes that TB she may have violated the University's General Rules of Conduct by using the same discretionary decision-making CC has instructed her to use for students who work full-time. TB asks how what she is being asked to account for is any different than what CC has done or instructed her to do.

17. TB also notes that the department is forcing her to violate the General Rules of Conduct by making her hold class at a time that all know does not work for the students – and against the students' documented preference for virtual sessions. HR responds that JI is not required to answer any further questions until the meeting.

18. TB questions why the rules appear to be applied to her differently than they are to her colleagues – the most recent of several documented instances in which she perceives she is being treated, admonished, and disciplined differently than her colleagues for reasons beyond her control.

19. November 9th, 2022: TB experiences severe anxiety and depressive symptoms in response to being falsely accused of breaking a policy on her own and simultaneously forced to break that policy to cover CC's mistake. She is advised by both her mental health care provider and her union rep to request FMLA leave.

20. November 10th, 2022: TB receives PTR letter from LB dated November 10th, 2022 stating that she is also voting that TB not be reappointed. The letter comes nearly a month after it was supposed to be sent to TB, shortly after their PTR meeting on October 17th, 2022.

21. November 11th, 2022: TB begins FMLA after this incident triggers severe anxiety and depression, and she is advised to do so by her mental health care provider and her union rep.

22. November 14th, 2022: TB receives email from HR stating that they have been made aware of TB's medical leave request, and will postpone the fact-finding meeting through Thanksgiving Day (November 24th, 2022) the deadline for providing medical documentation to HR.

23. December 7th, 2022: TB receives confirmation that her medical leave has been approved by HR from 11/11/22 to 5/11/23.

24. I therefore believe I have been discriminated against and denied equal terms and conditions of employment and subsequently not reappointed because of my race, color, age and sex - I am a young Black woman.

**STATE OF CONNECTICUT**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above cited laws and secure for me any remedy to which I may be entitled.

Tiffany Brown, being duly sworn, on oath, states that s/he is the Complainant herein; that's/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matters herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated in _New York_ on this 21st day of _March_ 20 _23_.

_____
Complainant's Signature

Subscribed and sworn before me on this 21st day of _March_, 20 23

_____
Notary Public/Commissioner of the Superior Court
My commission expires: _____

MIGUEL A. REY
Notary Public, State of New York
No. 01RE4616676
Qualified in Westchester County
Commission Expires July 02, 20 23

### STATE OF CONNECTICUT
### COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

### NOTICE OF RIGHT TO REQUEST REVIEW

**CCHRO Number:** 2340319
**EEOC Number:** 16A202300940

**Case Name: Complainant v. Respondent**

This notice is to inform you that the charge to which you are a party, filed with both the Connecticut Commission on Human Rights and Opportunities (CCHRO) and the federal Equal Employment Opportunity Commission (EEOC), will be processed by the CCHRO.

In accordance with the Commission's Procedural Regulations, the Commission will accept the CCRHO's final finding or resolution of the charge and adopt it as its own unless a party to the charge requests the EEOC to conduct a review of the CCHRO's final action.

To exercise this right you must submit your request for review, in writing, to the EEOC office at the following address **within fifteen (15) days** of the date on which you receive the CCHRO's notice of its final findings:

U.S. Equal Employment Opportunity Commission,
Boston Area Office,
John F. Kennedy Federal Building
Government Center, Room 475
Boston, MA 02203-0208

If you have any questions concerning this notice or your right to request review, please contact this office.

**I ACKNOWLEDGE RECEIPT OF THIS NOTICE**

Signature of the Complainant

03/24/23
**Date**

**Respondent**
**Respondent's name**

| CHARGE OF DISCRIMINATION<br>THIS FORM IS AFFECTED BY THE PRIVACY ACT OF 1974; SEE PRIVACY ACT STATEMENT BEFORE COMPLETING THIS FORM. | | AGENCY<br>FEPA<br>XX EEOC | CHARGE NUMBER<br>16A202300940 |
|---|---|---|---|

| CONNECTICUT COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES and EEOC | | |
|---|---|---|
| State or local Agency, if any | | |
| Complainant's Name Tiffany Brown<br>Complainant | | Telephone number |
| STREET ADDRESS | CITY, STATE AND ZIP CODE<br>New York, NY | Date of Birth |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (IF MORE THAN ONE LIST BELOW).

| NAME NEAG SCHOOL OF EDUCATION<br>RESPONDENT JASON IRIZARRY | NUMBER OF EMPLOYEES, MEMBERS 1000+ | Telephone (include area code)<br>860 486 1241 | |
|---|---|---|---|
| STREET ADDRESS<br>249 GLENBROOK ROAD | CITY, STATE AND ZIP CODE<br>STORRS, CT 06269 | | COUNTY<br>MANSFIELD |
| NAME | | Telephone (include area code) | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON (CHECK APPROPRIATE AREA) | | | Date Discrimination Took Place Earliest          Latest |
|---|---|---|---|
| Race  x | Color: | Sex | _x_ Continuing Action |
| Religion | National Origin | Retaliation  x | |
| Age  x | Disability | Other | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

FOR EEOC/CHRO USE ONLY
The particulars of this charge of discrimination are set forth in my complaint number
  2340319          Which I filed with the Connecticut Commission on Human Rights and Opportunities on
  3/21/23          And which are attached hereto and incorporated as if fully set forth herein.

| I want this charge filed with both the EEOC and the State or local agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures | Notary (When necessary for State and Local Requirements)<br>x Miguel A. Rey<br>Signature of Notary |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>x 3/21/2023   x<br>Date         Charging Party(signature) | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br><br>X<br>Signature of Complainant<br>Subscribed and sworn to before me this date<br>1st 03 2023<br>(Day, month, year) |

EEOC Form 5 (Rev. 3/01)

MIGUEL A. REY<br>Notary Public, State of New York<br>No. 01RE4616676<br>Qualified In Westchester County<br>Commission Expires July 02, 20 23

State of Connecticut
Commission on Human Rights and Opportunities

AMENDED COMPLAINT
************************************************************************************

**TIFFANY BROWN**
Complainant

CHRO No.: 2340319
Date Filed: 2/11/2023
as amended 4/5/2023

vs.

**UNIVERSITY OF CONNECTICUT (UCONN): NEAG SCHOOL OF EDUCATION**
Respondent

************************************************************************************

Comes now Complainant and amends the original complaint filed in this action on or about 2/11/2023; and in support of the amended complaint alleges and states as follows:

1. That complainant adopts each and every allegation contained in the original complaint unless specifically altered by expressed provisions to the contrary; and/or

2. Complainant amends and adds the following particulars:

   On or about 4/1/2023 my Supervisor sent out a spreadsheet to all employees that showed the comparative salaries paid to people in my Department. There are two non-Black full-time (tenure-track) coworkers who are similarly situated to me with similar (or fewer) credentials to mine who both earned more than I did. There is a part-time (non-tenure track) White female coworker with fewer credentials than mine who earns just $4000 less than me. I, therefore, further believe I have been discriminated against and denied equal pay for equal work performed for Respondent.

I allege respondent(s) violated the following statutes:
Connecticut General Statutes (as noted below):

☒ 46a-60(b)(1)
☒ 46a-60(b)(4)
☐ 46a-60(a)(5)
☐ 46a-60(a)(7)_____
☐ 46a-60(a)(8)_____
☐ 46a-60(a)(9)

☐ 46a-60(a)(10)
☐ 46a-60(a)(11)

☐ 46a-66(a)
☐ 46a-70a
☐ 46a-71_____
☐ 46a-80_____
☐ 46a-81c_____
☐ 46a-81d(a)_____

☐ 46a-81f_____
☐ 46a-81g

☐46a-63                                    ☐46a-81h_____
**☐46a-64(a)(1)**                          ☐46a-81I_____

**AND**

☒Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C 2000e and the Civil Rights Act of 1991
☐Age Discrimination in Employment Act of 1967, 29 U.S.C. 621-634 (20+ employees)
☒ Equal Pay Act of 1964
☐ Americans With Disabilities Act, 42 U.S.C. 12101 et seq.
☐Section 504 of the Rehabilitation Act of 1973, as amended
☐other:_____
☒ as enforced through <u>Conn. Gen. Stats</u>. §46a-58(a) (if applicable)

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint and amended complaint, secure for me my rights as guaranteed to me under the above cited laws and secure for me any remedy to which I may be entitled.

**TIFFANY BROWN**, being duly sworn, on oath, states that s/he is the Complainant herein; that s/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated at ___New York, New York___, Connecticut this ___5th___ day of ___April___ 20_23_.

_____
(Complainant's signature)

Subscribed and sworn to before me this ___5th___ day of ___April___ 20_23_

_____
Notary Public/Commissioner
Of the Superior Court
My commission expires:_____

MIGUEL A. REY
Notary Public, State of New York
No. 01RE4616676
Qualified In Westchester County
Commission Expires July 02, 20 23